IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

L.F.                                          :
                                              :     CIVIL ACTION LAW
                    Plaintiff                 :
                                              :     NO. 4:23-CV-01038 MWB
        v.                                    :     (Hon. Karoline Mehalchick)
                                              :
EF EDUCATIONAL TOURS,                         :
EF EDUCATION FIRST                            :
INTERNATIONAL, LTD., EF INSTITUTE :            Complaint Filed 6/22/2023
FOR CULTURAL EXCHANGE, INC., EF :
EDUCATION FIRST INTERNATIONAL,   :
LTD. (SWISS), DIEGO MANUEL                    :
TAYLOR, JENNIFER TAYLOR, and                  :     JURY TRIAL DEMANDED
JOHN DOES I-V.                                :
                                              :
                    Defendants                :

**APPENDIX OF EXHIBITS**

**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
DEFENDANTS EF EDUCATIONAL TOURS, EF EDUCATION FIRST
INTERNATIONAL, LTD (US), EF EDUCATION FIRST INTERNATIONAL,
LTD. (SWISS), EF INSTITUTE FOR CULTURAL EXCHANGE, INC., AND
JENNIFER TAYLOR**

Defendants EF Educational Tours, EF Education First International, Ltd.

(US), EF Institute For Cultural Exchange, Inc., EF Education First International,

Ltd. (Swiss), and Jennifer Taylor ("Defendants") respectfully submit this Appendix

in support of their Motion for Summary Judgment. The Appendix contains true and

accurate copies of the following documents:

| Exhibit | Document |
|---------|----------|

1.  EF Educational Tours, Get there, A parent's guide to making student travel happen ("Parent's Guide"), including Booking Conditions (L.F. 0483)

2.  Booking Conditions (EF Production, EF-00000002)

3.  Megan Allen Deposition Transcripts Excerpts

4.  EF Defendants' Responses to Pl. First Requests for Admission, Interrogatories, and Requests for the Production of Documents

5.  Declaration of Megan Allen

6.  EF Education First webpage, Who we are, https://www.ef.edu/about-us/

7.  EF Education First webpage, EF Traveler Support Specialists, https://www.eftours.com/support

8.  L.F. Deposition Transcripts Excerpts

9.  Plaintiff's Response to Interrogatories Propounded by Defendants EF Institute and EF Education First

10. Booking Details (EF-00000001)

11. Morgan Ash Deposition Transcripts Excerpts

12. Trenton Fallgatter Deposition Transcripts Excerpts

13. EF Educational Tours Safety policies & procedures (L.F. 0472)

14. EF Educational Tours Safey guidelines for Group Leaders, (L.F. 0478)

15. Jennifer Taylor Deposition Transcripts Excerpts

16. Student Behavior Contract

17. Diego Taylor Deposition Transcripts Excerpts

18. Defendants EF Education First International, Ltd. (Swiss) and EF Institute for Cultural Exchange, Inc.'s Answers to Plaintiffs' Second Set of Interrogatories

19. Declaration of Jennifer Taylor

20. Plaintiff's Responses to Interrogatories Propounded by Def. Diego Taylor

21. Defendant Diego Manuel Taylor's Initial Disclosures

22. Certified Translation of Prosecutor's Decree dated 6/28/22

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served on July 10, 2025, via the Court's ECF system and by email to:

Susan Ayers, Esq.
Hill & Associates, P.C.
1700 Market Street, Suite 1350
Philadelphia, PA 19103
sue@hilljustice.com

Edwin A. Schwartz, Esq.
McNees Wallace & Nurick, LLC
100 Pine Street, P.O. Box 1166
Harrisburg, PA 17108
eschwartz@mcneeslaw.com

/s/ Jeffrey P. Allen
Jeffrey P. Allen

# EXHIBIT 1



"This experience took our daughter out of her comfort zone in so many ways. She came home changed."

Teresa R., NC (Parent)



Ready to give your child a global perspective? Enroll them on tour today.



Visit
eftours.com/enroll

*OR*



Contact our
Traveler Support Team
at 800-665-5364



EF / EDUCATIONAL TOURS



# Get there

A parent's guide to making student travel happen

L.F. 0489

L.F. 0490



"I stepped outside my comfort zone. I tried unfamiliar foods, spoke Spanish, and danced with locals. It was so worth it."

Grace C., MI (Student)

# They've got this (and you do, too)

Growth happens when new experiences meet open minds. Like when your child encounters a painting that stops them in their tracks—even if they can't explain why yet. Or when they want ketchup and, for the first time, it's up to them to place the order. Growth can show up in big, life-changing realizations or within the littlest of victories.

At EF Educational Tours, we know those new experiences can be nerve-racking—for your child and for you, too. But it's these kinds of experiences that give kids the confidence and cultural awareness they'll carry throughout their lives. And when you have a support system by your side every step of the way, you start to see those experiences for what they really are: catalysts for growth. That's why we're both here, so let's get started.

02  Welcome to the EF family

04  Impact of educational travel

06  Everything you get

08  Safety is a non-negotiable

10  Planning for the future

12  Paying for your tour

14  Helping students travel

16  Booking Conditions

24  Hear from a fellow parent

L.F. 0491

# Your partner in travel-y goodness

Here at EF, our goal has always been *Opening the World Through Education,* and we've delivered on that promise for over 55 years. We believe travel is teeming with transformative moments just waiting to be experienced.

## Say hello to your Tour Director

Along with your local teacher (a.k.a. Group Leader), your child's tour will be led by a Tour Director who'll be with them from day one until they head home. They offer around-the-clock support and the training, experience, and local knowledge to keep groups safe. Plus, their personality and logistical wizardry make our tours shine.

**Your child's Tour Director will be:**



### Savvy

Tour Directors are full of cultural and historical knowledge only a local would have and are comfortable communicating in foreign languages.



### Professional

Tour Directors undergo a background check, are skilled at handling student groups, and travel with groups for the duration of their tour, ensuring safety for each traveler.



### A teacher at heart

Tour Directors make tours educational—from delivering illuminating commentary to enabling hands-on learning, they do it all.



**ARTIN**
Actually Greek
Baklava connoisseur
Strong commentary game

Meet Artin, a Tour Director in Greece. When he's not sidestepping ancient ruins, he's designing his own T-shirts and hunting down the best gyro in town. (Yup, he'll share.)



His passions—food, travel, and all things Greek—put a personal spin on his tours.



Travelers describe him as "nurturing," "engaging," and (this one's ours) "warm as the Athenian sun."



Every seaside learning moment or bus-ride lesson is infused with his lifelong love of Greece.

## Questions? Your Traveler Support Specialist has *all* the answers.

They're basically a human search engine for all things EF, so consider them your go-to for any what-ifs or other questions. Don't understand travel coverage options? Want to switch to bi-weekly payments? Got food allergy questions? Your Traveler Support Specialist has your back.

Just give them a call at **800-665-5364** and they'll help you out.

L.F. 0492

## The real-life benefits of real-world travel

Just like you, we're thinking about the future. More specifically, how to help your child succeed in their future. That's why when students travel with us they return home with more than a suitcase full of souvenirs—they also gain understanding of cultural differences, global issues, and, most importantly, themselves. Insights that lead the way for small and big transformations. But don't just take it from us.

**93%**

of travelers say their tour expanded their knowledge of the world

**89%**

say they understand more about new people, places, and cultures

**92%**

say they discovered more about themselves

**88%**

of travelers say they grew more confident and independent

Source: EF Educational Tours 2019 Post-Tour Student Survey



"From the moment you get off the plane until you leave, you are learning. EF makes sure you get a real feeling of the culture and all the country has to offer."

Beth H., NC (Teacher)

**Give their tour extra mileage**

Our educational tools are designed to give our travelers even more opportunities to grow from their experiences, this time in tangible ways. With EF, students can:

- Earn college credit with a course specially designed for EF tours and offered by Southern New Hampshire University

- Turn their tour into inspiration for a college essay that will stand out to any admissions officer

L.F. 0493

# From Airlines to Ziplines

When your child travels with us, you're giving them more than just a seat on a plane—you're giving them all the benefits of partnering with the leader in educational travel.

We're talking about an extensive global presence, culturally rich activities, integrated learning opportunities, and yes, you guessed it: a free backpack.

# Everything that's included





**Airfare and on-tour transportation**
Round-trip flights on major carriers and all on-tour transportation

**Hotel accommodations**
All hotels must meet our high standards for quality, safety, and cleanliness to become a home away from home

**Regional-style meals**
Local cuisine at breakfast and dinner for a more immersive cultural experience

**Guided tours, activities, and entries**
Students experience everything the destination has to offer with educational, insightful, and hands-on learning experiences that enhance their curriculum

**Full-time professional Tour Director**
The Tour Director is full of cultural insights only a local could know and is a constant companion for every traveler's group

**Expert local guides**
Topic-and location-specific guides share their deep knowledge on cultural and historical touchstones with students

**24-hour emergency assistance**
Our Emergency Service & Support Team is available around the clock to help groups from our European and North American offices

**Peace of Mind program**
Automatic coverage that provides flexibility to change travel dates, destination, or itinerary up to 45 days before departure

**Safety precautions and procedures**
We've taken steps including 24/7 response teams in our European and North American offices, background checks, on-site quality control, and more

**Traveler Support resources**
This team will walk you through the what-ifs and how-tos of any topic, including things like payment plans and insurance inquiries

**$50 million general liability policy**
All Group Leaders and their schools are automatically added as additional insureds under our General Liability Policy, which helps safeguard against claims related to covered on-tour incidents like personal injury

**Tour donation page**
Available to every traveler, this easy-to-share page makes it simple for friends and family to contribute a little something that's automatically applied to the balance of their tour

**High school and college credit opportunities**
In addition to the intangible benefits of travel that last forever, students can earn actual credits for transcripts and gain the confidence that comes along with them

**Travel gear**
For style and safety, every traveler gets a complimentary EF backpack and emergency wristband to wear on tour

**College essay help**
Students can receive guidance on turning a life-changing trip into inspiration for essays and college applications

Actually, that's not everything. But it couldn't all fit here.
See the whole list at eftours.com/whats-included

L.F. 0494



# Our commitment to safety

Your child's safety is a non-negotiable. We would never send a traveler to a location we believe to be unsafe—and with our extensive global presence, our best-in-the-industry experience, and our close working relationships with U.S. and international authorities, that's a statement we can back up with real insight.

### We're leading the charge on student safety

In addition to following guidance from the U.S. Centers for Disease Control and local and federal authorities around the world, we're developing our own protocols to help keep your child healthy and safe. Our teams are actively innovating on and shaping the new worldwide standards for cleanliness and safety.

### When you need us most, we're always close

We have staff on the ground 365 days a year in over 50 countries. And we call these countries home. EF team members live in nearly every one of our tour destinations. That means we have the local knowledge to help keep our groups safe, and there's always a friendly face nearby to offer a helping hand (or a high five).

### Safety & Incident Response Team

EF's Safety & Incident Response Team is strategically based in our Boston, Panama, Tokyo, and Zurich offices to accommodate for all time zones. Available 24 hours a day, every day of the year, they are trained to react quickly if our travelers need help.



L.F. 0495

# Feel confident planning for the future

When you decide to have your child travel with EF, we want you to feel secure in the decision. That's why as the world changes, so do we. By constantly adapting, enhancing, and expanding our policies, we're doing everything we can to make planning for the future as flexible as possible.

For full details on all EF policies, visit **eftours.com/flexibility**



## Flexible and secure traveling

These exclusive benefits are built into every EF program. They provide families and travelers with added security when planning future travel.

### Peace of Mind

We understand plans can change due to unforeseen circumstances. This program accounts for such circumstances and can be enacted anytime up to 45 days prior to departure at the group level for any reason, including terrorism or other world events.

### COVID Care Promise

If any EF customer is diagnosed with—or requires quarantine on account of—COVID-19 while on tour, we'll help facilitate the care and support they need.

### COVID Peace of Mind

In addition to our standard Peace of Mind program, this accounts for situations related to the COVID-19 pandemic. It can be enacted from 109 to 45 days prior to departure at the group level, while specific options can be implemented at the individual level.



## Individual protection

Travelers can help protect their investment and themselves from certain unexpected events and expenses while on tour.

### Global Travel Protection

Provides both pre-departure and post-departure benefits, including medical expense coverage that may apply on tour and tour cancellation for specified reasons.

### Global Travel Protection Plus

To further protect your investment, this plan provides all of the coverage included in the Global Travel Protection plan as well as expanded cancellation protection.

L.F. 0496

# Let's do this

## (Payments made easy)

Travel is for everyone and, by breaking the cost of your trip into manageable payments, our recommended **Automatic Payment Plan** makes it possible for everyone, too. With tours planned well ahead of departure, you can make small payments over a long period of time—often up to two years in advance.

✓ Enroll with just $95

✓ Pay with your checking account or debit card*

✓ Choose monthly or bi-weekly payments, down to the very day of the week

✓ Make your final payment about a month before you leave

*Card must display the Visa or Mastercard logo



**Want more options?**
We have other payment plans. Just give us a call at **800-665-5364** and we'll find the right one for you.

## Get a helping hand

Sometimes it takes a village—and a donation page. That's why each of our travelers gets their very own. It's an easy-to-share page where friends and family can contribute to their tour in exchange for, say, mowing the lawn or babysitting, maybe cooking dinner, or just because.







**Build your page**
We give you the platform. You fill in the details.

**Share your page**
Got friends? Share your child's tour donation page through email or social media.

**Get donations**
All contributions are automatically applied to your child's balance. Easy-peasy.



800-665-5364    13

L.F. 0483

> **"I believe travel will help me appreciate the world more than ever—not just its beauty, but all the history and culture the world has to offer."**
>
> Monica F., DE (Student)
> 2020 Global Citizen Scholarship Winner





## A scholarship that helps students see the world

Travel has the ability to bring classroom lessons to life, unlock new potential, and open a world of possibilities. That's why we believe everyone should have the opportunity to go on tour. Through our annual **Global Citizen Scholarship**, we give up to 100 students from across the country $1,000 off their EF tours.

**It's easy to apply:**

- Fill out a quick online application
- Have your child create a short video explaining how traveling will change the way they think or feel about the world

For more information visit **eftours.com/global-citizen**

800-665-5364    15

L.F. 0484

# General Terms and Conditions

These Booking Conditions are valid for all EF tours departing after October 1, 2020, and are subject to change with or without notice. The most current Booking Conditions at the time of your departure will apply, which are available at eftours.com/bc. All tours are operated outside of the U.S. by EF Education First International, Ltd., Switzerland. EF Institute for Cultural Exchange, Inc. is a marketing service provider for that company and is referred herein together with EF Education First International, Ltd. as "EF."

## WHAT'S INCLUDED IN THE PROGRAM PRICE?
– $95 non-refundable deposit

– Round-trip airfare

– Accommodations in hotels with private bathrooms

– A Tour Director available 24 hours a day from when you arrive until you depart

– Breakfast and dinner daily in Europe. (For non-European destinations different meal plans may apply.)

– Sightseeing tours and excursions led by licensed local guides as specified

– Airport transfers and transportation between destination cities

– Transportation to all included activities

– Entrance fees and theater tickets as specified

– EF walking tours and Tour Director-led sightseeing as specified

– Cruises, trains, or ferries as specified

– Adult supplement (if applicable)

– 24-hour worldwide emergency service

– Support from EF representatives abroad

– EF backpack and luggage tag for each tour

The above apply to all tours unless otherwise noted on the tour itinerary. If we ever fail to provide you with any of the above, we will refund you its value upon your return from the tour.

### What does the non-refundable deposit include?
All travelers must pay the non-refundable, non-transferable $95 deposit upon enrollment in order for the enrollment to be complete. After travel is completed on the first tour, repeat travelers will receive a $100 repeat traveler discount off of future tours.* (EF Explore America repeat travelers will receive a $50 repeat traveler discount off of future EF tours.) The $95 non-refundable deposit includes:
– EF's Standard Cancellation Policy and Peace of Mind program as described on p. 20
– Processing services by EF staff
– Eligibility for discounts on other EF programs

*Repeat travelers are paying travelers who traveled beginning in 2003. Travelers who cancel their tour prior to traveling are not eligible for a repeat traveler discount. The repeat traveler discount is non-refundable and non-transferable.

## WHAT'S NOT INCLUDED IN THE PRICE?
– Rooming supplement (if applicable)

– Optional excursions (except where indicated)

– Global Travel Protection plan or Global Travel Protection Plus plan (except where indicated)

– Beverages and lunches (except where indicated)

– Transportation to free-time activities

– Customary gratuities (for your Tour Director, bus drivers, and local guides)

– Porterage

– Any applicable baggage-handling fees imposed by the airlines (see eftours.com/baggage for complete details)

– Expenses caused by airline rescheduling, cancellations, or delays caused by the airlines, bad weather, or events beyond EF's control (see next page for details)

– Passport, visa, and reciprocity fees or any other fees associated with entry to a specific destination

## GROUP TRAVEL
### How does group travel work?
We believe that all students should have the opportunity to travel, which means we do everything we can to keep our program prices the lowest in the industry without sacrificing quality. One of the ways we do that is by combining groups to fill a tour bus so that all travelers help cover the costs of the bus, the Tour Director, local guides, etc. Consolidating groups also allows travelers to meet students from other schools, although groups may not be of the same age level.

Therefore, in order for everyone to travel for the lowest price possible, group travel requires some flexibility. Each group submits its preferred tour choices and travel dates, and then we book all of the groups with the same requested tours on one specific departure date. Because EF is the largest student travel provider, it's rare that groups do not travel on their first-choice tour. However, on occasion, we may need to book your group on a second-choice tour. In the event we cannot offer for booking a tour comparable to your first-choice tour, travelers can opt to receive a full refund. Once a program is booked, EF's Standard Cancellation Policy applies. EF strives to keep departure dates within two days of the requested date for tours departing October through April and within four days of the requested date for tours departing May through September. Your final tour itinerary and travel dates will be confirmed approximately two months prior to departure.

### Anything else I need to know about my itinerary?
Based on your travel dates, there may be times when it becomes necessary to modify your itinerary. Sometimes this involves changing the order in which cities are visited, altering your length of stay in a city or country, or using an alternate airport. On certain days, especially holidays, some tour inclusions may be unavailable. In such cases, we will substitute different inclusions or provide a refund after the tour. Tours are designed for students, as reflected in the pacing, accommodations, and other aspects of the tour.

## PRIVATE GROUPS
### What if my group wants to travel on our own without being consolidated?
If you want the privacy of your own tour bus and Tour Director, you can choose to travel as a private group. This option is available for an additional fee, which varies based on the final number of paying travelers. If your group fills a standard-size tour bus, the private group option is free. The itinerary may not be modified while on tour (i.e. you do not have the tour bus at your disposal); however you are able to make certain tour modifications prior to the tour departure. Although your base itinerary will include only your group, you may be consolidated with others during optional excursions. Also, due to flight and hotel availability, we require the same departure date flexibility as described above. Please let EF know prior to your first enrollment if you would like to be a private group.

### What if my group is traveling on a customized tour?
If your group is traveling on a customized tour, you will automatically be traveling as a private group. The tour price for your customized tour can fluctuate based on the group size and will be finalized based on the number of paying travelers at the time of departure.

## ENROLLMENT
All Enrollment Forms must be received at EF by at least 110 days prior to departure. Travelers should provide complete first, middle, and last names, and dates of birth as they appear (or will appear) on their passports.

### What is the cost of a name correction?
Any corrections to match passport names made after 110 days prior to departure require that we change the flight reservation, resulting in a minimum fee of $200

---

per airline up to the cost of a new published fare ticket. This may also result in a different flight itinerary from the rest of the group. Travelers who have not yet applied for a passport should provide their full name and date of birth as they appear on their birth certificate.

### How do travelers enroll?
Enrollment Forms and payment can be submitted to EF in any of the following ways:
– Online: eftours.com/enroll

– Phone: 800-665-5364

– Mail:
EF Educational Tours
EF Center Boston
Two Education Circle
Cambridge, MA 02141

For your convenience, travelers are automatically enrolled in paperless billing. Travelers who prefer to receive invoices by mail may request this by logging into their account at eftours.com or by calling 800-665-5364.

### Can a traveler enroll on a waitlist if the tour is full?
Upon the discretion of the Group Leader, a waitlist may be offered for full tours. The $95 non-refundable deposit is required for waitlist enrollments. If space becomes available on the tour and the applicant chooses to enroll, EF's payment plan and cancellation policies apply immediately. If space is not available by 14 days prior to departure or if the applicant cancels from the waitlist, the $95 deposit will be refunded.

### Can children under 11 go on tour?
We do not allow children under the age of 6 to travel with us. Travelers ages 6-10 must have an adult chaperone other than the Group Leader and will have to room with that chaperone. Travelers may choose to stay in a family room (a room with two twin beds and a cot) or in a twin (a room with two beds). Applicable fees will apply.

### Can adults go on tour?
EF's published program prices are based on student rates for transportation, admissions, accommodations, etc. We welcome adults (those age 20 and older, including those who will turn 20 while on tour) but have to charge a per-person flat fee supplement of $100 plus $50 per night of the tour to cover the difference between student and adult rates. Adults will pay an additional $40 per night for the sea portion of their tour on overnight ferries and cruises, where applicable. Please see next page for information on adult rooming. Groups comprised of a majority of adults must select the private group option. All adult travelers will be required to complete a background check through a third party company prior to traveling. EF reserves the right to cancel any traveler if, in EF's sole discretion, it determines the results pose a risk to the group's safety or wellbeing.

### LATE ENROLLMENTS
### Can a traveler enroll on tour after 110 days prior to departure?
Yes. A traveler may submit a late enrollment request 109 days or fewer prior to departure. The traveler must enroll on the tour, pay a non-refundable $145 late enrollment fee, and make full payment of the current program fee. The traveler will be placed on a waiting list while we check bus, flight, and hotel availability. The traveler is responsible for any additional charges that may apply. We may also offer an alternate flight to meet up with the tour or the option of arranging your own flight and buying the land-only portion of the tour.

If we are unable to place the traveler on a tour or the traveler does not wish to pay the additional charges, the traveler may cancel their enrollment request and receive a full refund.

## PASSPORTS AND VISAS
### Who is responsible for getting travelers' passports, visas, and other travel documents?
Each traveler must obtain a passport and any applicable visas or other travel documents prior to departure. For all tours, we will need passport information by 110 days prior to departure. If a traveler is unable to obtain these travel documents, EF's Standard Cancellation Policy will apply (see first column on p. 18). Please be sure that passports are valid for at least six months after the tour ends. Visit the U.S. Department of State at www.travel.state.gov for further information. Non-U.S. citizens will need to contact the embassy or consulate of their destination countries to ensure they meet specific entry requirements. Remember to check the itinerary carefully for all countries that will be visited (including countries visited in transit).

### CAN I HELP PROTECT MY INVESTMENT?
### Global Travel Protection plan
Travelers can help protect their investment from the unexpected with the offered Global Travel Protection plan. Designed specifically with EF travelers in mind, this plan includes both pre and post departure benefits, which includes medical expense coverage that may apply on tour and tour cancellation for stated reasons such as serious injury or illness or financial hardship due to job loss. All benefits are subject to the limits, terms, and exclusions of the policy available at https://www.sis-inc.biz/tours/efeducationaltours/. Learn more at eftours.com/protection. The Global Travel Protection plan becomes non-refundable after any of the following occur: when you depart on your tour, when you file a claim, or 10 days after receipt.

### Global Travel Protection Plus plan
In addition to the benefits provided in our Global Travel Protection plan, travelers who purchase the Global Travel Protection Plus plan are provided with additional coverage for tour cancellation. Travelers are able to cancel their tour up to 24 hours prior to departure for any reason. Learn more at eftours.com/protection. The Global Travel Protection Plus plan must be purchased at the time of enrollment and is non-refundable after any of the following occur: when you depart on your tour, when you file a claim, or 10 days after receipt.

### FLIGHT INFORMATION
### Which airlines are used by EF?
EF reserves seats with major airlines, including Aer Lingus, Air Canada, Air France, Air New Zealand, Alitalia, American, British Airways, Copa Airlines, Delta, Iberia, Icelandair, KLM, LATAM Airlines, Lufthansa, Qantas, Swiss, United, Virgin Atlantic Airways, and other U.S. and international carriers. Our contracts do not allow upgrades, stopovers, or the accrual of frequent flier miles.

### What will my flights be like?
We always do our best to provide the most direct route to your destination city. However, due to available flight routings, we cannot guarantee non-stop or direct flights. Sometimes, groups may travel on an overnight red-eye flight, departing the evening before the tour is scheduled to begin. In rare cases, groups may have a domestic and/or international overnight, layover, and/or bus transfer. Based on seat availability and the size of the plane, we may not be able to accommodate all members of a group on the same flight, in which case the Group Leader will determine on which flight itinerary each traveler will travel. In such instances that a traveler is not satisfied with their flight assignment, standard cancellation fees apply. We are not able to pre-assign seating. Seat assignments will be provided upon check-in. Depending on your group's size, travelers may or may not sit together. Some countries may require aircraft insecticide treatment for inbound foreign flights. A list of such countries is available at eftours.com/insecticide.

### Do I have to travel on all legs of my flight itinerary?
You must travel on all legs of your itinerary. If you do not travel on a portion of your flights, the remaining portions will be cancelled. You will be responsible for purchasing a new ticket as well as for any service fees charged by the airlines.

### What happens if my flight is delayed?
EF is not responsible for airline schedule changes or mechanical, weather, or capacity-related flight delays; however, visit eftours.com/protection for benefits offered in the Global Travel Protection plan and Global Travel Protection Plus plan.

L.F. 0485

Booking Conditions

General Terms and Conditions

## Are any airports interchangeable?

Flights to and from the following destinations may originate/end at any of the airports in that vicinity. On occasion, the tour may return to a different airport than the one you departed from.

– Chicago: O'Hare or Midway

– Dallas: Dallas/Fort Worth or Dallas Love Field

– Houston: George Bush Intercontinental or Hobby

– Miami: Fort Lauderdale or Miami

– New York: LaGuardia, JFK, or Newark

– San Francisco: Oakland, San Jose, or San Francisco

– Washington, D.C./Baltimore: BWI, Dulles, or Ronald Reagan National

– Ireland: Cork or Shannon

– Italy: Milan or Venice

– Scotland: Edinburgh or Glasgow

## Are there flight restrictions for travelers under 18?

Anyone younger than 18 years old traveling apart from the group without an adult companion must contact each airline on the minor's itinerary and may need to register as an unaccompanied minor per the airline's policies. Some airlines will not allow minors under 16 years of age to travel without an adult companion. Any resulting fees will be assessed by the airlines and are the responsibility of the traveler. Additionally, travelers younger than 18 years old are not permitted to travel land-only unless accompanied by an adult traveling on the tour.

## SPECIAL TRAVEL REQUESTS

EF is happy to provide stay-ahead/stay-behind options, alternate departure airports, and land-only tours for individual travelers or the whole group. If you have requested special travel arrangements, EF cannot guarantee that you will fly with your group in either direction.

## What if the whole group wants to do a stay-ahead or stay-behind?

Where possible, EF will provide altered flight and/or land arrangements for a group of at least six paying travelers plus the Group Leader. Each traveler will have to pay any additional air and/or land costs. The Group Leader should submit one request for the whole group, which needs to be received prior to the first enrollment.

## What if only one traveler has a special travel request?

Individual special travel requests should be submitted online at eftours.com by 110 days prior to departure. Please keep in mind that you should not make any actual arrangements—such as booking a flight or hotel—until final tour itinerary and departure date have been finalized (around 60 days prior to departure). A $150 service fee plus any additional air and/or land costs will be charged.

## What are the types of individual special travel requests?

– Individual stay-ahead/stay-behind option: Where possible, EF will provide altered flight and/or land arrangements, according to a traveler's request. Travelers are responsible for making their own arrangements to and from the hotel or airport as well as all land arrangements pertaining to their individual itinerary.

– Alternate departure airports: Program prices are based on group departures. If an individual chooses to fly out of a different airport than the group, the program price of the alternate airport will apply. Travelers must depart from and return to the same domestic airport.

– Land-only tours: On certain tours, travelers have the option to make their own flight arrangements and join the tour at the first hotel on the itinerary. Travelers are responsible for making their own arrangements to and from the hotel or airport. In this case, the program price will be reduced depending on the length and destination of the tour. EF is not responsible for any travel-related delays or inconveniences for land-only travelers. Additionally, travelers younger than 18 years old are not permitted to travel land-only unless accompanied by an adult traveling on the tour.

## EXCURSIONS

### What are excursions?

EF offers these activities in addition to what is already included on the itinerary. Most Group Leaders choose to add excursions to all traveler accounts.

### When should I purchase excursions?

To secure a discounted price, most excursions need to be purchased by 50 days prior to departure (70 days for Versailles). Some excursions may be purchased on tour, though at an increased price.

### Are excursions refundable?

If EF cancels an excursion (due to low enrollment, for example), travelers will receive a full refund for the excursion after returning home from tour. To receive a refund for an excursion that you simply no longer wish to be enrolled in, you must let us know by 50 days prior to departure or no refund will be given.

## ROOMING

EF handles final rooming assignments for all travelers. We make rooming assignments based on the sex identified on your passport. If you tell us you identify as a different sex, we will work to accommodate you. Please ensure that all rooming requests are submitted by 110 days prior to departure.

### How are students roomed?

Students will room in triples or quads with others of the same sex from the entire tour group. This means that students from different schools may room together. EF uses hotels with rooms that contain two double beds (beds for two people). Two students are expected to share each bed.

### Can students request a twin room?

Students may request twin accommodations (a hotel room with two single beds) by submitting the name of their roommate. The following additional fees will apply:

– $50 per hotel night per student

– $90 per ferry or cruise night per student
  (Please note: Twin accommodations are not available on overnight trains.)

### How are adults roomed?

Adults are placed in twin accommodations (a hotel room with two single beds) with another adult of the same sex from the entire tour group, unless the name of a roommate has been provided. This will mean that adults from different schools/organizations may room together.

### Can adults request a room with a double bed?

Adults can request double-bed accommodations (a room with one bed for two people) by providing EF with the name of their roommate by 110 days prior to departure.

### Can adults request a single room?

Adults can request a single room for an additional $40 per hotel, cruise, or ferry night. This fee is in addition to the standard adult supplement fees covered on the previous page. Single rooms are not available on overnight trains.

### What are the sleeping arrangements on trains?

Overnight trains provide couchette sleeping berths or sessels (recliners). The couchettes contain up to six fold-out beds that come down from the wall; on rare occasions, these compartments may not be exclusive to EF travelers and may be mixed gender. Single rooms and private bathrooms are not available on overnight trains.

## MISCELLANEOUS

### When does the tour officially start and end?

Each tour begins with the take-off from the departure airport and ends when the flight lands at the return airport. For those making their own flight arrangements, the tour begins upon arrival at the first EF hotel and ends upon departure from the last EF hotel, according to the itinerary. The official length of an EF tour does not include stay-ahead, stay-behind, or any optional periods or activities when travelers are not escorted by a Tour Director.

Booking Conditions

General Terms and Conditions | Payment Plan Terms

## What if a refund is due?

Where applicable, refunds for overpayment will be issued upon request and after the most recent payment has been in the traveler's account for 21 days. Refunds will be issued back to the original form of payment unless that is no longer valid, in which case a refund check will be issued in the name that appears on the traveler's account. All refund checks are mailed 4-6 weeks after the request has been processed. There will be a non-refundable $35 stop-payment fee for lost refund checks.

## Non-Refundable Fees

Non-Refundable Fees are defined as the Enrollment Deposit ($95), Global Travel Protection plan cost ($165), Global Travel Protection Plus plan cost ($460) and Manual Payment Plan Fee ($50) as well as any late fees, late enrollment fees, Automatic Payment Plan decline charges, return check/ direct debit fees, late special travel request fees and canceled check fees which have been applied to the account at the time of cancellation.

## What about lost belongings?

EF is not responsible for loss of passports, airline tickets, or other documents, or for loss of or damage to luggage or any other passenger belongings. In the case of lost travel documents, the traveler is solely responsible for meeting the airline's requirements (both logistical and financial) for ticket replacement.

## What about travelers with food allergies?

EF recognizes that some travelers may have severe food allergies. We will do our best to ensure that our suppliers are informed of the situation, but we cannot guarantee that all requests will be accommodated. Travelers are responsible for making their own arrangements for all in-flight meals.

## How can I protect myself from the risk of COVID-19 while on tour?

Taking personal responsibility for your wellbeing begins with packing any personal protective equipment and sanitizers you require. Adopt physical distancing and hygiene practices throughout your pre-trip travel arrangements and follow all health instruction whether physical signage, or requests from the Tour Director or our staff once on tour.

## What items are prohibited from tour?

For the safety and well-being of all travelers, no firearms or any other weapons are permitted on tour except as required by law.

## What if my tour dates do not fall in the range covered by these Booking Conditions?

Visit eftours.com/bc for the most recent version of the latest travel year's Booking Conditions. The most current Booking Conditions will apply.

## PERSONAL DATA

EF will process your personal data in compliance with applicable data protection legislation for the purposes of completing your enrollment, customer service, the purchase of an offered travel protection plan, and providing you with the products and services related to your tour. This may entail sharing your personal data with corporate affiliates, claims handlers, insurance providers, and other business partners both within and outside the U.S., including to and within the EEA/Switzerland. We have put appropriate safeguards in place for such transfers of your personal data, including the standard data protection clauses adopted by the European Commission. EF may also use your personal data, combined with data from third parties, to market products and services based on your interests, including by email and SMS/text. You may contact EF at any time to unsubscribe from any direct marketing purposes.

We will only keep your personal data for as long as it is necessary for the purposes for which it has been collected or in accordance with time limits stipulated by law and good market practice, unless further retention is necessary for compliance with a legal obligation or for the establishment, exercise or defense of legal claims. We will keep your personal data for marketing purposes until you withdraw your consent.
If you have questions about the processing or use of your personal data, would like to have a copy of the information EF holds about you, or have inaccurate personal data corrected or erased, please contact Traveler Support at 800-665-5364.

## PROTECTION FOR TRAVELERS' PAYMENTS

Traveler's tour money has protection in the unlikely event of EF bankruptcy, insolvency, or cessation of business under our participation in the United States Tour Operators Association (USTOA) $1 Million Travelers Assistance Program. For program details and a list of its affiliates, contact USTOA by mail at 275 Madison Avenue, Suite 2014, NY, NY 10016, by email at information@ustoa.com, or online at USTOA.com.

## TERMS AND PROVISIONS

The terms and provisions of these Booking Conditions supersede any other warranties, representations, terms, or conditions, unless they are expressly stated within a Booking Conditions Addendum or in a letter signed by an EF officer. While EF makes every effort to ensure the accuracy of its publications, it cannot be held responsible for typographical or printing errors (including prices).

The tour operator for your trip is EF Education First International, Ltd., Selnaustrasse 30, 8001 Zurich, Switzerland, organization number CHE-109.874.655, VAT number CHE- 116.325.678 MWST. EF Institute for Cultural Exchange, Inc. is an affiliate of EF Education First International, Ltd. and acts only as a marketing services provider for that company. EF Institute for Cultural Exchange Inc. is not an agent of EF Education First International, Ltd., does not provide any goods or services for your trip, and is located at Two Education Circle, Cambridge, MA 02141 (t: 800-665-5364). The services provided are tax-exempt with credit in accordance with Swiss Federal Law with regard to VAT Article #23.

EF is a registered as a Seller of Travel with the following states: Florida (Reg. No. ST36778); California (Reg. No. 2015641-20); Washington (Reg. No. 603084928); Iowa (Reg. No. TA1300).

## Cancellations and Modifications

### STANDARD CANCELLATION POLICY

The cancellation policies outlined below take into consideration the costs EF incurs long before groups ever depart. Notice of cancellation from an EF tour will only be accepted from the traveler, his or her legal guardian, or the Group Leader. The date of cancellation will be determined by the date on which EF receives notice. In order to qualify for refunds in accordance with EF's Standard Cancellation Policy, all payments must be received on time.

### EF's Standard Cancellation Policy*

– 150 days or more prior to departure: Full refund less the $95 non-refundable deposit, all Non-Refundable Fees, and a $300 cancellation fee.

– 149 to 110 days prior to departure: Full refund less the $95 non-refundable deposit, all Non-Refundable Fees, and a $500 cancellation fee.

– 109 to 45 days prior to departure: Full refund less the $95 non-refundable deposit, all Non-Refundable Fees, and 50% of the program price.

– 44 days or less prior to departure: No refund will be issued.

*Travelers who purchase a Global Travel Protection plan have the opportunity to cancel the trip until 60 days prior to departure due to reasons not covered by the insurance underwritten by United States Fire Insurance Company and have the option to rebook to another EF Educational Tour within 30 days of such cancellation. Traveler is responsible for finding a new tour, and final placement is based on availability. Such tour needs to take place within 180 days from cancellation, and any difference in price will be covered by the traveler (non-refundable fees from the original tour will not be put toward the rebooked tour). This benefit is not an insurance provided by United States Fire Insurance Company.

*Travelers who purchase the Global Travel Protection Plus plan have the option to cancel with a non-insurance Cancel for Any Reason waiver provided by EF Educational Tours. The non-insurance Cancel for Any Reason waiver provided by EF Educational Tours provides a cash refund for trip costs paid to EF Educational Tours for cancellation prior to departure. For plans issued in New York, customers

L.F. 0486

can purchase the non-insurance Cancel for Any Reason waiver separately from the rest of the travel protection plan – for further details, please contact Specialty Insurance Solutions at 877-974-7462 ext. 321.

**Cancellation with replacement\*\***
- *150 days or more prior to departure:* Full refund less the $95 non-refundable deposit and all Non-Refundable Fees.
- *149 to 110 days prior to departure:* Full refund less the $95 non-refundable deposit, all Non-Refundable Fees, and a $100 substitution fee.
- *109 days or less prior to departure:* Replacements can no longer be accepted and EF's Standard Cancellation Policy will apply.

\*\* Cancellation with replacement refers to a traveler who cancels but finds a person to replace him or her for the same program. The replacement's Enrollment Form must be submitted at the same time as the notification of cancellation.

**GROUP LEADER CANCELLATIONS**
A Group Leader must accompany travelers on every tour. If a Group Leader cancels for any reason, he or she will be asked to assign a new Group Leader. Any travelers who cancel at this point and choose not to travel with their replacement Group Leader will be treated as standard cancellations. If no replacement Group Leader is found, the affected travelers will need to cancel to be eligible for EF's Standard Cancellation Policy. Those travelers interested in being placed with a new tour group should contact EF at 800-665-5364. If we cannot find a new tour for these travelers, EF's Standard Cancellation Policy will apply.

**CANCELLATIONS OR MODIFICATIONS REQUIRED BY EXTERNAL EVENTS BEYOND EF'S REASONABLE CONTROL**
EF shall not be liable to any traveler for the need to cancel, modify, or postpone the tour as a result of events that are beyond EF's reasonable control. These matters include such "acts of God" or force majeure events as actual or threats of: epidemics or pandemics, or other public health issues or emergencies (such as but not limited to the current COVID-19 pandemic); severe weather events or natural disasters such as but not limited to hurricanes, earthquakes, tsunamis, tornadoes, fires, floods, volcanic activity, or landslides; war (whether declared or undeclared); terrorist activities; instability in a destination location; incidents of violence, riot, sabotage, civil commotion, or nationalization; strikes or labor disputes or lockouts; government orders, sanctions, actual or potential quarantines, or other restrictions affecting travel in, to, or around a location; disruption to transportation; chemical or radioactive contamination; or any other reason that makes it actually or potentially impossible or illegal for EF to conduct the tour as originally contracted. EF incurs substantial non-recoverable costs and expenses of its own in planning, preparing, and pre-paying amounts for such tours. Accordingly, if EF cancels a tour for any such reason, travelers will receive an EF future travel voucher for all monies paid, less the cost of any purchased travel protection plan. Cancellation, modification, or postponement by EF for causes described in this section shall not be a violation of its obligations to any traveler.

**COVID-19 CANCELLATIONS OR MODIFICATIONS BY EF**
In the event external events beyond EF's reasonable control have not rendered a tour program impossible or illegal to depart as scheduled yet EF decides in its sole discretion that the program must nevertheless be cancelled, modified, or postponed due to health or safety concerns related to the COVID-19 pandemic or because issues related to the COVID-19 pandemic would affect the quality of the program, travelers acknowledge that EF's sole obligation to them will be to issue a COVID-19 Future Travel Voucher that may be used for future travel or exchanged for the cash refund option consistent with all terms and conditions set forth in the COVID-19 Peace of Mind section of these Booking Conditions. EF and the enrolled traveler agree that, in the event of a cancellation, modification, or postponement of a tour program by EF consistent with this provision, the cash refund option made available through the exchange of the COVID-19 Future Travel Voucher shall constitute fair consideration under the circumstances.

## Peace of Mind Program

We understand that plans can change due to unforeseen circumstances. EF provides an exclusive Peace of Mind program to account for such situations. This program is automatically included for all travelers and can be enacted at the group level for any reason, including terrorism or other world events. Your Group Leader may choose from the following options:

**45 days or more prior to departure**
- Change the travel dates of your group's current tour
- Work with EF to modify your group's current tour or find a new tour
- Cancel your tour and all travelers will receive a transferrable travel voucher

**44 days or less prior to departure**
If any location(s) included in the group's tour itinerary is designated as a Travel Advisory Level 3 or 4 by the U.S. Department of State, your Group Leader may still choose any option from the section above.

**Peace of Mind Program Terms & Conditions**
Benefits of the Peace of Mind program are only available to the entire group and not to individual travelers. Travelers missing any payment deadlines must pay any incurred late fees to qualify for this program. Revised tours must fall within the date range that these Booking Conditions are valid. If the revised tour has a higher price than the original tour, travelers will be required to pay the difference as a condition of traveling on the revised tour. If EF cannot accommodate a revised tour request and/or the group decides not to travel on the original tour, then the group may opt for travel vouchers. If the group does not travel on the original tour, travel on a revised tour, or receive a future travel voucher, standard cancellation fees will apply. Travelers cancelling from a revised tour will be charged a cancellation fee based on the date that the original tour was revised or the date of cancellation from the revised tour, whichever is higher. EF will make every effort to accommodate revised tour requests. Travel vouchers will be issued in the amount of all monies paid by a traveler for the original tour less the $95 non-refundable deposit and any other non-refundable fees. Travel vouchers are valid for the current and following travel year. Travel vouchers are transferable at the face value of the voucher to members of the traveler's immediate family or to students and faculty of the traveler's school. The future travel voucher is not a merchandise credit or a gift certificate and may not be redeemed for cash.

**COVID-19 Peace of Mind Program**
In addition to our standard Peace of Mind program, EF provides an exclusive COVID-19 Peace of Mind program to account for situations related to the COVID-19 pandemic. This program is automatically included for all travelers and can be enacted at the group level and specific options can be implemented at the individual level.

For programs scheduled to depart between October 1, 2020 and September 30, 2021, your Group Leader can enact the COVID-19 Peace of Mind program in the event that any of the following conditions occur as a result of the COVID-19 pandemic between 109 to 45 days prior to your tour program's original departure date:
- a U.S. federal governmental authority has issued a travel ban or an order restricting travel to a location on your group's itinerary
- a U.S. federal or state governmental authority has issued an order that would require a self-quarantine for travelers in your group upon return home from a location on your group's itinerary
- a governmental order applicable to a location on your group's itinerary would ban or restrict travel or require visitors to self-quarantine upon arrival

If COVID-19 Peace of Mind is enacted, your Group Leader may choose one of the following COVID-19 Options:
- Change the travel dates or tour itinerary of your group's current tour; or
- Cancel your tour with each traveler receiving a transferable COVID-19 Future Travel Voucher for 100% of all money paid to EF; or

- Cancel your tour with each traveler receiving a cash refund for all of the money paid to EF less $500

**COVID-19 Peace of Mind Program Terms & Conditions**
The benefits of the COVID-19 Peace of Mind program are available at the group level and for individual travelers. So long as the COVID-19 Peace of Mind program would apply, individual travelers can choose to cancel from their original tour or revised tour and receive a COVID-19 Future Travel Voucher to be used for future travel or exchanged for the cash refund option detailed above. Travelers missing any payment deadlines must pay any incurred late fees to qualify for this program. EF will make every effort to accommodate revised tour requests. Revised tours must fall within the date range that these Booking Conditions are valid. If the revised tour has a higher price than the original tour, travelers will be required to pay the difference as a condition of traveling on the revised tour. If the group does not travel on the original tour, travel on a revised tour, or if EF cannot accommodate a revised tour request, the travelers will receive COVID-19 Future Travel Vouchers. Travelers cancelling from a revised tour will be charged a cancellation fee based on the date that the original tour was revised or the date of cancellation from the revised tour, whichever is higher. COVID-19 Future Travel Vouchers will be issued in the amount of all monies paid by a traveler for the original tour. COVID-19 Future Travel Vouchers are valid for the current and following two travel years expiring on September 30, 2023 and may be exchanged during that time period for the cash refund option set forth in this COVID-19 Peace of Mind program provision COVID-19 Future Travel Vouchers are transferable at the face value of the voucher to members of the traveler's immediate family or to students and faculty of the traveler's school. The COVID-19 Future Travel Voucher is not a merchandise credit or a gift certificate.

## Payment Plan Terms and Conditions

Should you choose the Automatic Payment Plan or Manual Payment Plan, the following Terms and Conditions apply.

**AUTOMATIC PAYMENT PLAN**
- Travelers must select a payment method of either direct debit from a checking account or an ATM/debit card (card must display the Visa or MasterCard logo).
- EF must have the checking account or card holder signature on the Enrollment Form, electronic signature, or verbal authorization indicating agreement to EF's Automatic Payment Plan Terms and Conditions before the plan is activated.
- A minimum of three months of automated payments are required. Travelers who are not eligible for the Automatic Payment Plan must pay in full upon enrollment or enroll in the Manual Payment Plan.
- Travelers must provide a valid email address and pay the tour's $95 non-refundable deposit before the plan is activated.
- Travelers who choose monthly payments must choose a date between the 1st and 26th of the month on which their account will be automatically debited.
- Travelers who choose bi-weekly payments must choose a weekday on which their account will be automatically debited.
- Due to weekends and holidays, EF reserves the right to debit the travelers' account up to three days after the scheduled date.
- The Automatic Payment Plan amounts are subject to change if tour items or payments (other than the Automatic Payment Plan) are added or removed in excess of $20. All other items or payments totaling $20 or less that are added or removed will only be reflected in the final payment.
- After the Automatic Payment Plan's final scheduled payment, any additional items are due at time of purchase. Payments will no longer be automatically deducted.
- A non-refundable $35 fee will be assessed each time a payment is returned or declined. In these cases, the plan will be recalculated to have the missed payment redistributed across the remaining schedule. EF reserves the right to withdraw travelers from the plan for returns or declines in two consecutive payments. Should the final payment be returned or declined, travelers will automatically be withdrawn from the plan.

- Travelers are not charged late fees while enrolled in the Automatic Payment Plan. If the traveler opts to withdraw from the plan or is withdrawn by EF, the traveler will be enrolled in the Manual Payment Plan, and the $50 plan fee will be assessed.
- All of the above terms and conditions of the Automatic Payment Plan also apply to travelers on EF Tours for Girls programs.

**MANUAL PAYMENT PLAN**
- If travelers do not pay in full upon enrollment or choose the Automatic Payment Plan, they will be enrolled in the Manual Payment Plan and a non-refundable $50 plan fee will be applied.
- Based on date of enrollment, travelers will be invoiced up to three payments. The first payment of $500 is due 30 days after enrollment. The second payment of $500 is due 90 days after enrollment. The remaining balance is due 110 days prior to departure.
- Based on date of enrollment, travelers on an EF Tours for Girls program will be invoiced up to four payments. The deposit of $95 is due at the time of enrollment. The first payment of $300 is due 14 months prior to departure. The second payment of $500 is due 14 months prior to departure. The third payment of $500 is due 9 months prior to departure. The remaining balance is due 110 days prior to departure.
- A late fee of $95 will be assessed for any missed payment. All late fees are non-refundable.
- Travelers can pay with ATM/debit card, credit card (card must display the Visa or MasterCard logo), or personal checks.
- Payments made by personal check must be submitted with the traveler's name and account number.
- A non-refundable $35 fee will be assessed each time a payment is returned or declined.
- Travelers are responsible for making on-time payments even if an invoice is not received.
- All payment due dates refer to the dates by which each payment must be received by EF.
- EF reserves the right to cancel the traveler's reservation if any payment is past due by 30 days (or 15 days after final payment).
- Payment for the Global Travel Protection plan or Global Travel Protection Plus plan is due at time of purchase, and the plan will not be purchased until payment is received.

## Paperless Billing Terms and Conditions

For travelers enrolled in Paperless Billing, the following Terms and Conditions apply:
- Travelers will receive electronic invoices in connection with all information related to their EF account, including tour invoices, and other notices that are available in electronic format. Travelers understand this means that, once enrolled, they will not receive paper copies. Invoice reminders will be sent to the primary contact e-mail address that travelers provide on their enrollment form. Travelers may view and print invoices by logging into their account at eftours.com.
- EF is not responsible for any delay or failure to deliver any invoice, and travelers understand that nothing in these Terms and Conditions relieves obligation to pay any invoice.
- Travelers may elect not to receive electronic invoices and change to billing by US mail at any time by logging into account at eftours.com or by calling 800-665-5364.
- To the extent permitted by law, paperless billing is provided "as is" with faults and without warranties of any kind, either expressed or implied. Travelers assume all responsibility and risk for use of paperless billing. EF does not warrant that the information, processes, or services will be uninterrupted, or bug or error free.

EF's Rules of the Road | Release and Agreement

## DIVERSITY, EQUITY, INCLUSION AND BELONGING

EF is committed to providing an inclusive tour experience, and all of our travelers play a role in this. On tour, you will meet people who represent a variety of backgrounds and beliefs and explore diverse cultures and histories. Our goal is to create an environment that celebrates these differences and fosters learning more about the world, yourself, and yourself in the world.

## EF's Rules of the Road

When you enroll on tour, you agree to EF's Rules of the Road, which can also be found on your personalized website. If you do not conform to these regulations or any specific rules set by your Group Leader, you risk dismissal from the tour, returning home at your expense with no refund for the missed tour portion. Decisions regarding tour dismissal are up to EF and/or your Group Leader.

**All travelers must adhere to the following regulations while on tour:**

1. All scheduled activities are obligatory. If you are sick, have signs of becoming sick, or have a physical ailment that might prevent you from participating in an activity, you must notify the Tour Director, who should notify the Tour Director.
2. If you want to visit friends or relatives in a destination country, your Group Leader must be told before the tour begins. Please complete the Tour Leave Form, found under Forms and Resources on the Help Center (eftours.com/help-center), to receive permission for the visits. You must then give the form to your Tour Director upon arrival.
3. You are expected to respect the nightly curfew that your Group Leader may set for your own safety and security. Room checks will be conducted at the Group Leader's discretion. Visitors or group members of the opposite sex are not permitted in your room.
4. Smoking is not allowed on buses, during meals, in hotel rooms, or in any other shared, enclosed space.
5. Hitchhiking and the driving or renting of any motor vehicle is strictly forbidden for all travelers.
6. You are required to pay for any phone calls or incidental personal expenses incurred at hotels. These will be payable the evening before departure at each hotel.
7. Travelers under the age of 18 may not consume alcohol on tour. Travelers over the age of 18 (or older, if local laws require) may consume beer or wine in moderation. The consumption of hard liquor is strictly forbidden. Group Leaders and/or parents may prohibit all alcohol consumption at their discretion. Excessive drinking by any traveler will not be tolerated and will result in dismissal from tour at the traveler's own expense.
8. Illegal activities will not be tolerated and are punishable by immediate dismissal from the tour. If you are involved in any illegal activities, all costs to return home are at your own expense. If the local authorities are involved, you will be subject to the laws of the country you are visiting.
9. Payment for damage done to hotel rooms or to buses is your responsibility. If you notice any damage upon arrival at a hotel, you should notify the Tour Director immediately.

## Release and Agreement

**I (or parent or legal guardian if enrollee is under 18 or a minor under any other applicable law) have read, understand and agree to the following in exchange for enrollment on an EF Educational Tour:**

1. I acknowledge and understand that my tour is operated outside of the U.S. by EF Education First International, Ltd., Switzerland, and that EF Institute for Cultural Exchange, Inc. acts only as a marketing service provider for that company.

2. EF Institute for Cultural Exchange, Inc., EF Education First International, Ltd., and their affiliated companies, partners, and any companies acting on their behalf, along with their officers, directors, employees, agents, and authorized representatives (collectively referred to herein as "EF") do not own or operate any entity which is to or does provide goods or services for my program, including, for example, hotels; arrangements for, ownership of, or control over houses, apartments, or other lodging facilities; tour directors; airline, vessel, bus, or other transportation companies; local ground operators; visa processing services; providers or organizers of optional excursions; or food service or entertainment providers; etc. I acknowledge that all such persons and entities, specifically the Tour Director assigned to my tour, are independent contractors and not employees or agents of EF. As a result, EF is not liable for any negligent or willful act or failure to act of any such person or entity or of any third party.

3. Without limitation, EF is not responsible for any injury, loss or damage to person or property, death, delay, or inconvenience in connection with the provision of any goods or services occasioned by or resulting from, but not limited to, acts of God; force majeure; acts of government; acts of war or civil unrest; insurrection or revolt; strikes or other labor activities; public health issues or emergencies, epidemics, pandemics, plagues, outbreaks of infectious disease, mass-illness; criminal, terrorist, or threatened terrorist activities of any kind; overbooking or downgrading of accommodations; structural or other defective conditions in houses, apartments, or other lodging facilities (or in any heating, plumbing, electrical, or structural problem therein); mechanical or other failure of airplanes or other means of transportation or for any failure of any transportation mechanism to arrive or depart timely or safely; financial failure or other defaults by suppliers; dangers associated with water-based activities; dangers associated with or bites from animals, insects, or pests; sanitation problems; food poisoning; lack of access to or quality of medical care; difficulty in evacuation in case of a medical or other emergency; or any negligent or willful act or failure to act of any third party or for any other cause beyond the direct control of EF.

4. I agree to release EF and my school, my school district, my school board, my Group Leader, and Tour Director (collectively, the "Released Parties") from, and agree not to sue the Released Parties for, any and all claims of any nature related in any manner to my participation in an EF-sponsored tour or a Service Learning Tour, including, but not limited to, claims for negligence, breach of contract, breach of express or implied warranties, negligence or wrongful death, or any statutorily based claim. I hereby unconditionally and unequivocally waive any and all claims and demands for all damages, losses, costs and expenses of any nature whatsoever (including attorneys' fees) on account of or arising out of any and all personal injury, death, bodily injury, mental anguish, emotional distress, or property or other damage that I may suffer from any cause whatsoever related in any way to my participation in any EF-sponsored tour or a Service Learning Tour.

5. I understand that travel in other nations is not similar to travel within the United States. Travel outside of the United States can involve inconvenience and risk, including, but not limited to, forces of nature, geographic and climatic conditions, different hygienic standards, infrastructure problems (including road maintenance, transportation delays and accommodation conditions), civil unrest, vandalism, crime, political instability, and terrorism. Medical services or facilities may not be readily available or available at all during all or part of a program and, if available, may not be equal to standards in the participant's home country. I understand that a Service Learning Tour is a physically demanding excursion in a developing country, and I knowingly assume the risks of such an excursion. I further understand that different parts of the world present unique health, disease, and safety concerns, and I agree to review any specific risks related to my destination by visiting the Centers for Disease Control and Prevention's Traveler's Health website at www.cdc.gov/travel and the State Department's International Travel website at travel.state.gov/content/travel/en/international-travel.html. I assume all risk of bodily injury, death, emotional trauma, property damage, inconvenience, and/or loss resulting from negligence or any other acts of any and all persons or entities, however caused, including, but not limited to, those risks mentioned above. It is my intention fully to assume all of the risks of travel and participation in the program and to release the Released Parties from any and all liabilities to the maximum extent permitted by law.

6. I further agree to release the Released Parties from any and all decisions to cancel, modify, or delay the tour as a result of unforeseeable events that are beyond the reasonable control of EF or which become necessary or advisable for my safety or for the quality of the tour experience.

7. I agree that this Release applies to and binds myself and my minor child enrolling on tour (if applicable) along with my personal representatives, executors, heirs, and family.

8. In addition, EF shall have no responsibility for me whatsoever when I am absent from an EF-supervised activity or for non-supervised activities, such as visits to friends or relatives or during stay-ahead/stay-behind option periods or any other optional period or activity when not escorted by a Tour Director.

9. My tour begins with the takeoff from the EF departure airport and ends upon completion of the flight back to the origination (or other arrival) airport.

10. The air carrier's liability for loss of or damage to baggage or property, or for death or injury to person, is subject to and limited by the airlines' contract of carriage, its tariff, the Montreal Convention or Warsaw Convention and their amendments or both.

11. EF or my Group Leader reserves the right to refuse or cancel my registration at its sole discretion. In such event, standard cancellation policies as outlined in the Booking Conditions apply.

12. I agree to abide by EF's regulations and the directions of my Group Leader, my Tour Director, and EF's personnel during my tour. Failure to do so may result in my Group Leader or EF terminating me from the tour immediately. I understand that to disobey such rules or directions is to waive the right to a refund of any part of my program price, and that my Group Leader or EF may then send me home at my own expense.

13. I agree to abide by all local laws, regulations, and governmental advisories for all locations of my tour while abroad. I understand that if I refuse to follow, abuse, or disobey those laws, even unintentionally, I waive my right to a refund of any part of the program price, and my Group Leader or EF may send me home at my own expense. I also understand that, should local authorities be involved, I will be subject to the laws of the country I am visiting.

14. If I become ill or incapacitated, EF and their employees, my Tour Director, or my Group Leader, may take any action they deem necessary for my safety and wellbeing, including notifying parents/guardians and/or securing medical treatment (at my own expense) and transporting me home. EF retains the right, in its sole discretion, to contact the traveler's parents/guardians with regard to health issues or any matter whatsoever that relates to the traveler's tour. These rights transcend any and all privacy regulations that may apply. In the event of a medical emergency, EF will attempt to cause appropriate treatment to be administered, and the traveler authorizes EF to do so. EF, however, makes no warranty that it will be able to cause effective (or any) emergency treatment to be administered or to be timely administered.

15. I have made the choice to travel with the teacher/Group Leader organizing my group. I understand that this choice is not the responsibility of EF. I understand that my Group Leader is able to make decisions on my behalf, including but not limited to changing the group's requested tour or travel date and requiring that I purchase items such as the Global Travel Protection plan and optional excursions. I understand that a Group Leader must accompany me on tour. If my Group Leader cancels for any reason, EF will ask him or her to assign a new Group Leader. If I cancel at this point and choose not to travel with the replacement Group Leader, I will be treated as a standard cancellation. If no replacement Group Leader can be found, I will need to cancel and EF's Standard Cancellation Policy will apply. I may also request that EF place me with a new tour group. If EF cannot find a new tour group for me, EF's Standard Cancellation Policy will apply.

16. If I will be age 20 or older at any time during my tour, I acknowledge that EF will conduct a criminal background check ("CBC") as a pre-condition to travel. If such a traveler refuses to consent to the CBC, it will be deemed a cancellation and EF's Standard Cancellation Policy will apply.

17. This Release and Agreement and EF's Booking Conditions constitute the entire agreement between EF and me with reference to the subject matter herein, and I do not rely upon any promises, inducements, marketing materials, or agreements not herein, including, but not limited to, any oral statements made to me by any agents or employees of EF or by my school or Group Leader. This agreement may be amended or modified only in a writing, signed by EF. The waiver by EF of any provision of this agreement shall in no way affect the remaining provisions of this agreement, and this agreement shall be interpreted as if such clause or provision were not contained herein.

18. This agreement and performance hereunder shall be governed in all respects by the substantive laws of the Commonwealth of Massachusetts. In the event of any claim, dispute, or proceeding arising out of my relationship with EF, or any claim which arises between the Parties, whether or not related to this agreement, the literature for the trip or the trip itself, it shall be resolved solely in courts of the Commonwealth of Massachusetts and/or the United States District Court for the District of Massachusetts.

19. For travelers in Utah only: This tour is not sponsored by any public school, public school district, or other public entity and is operated and organized by a privately owned company.

20. EF may use any film or digital likeness taken of me and any of my comments while on an EF tour as well as any project work (including, but not limited to, online learning programs offered by EF) for future publicity without compensation to me and also use my contact information for future EF promotions. I have read and agreed to the Terms of Use and Privacy Policy outlined at eftours.com/legal-notices and I consent to EF's processing of my personal data.

21. I have read and agreed to the Terms of Use and Privacy Policy outlined at eftours.com/legal-notices, and I consent to EF's processing of my personal data as set forth on page 17.

## LIMITED POWER OF ATTORNEY
**For parents/guardians of travelers under the age of 18 or a minor under any applicable law**

The tour itinerary may include certain activities (such as whitewater rafting in Costa Rica) that may require the Group Leader to sign a release on behalf of the travelers (who are minors and cannot sign for themselves) in order to allow participation. This Limited Power of Attorney allows the Group Leader to execute these documents on your behalf should the need arise. Your execution of this Limited Power of Attorney is voluntary, and if you choose not to grant this Limited Power of Attorney, your child may still participate in the tour but may not be able to participate in some tour activities. With regard to said activities:

1. I understand and agree that my child, with my permission, has voluntarily chosen to participate in the activities, and we assume all dangers and risks associated with the activities.

2. I do hereby delegate to the Group Leader a "Limited Power of Attorney" and full authority to sign any documents, including, but not limited to, liability releases, permission slips, waivers, and/or any other type of participation agreement required by the operators of any activity for participation. By signing the EF Educational Tours Enrollment Form, I understand and agree to the above.

EF Education First 2020 | BC12022020              BC12022020



**BRISCILLA**

**SHANII**

# One trip.
# Two changed lives.

Traveling to the other side of the world is no small feat—something that 16-year-old Shanii and her mother Briscilla were well aware of. After overcoming a bit of initial nervousness, both mother and daughter experienced some big changes. Here's their story.

### On letting go

"The tour was like a test. Like, if she can make it in China then she can go anywhere. As a parent, you want to prepare your child to fly, and her going to China was exactly that. Yes, you're freaking out, but you can do this." –Briscilla

### On making it happen

"When I saw the tour to China, I was like, 'Mom, listen. I have to go to China.'" –Shanii

"I don't think for parents there's such a thing as a dumb question, especially when your kid is going away. Sometimes you just get nervous and when you read something, it doesn't stick. But when EF tells you, it makes sense." –Briscilla

### On cultural differences

"It's surprising how much you learn by going to another country without realizing it, and how different people can be while still being people. And it helps you realize how similar people can be but still be different." –Shanii

### On moving away for college

"I was like, 'Well, I went to China. How hard can Boston be?' It's not that far. It's still the U.S., so I thought, 'Yeah, I got this.'" –Shanii

### On showing them the world

"It was just a few days, but it's totally changed her perspective on how the world works. When you go out into the world and you're able to talk to new people, change is inevitable. You evolve and grow. And I saw that change in her." –Briscilla



**Hear the full story:**
Scan the code with your phone's camera or visit eftours.com/gettingthere

"I saw joy on my students' faces. Being immersed in the local culture gave everyone a confidence they will always carry with them."

Katie N., WI (Teacher)

L.F. 0488

# **EXHIBIT 2**

# General Terms and Conditions

These Booking Conditions are valid for all EF tours departing after October 1, 2021. All tours are operated outside of the U.S. by EF Education First International, Ltd., Switzerland. EF Institute for Cultural Exchange, Inc. is a marketing service provider for that company and is referred herein together with EF Education First International, Ltd. as "EF."

## WHAT'S INCLUDED IN THE PROGRAM PRICE?
– $95 non-refundable enrollment deposit

– Round-trip airfare

– Accommodations in hotels with private bathrooms

– A Tour Director available 24 hours a day from when you arrive until you depart

– Breakfast and dinner daily in Europe. (For non-European destinations different meal plans may apply.)

– Sightseeing tours and excursions led by licensed local guides as specified

– Airport transfers and transportation between destination cities

– Transportation to all included activities

– Entrance fees and theater tickets as specified

– EF walking tours and Tour Director-led sightseeing as specified

– Cruises, trains, or ferries as specified

– Adult supplement (if applicable)

– 24-hour worldwide emergency service

– Support from EF representatives abroad

– EF backpack and luggage tag for each tour

The above apply to all tours unless otherwise noted on the tour itinerary. If we ever fail to provide you with any of the above, we will refund you its value upon your return from the tour.

## What does the non-refundable enrollment deposit include?
All travelers must pay the non-refundable, non-transferable $95 enrollment deposit upon enrollment in order for the enrollment to be complete. After travel is completed on the first tour, repeat travelers will receive a $100 repeat traveler discount off of future tours.* (EF Explore America repeat travelers will receive a $50 repeat traveler discount off of future EF tours.) The $95 non-refundable enrollment deposit includes:

– EF's Standard Cancellation Policy and Peace of Mind program as described on pages 19-21
– Processing services by EF staff
– Eligibility for discounts on other EF programs

*Repeat travelers are paying travelers who traveled beginning in 2003. Travelers who cancel their tour prior to traveling are not eligible for a repeat traveler discount. The repeat traveler discount is non-refundable and non-transferable.

## WHAT'S NOT INCLUDED IN THE PRICE?
– Rooming supplement (if applicable)

– Optional excursions (except where indicated)

– Global Travel Protection plan or Global Travel Protection Plus plan (except where indicated)

– Beverages and lunches (except where indicated)

– Transportation to free-time activities

– Customary gratuities (for your Tour Director, bus drivers, and local guides)

– Porterage

– Any applicable baggage-handling fees imposed by the airlines (see eftours.com/baggage for complete details)

– Expenses caused by airline rescheduling, cancellations, or delays caused by the airlines, bad weather, or events beyond EF's control (see next page for details)

– Passport, visa, and reciprocity fees or any other fees associated with entry to or exit from a specific destination

## GROUP TRAVEL
### How does group travel work?
We believe that all students should have the opportunity to travel, which means we do everything we can to keep our program prices the lowest in the industry without sacrificing quality. One of the ways we do that is by combining groups to fill a tour bus so that all travelers help cover the costs of the bus, the Tour Director, local guides, etc. Consolidating groups also allows travelers to meet students from other schools, although groups may not be of the same age level.

Therefore, in order for everyone to travel for the lowest price possible, group travel requires some flexibility. Each group submits its preferred tour choices and travel dates, and then we book all of the groups with the same requested tours on one specific departure date. Because EF is the largest student travel provider, it's rare that groups do not travel on their first-choice tour. However, on occasion, we may need to book your group on a second-choice tour. In the event we cannot offer for booking a tour comparable to your first-choice tour, travelers can opt to receive a full refund. Once a program is booked, EF's Standard Cancellation Policy applies. EF strives to keep departure dates within two days of the requested date for tours departing October through April and within four days of the requested date for tours departing May through September. Your final tour itinerary and travel dates will be confirmed approximately two months prior to departure. Group Leaders also retain the ability to change the requested tour or travel dates on behalf of their group.

### Anything else I need to know about my itinerary?
Based on your travel dates, there may be times when it becomes necessary to modify your itinerary. Sometimes this involves changing the order in which cities are visited, altering your length of stay in a city or country, or using an alternate airport. On certain days, especially holidays, some tour inclusions may be unavailable. In such cases, we will substitute different inclusions or provide a refund after the tour. Tours are designed for students, as reflected in the pacing, accommodations, and other aspects of the tour.

## PRIVATE GROUPS
### What if my group wants to travel on our own without being consolidated?
If you want the privacy of your own tour bus and Tour Director, you can choose to travel as a private group. This option is available for an additional fee, which varies based on the final number of paying travelers. If your group fills a standard-size tour bus, the private group option is free. The itinerary may not be modified while on tour (i.e. you do not have the tour bus at your disposal); however you are able to make certain tour modifications prior to the tour departure. Although your base itinerary will include only your group, you may be consolidated with others during optional excursions. Also, due to flight and hotel availability, we require the same departure date flexibility as described above. Please let EF know prior to your first enrollment if you would like to be a private group.

### What if my group is traveling on a customized tour?
If your group is traveling on a customized tour, you will automatically be traveling as a private group. The tour price for your customized tour can fluctuate based on the group size and will be finalized based on the number of paying travelers at the time of departure.

## ENROLLMENT
All Enrollment Forms must be received at EF by at least 110 days prior to departure. Travelers should provide complete first, middle, and last names, and dates of birth as they appear (or will appear) on their passports.

### What is the cost of a name correction?
Any corrections to match passport names made after 110 days prior to departure require that we change the flight reservation, resulting in a minimum fee of $200 per airline up to the cost of a new published fare ticket. This may also result in a different flight itinerary from the rest of the group. Travelers who have not yet applied for a passport should provide their full name and date of birth as they appear on their birth certificate.

### How do travelers enroll?
Enrollment Forms and payment can be submitted to EF in any of the following ways:

– Online: eftours.com/enroll

– Phone: 800-665-5364

– Mail:
  EF Educational Tours
  EF Center Boston
  Two Education Circle
  Cambridge, MA 02141

© EF Education First 2022  |  BC01032022

EF-00000002

For your convenience, travelers are automatically enrolled in paperless billing. Travelers who prefer to receive invoices by mail may request this by logging into their account at eftours.com or by calling 800-665-5364.

**Can a traveler enroll on a waitlist if the tour is full?**
Upon the discretion of the Group Leader, a waitlist may be offered for full tours. The $95 non-refundable enrollment deposit is required for waitlist enrollments. If space becomes available on the tour and the applicant chooses to enroll, EF's payment plan and cancellation policies apply immediately. If space is not available by 14 days prior to departure or if the applicant cancels from the waitlist, the $95 non-refundable enrollment deposit will be refunded.

**Can children under 11 go on tour?**
We do not allow children under the age of 6 to travel with us. Travelers ages 6-10 must have an adult chaperone other than the Group Leader and will have to room with that chaperone. Travelers may choose to stay in a family room (a room with two twin beds and a cot) or in a twin (a room with two beds). Applicable fees will apply.

**Can adults go on tour?**
EF's published program prices are based on student rates for transportation, admissions, accommodations, etc. We welcome adults (those age 20 and older, including those who will turn 20 while on tour) but have to charge a per-person flat fee supplement of $100 plus $50 per night of the tour to cover the difference between student and adult rates. Adults will pay an additional $40 per night for the sea portion of their tour on overnight ferries and cruises, where applicable. Please see next page for information on adult rooming. Groups comprised of a majority of adults must select the private group option. All adult travelers will be required to complete a background check through a third party company prior to traveling. EF reserves the right to cancel any traveler if, in EF's sole discretion, it determines the results pose a risk to the group's safety or wellbeing.

**LATE ENROLLMENTS**
**Can a traveler enroll after 110 days prior to departure?**
Yes. A traveler may submit a late enrollment request 109 days or fewer prior to departure. The traveler must enroll on the tour, pay a non-refundable $145 late enrollment fee, and make full payment of the current program fee. The traveler will be placed on a waiting list while we check bus, flight, and hotel availability. The traveler is responsible for any additional charges that may apply. We may also offer an alternate flight to meet up with the tour or the option of arranging your own flight and buying the land-only portion of the tour.

If we are unable to place the traveler on a tour or the traveler does not wish to pay the additional charges, the traveler may cancel their enrollment request and receive a full refund.

**PASSPORTS, VISAS, OTHER TRAVEL DOCUMENTS & ENTRY REQUIREMENTS**
**Who is responsible for obtaining a traveler's passport, visas, and other travel documents and for complying with a destination's entry requirements?**
Each traveler is solely responsible for obtaining prior to departure a valid passport, applicable visas, and any other required travel documents, as well as verifying and satisfying the entry and exit requirements necessary for each destination of the tour itinerary. This may include required medical documents, testing, or proof of vaccinations (including any requirement to provide proof of full and up to date COVID-19 vaccination). All U.S. passports must be valid for at least six months following the tour's return date, and travelers will need to provide passport information to EF by 110 days prior to departure. Non-U.S. citizens will need to contact the embassy or consulate of their destination countries to ensure they meet specific entry requirements. Remember to check your itinerary carefully for all countries that will be visited (including countries visited in transit). Visit the U.S. Department of State's travel website at www.travel.state.gov for more information.  If a traveler is unable to obtain these travel documents or meet any applicable entry or exit requirement, EF's Standard Cancellation Policy will apply and travelers will be solely responsible for any incurred expenses.

**CAN I HELP PROTECT MY INVESTMENT?**
**Global Travel Protection plan**
Travelers can help protect their investment from the unexpected with the offered Global Travel Protection plan. Designed specifically with EF travelers in mind, this plan includes both pre and post departure benefits, which includes medical

expense coverage that may apply on tour and tour cancellation for stated reasons such as serious injury or illness or financial hardship due to job loss. All benefits are subject to the limits, terms, and exclusions of the policy available at https://www.sis-inc.biz/tours/efeducationaltours/. Learn more at eftours.com/protection. The Global Travel Protection plan becomes non-refundable after any of the following occur: when you depart on your tour, when you file a claim, or 10 days after receipt.

**Global Travel Protection Plus plan**
In addition to the benefits provided in our Global Travel Protection plan, travelers who purchase the Global Travel Protection Plus plan are provided with additional benefits for tour cancellation. Travelers are able to cancel their tour up to 24 hours prior to departure for any reason and receive a refund of their tour program cost (less the cost of the plan and other Non-Refundable Fees). Learn more at eftours.com/protection. The Global Travel Protection Plus plan must be purchased at the time of enrollment and is non-refundable after any of the following occur: when you depart on your tour, when you file a claim, or 10 days after receipt.

**FLIGHT INFORMATION**
**Which airlines are used by EF?**
EF reserves seats with major airlines, including Aer Lingus, Air Canada, Air France, Air New Zealand, Alitalia, American, British Airways, Copa Airlines, Delta, Iberia, Icelandair, KLM, LATAM Airlines, Lufthansa, Qantas, Swiss, United, Virgin Atlantic Airways, and other U.S. and international carriers.
Our contracts do not allow upgrades, stopovers, or the accrual of frequent flier miles.

**What will my flights be like?**
We always do our best to provide the most direct route to your destination city. However, due to available flight routings, we cannot guarantee non-stop or direct flights. Sometimes, groups may travel on an overnight red-eye flight, departing the evening before the tour is scheduled to begin. In rare cases, groups may have a domestic and/or international overnight, layover, and/or bus transfer. Based on seat availability and the size of the plane, we may not be able to accommodate all members of a group on the same flight, in which case the Group Leader will determine on which flight itinerary each traveler will travel. In such instances that a traveler is not satisfied with their flight assignment, standard cancellation fees apply. We are not able to pre-assign seating. Seat assignments will be provided upon check-in. Depending on your group's size, travelers may or may not sit together. Some countries may require aircraft insecticide treatment for inbound foreign flights. A list of such countries is available at eftours.com/insecticide.

**Do I have to travel on all legs of my flight itinerary?**
You must travel on all legs of your itinerary. If you do not travel on a portion of your flights, the remaining portions will be cancelled. You will be responsible for purchasing a new ticket as well as for any service fees charged by the airlines.

**What happens if my flight is delayed?**
EF is not responsible for airline schedule changes or mechanical, weather, or capacity-related flight delays; however, visit eftours.com/protection for benefits offered in the Global Travel Protection plan and Global Travel Protection Plus plan.

**Are any airports interchangeable?**
Flights to and from the following destinations may originate/end at any of the airports in that vicinity. On occasion, the tour may return to a different airport than the one you departed from.

– Chicago: O'Hare or Midway

– Dallas: Dallas/Fort Worth or Dallas Love Field

– Houston: George Bush Intercontinental or Hobby

– Miami: Fort Lauderdale or Miami

– New York: LaGuardia, JFK, or Newark

– San Francisco: Oakland, San Jose, or San Francisco

– Washington, D.C./Baltimore: BWI, Dulles, or Ronald Reagan National

– Ireland: Cork or Shannon

– Italy: Milan or Venice

– Scotland: Edinburgh or Glasgow

EF-00000003

**Are there flight restrictions for travelers under 18?**
Anyone younger than 18 years old traveling apart from the group without an adult companion must contact each airline on the minor's itinerary and may need to register as an unaccompanied minor per the airlines' policies. Some airlines will not allow minors under 16 years of age to travel without an adult companion. Any resulting fees will be assessed by the airlines and are the responsibility of the traveler. Additionally, travelers younger than 18 years old are not permitted to travel land-only unless accompanied by an adult traveling on the tour.

**SPECIAL TRAVEL REQUESTS**
EF is happy to provide stay-ahead/stay-behind options, alternate departure airports, and land-only tours for individual travelers or the whole group. If you have requested special travel arrangements, EF cannot guarantee that you will fly with your group in either direction.

**What if the whole group wants to do a stay-ahead or stay-behind?**
Where possible, EF will provide altered flight and/or land arrangements for a group of at least six paying travelers plus the Group Leader. Each traveler will have to pay any additional air and/or land costs. The Group Leader should submit one request for the whole group, which needs to be received prior to the first enrollment.

**What if only one traveler has a special travel request?**
Individual special travel requests should be submitted online at eftours.com by 110 days prior to departure. Please keep in mind that you should not make any actual arrangements—such as booking a flight or hotel—until final tour itinerary and departure date have been finalized (around 60 days prior to departure). A $150 service fee plus any additional air and/or land costs will be charged.

**What are the types of individual special travel requests?**
– Individual stay-ahead/stay-behind option: Where possible, EF will provide altered flight arrangements, according to a traveler's request. Travelers are responsible for making their own arrangements to and from the hotel or airport as well as all land arrangements pertaining to their individual itinerary.

– Alternate departure airports: Program prices are based on group departures. If an individual chooses to fly out of a different airport than the group, the program price of the alternate airport will apply. Travelers must depart from and return to the same domestic airport.

– Land-only tours: On certain tours, travelers have the option to make their own flight arrangements and join the tour at the first hotel on the itinerary. Travelers are responsible for making their own arrangements to and from the hotel or airport. In this case, the program price will be reduced depending on the length and destination of the tour. EF is not responsible for any travel-related delays or inconveniences for land-only travelers. Additionally, travelers younger than 18 years old are not permitted to travel land-only unless accompanied by an adult traveling on the tour.

**EXCURSIONS**
**What are excursions?**
EF offers these activities in addition to what is already included on the itinerary. Most Group Leaders choose to add excursions to all traveler accounts.

**When should I purchase excursions?**
To secure a discounted price, most excursions need to be purchased by 50 days prior to departure (70 days for Versailles). Some excursions may be purchased on tour, though at an increased price.

**Are excursions refundable?**
If EF cancels an excursion (due to low enrollment, for example), travelers will receive a full refund for the excursion after returning home from tour. To receive a refund for an excursion that you simply no longer wish to be enrolled in, you must let us know by 50 days prior to departure or no refund will be given.

**ROOMING**
EF handles final rooming assignments for all travelers. We make rooming assignments based on the sex identified on your passport. If you tell us you identify as a different sex, we will work to accommodate you. Please ensure that all rooming requests are submitted by 110 days prior to departure.

**How are students roomed?**
Students will room in triples or quads with others of the same sex from the entire tour group. This means that students from different schools may room together. EF uses hotels with rooms that contain two double beds (beds for two people). Two students are expected to share each bed.

**Can students request a twin room?**
Students may request twin accommodations (a hotel room with two single beds) by submitting the name of their roommate. The following additional fees will apply:

– $50 per hotel night per student

– $90 per ferry or cruise night per student

**How are adults roomed?**
Adults are placed in twin accommodations (a hotel room with two single beds) with another adult of the same sex from the entire tour group, unless the name of a roommate has been provided. This will mean that adults from different schools/organizations may room together.

**Can adults request a room with a double bed?**
Adults can request double-bed accommodations (a room with one bed for two people) by providing EF with the name of their roommate by 110 days prior to departure.

**Can adults request a single room?**
Adults can request a single room for an additional $40 per hotel, cruise, or ferry night. This fee is in addition to the standard adult supplement fees covered on the previous page.

**MISCELLANEOUS**
**When does the tour officially start and end?**
Each tour begins with the take-off from the departure airport and ends when the flight lands at the return airport. For those making their own flight arrangements, the tour begins upon arrival at the first EF hotel and ends upon departure from the last EF hotel, according to the itinerary. The official length of an EF tour does not include stay-ahead, stay-behind, or any optional periods or activities when travelers are not escorted by a Tour Director.

**What if a refund is due?**
Where applicable, refunds for overpayment will be issued upon request and after the most recent payment has been in the traveler's account for 21 days. Refunds will be issued back to the original form of payment unless that is no longer valid, in which case a refund check will be issued in the name that appears on the traveler's account. All refund checks are mailed 4-6 weeks after the request has been processed. There will be a non-refundable $35 stop-payment fee for lost refund checks.

**Non-Refundable Fees**
Non-Refundable Fees are defined as the Enrollment Deposit ($95), Global Travel Protection plan cost ($165), Global Travel Protection Plus plan cost ($460) and Manual Payment Plan Fee ($50) as well as any late fees, late enrollment fees, Automatic Payment Plan decline charges, return check/direct debit fees, late special travel request fees and canceled check fees which have been applied to the account at the time of cancellation.

**What about lost belongings?**
EF is not responsible for loss of passports, airline tickets, or other documents, or for loss of or damage to luggage or any other passenger belongings. In the case of lost travel documents, the traveler is solely responsible for meeting the airline's requirements (both logistical and financial) for ticket replacement.

**What about travelers with food allergies?**
EF recognizes that some travelers may have severe food allergies. We will do our best to ensure that our suppliers are informed of the situation, but we cannot guarantee that all requests will be accommodated. Travelers are responsible for making their own arrangements for all in-flight meals.

**How can I protect myself from the risk of COVID-19 while on tour?**
Taking personal responsibility for your wellbeing begins with packing any personal protective equipment and sanitizers you require. Adopt physical distancing and hygiene practices throughout your pre-trip travel arrangements and follow all health instruction, whether physical signage or requests from the Tour Director or our staff once on tour.

© EF Education First 2022  |  BC01032022

EF-00000004

**What items are prohibited from tour?**
For the safety and well-being of all travelers, no firearms or any other weapons are permitted on tour except as required by law.

**What if my tour dates do not fall in the range covered by these Booking Conditions?**
Visit eftours.com/bc for the most recent version of the latest travel year's Booking Conditions.

**PERSONAL DATA**
EF will process your personal data in compliance with applicable data protection legislation for the purposes of completing your enrollment, customer service, the purchase of an offered travel protection plan, and providing you with the products and services related to your tour. This may entail sharing your personal data with corporate affiliates, claims handlers, insurance providers, and other business partners both within and outside the U.S., including to and within the EEA/Switzerland. We have put appropriate safeguards in place for such transfers of your personal data, including the standard data protection clauses adopted by the European Commission. EF may also use your personal data, combined with data from third parties, to market products and services based on your interests, including by email and SMS/text. You may contact EF at any time to unsubscribe from any direct marketing purposes.

We will only keep your personal data for as long as it is necessary for the purposes for which it has been collected or in accordance with time limits stipulated by law and good market practice, unless further retention is necessary for compliance with a legal obligation or for the establishment, exercise or defense of legal claims. We will keep your personal data for marketing purposes until you withdraw your consent.
If you have questions about the processing or use of your personal data, would like to have a copy of the information EF holds about you, or have inaccurate personal data corrected or erased, please contact Traveler Support at 800-665-5364.

**PROTECTION FOR TRAVELERS' PAYMENTS**
Traveler's tour money has protection in the unlikely event of EF bankruptcy, insolvency, or cessation of business under our participation in the United States Tour Operators Association (USTOA) $1 Million Travelers Assistance Program. For program details and a list of its affiliates, contact USTOA by mail at 275 Madison Avenue, Suite 2014, NY, NY 10016, by email at information@ustoa.com, or online at USTOA.com.

# Cancellations and Modifications

**STANDARD CANCELLATION POLICY**
The cancellation policies outlined below take into consideration the costs EF incurs often years before groups ever depart. Notice of cancellation from an EF tour will only be accepted from the traveler, their legal guardian, or the Group Leader. The date of cancellation will be determined by the date on which EF receives notice. In order to qualify for refunds in accordance with EF's Standard Cancellation Policy, all payments must be received on time.

**EF's Standard Cancellation Policy***
– *150 days or more prior to departure:* Full refund less the $95 non-refundable enrollment deposit, all Non-Refundable Fees, and a $300 cancellation fee.

– *149 to 110 days prior to departure:* Full refund less the $95 non-refundable enrollment deposit, all Non-Refundable Fees, and a $500 cancellation fee.

– *109 to 45 days prior to departure:* Full refund less the $95 non-refundable enrollment deposit, all Non-Refundable Fees, and 50% of the program price.

– *44 days or less prior to departure:* No refund will be issued.

*Travelers who purchase a Global Travel Protection plan have the opportunity to cancel the trip until 60 days prior to departure due to reasons not covered by the insurance underwritten by United States Fire Insurance Company and have the option to rebook to another EF Educational Tour within 30 days of such cancellation. Traveler is responsible for finding a new tour, and final placement is based on availability. Such tour needs to take place within 180 days from cancellation, and any difference in price will be covered by the traveler (non-refundable fees from the original tour will not be put toward the rebooked tour). This benefit is not an insurance provided by United States Fire Insurance Company.

*Travelers who purchase the Global Travel Protection Plus plan have the option to cancel with a non-insurance Cancel for Any Reason waiver provided by EF Educational

Tours. The non-insurance Cancel for Any Reason waiver provided by EF Educational Tours provides a cash refund for trip costs paid (less the cost of the plan and other Non-Refundable Fees) to EF Educational Tours for cancellation prior to departure. For plans issued in New York, customers can purchase the non-insurance Cancel for Any Reason waiver separately from the rest of the travel protection plan – for further details, please contact Specialty Insurance Solutions at 877-974-7462 ext. 321.

**Cancellation with replacement****
– *150 days or more prior to departure:* Full refund less the $95 non-refundable enrollment deposit and all Non-Refundable Fees.

– *149 to 110 days prior to departure:* Full refund less the $95 non-refundable enrollment deposit, all Non-Refundable Fees, and a $100 substitution fee.

– *109 days or less prior to departure:* Replacements can no longer be accepted and EF's Standard Cancellation Policy will apply.

** Cancellation with replacement refers to a traveler who cancels but finds a person to replace them for the same program. The replacement's Enrollment Form must be submitted at the same time as the notification of cancellation.

**GROUP LEADER CANCELLATIONS**
A Group Leader must accompany travelers on every tour. If a Group Leader cancels for any reason, they will be asked to assign a new Group Leader. Any travelers who cancel at this point and choose not to travel with their replacement Group Leader will be treated as standard cancellations. If no replacement Group Leader is found, the affected travelers will need to cancel to be eligible for EF's Standard Cancellation Policy. Those travelers interested in being placed with a new tour group should contact EF at 800-665-5364. If we cannot find a new tour for these travelers, EF's Standard Cancellation Policy will apply.

**CANCELLATIONS OR MODIFICATIONS REQUIRED BY EXTERNAL EVENTS BEYOND EF'S REASONABLE CONTROL**
EF shall not be liable to any traveler for the need to cancel, modify, or postpone the tour as a result of events that are beyond EF's reasonable control. These matters include such "acts of God" or force majeure events as actual or threats of: epidemics or pandemics, or other public health issues or emergencies (such as but not limited to the current COVID-19 pandemic); severe weather events or natural disasters such as but not limited to hurricanes, earthquakes, tsunamis, tornadoes, fires, floods, volcanic activity, or landslides; war (whether declared or undeclared); terrorist activities; instability in a destination location; incidents of violence, riot, sabotage, civil commotion, or nationalization; strikes or labor disputes or lockouts; government orders, sanctions, actual or potential quarantines, or other restrictions affecting travel in, to, or around a location; disruption to transportation; chemical or radioactive contamination; or any other reason that makes it actually or potentially impossible or illegal for EF to conduct the tour as originally contracted. EF incurs substantial non-recoverable costs and expenses of its own in planning, preparing, and pre-paying amounts for such tours. Accordingly, if EF cancels a tour for any such reason, travelers will receive an EF Future Travel Voucher for all monies paid, less the cost of any purchased travel protection plan. Cancellation, modification, or postponement by EF for causes described in this section shall not be a violation of its obligations to any traveler and will not be deemed a "failure" to provide travel services.

**COVID-19 CANCELLATIONS, MODIFICATIONS, OR REQUIREMENTS**
In the event external events beyond EF's reasonable control have not rendered a tour program impossible or illegal to depart as scheduled yet EF reasonably decides in its sole discretion that the program must nevertheless be cancelled, modified, or postponed due to health or safety concerns related to the COVID-19 pandemic or because issues related to the COVID-19 pandemic would affect the quality of the program, travelers acknowledge that EF's sole obligation to them will be to issue an EF Future Travel Voucher in the amount of all monies paid, less the cost of any purchased travel protection plan. EF and the enrolled traveler agree that a cancellation, modification, or postponement by EF for causes described in this section shall not be a violation of its obligations to any traveler and shall not be deemed a "failure" to provide travel services.

EF-00000005

EF is not responsible and shall not be liable to any traveler for any destination-imposed travel entry or exit requirement related to COVID-19, including but not limited to vaccination, testing, or other public health requirements. Customers who are unwilling or unable to comply with such travel or entry requirements and who choose to cancel their tour are subject to EF's Standard Cancellation Policy. EF also reserves the right in its sole discretion to, in good faith efforts to protect against health concerns, exceed destination-imposed travel or entry requirements and require full vaccination against COVID-19, pre-tour and on-tour testing for COVID-19, and other public health measures for travelers to certain destination. In such an event, for tours departing prior to September 30th, 2022, travelers unable or unwilling to meet such requirements must notify EF of their decision to cancel by no later than 110 days prior to departure. Travelers acknowledge that EF's sole obligation in that instance is to issue an EF Future Travel Voucher for all monies paid, less the cost of any purchased travel protection plan. EF's Standard Cancellation Policy applies to travelers who cancel for a reason covered by this provision within 110 days prior to departure. Travelers departing on a tour after September 30th, 2022 are subject to EF's Standard Cancellation Policy.

## Peace of Mind Program

We understand that plans can change due to unforeseen circumstances. EF provides an exclusive Peace of Mind program to account for such situations. This program is automatically included for all travelers and can be enacted at the group level for any reason, including terrorism, pandemics, or other world events. Your Group Leader may choose from the following options:

**45 days or more prior to departure**

– Work with EF to modify your group's current tour itinerary and dates, or find a new tour, and apply all money paid to the new tour

– Cancel your tour and all travelers will receive a transferable Future Travel Voucher in the amount of all monies paid for the original tour, less the cost of any purchased travel protection plan

– Cancel your tour with applicable fees under the Standard Cancellation Policy

**44 days or less prior to departure**
If any location(s) included in the group's itinerary is newly designated as a Travel Advisory Level 4 by the U.S. Department of State; or a U.S. federal or state governmental authority has newly imposed a travel ban to your destination, or newly issued an order requiring a self-quarantine for travelers in your group upon arrival to a location on your itinerary or upon return home from a location on your group's itinerary; your Group Leader or the individual traveler may chose not to depart on the tour as scheduled and will have the same Peace of Mind Options set forth above.

**Peace of Mind Program Terms & Conditions**
Benefits of the Peace of Mind program are only available to the entire group and not to individual travelers unless specifically indicated. Travelers missing any payment deadlines must pay any incurred late fees to qualify for this program. Revised tours must depart within 1 year of the original tour. If the revised tour has a higher price than the original tour, travelers will be required to pay the difference as a condition of traveling on the revised tour. If EF cannot accommodate a revised tour request and/or the group decides not to travel on the original tour, then the group may opt for Future Travel Vouchers. If the group does not travel on the original tour, travel on a revised tour, or receive a Future Travel Voucher, standard cancellation fees will apply.

Travelers cancelling from a revised tour will be charged a cancellation fee based on the date that the original tour was revised or the date of cancellation from the revised tour, whichever is higher. EF will make every effort to accommodate revised tour requests.

Future Travel Vouchers are valid up to 25 months from the month of the original tour's scheduled departure. Future Travel Vouchers are transferable at the face value of the voucher to members of the traveler's immediate family or school community. The Future Travel Voucher is not a merchandise credit or a gift certificate and may not be redeemed for cash unless specifically noted on the voucher. Travelers who had booked their program by redeeming a previously issued Future Travel Voucher may have different terms and options available to them based on the originally issued voucher terms.

## COVID-19 Peace of Mind Program

EF provides an exclusive COVID-19 Peace of Mind program for tours scheduled to depart between October 1, 2020 and September 30, 2022, to account for situations related to the COVID-19 pandemic. This program is automatically included for travelers within these departure dates and can be enacted at the group level and specific options can be implemented at the individual level.

**Up until 110 days prior to the departure of your tour's original departure date, your Group Leader can enact the COVID-19 Peace of Mind program on behalf of your group for any reason. In that event, your Group Leader can choose one of the following options (referred to as "Group COVID-19 Options"):**

– Change the travel dates or tour itinerary of your group's current tour; or

– Cancel your tour with each traveler receiving a transferable COVID-19 Future Travel Voucher for 100% of all money paid to EF; or

– Cancel your tour with each traveler receiving a cash refund for all of the money paid to EF less $500*

Individual travelers also have up until 110 days prior to their tour's original departure date to choose one of the following options (referred to as "Individual COVID-19 Options"):

– Cancel off your tour and receive or reinstate a transferable COVID-19 Future Travel Voucher for 100% of all money paid to EF; or

– Cancel off your tour and receive a cash refund for all of the money paid to EF less $500*

**Between 109 to 45 days prior to your tour's original departure date, your Group Leader can enact the COVID-19 Peace of Mind program on behalf of your group and choose among the Group COVID-19 Options if any of the following conditions (referred to as "COVID-19 Travel Events") occur within that timeframe as a result of the COVID-19 pandemic:**

– A U.S. federal governmental authority has issued a travel ban or an order restricting travel to a location on your group's itinerary

– A U.S. federal or state governmental authority has issued an order that would require a self-quarantine for travelers in your group upon return home from a location on your group's itinerary

– A governmental order applicable to a location on your group's itinerary would ban or restrict travel or require visitors to self-quarantine upon arrival

**If COVID-19 Peace of Mind is enacted, your Group Leader may choose one of the following COVID-19 Options:**

– Change the travel dates or tour itinerary of your group's current tour; or

– Cancel your tour with each traveler receiving a transferable COVID-19 Future Travel Voucher for 100% of all money paid to EF; or

– Cancel your tour with each traveler receiving a cash refund for all of the money paid to EF less $500*

Individual travelers also have between 109 to 45 days prior to their tour's original departure date to choose among the Individual COVID-19 Options if any of the COVID-19 Travel Events occur within that timeframe as a result of the COVID-19 pandemic.

If at 44 days or less prior to departure of your tour, travel restrictions, governmental orders, or other conditions related to the COVID-19 pandemic make it impossible or impracticable for EF to operate your tour as scheduled or any of the COVID-19 Travel Events referenced above are newly imposed such that a postponement of your tour program becomes necessary then Group Leader will be offered the same Group COVID-19 Options or travelers will have the same Individual COVID-19 Options referenced above with the cash refund option increased to all monies paid less $350.

*For travelers who had booked their program by redeeming a previously issued COVID-19 Future Travel Voucher, the cash refund option available will be based on the originally issued voucher terms (e.g., travelers who received a COVID-19 Future Travel Voucher for a tour originally scheduled to depart between March 1, 2020 and May 14, 2020, may exchange their voucher for all monies paid less $565).

© EF Education First 2022  |  BC01032022

EF-00000006

**COVID-19 Peace of Mind Program Terms & Conditions**

This COVID-19 Peace of Mind program is applicable to travelers on EF Educational Tours and EF Tours for Girls programs scheduled to depart between October 1, 2020 and September 30, 2022. The benefits of the COVID-19 Peace of Mind program are available at the group level and for individual travelers. The COVID-19 Peace of Mind program will not apply based on travel conditions or restrictions imposed or recommended by local (i.e., non-state) governmental entities or third-party entities unrelated to the provision or arrangement of travel services for your tour. So long as the COVID-19 Peace of Mind program would apply, individual travelers can choose to cancel from their original tour or revised tour and receive a COVID-19 Future Travel Voucher to be used for future travel or exchanged for the cash refund option detailed above. Travelers missing any payment deadlines must pay any incurred late fees to qualify for this program. EF will make every effort to accommodate revised tour requests. Revised tours must depart prior to September 30, 2023. If the revised tour has a higher price than the original tour, travelers will be required to pay the difference as a condition of traveling on the revised tour. If the group does not travel on the original tour, travel on a revised tour, or if EF cannot accommodate a revised tour request, the travelers will receive COVID-19 Future Travel Vouchers. Travelers cancelling from a revised tour will be charged a cancellation fee based on the date that the original tour was revised or the date of cancellation from the revised tour, whichever is higher. COVID-19 Future Travel Vouchers will be issued in the amount of all monies paid by a traveler for the original tour. COVID-19 Future Travel Vouchers are valid for the current and following travel year expiring on September 30, 2023 and may be exchanged during that time period for the cash refund option that the traveler was originally eligible to receive pursuant to the COVID-19 Peace of Mind program policy at the time of issuance. COVID-19 Future Travel Vouchers are transferable at the face value of the voucher to members of the traveler's immediate family or community. The COVID-19 Future Travel Voucher is not a merchandise credit or a gift certificate.

## Payment Plan Terms and Conditions

Should you choose the Automatic Payment Plan or Manual Payment Plan, the following Terms and Conditions apply.

### AUTOMATIC PAYMENT PLAN

– Travelers must select a payment method of either direct debit from a checking account or an ATM/debit card (card must display the Visa or MasterCard logo).

– EF must have the checking account or card holder signature on the Enrollment Form, electronic signature, or verbal authorization indicating agreement to EF's Automatic Payment Plan Terms and Conditions before the plan is activated.

– A minimum of three months of automated payments are required. Travelers who are not eligible for the Automatic Payment Plan must pay in full upon enrollment or enroll in the Manual Payment Plan.

– Travelers must provide a valid email address and pay the tour's $95 non-refundable enrollment deposit before the plan is activated.

– Travelers who choose monthly payments must choose a date between the 1st and 26th of the month on which their account will be automatically debited.

– Travelers who choose bi-weekly payments must choose a weekday on which their account will be automatically debited.

– Due to weekends and holidays, EF reserves the right to debit the travelers' account up to three days after the scheduled date.

– The Automatic Payment Plan amounts are subject to change if tour items or payments (other than the Automatic Payment Plan) are added or removed in excess of $20. All other items or payments totaling $20 or less that are added or removed will only be reflected in the final payment.

– After the Automatic Payment Plan's final scheduled payment, any additional items are due at time of purchase. Payments will no longer be automatically deducted.

– A non-refundable $35 fee will be assessed each time a payment is returned or declined. In these cases, the plan will be recalculated to have the missed payment redistributed across the remaining schedule. EF reserves the right to withdraw travelers from the plan for returns or declines in two consecutive payments. Should the final payment be returned or declined, travelers will automatically be withdrawn from the plan.

– Travelers are not charged late fees while enrolled in the Automatic Payment Plan. If the traveler opts to withdraw from the plan or is withdrawn by EF, the traveler will be enrolled in the Manual Payment Plan, and the $50 plan fee will be assessed.

– All of the above terms and conditions of the Automatic Payment Plan also apply to travelers on EF Tours for Girls programs.

### MANUAL PAYMENT PLAN

– If travelers do not pay in full upon enrollment or choose the Automatic Payment Plan, they will be enrolled in the Manual Payment Plan and a non-refundable $50 plan fee will be applied.

– Based on date of enrollment, travelers will be invoiced up to three payments. The first payment of $500 is due 30 days after enrollment. The second payment of $500 is due 90 days after enrollment. The remaining balance is due 110 days prior to departure.

– Based on date of enrollment, travelers on an EF Tours for Girls program will be invoiced up to four payments. The non-refundable enrollment deposit of $95 is due at the time of enrollment. The first payment of $300 is due 60 days after enrollment. The second payment of $500 is due 14 months prior to departure. The third payment of $500 is due 9 months prior to departure. The remaining balance is due 110 days prior to departure.

– A late fee of $95 will be assessed for any missed payment. All late fees are non-refundable.

– Travelers can pay with ATM/debit card, credit card (card must display the Visa or MasterCard logo), or personal checks.

– Payments made by personal check must be submitted with the traveler's name and account number.

– A non-refundable $35 fee will be assessed each time a payment is returned or declined.

– Travelers are responsible for making on-time payments even if an invoice is not received.

– All payment due dates refer to the dates by which each payment must be received by EF.

– EF reserves the right to cancel the traveler's reservation if any payment is past due by 30 days (or 15 days after final payment).

– Payment for the Global Travel Protection plan or Global Travel Protection Plus plan is due at time of purchase, and the plan will not be purchased until payment is received.

## Paperless Billing Terms and Conditions

For travelers enrolled in Paperless Billing, the following Terms and Conditions apply:

– Travelers will receive electronic invoices in connection with all information related to their EF account, including tour invoices, and other notices that are available in electronic format. Travelers understand this means that, once enrolled, they will not receive paper copies. Invoice reminders will be sent to the primary contact e-mail address that travelers provide on their enrollment form. Travelers may view and print invoices by logging into their account at eftours.com.

– EF is not responsible for any delay or failure to deliver any invoice, and travelers understand that nothing in these Terms and Conditions relieves obligation to pay any invoice.

– Travelers may elect not to receive electronic invoices and change to billing by US mail at any time by logging into account at eftours.com or by calling 800-665-5364.

– To the extent permitted by law, paperless billing is provided "as is" with faults and without warranties of any kind, either expressed or implied. Travelers assume all responsibility and risk for use of paperless billing. EF does not warrant that the information, processes, or services will be uninterrupted, or bug or error free.

EF-00000007

## Other Terms and Conditions

The terms and provisions of these Booking Conditions supersede any other warranties, representations, terms, or conditions, unless they are expressly stated within a Booking Conditions Addendum or in a letter signed by an EF officer. While EF makes every effort to ensure the accuracy of its publications, it cannot be held responsible for typographical or printing errors (including prices).

Enrolling travelers acknowledge that EF may change the Booking Condition terms from time to time and those changes become effectively immediately.  Notice will be provided to you in the event of a material change. A traveler's continued use of EF's services following such notice constitutes acceptance and agreement to be bound by such changes.  Travelers agree that the current version of the Booking Conditions in effect at the time of travel or cancellation applies to their tour program.

The tour operator for your trip is EF Education First International, Ltd., Selnaustrasse 30, 8001 Zurich, Switzerland, organization number CHE-109.874.655, VAT number CHE- 116.325.678 MWST. EF Institute for Cultural Exchange, Inc. is an affiliate of EF Education First International, Ltd. and acts only as a marketing services provider for that company. EF Institute for Cultural Exchange Inc. is not an agent of EF Education First International, Ltd., does not provide any goods or services for your trip, and is located at Two Education Circle, Cambridge, MA 02141 (t: 800-665-5364). The services provided are tax-exempt with credit in accordance with Swiss Federal Law with regard to VAT Article #23.

EF is a registered as a "Seller of Travel" as defined by travel regulations in the following states: Florida (Reg. No. ST36778); California (Reg. No. 2015641-20); Washington (Reg. No. 603084928).

### DIVERSITY, EQUITY, INCLUSION AND BELONGING

EF is committed to providing an inclusive tour experience, and all of our travelers play a role in this.  On tour, you will meet people who represent a variety of backgrounds and beliefs and explore diverse cultures and histories.  Our goal is to create an environment that celebrates these differences and fosters learning more about the world, yourself, and yourself in the world.

## EF's Rules of the Road

When you enroll on tour, you agree to EF's Rules of the Road, which can also be found on your personalized website. If you do not conform to these regulations or any specific rules set by your Group Leader, you risk dismissal from the tour, returning home at your expense with no refund for the missed tour portion. Decisions regarding tour dismissal are up to EF and/or your Group Leader.

**All travelers must adhere to the following regulations while on tour:**

1. All scheduled activities are obligatory. If you are sick, have signs of becoming sick, or have a physical ailment that might prevent you from participating in an activity, you must tell the Group Leader, who should notify the Tour Director.

2. If you want to visit friends or relatives in a destination country, your Group Leader must be told before the tour begins. Please complete the Tour Leave Form, found under Forms and Resources on the Help Center (eftours.com/help-center), to receive permission for the visits. You must then give the form to your Tour Director upon arrival.

3. You are expected to respect the nightly curfew that your Group Leader may set for your own safety and security. Room checks will be conducted at the Group Leader's discretion. Visitors or group members of the opposite sex are not permitted in your room.

4. Smoking is not allowed on buses, during meals, in hotel rooms, or in any other shared, enclosed space.

5. Hitchhiking and the driving or renting of any motor vehicle is strictly forbidden for all travelers.

6. You are required to pay for any phone calls or incidental personal expenses incurred at hotels. These will be payable the evening before departure at each hotel.

7. Travelers under the age of 18 may not consume alcohol on tour. Travelers over the age of 18 (or older, if local laws require) may consume beer or wine in moderation. The consumption of hard liquor is strictly forbidden. Group Leaders and/or parents may prohibit all alcohol consumption at their discretion. Excessive drinking by any traveler will not be tolerated and will result in dismissal from tour at the traveler's own expense.

8. Illegal activities will not be tolerated and are punishable by immediate dismissal from the tour. If you are involved in any illegal activities, all costs to return home are at your own expense. If the local authorities are involved, you will be subject to the laws of the country you are visiting.

9. Payment for damage done to hotel rooms or to buses is your responsibility. If you notice any damage upon arrival at a hotel, you should notify the Tour Director immediately.

## Release and Agreement

**I (or parent or legal guardian if enrollee is under 18 or a minor under any other applicable law) have read, understand and agree to the following in exchange for enrollment on an EF Educational Tour:**

1. I acknowledge and understand that my tour is operated outside of the U.S. by EF Education First International, Ltd., Switzerland, and that EF Institute for Cultural Exchange, Inc. acts only as a marketing service provider for that company.

2. EF Institute for Cultural Exchange, Inc., EF Education First International, Ltd., and their affiliated companies, partners, and any companies acting on their behalf, along with their officers, directors, employees, agents, and authorized representatives (collectively referred to herein as "EF") do not own or operate any entity which is to or does provide goods or services for my program, including, for example, hotels; arrangements for, ownership of, or control over houses, apartments, or other lodging facilities; tour directors; airline, vessel, bus, or other transportation companies; local ground operators; visa processing services; providers or organizers of optional excursions; or food service or entertainment providers; etc. I acknowledge that all such persons and entities, specifically the Tour Director assigned to my tour, are independent contractors and not employees or agents of EF. As a result, EF is not liable for any negligent or willful act or failure to act of any such person or entity or of any third party.

3. Without limitation, EF is not responsible for any injury, loss or damage to person or property, death, delay, or inconvenience in connection with the provision of any goods or services occasioned by or resulting from, but not limited to, acts of God; force majeure; acts of government; acts of war or civil unrest; insurrection or revolt; strikes or other labor activities; public health issues or emergencies, epidemics, pandemics, plagues, outbreaks of infectious disease, mass-illness; criminal, terrorist, or threatened terrorist activities of any kind; overbooking or downgrading of accommodations; structural or other defective conditions in houses, apartments, or other lodging facilities (or in any heating, plumbing, electrical, or structural problem therein); mechanical or other failure of airplanes or other means of transportation or for any failure of any transportation mechanism to arrive or depart timely or safely; financial failure or other defaults by suppliers; dangers associated with water-based activities; dangers associated with or bites from animals, insects, or pests; sanitation problems; food poisoning; lack of access to or quality of medical care; difficulty in evacuation in case of a medical or other emergency; or any negligent or willful act or failure to act of any third party or for any other cause beyond the direct control of EF.

4. I agree to release EF and my school, my school district, my school board, my Group Leader, and Tour Director (collectively, the "Released Parties") from, and agree not to sue the Released Parties for, any and all claims of any nature related in any manner to my participation in an EF-sponsored tour or a Service Learning Tour, including, but not limited to, claims for negligence, breach of contract, breach of express or implied warranties, negligence or wrongful death, or any statutorily based claim. I hereby unconditionally and unequivocally waive any and all claims and demands for all damages, losses, costs and expenses of any nature whatsoever (including attorneys' fees) on account of or arising out of any and all personal injury, death, bodily injury, mental anguish, emotional distress, or property or other damage that I may suffer from any cause whatsoever related in any way to my participation in any EF-sponsored tour or a Service Learning Tour.

5. I understand that travel in other nations is not similar to travel within the United States. Travel outside of the United States can involve inconvenience and risk, including, but not limited to, forces of nature, geographic and climatic conditions, different hygienic standards, infrastructure problems (including road maintenance,

© EF Education First 2022  |  BC01032022

EF-00000008

transportation delays and accommodation conditions), civil unrest, vandalism, crime, political instability, and terrorism. Medical services or facilities may not be readily available or available at all during all or part of a program and, if available, may not be equal to standards in the participant's home country. I understand that a Service Learning Tour is a physically demanding excursion in a developing country, and I knowingly assume the risks of such an excursion. I further understand that different parts of the world present unique health, disease, and safety concerns, and I agree to review any specific risks related to my destination by visiting the U.S. Centers for Disease Control and Prevention's Traveler's Health website at www.cdc.gov/travel and the State Department's International Travel website at travel.state.gov/content/travel/en/international-travel.html. I assume all risk of bodily injury, death, emotional trauma, property damage, inconvenience, and/or loss resulting from negligence or any other acts of any and all persons or entities, however caused, including, but not limited to, those risks mentioned above. It is my intention fully to assume all of the risks of travel and participation in the program and to release the Released Parties from any and all liabilities to the maximum extent permitted by law.

6. I further agree to release the Released Parties from any and all decisions to cancel, modify, or delay the tour as a result of unforeseeable events that are beyond the reasonable control of EF or which become necessary or advisable for my safety or for the quality of the tour experience.

7. I agree that this Release applies to and binds myself and my minor child enrolling on tour (if applicable) along with my personal representatives, executors, heirs, and family.

8. In addition, EF shall have no responsibility for me whatsoever when I am absent from an EF-supervised activity or for non-supervised activities, such as visits to friends or relatives or during stay-ahead/stay-behind option periods or any other optional period or activity when not escorted by a Tour Director.

9. My tour begins with the takeoff from the EF departure airport and ends upon completion of the flight back to the origination (or other arrival) airport.

10. The air carrier's liability for loss of or damage to baggage or property, or for death or injury to person, is subject to and limited by the airlines' contract of carriage, its tariff, the Montreal Convention or Warsaw Convention and their amendments or both.

11. EF or my Group Leader reserves the right to refuse or cancel my registration at its sole discretion. In such event, standard cancellation policies as outlined in the Booking Conditions apply.

12. I agree to abide by EF's regulations and the directions of my Group Leader, my Tour Director, and EF's personnel during my tour. Failure to do so may result in my Group Leader or EF terminating me from the tour immediately. I understand that to disobey such rules or directions is to waive the right to a refund of any part of my program price, and that my Group Leader or EF may then send me home at my own expense.

13. I agree to abide by all local laws, regulations, and governmental advisories for all locations of my tour while abroad. I understand that if I refuse to follow, abuse, or disobey those laws, even unintentionally, I waive my right to a refund of any part of the program price, and my Group Leader or EF may send me home at my own expense. I also understand that, should local authorities be involved, I will be subject to the laws of the country I am visiting.

14. If I become ill or incapacitated, EF and their employees, my Tour Director, or my Group Leader, may take any action they deem necessary for my safety and wellbeing, including notifying parents/guardians and/or securing medical treatment (at my own expense) and transporting me home. EF retains the right, in its sole discretion, to contact the traveler's parents/guardians with regard to health issues or any matter whatsoever that relates to the traveler's tour. These rights transcend any and all privacy regulations that may apply. In the event of a medical emergency, EF will attempt to cause appropriate treatment to be administered, and the traveler authorizes EF to do so. EF, however, makes no warranty that it will be able to cause effective (or any) emergency treatment to be administered or to be timely administered.

15. I have made the choice to travel with the teacher/Group Leader organizing my group. I understand that this choice is not the responsibility of EF. I understand that my Group Leader is able to make decisions on my behalf, including but not limited to changing the group's requested tour or travel date and requiring that I purchase items such as the Global Travel Protection plan and optional excursions. I understand that a Group Leader must accompany me on tour. If my Group Leader cancels for any reason, EF will ask them to assign a

new Group Leader. If I cancel at this point and choose not to travel with the replacement Group Leader, I will be treated as a standard cancellation. If no replacement Group Leader can be found, I will need to cancel and EF's Standard Cancellation Policy will apply. I may also request that EF place me with a new tour group. If EF cannot find a new tour group for me, EF's Standard Cancellation Policy will apply.

16. If I will be age 20 or older at any time during my tour, I acknowledge that EF will conduct a criminal background check ("CBC") as a pre-condition to travel. If such a traveler refuses to consent to the CBC, it will be deemed a cancellation and EF's Standard Cancellation Policy will apply.

17. This Release and Agreement and EF's Booking Conditions constitute the entire agreement between EF and me with reference to the subject matter herein, and I do not rely upon any promises, inducements, marketing materials, or agreements not herein, including, but not limited to, any oral statements made to me by any agents or employees of EF or by my school or Group Leader. This agreement may be amended or modified only in a writing, signed by EF. The waiver by EF of any provision of this agreement shall in no way affect the remaining provisions of this agreement, and this agreement shall be interpreted as if such clause or provision were not contained herein.

18. This agreement and performance hereunder shall be governed in all respects by the substantive laws of the Commonwealth of Massachusetts. In the event of any claim, dispute, or proceeding arising out of my relationship with EF, or any claim which arises between the Parties, whether or not related to this agreement, the literature for the trip or the trip itself, it shall be resolved solely in courts of the Commonwealth of Massachusetts and/or the United States District Court for the District of Massachusetts.

19. For travelers in Utah only: This tour is not sponsored by any public school, public school district, or other public entity and is operated and organized by a privately owned company.

20. EF may use any film or digital likeness taken of me and any of my comments while on an EF tour as well as any project work (including, but not limited to, online learning programs offered by EF) for future publicity without compensation to me and also use my contact information for future EF promotions. I have read and agreed to the Terms of Use and Privacy Policy outlined at eftours.com/legal-notices and I consent to EF's processing of my personal data.

21. I have read and agreed to the Terms of Use and Privacy Policy outlined at eftours.com/legal-notices, and I consent to EF's processing of my personal data as set forth on page 19.

**LIMITED POWER OF ATTORNEY**
**For parents/guardians of travelers under the age of 18 or a minor under any applicable law**

The tour itinerary may include certain activities (such as whitewater rafting in Costa Rica) that may require the Group Leader to sign a release on behalf of the travelers (who are minors and cannot sign for themselves) in order to allow participation. This Limited Power of Attorney allows the Group Leader to execute these documents on your behalf should the need arise. Your execution of this Limited Power of Attorney is voluntary, and if you choose not to grant this Limited Power of Attorney, your child may still participate in the tour but may not be able to participate in some tour activities. With regard to said activities:

1. I understand and agree that my child, with my permission, has voluntarily chosen to participate in the activities, and we assume all dangers and risks associated with the activities.

2. I do hereby delegate to the Group Leader a "Limited Power of Attorney" and full authority to sign any documents, including, but not limited to, liability releases, permission slips, waivers, and/or any other type of participation agreement required by the operators of any activity for participation. By signing the EF Educational Tours Enrollment Form, I understand and agree to the above.

EF-00000009

# **EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
- - -

| | | |
|---|---|---|
| L.F., | : | NO. 4:23-CV-01038-MWB |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| EF EDUCATIONAL TOURS, | : | |
| EF EDUCATION FIRST | : | |
| INTERNATIONAL, LTD., | : | |
| EF INSTITUTE FOR | : | |
| CULTURAL EXCHANGE, | : | |
| INC., EF EDUCATION | : | |
| FIRST INTERNATIONAL, | : | |
| LTD., SWITZERLAND, | : | |
| DIEGO MANUEL TAYLOR, | : | |
| JENNIFER TAYLOR & | : | |
| JOHN DOES I-V, | : | |
| | : | |
| Defendants. | | |

- - -

VIDEOTAPED DEPOSITION OF MEGAN ALLEN

FRIDAY, JANUARY 3, 2025

10:07 A.M.
- - -

REPORTED BY:

Jean M. Walker, Court Reporter - Notary Public

APPEARING REMOTELY FROM CAMDEN COUNTY, NEW JERSEY

Institute for Cultural Exchange, Inc.?

A.        So the company markets and -- markets tours to teachers, middle school and high school teachers, who want to travel with their students. And then those teachers, in turn, recruit the students who would like to travel with them.  And then we offer support to both of those parties while they're on the tour.

Q.        All right.  Ms. Allen, I just am asking because it appears to me, and I may be mistaken, that you're referring to something in answering your question.  Do you have another computer or something open that you have some information on?

A.        No, I don't have another computer.

Q.        Okay.  And do you have any -- are you relying upon your own personal knowledge for that, are you relying -- for your testimony that you just gave or do you have any documentation or anything in front of you that you're relying?

                MR. ALLEN:  You already asked her and she said she has nothing in front of her.

                MS. AYRES:  I asked her before if she has any documents in front of her, but I'm asking more, I guess, about

purposes of the transcript is EF Education First International, Swiss, do you know when that entity was formed?

A.          I do not.

Q.          Do you know how many employees it has?

A.          I do not.

Q.          Do you know where it is headquartered?

A.          I don't know.

Q.          Do you have any understanding as to what the nature the Swiss entity's business is?

A.          They coordinate the logistics on the ground for the tours.

Q.          And do you -- do you know whether any employees of the Swiss entity were -- attended the tour?

A.          I don't.

Q.          All right.  Let's take a look, Ms. Allen, at a document we'll mark as Exhibit-2.

                    (Exhibit 2, remotely introduced
             and provided electronically to the
             reporter.)

                    MR. ALLEN:  Did we mark
             Exhibit-1?

                    MS. AYRES:  Yes, it was the
             notice of deposition.

Megan Allen
January 03, 2025                                                    32

that?

A.        I do see it.

Q.        All right.  In what way does EF handle the final rooming assignments for travelers?

A.        Well, I think what's referred to there is that we have to collect how many boys and girls and males and females are on the trip because we have to organize the number of rooms according to that.  And then, the group leader is responsible, as they go from hotel to hotel, to dictate who is going to be in each of the reserved rooms.  They convey that to the tour director, due to the language barriers that exist in those countries, and the tour director then relays that to the hotel.

Q.        Okay.  Does EF actually determine which room number which student will be in at any given hotel?

A.        No.

Q.        Is that the function of the group leader on the tour?

A.        Yes.

Q.        Is the group leader an employee of EF Institute?

A.        No.

Q.        Is the group leader an employee of the

Megan Allen
January 03, 2025                                      37

that, but I'm asking you a little bit more specifically whether there's anything else written, provided to group leaders, beyond what we see in the booking conditions about how they should assign rooms?

A.        I don't recall, no.

Q.        Does EF Institute have a written policy with regard to the -- with regard to nightly room checks for the children's rooms while they're on tour?

A.        So we recommend that the group leaders establish a curfew, but that is up to the group leaders to decide on their own.

Q.        Okay.  Does -- to be clear, does EF Institute set a curfew for the children on the tour?

A.        No, the group leaders are responsible for the wellbeing, supervision and discipline of the students at all times.

Q.        How about the Swiss entity, does the Swiss entity assign a curfew for the children on the tour?

A.        No.  Any sort of supervision or discipline falls completely under the group leader.

Q.        Did the EF Institute have any written rules regarding the children on the tour engaging in sexual activity?

Megan Allen
January 03, 2025                                                 67

Q.        Ms. Allen, did you ever have any conversations with Evelio Arriaga concerning this incident?  He was the group leader for the California group, according to the discovery responses.

A.        Yes.

Q.        Tell me about your conversations with him about the incident.

A.        He, basically, just let me know that he was -- we had to discuss how the parents were going to be informed of this, so a lot of the conversations just centered on how we got the information from the parents -- or to the parents. And then, as you're likely aware, Lynzee's father came over to meet her and there were a lot of logistics that we needed to discuss with him when we were facilitating that travel.

Q.        Did Mr. Arriaga share with you how he learned of the incident?

A.        Not that I remember, no.  I can't remember that detail.

Q.        Did you or anyone from the EF entities prepare any type of incident reports concerning this alleged incident in order to document where the information came from and what the content of the

# **EXHIBIT 4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRENTON FALLGATTER, on behalf on his natural and biological minor child, L.F., and MORGAN ASH, on behalf of her natural and biological minor child, L.F. | : : : : : | CIVIL ACTION LAW |
| Plaintiffs | : : | |
| v. | : : : | NO. 4:23-CV-01038 MWB (Hon. Matthew W. Brann) |
| EF EDUCATIONAL TOURS, EF EDUCATION FIRST INTERNATIONAL, LTD., EF INSTITUTE FOR CULTURAL EXCHANGE, INC., EF EDUCATION FIRST INTERNATIONAL, LTD. (SWISS), DIEGO MANUEL TAYLOR, JENNIFER TAYLOR, and JOHN DOES I-V. | : : : : : : : : : | Complaint Filed 6/22/2023    JURY TRIAL DEMANDED |
| Defendants | : | |

**DEFENDANTS EF EDUCATION FIRST INTERNATIONAL, LTD. (SWISS) AND EF INSTITUTE FOR CULTURAL EXCHANGE, INC.'S RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

Defendants EF Education First International, Ltd (Swiss), and EF Institute for Cultural Exchange, Inc., ("EF Defendants") hereby provide these responses to Plaintiffs Trenton Fallgatter, on behalf of his natural and biological minor child, L.F., and Morgan Ash, on behalf of her natural and biological minor child, L.F.'s (collectively "Plaintiffs") first set of requests for admission, first set of interrogatories, and first set of requests for the production of documents in accordance with Rules 36, 33, and 34 of the Federal Rules of Civil Procedure.

**RESPONSES**

**REQUEST FOR ADMISSION NO. 1:**

Defendant EF Institute for Cultural Exchange, Inc., is a corporation in the business of selling and marketing educational tours, including the tour to Spain that the minor Plaintiff, L.F., and individual

1

Taylor Defendants were participating in at the relevant time.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Admitted that Defendant EF Institute for Cultural Exchange, Inc. is a corporation in the business of providing marketing services for educational tours which included the tour to Spain that the minor Plaintiff, L.F., and individual Taylor Defendants were participating in at the relevant time. The remainder of Request for Admission No. 1 is denied, and it is specifically denied that Defendant EF Institute for Cultural Exchange, Inc. sells the educational tours.

**INTERROGATORY NO. 1:**

If the answer to Request for Admission No. 1 is anything other than an unqualified admission, state all facts upon which the denial or partial denial is based.

**ANSWER TO INTERROGATORY NO. 1:**

Defendant EF Institute for Cultural Exchange, Inc. acted as the marketing service provider for Defendant EF Education First International, Ltd. (Swiss). Defendant EF Education First International, Ltd. (Swiss) sells and operates the tours, which included the tour to Spain and the Basque Country that the minor Plaintiff, L.F., and individual Taylor Defendants were participating in June 2022 ("EF Spain Tour").

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:**

Identify and produce all documents related to your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:**

Please refer to Defendants' documents produced and identified as EF-00000002 – EF-00000009.

**REQUEST FOR ADMISSION NO. 2:**

EF Education First International, Ltd. Switzerland is a Swiss business entity that is in the business of operating international educational tours, including the management of the chaperones, group leaders, participants, and/or students involved in the trips, that are sold and marketed by Defendant

2

EF Institute for Cultural Exchange, Inc., including the tour to Spain that the minor Plaintiff, L.F., and individual Taylor Defendants were participating in at the relevant time.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Admitted that Defendant EF Education First International, Ltd. (Swiss) is a Swiss corporation in the business of selling and operating international educational tours which included the sale and operation of the EF Spain Tour.  Admitted that the educational tours are marketed by Defendant EF Institute for Cultural Exchange, Inc.  The remainder of Request for Admission No. 2 is denied, and it is specifically denied that Defendant EF Education First International, Ltd. (Swiss) managed or exercised control over the chaperones, group leaders, participants, and/or students involved in the educational tours and the EF Spain Tour.

**INTERROGATORY NO. 2:**

If the answer to Request for Admission No. 2 is anything other than an unqualified admission, state all facts upon which the denial or partial denial is based.

**ANSWER TO INTERROGATORY NO. 2:**

Defendant EF Education First International, Ltd. (Swiss) sells and operates the educational tours, which included the EF Spain Tour, but does not manage or exercise control over the chaperones, group leaders, participants, and/or students involved in the educational tours.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:**

Identify and produce all documents related to your response to Interrogatory No. 2.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:**

Please refer to Defendants' documents produced and identified as EF-00000002 – EF-00000009 and EF-00000165 – EF-00000175.

**REQUEST FOR ADMISSION NO. 3:**

EF Education Tours is a trade name/fictious name/d.b.a used jointly by EF Institute for Cultural

3

Exchange, Inc. and EF Education First International, Ltd. Switzerland for the services they provide in selling, marketing, and operating and managing the international education tours, including the tour to Spain that the minor Plaintiff, L.F., and individual Taylor Defendants were participating in at the relevant time.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admitted that EF Educational Tours is a trade name and "doing business as" name used by EF Institute for Cultural Exchange, Inc. and EF Education First International, Ltd. Switzerland to identify the international educational tours sold and operated by EF Education First International, Ltd. Switzerland, which included the EF Spain Tour. The remainder of Request for Admission No. 3 is denied, and it is specifically denied that Defendant EF Education First International, Ltd. (Swiss) managed or exercised control over the chaperones, group leaders, participants, and/or students involved in the educational tours and the EF Spain Tour.

**INTERROGATORY NO. 3:**

If the answer to Request for Admission No. 3 is anything other than an unqualified admission, state all facts upon which the denial or partial denial is based.

**ANSWER TO INTERROGATORY NO. 3:**

Defendant EF Institute for Cultural Exchange, Inc. is the marketing services provider for EF Education First International, Ltd. (Swiss). Defendant EF Education First International, Ltd. (Swiss) sells and oversees the operation of the educational tours, which included the EF Spain Tour, and does not manage or exercise control over the chaperones, group leaders, participants, and/or students involved in the educational tours.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

Identify and produce all documents related to your response to Interrogatory No. 3.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

4

Please refer to Defendants' documents produced and identified as EF-00000002 – EF-00000009 and EF-00000165 – EF-00000175.

**REQUEST FOR ADMISSION NO. 4:**

There are no other entities that were selling, marketing, managing, and operating the EF Education Tours international educational tour to Spain that the minor Plaintiff, L.F., and the Taylor Defendants were participating in at the relevant time other than EF Institute for Cultural Exchange, Inc. and EF Education First International, Ltd. Switzerland.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Admitted that there were no other EF entities that sold, marketed, or operated the EF Educational Tour's international educational tours, which included the EF Spain Tour, other than Defendants EF Institute for Cultural Exchange, Inc. and EF Education First International, Ltd. Switzerland. The remainder of Request for Admission No. 4 is denied, and it is specifically denied that Defendant EF Education First International, Ltd. (Swiss) managed or exercised control over the chaperones, group leaders, participants, and/or students involved in the educational tours and the EF Spain Tour.

**INTERROGATORY NO. 4:**

If the answer to Request for Admission No. 4 is anything other than an unqualified admission, state all facts upon which the denial or partial denial is based.

**ANSWER TO INTERROGATORY NO. 4:**

Defendant EF Institute for Cultural Exchange, Inc. is the marketing services provider for EF Education First International, Ltd. (Swiss). Defendant EF Education First International, Ltd. (Swiss) sells and oversees the operation of the educational tours, which included the EF Spain Tour, and does not manage or exercise control over the chaperones, group leaders, participants, and/or students involved in the educational tours.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

5

Identify and produce all documents related to your response to Interrogatory No. 4.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

Please refer to Defendants' documents produced and identified as EF-00000002 – EF-00000009 and EF-00000165 – EF-00000175.

**REQUEST FOR ADMISSION NO. 5:**

There are no other entities responsible for the supervision and care of persons who take the tours sold by EF Institute for Cultural Exchange, Inc., including tours to Spain.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

**OBJECTION:** Defendants object to Request No. 5. on the grounds that it is vague, ambiguous, and the undefined terms "supervision" and "care" are subject to multiple interpretations.

Subject to and without waiving the foregoing objection, denied and it is specifically denied that Defendant EF Education First International, Ltd. (Swiss) managed or exercised control over the chaperones, group leaders, participants, and/or students involved in the educational tours and the EF Spain Tour.

**INTERROGATORY NO. 5:**

If the answer to Request for Admission No. 5 is anything other than an unqualified admission, state all facts upon which the denial or partial denial is based.

**ANSWER TO INTERROGATORY NO. 5:**

**OBJECTION:** Defendants object to Request No. 5. on the grounds that it is vague, ambiguous, and the undefined terms "supervision" and "care" are subject to multiple interpretations.

Subject to and without waiving the foregoing objection, Defendant EF Institute for Cultural Exchange, Inc. provides marketing services for EF Education First International, Ltd. (Swiss). Defendant EF Education First International, Ltd. (Swiss) sells and oversees the operation of the educational tours, which included the EF Spain Tour, and does not manage or exercise control over

the chaperones, group leaders, participants, and/or students involved in the educational tours.

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

Identify and produce all documents related to your response to Interrogatory No. 5.

**RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

Please refer to Defendants' documents produced and identified as EF-00000002 – EF-00000009

and EF-00000165 – EF-00000175.

The EF Defendants' Answers to Interrogatories are signed under the penalties of perjury on this

14th of December, 2023.

*William Dunn*
_____
By: William Dunn, General Counsel

Dated: December 14, 2023

LAWSON & WEITZEN, LLP

By: /s/ Jeffrey P. Allen
_____
Jeffrey P. Allen (Admitted *Pro Hac
Vice*)
MA BBO 015500
Attorney for Defendants EF
Educational Tours, EF
Education First International, Ltd., EF
Institute for Cultural Exchange, Inc.,
EF Education First International, Ltd.
(Swiss), and Jennifer Taylor

88 Black Falcon Avenue
Suite 345
Boston, MA 02210
Tel: (617) 439-4990
Fax: (617) 439-3987
jallen@lawson-weitzen.com

7

McCORMICK LAW FIRM

By: /s/ Brian J. Bluth

Brian J. Bluth
PA 87432
Attorney for Defendants EF
Educational Tours, EF
Education First International, Ltd., EF
Institute for Cultural Exchange, Inc.,
EF Education First International, Ltd.
(Swiss), and Jennifer Taylor

835 West Fourth Street
Williamsport, PA 17701
(570) 326-5131
(570) 601-0768 (fax)
bbluth@mcclaw.com

8

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Defendants EF Education First International, Ltd (Swiss) and EF Institute for Cultural Exchange, Inc.'s Responses to Plaintiffs' First Requests for Admission, Interrogatories, and Requests for the Production of Documents were served on this 14th day of December, 2023, by delivering a copy of same via first-class mail and e-mail to:

Susan Ayers, Esq.
Hill & Associates, P.C.
1700 Market Street, Suite 1350
Philadelphia, PA 19103
sue@hilljustice.com

Edwin A. Schwartz, Esq.
McNees Wallace & Nurick, LLC
100 Pine Street, P.O. Box 1166
Harrisburg, PA 17108
eschwartz@mcneeslaw.com

/s/ Jeffrey P. Allen

Jeffrey P. Allen

9



EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

Date: 05/02/2022

Private and confidential

Serena Avila
Calle Penalara 4 Portal B 1D
Madrid 28224
Spain

Dear  Serena Avila                                                            ,

Enclosed with this letter is the Tour Director Agreement ("**Agreement**") which is intended to clarify the relationship between you, an independent contractor and in your capacity as tour director, and EF Cultural Tours GmbH ("**EF**"), as your client. It is valid for the length of all tours commencing January 1, 2022 onwards. As such, it does not constitute any undertaking that EF will offer you tours or transfers. To indicate your understanding and acceptance of the terms and conditions contained in the Agreement, you must initial the bottom of each page, and sign and date the Agreement in the space provided on page 9 through AdobeSign. A copy of the Agreement will automatically be sent back to you and EF via email.

Once we receive the signed Agreement, you will become eligible for engagement starting from the aforementioned date. EF will include your name in the list of tour directors, to whom, subject to your availability and without guarantee, EF may offer tours, transfers, and other additional tour services for a determined number of days. Accordingly, EF may require services for one or more of the following tours:
(a)      an EF Educational Tour;
(b)      an EF Go Ahead Tour;
(d)      an EF Ultimate Break Tour; or
(e)      an EF Gap Year Tour.

Each of the above tours is a registered trademark of EF or its affiliates.

Tours will be offered via IRIS, an EF proprietary web interface. The tour service request will include details as to itinerary, start date, duration and tour code, which you will be free to accept or reject via IRIS. You should reply within 7 days if you accept the tour(s) service request, and keep EF informed of any changes to your personal contact information.

Where applicable, any subsequent offers of tours will be based on performance and general aptitude.

We look forward to engaging your services in one or more of the above tours. Kindly sign and return the Agreement indicating your acceptance of its terms.

If you have any questions, please do not hesitate to contact us.

With kind regards,
Tour Director Department

1                                    *MGA*

EF-00000165



EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

## Tour Director Agreement

This Agreement is made on  05/02/2022          between:

EF Cultural Tours GmbH whose registered office is at Selnaustrasse 30, CH-8001 Zurich, Switzerland, (**EF**); and

Serena Avila
of
Calle Penalara 4 Portal B 1D
Madrid 28224
Spain
(the **Tour Director**)

**1.     Definitions**

1.1     Unless defined otherwise, capitalized letters used in this Agreement shall have the meaning ascribed to them in <u>Annex 1</u>.

**2.     Tour Director Services**

2.1     The Tour Director agrees to do one or more of the following tours on behalf of EF: EF Educational Tour, EF Go Ahead Tour, EF Ultimate Break Tour, or EF Gap Year Tour.

2.2     In particular, the Tour Director agrees to perform the following tour related services to EF:

  a. Promote overall satisfaction and reassurance among EF's customers by maintaining a consistently high level of service on tour, including but not limited to:
   i. implementing the tour as sold to EF's customers or designing and subsequently implementing any itinerary changes;
   ii. communicating regularly with the group as to the upcoming itinerary, whether by verbal briefing, and/or posting tour information posters in hotels and/or via other communication channels;
   iii. organising and/or suggesting free-time activities according to customer interest;
   iv. enhancing the educational and cultural content of the tour including, but not limited to, providing engaging activities and commentary throughout;
   v. providing an orientation to all destinations visited;
   vi. helping EF implement any emergency and/or insurance procedures on-tour;
   vii. helping EF impart safety information to its customers, rectifying or reporting safety concerns and conducting and submitting a daily hotel safety check, as specified by EF; and

2                    *MGA*



EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

viii. discussing any points of concern with customers as they arise and escalating to EF where necessary, and by encouraging customers to regularly complete the tour evaluation and ensuring that customers have completed their tour evaluation by the end of the tour.

b. Maintain good supplier relationships by:
   i. reconfirming tour arrangements as listed in the Tour Director itinerary provided by EF;
   ii. not seeking to contract on behalf of EF any additional services, such as additional coach services, without prior agreement.

c. Ensure that post-tour administration may be handled efficiently by:
   i. completing and transmitting any company-specific paperwork as requested, to be submitted through the Tour Director App or emailed to EF on or before the last day of tour;
   ii. handling any EF funds safely, properly accounting for any tour-related expenses and customer-specific funds; and
   iii. issuing the relevant receipt or invoice, as the case may be.

2.3    Furthermore, the Tour Director may provide non-tour-related ad hoc services to EF which shall be governed by the terms of this Agreement. The parties shall agree on the scope and the fee of such ad hoc services on a case by case basis.

2.4    EF shall offer tours and/or certain other services to the Tour Director via IRIS. With the acceptance of each Service by the Tour Director via IRIS within 7 days, EF and the Tour Director have bindingly agreed that the Tour Director may render a Service as governed by the terms of this Agreement. For the avoidance of doubt, regardless of whether a Tour Director has agreed to render a Service or whether the Tour Director was prevented from rendering a Service due to circumstances beyond the Tour Director's control, Fees are only owed for Services that were fully and successfully completed by the Tour Director (see Clause 4 below).

**3.    Tour Director Obligations**

3.1    For each tour, the Tour Director shall:

a. familiarise himself/herself with the destinations listed in the tour itinerary;
b. exercise full autonomy to run the tour within EF's general frameworks;
c. offer additional services to EF's customers as the Tour Director deems acceptable, including, without limitation, the running of additional activities;
d. perform the Services with due diligence, professionalism and in a safe and competent manner consistent with industry standards;
e. comply with all applicable laws and regulations;
f. not introduce venues or activities that endanger animal welfare. Instead, if relevant in the context of a tour, the Tour Director shall only introduce those with a high standard of animal welfare.

3.2    In the event of any claim, complaint, action, suit, investigation or other proceedings against EF, the Tour Director agrees to cooperate with EF, to provide

3

*MGA*

EF-00000167



EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

all information and documentation in their possession and to take best efforts to assist EF responding and defending against thereto. EF shall reimburse the Tour Director for reasonable out-of-pocket expenses incurred by the Tour Director in connection with such undertakings.

## 4.    Fees

4.1    Upon successfully concluding each tour and submitting the corresponding supporting documents, EF shall pay the Tour Director a Fee per day on tour in the amount discussed with the regional office and confirmed by the EF Tour Director Department via e-mail. The Fee, as confirmed via e-mail, is applicable to all tours starting after receipt of the confirmatory e-mail until a new Fee is confirmed via e-mail by the EF Tour Director Department.

4.2    The Tour Director will receive other agreed Fees linked to the provision of Services. These amounts will be paid upon the conclusion of the tour and upon presentation of all supporting documents. Full and up to date details of these allowances are provided by EF.

4.3    EF shall pay the Tour Director a fixed percentage of certain optional activities sold to customers of EF while on tour, as follows:
   a.  For EF Educational Tours and EF Ultimate Break Tours: 5% of the gross income for those activities that are contracted initially by the customers in advance of the tour, and for EF Go Ahead Tours: 10% of the gross income for those activities that are contracted initially by the customers in advance of the tour.
   b.  For EF Educational Tours, EF Ultimate Break Tours and EF Go Ahead Tours: 10% of the gross income for those activities contracted by the customers whilst on the tour.

4.4    The Tour Director shall submit all relevant supporting documents within 8 days of completion of each tour which shall be approved by EF before any Fee shall be payable. EF will transfer all Fees payable to the Tour Director to a personal pre-paid card (**Personal Cash Card**) or bank account, according to the preference indicated by the Tour Director. For the avoidance of doubt, EF shall pay the first Fee to the Tour Director provided the criminal background information of the Tour Director has been received by EF.

4

*MGA*



EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

4.5     The Fee shall only be payable in respect of the Services actually provided. Nothing in this Agreement entitles the Tour Director to be paid a retainer when there are no Services provided (including for the avoidance of doubt, where the Contractor is unable to provide the Services due to illness or injury or where EF has cancelled a tour in EF's sole discretion).

**5.     Expenses**

5.1     EF shall provide the Tour Director with a corporate cash card (**EF Cash Card**) credited with a Float for each tour. The Tour Director should use the EF Cash Card to cover payment of any cash expenses to be met during each tour on behalf of EF including, but not limited to, those related to travel, accommodation, visits, restaurants, excursions, and, in general, the activities included in the Tour Director Itinerary. The Tour Director may only withdraw funds required to run the tour and shall leave any excess money on the EF Cash Card. In addition, EF may place vouchers, coupons and other similar documents at the Tour Director's disposal for covering the expenses of tour.

5.2     Expenses will not be reimbursed without receipts. Only costs included in the Tour Director Itinerary or approved by EF staff will be reimbursed.

5.3     The Tour Director shall submit all relevant supporting documents within 8 days of completion of the tour.

5.4     The Tour Director must return any unused tickets and vouchers within 8 days of the end of the tour.

5.5     The Tour Director agrees to reimburse any expenses overpaid by EF within 30 days following the debriefing. EF is entitled to offset any funds that the Tour Director owes to EF with Fees payable to the Tour Director.

**6.     Equipment**

6.1     The Tour Director is required to provide their own material and equipment including, but not limited to, a smartphone with the Tour Director App installed, maps and educational resources.

6.2     EF shall make available to the Tour Director support materials and sales materials which shall contain all necessary supplier and customer information to enable the Tour Director to conduct the tour.

6.3     For the avoidance of doubt, any documents or related material which EF could occasionally make available to the Tour Director remain the property of the EF and must be returned by the Tour Director at any time on EF's request.

**7.     Personal Data**

7.1     EF takes its data protection obligations very seriously and complies with its legal obligations under the General Data Protection Regulation and local data protection

5                                    *MGA*

EF-00000169



laws to protect the privacy and security of Tour Director personal information. As a data controller, EF is required to inform the Tour Director how EF holds and uses the Tour Director's information. Full details of how EF collects, uses and retains personal information about the Tour Director, together with their rights and details of their data protection obligations, are enclosed hereto in the EF Tour Director Privacy Notice as <u>Annex 2</u>.

7.2     The Tour Director may have to process personal data about EF's customers or other members of the group travelling with EF (such as e.g. names, passport information, birthdays, etc.) in order to facilitate check-ins and render other tour related Services under the Agreement. The Tour Director shall:

    a. process personal data only to the extent reasonably necessary for the performance of the Agreement and in accordance with all documented and lawful instructions from EF;

    b. take and implement all appropriate technical and organizational procedures and measures to prevent the unauthorized or unlawful processing of personal data and accidental loss or destruction of, or damage of personal data;

    c. promptly notify EF of any actual, suspected, accidental or unauthorized access, disclosure, loss or use of personal data;

    d. provide EF with full co-operation and assistance in complying with any request to access personal data that is made by a data subject;

    e. provide EF with all information necessary to demonstrate compliance with applicable privacy and data protection legislations and allow for, and contribute to, audits and inspections conducted by EF or any auditor mandated by EF;

    f. treat the personal data as Confidential Information; and

    g. after each tour or at the termination or expiration of the Agreement, delete all the personal data collected or received by the Tour Director."

## 8.    Confidentiality

8.1     The Tour Director acknowledges that, in the course of providing service to EF, the Tour Director will have access to confidential information belonging to EF.

8.2     The Tour Director shall not make use of or divulge to any person any confidential information:

    a. concerning EF's business which comes to their knowledge during the course of or in connection with the provision of the services to EF;

    b. concerning the business of any person having dealings with EF and which is obtained directly or indirectly in circumstances in which EF is subject to a duty of confidentiality in relation to that information.

8.3     Confidential information includes, but is not limited to, important EF material and confidential and/or proprietary information, and unique and valuable information, which affects the successful conduct of the business and EF's goodwill.

8.4     The Tour Director acknowledges that EF shall be entitled to recover its damages, in addition to any injunctive remedy that may be available, for any confidentiality breach.

6            *MGA*



EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

## 9.    Term and Termination

9.1    This Agreement shall come into force on January 1st, 2022. Unless terminated by either party as per December 31, 2022 (or as per the end of any renewal term) by giving one-month prior notice, this Agreement shall automatically renew for additional terms of one year each.

9.2    In the event of breach of this Agreement, the non-breaching party shall notify the breaching party in writing about the breach and the desire to terminate. If the breach is not curable or was not cured within a reasonable time, the non-breaching party may terminate this Agreement immediately by written notice to the other party.

9.3    EF may terminate this Agreement at any time without the need for advance notice if the Tour Director fails to meet the standards expected and described herein. In particular, EF may remove the Tour Director from a tour and terminate this Agreement immediately:

   a. in case of the Tour Director's emotional or intimate involvement with any participant, whether real or perceived by others, and as assessed by EF in its sole discretion; or
   b. if the Tour Director is guilty of fraud, or acts in a manner which, in EF's reasonable opinion, has brought or is likely to bring the Tour Director or EF into disrepute, or is convicted of an offence that is relevant in connection with the performance of this Agreement.

9.4    By agreeing to this Agreement, the Tour Director authorises EF, except where prohibited by law, to collect and/or carry out a complete criminal background check on the Tour Director each year, for the purpose of assessing their suitability for the tour assignments. This information will either be collected directly from a third party or through the Tour Director.

9.5.    The Tour Director shall inform EF about any crime or offence of which the Tour Director has been accused or convicted during the term of this Agreement or in the past 5 years that may be deemed relevant for the performance of the duties outlined in this Agreement.

9.6    EF may terminate this Agreement only:

   a. if the crime of which the Tour Director has been convicted in the past is relevant for the duties performed pursuant to this Agreement; and/or
   b. if the crime committed is deemed very serious in nature; and/or
   c. if the Tour Director's criminal history or accusations are likely to result in reputational damage for the Company.

9.7    EF may also terminate the Agreement if the Tour Director fails to provide updated criminal background information upon EF's request.

9.8    Upon termination of this Agreement, the Tour Director shall:
   a. deliver to EF all books, documents, papers, materials, records, correspondence

7                                                        *MGA*

EF-00000171

EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

(on whatever media and wherever located) relating to EF's business and its customers, and any other property which may then be in their possession or under their power or control; and

b. delete any information relating to EF's business or its customers stored on any computer, disk, memory stick or other storage media which is in the Tour Director's possession or control outside EF.

9.9    Clauses 8 and 10 shall survive the termination of this Agreement.

**10.    Independent Contractor Status**

10.1    Nothing contained in this Agreement shall be construed or have effect as constituting an employment, partnership, joint venture, agency, worker status or any other relationship whatsoever, except that of independent contractors, between the Tour Director and EF.

10.2    The Tour Director will have no authority to act in the name of, or to incur any obligation binding on EF.

10.3    As an independent contractor, the Tour Director shall not be eligible to participate in any EF employee benefit plans, including paid vacation days, or to receive other benefits otherwise provided to employees of EF.

10.4    The Tour Director shall be responsible for any and all payments due to applicable taxation and other governmental authorities in respect of the Fees paid hereunder.

10.5    The Tour Director does not render services exclusively to EF and can work for other companies that they choose except during the EF tours that they accepted.

**11.    General**

11.1    This Agreement is the sole and entire agreement between the Tour Director and EF with respect to the subject matter hereof and supersedes and terminates all prior agreements, understandings, arrangements and discussions.

11.2    This Agreement may not be assigned or transferred by the Tour Director without the advance written permission of EF.

11.3    This Agreement may not be amended except by a writing signed by the Tour Director and EF. No failure by either party to exercise, and no delay in exercising, any right hereunder will operate as a waiver of such right, nor will any single or partial exercise by either party of any right hereunder preclude any other or future exercise of that right, or any other right, by that party.

11.4    N/A

11.5    Unless instructed otherwise by EF, the Tour Director shall not take any pictures or make video recordings of EF's customers (or other persons joining the group of EF customers) or in any other way use or publish information (for advertising purposes

*MGA*

EF-00000172



EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

or otherwise) relating to the EF customers (or other persons joining the group) without the prior written consent from both EF and the EF customer's legal guardian respectively.

11.6    In the case that the Tour Director cannot perform a service and/or a tour that they had previously accepted, they should inform EF as soon as possible. They should provide to EF the name of a suitable substitute Tour Director who, subject to EF's approval, can carry out the tour.

11.7    This Agreement shall be governed by the laws of Switzerland without regard to conflicts of laws principles. Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce. The place of arbitration shall be in Zurich, Switzerland, and the arbitration proceedings shall be conducted in English.

I have read and understood the terms of this Agreement and hereby accept the terms and conditions set out herein:

Date:  May 2, 2022

On behalf of EF Cultural Tours GmbH                    On behalf of the Tour Director

_____                    _____

Marco Giordano (by power of attorney)                 Name:  Marta Gómez Ávila

EF Supplier Code:  MAD-01655

9                                                     MGA

EF-00000173

EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

## ANNEX 1: DEFINITIONS

**EF Cash Card** means a payment card supplied by EF for use by the Tour Director in relation to expenses incurred in the proper performance of the Services.

**Personal Cash Card** means the Tour Director's own cash card onto which they can choose to be paid the Fees and ad-hoc service payments and reimbursements to which they are entitled under this Agreement.

**EF** means EF Cultural Tours GmbH.

**Fee** means any amounts owed by EF to the Tour Director pursuant to Section 4 of the Agreement.

**Float** means the amount of credit provided by EF on the EF Cash Card to pay for expenses.

**IRIS** means the EF proprietary web interface used to offer and accept tours and certain other services that shall be governed by the terms of this Agreement.

**Services** means the services to be provided by the Tour Director on the terms contracted in this Agreement as described in Clause 2.

**Tour Director App** means an app available to Tour Directors leading EF tours containing relevant supplier and customer information required to run the tour.

EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

*MGA*

EF-00000174



EF Cultural Tours GmbH
Selnaustrasse 30
CH-8001 Zurich
Switzerland

## ANNEX 2: EF TOUR DIRECTOR PRIVACY NOTICE

In order for EF Cultural Tours GmbH (hereinafter referred to as "EF") to be able to fulfil its legal and contractual obligations and in order to establish a safe and efficient administration, such as to be able to pay fees, administer expenses, contact tour directors to receive their offers for tours, EF needs to collect, process and store personal data regarding tour directors in accordance with what is set out in this Privacy Notice.

The personal data that will be collected by EF include information provided by you as an independent contractor, as well as information required in order for EF to fulfil its legal and contractual obligation as your client, such as e.g. name, home address, telephone number, passport information, customer feedback in relation to services provided by you, emergency contacts and criminal background check information made available by you.

The personal data will be processed during the entire term of the agreement and for a period of time after the agreement to be able to meet mandatory legal requirements and to address potential claims of a tour director.

The tour director is informed that due to the fact that EF is part of a group of companies with business activities in several different countries, the relevant personal data may be shared with other group companies in the EF group having a need to receive such data for the purpose of EF to coordinate tours. Such group companies may be located outside the tour director's own country, including countries outside the EEA/Switzerland that do not ensure the same level of protection as the country where the tour director is domiciled. Personal data may also be handed over to companies engaged by EF to carry out certain processing on EF's behalf (personal data processors) or on the third-party companies' behalf (separate data controllers). The services which may be requested are, for example, the provision of cash cards, the check-in with hotels or transport services and IT services. Such companies may also be located outside the EEA/Switzerland.

Unless the European Commission has decided that a country ensures an adequate level of protection for personal data, EF will use contracts based on the European Commission's standard data protection clauses or rely on the Privacy Shield for international transfers of personal data to ensure compliance with applicable law. In case personal data actually is transferred to third countries, more detailed information, as well as the applicable measure for each third country transfer, can be obtained from EF.

You are entitled to receive information on what personal data concerning yourself that is being processed, and the purpose of such processing. You are also entitled to request for any erroneous, misleading or incomplete personal data to be corrected. You may also have the right to have some of your personal data transferred in a structured and commonly used and machine-readable format to yourself or another data controller.

If you wish to lodge a complaint regarding the data processing, you should turn to your national data protection authority (contact details are available through this link: http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=612080) or another relevant authority in another country.

Please note that this Privacy Notice may be amended from time to time. In order to read the latest version, please access it here: https://td.eftours.com/legal-notices/.

*MGA*

EF-00000175

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| L.F. | : | |
| | : | CIVIL ACTION LAW |
| Plaintiff | : | |
| | : | NO. 4:23-CV-01038 MWB |
| v. | : | (Hon. Karoline Mehalchick) |
| | : | |
| EF EDUCATIONAL TOURS, | : | |
| EF EDUCATION FIRST | : | |
| INTERNATIONAL, LTD., EF INSTITUTE | : | Complaint Filed 6/22/2023 |
| FOR CULTURAL EXCHANGE, INC., EF | : | |
| EDUCATION FIRST INTERNATIONAL, | : | |
| LTD. (SWISS), DIEGO MANUEL | : | |
| TAYLOR, JENNIFER TAYLOR, and | : | JURY TRIAL DEMANDED |
| JOHN DOES I-V. | : | |
| | : | |
| Defendants | : | |

**DECLARATION OF MEGAN ALLEN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Megan Allen, make the following declaration under penalty of perjury:

1.      I am currently the Vice President of Customer Experience at EF Institute for Cultural Exchange ("EF Institute"). At the time of the alleged incident at issue in this case, I was the Vice President of On-Tour Support at EF Institute.

2.      The following declaration is made based on my own personal knowledge or information that I have obtained by review of the regularly kept business records of EF Institute.

3. EF Education First International, Ltd. is a Swiss entity ("EF Education First") which operates educational tours for student groups outside of the United States. These tours are marketed as "EF Educational Tours."

4. There is no other separate legal entity called EF Education First International Ltd. organized in the Commonwealth of Massachusetts or with a principal place of business in Massachusetts.

5. EF Institute has a principal place of business in Massachusetts and acts as a marketing service provider for EF Education First and markets EF Educational Tours in the United States.

6. "EF Educational Tours" is not a legal entity with a separate legal existence.

7. Other than EF Institute and EF Education First, there are no other EF-affiliated entities involved in the marketing or operation of EF Educational Tours.

8. One of EF's program offerings is EF Educational Tours, which are all-inclusive group tours designed primarily for middle and high school students.

9. EF operates the tours, which are marketed in the U.S. to schools and teachers by EF Institute.

10. Unlike traditional travel service providers, the EF Defendants secure travel services in bulk from airlines, hotels, bus companies, and other vendors and package them for group educational tours.

11. The EF Defendants do not own or operate any of the travel related services that make up the tours, such as the transportation, hotels, or excursions.

12. EF Educational Tours are marketed to schools and teachers, who make them available to their students in order to enhance their academic curriculum.

13. This model allows groups of students to experience international travel with their friends and teachers at a lower cost than would be available to them as individual travelers in the traditional travel market.

14. EF strives to make its Educational Tours affordable for students. One of the key ways it does so is by utilizing Group Leaders—typically teachers—to assist in selecting, planning, and running the tours for groups of their own students.

15. Group Leaders select or customize itineraries and host information sessions for schools. Interested students' parents can enroll their children through EF's enrollment portal.

16. Once the tour is designed, the Group Leaders host information sessions at schools and interested students' parents can enroll their children through EF's enrollment portal.

17. EF Educational Tours are offered to groups of students all over the country.

18. Enrollment is optional for students, not a required part of the curriculum.

19.    To keep tours affordable, tour groups with the same itineraries are consolidated to achieve economies of scale by, for example, ensuring that tour buses used can be fully occupied.

20.    A group may select a private tour option so that they will not be combined with another group, but it typically comes at an additional cost to students. This decision is up to the Group Leaders who plan the trip. *See* Booking Conditions.

21.    While traveling, Group Leaders are responsible for student guidance and discipline.

22.    Tour Directors, independent contractors who are in-country local travel specialists, assist with local logistics and travel arrangements.

23.    As a condition of enrolling and participating in an EF Educational Tour, student travelers are required to electronically sign EF's Booking Conditions/General Terms and Conditions ("Booking Conditions").

24.    If a traveler is a minor, he or she must have a parent or legal guardian sign the Booking Conditions, either in paper or electronic form.

25.    The Booking Conditions contain a choice of law clause specifying that Massachusetts substantive law shall be applied to the agreement and performance under the agreement.

26.    Students from many different states participate in EF Educational Tours, so enforcement of the choice of law provision in the Booking Conditions is

important to allow uniformity and predictability as to how the relationship between the EF entities and participants is governed.

27.    No traveler may enroll in an EF Educational Tour unless they agree to be bound by the Booking Conditions.

28.    I have reviewed EF Institute's business records relating to the June 2022 EF Educational Tour to Spain and the Basque Region (the "Tour").

29.    The document labeled EF-00000001 produced by the EF Defendants is a true and correct copy of a screenshot of the electronic record of L.F.'s enrollment in the Tour.

30.    According to EF Institute's business records, Plaintiff L.F. applied to enroll in the Tour on June 19, 2021. *See* EF-00000001.

31.    EF Institute's electronic record keeping system relating to enrollment indicates that the Booking Conditions were electronically signed on June 19, 2021 at 10:29:57 PM by Morgan Ash. *See* EF-00000001.

32.    The document labeled EF-00000002-00000009 is a true and correct copy of the Booking Conditions that Morgan Ash electronically signed.

33.    The document labeled L.F. 0483-0496 appears to be a true and correct copy of a brochure provided to parents of students enrolled in the Tour, which includes a copy of the Booking Conditions.

34. Neither EF Institute nor EF Education First owned or operated the hotels where participants on the Tour stayed.

I, Megan Allen, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge and understanding.

Executed on July 10, 2025

DocuSigned by:

*Megan Allen*

FBE9C25D606F487...

Megan Allen
Vice President, Customer Experience
EF Institute for Cultural Exchange, Inc.

# EXHIBIT 6

☎(tel:18004571300)

(/)

**About us (/about-us/)**

# Who we are

At EF (Education First), we believe that the world is better when people try to understand one another. Since 1965, EF has helped millions of people see new places, experience new cultures, and learn new things about the world and about themselves.

# Opening the world through



**Academic study**



**Educational travel**

# education

Our experiential learning programs—focused on language, travel, cultural exchange, and academics—help turn dreams into opportunities for people of all ages and nationalities.

Interested in finding more about our programs (/pg/)?

**Earn a degree, certificate, or credential.**

We offer degree programs at secondary, university, and post-graduate levels. Students who attend our schools go on to study at the world's best universities. We are also associated with Hult International Business School, renowned for its top-ranked graduate and undergraduate programs.

**Turn the world into your classroom**

EF leads expertly guided tours to the world's greatest sights and landscapes. Itineraries are tailored to the needs of teachers and students at all levels. We also develop adventures and travel experiences for people of all ages and interests.



## Learn a language

**Communicate with the world in 10+ languages**

An EF language course can help you talk to the world, in English and other widely spoken languages. We have fully accredited schools in 50 of the world's most exciting cities, as well as EF English Live – the world's largest online English school.



## Cultural exchange

**Experience life as a local**

Our exchange programs give young adults the chance to experience America as a local. Host families provide safe and secure homes in US communities for our high school students choosing to study for a year abroad.



# Global reach

With staff and locations in time zones around the world, our vast global presence means that EF never sleeps...

| **1965** | **100+** | **646** |
|---|---|---|
| Founded in Sweden | Countries/regions | Offices and schools |

Company fact sheet(https://a.storyblok.com/f/102671/x/d9d6df79d4/ef-2025-fact-sheet.pdf?cv=1739435795822)



# A heritage of industry firsts

In 1965 Bertil Hult brought a group of Swedish students to Brighton, England. The idea was simple — students would learn English while traveling on holiday. Over 60 years later, millions of people have created opportunities for themselves through EF.



### 1980's

EF launches educational tours in the US and provides education services to the Olympic Games for the first time at the Seoul 1988 Summer Olympics

### 2000's

EF opens higher edu programs and intern boarding schools

### 1965

Bertil Hult invents the concept of English language travel



### 1970's

Government deregulation of air travel makes mass tourism possible. EF opens in many new markets with programs such as cultural exchange for high school students

### 1990's

The internet becomes publicly available and EF starts what is today the world's largest online language school





# EF Impact

At EF, everything we do ripples outwards, transforming people, communities, and ultimately, the planet. Our impact defines who we are as a company and how we contribute to a better world.



## Taking climate action with the EF Forest Initiative and WeForest

(https://impact.ef.com/stories/taking-climate-action-with-the-ef-forest-initiative-and-weforest/)

## Leveraging the power of education to help Médecins Sans Frontières provide lasting solutions to global crises

(https://impact.ef.com/stories/our-support-of-medecins-sans-frontieres-doctors-without-borders/)

More stories ⬀(https://impact.ef.com/)



# Working at EF

A career with EF combines the support and opportunity of a large organization with the spirit and energy of a small business. We look for thinkers and doers - creative, collaborative, and motivated people who are excited by education, communication, and travel.

01:02

Careers at EF (https://careers.ef.com/)

# Highlights

Updates from the world of EF

**EF Pro Cycling**

Our international pro cycling team is on
a quest to share our story and our sport.

# Find our offices

Get in touch with one of our offices, locally or worldwide, to discover how far EF can take you.

View office details(/contact/)

# Learn more about EF

Browse further pages within EF's About Us site.

## EF Impact

How we're making a difference in the world.

More on EF's impact (/about-us/impact/) (/about-us/impact/)

## Research and innovation

Driving the revolution in education.

Research and innovation at EF (/about-us/research-and-innovation/) (/about-us/research-and-innovation/)

> Who we are

(/)

**Programs by age**                                    ⌄

**Popular programs**                                   ⌄

**Discover**                                           ⌄

**About EF**                                           ⌄



United States / English

Privacy policy (/legal/privacy-policy/)

Terms and Conditions (/legal/terms-and-conditions/)

Cookies (/legal/cookie-policy/)

© Signum International AG 2025. All rights reserved. (/legal/contact-us/)

# **EXHIBIT 7**

# You've got friends in all the places

Here at EF, support isn't one-size-fits-all. There's our on-the-ground presence in 114 countries (that's the big, sweeping kind). But there's also the team we build around every teacher who leads an educational tour with us. From day one, you can lean on your EF people for the kind of one-to-one traveler support that'll make a huge difference in your group's travel experience.

**Meet your people**



## The wind beneath your (airplane) wings

Ready to meet the experts who'll come together to make sure your tour experience is safe, smooth, and rich with possibility for your students? Each member of your team serves a crucial role—whether it's helping you explore destinations over a call or text or organizing flights and meals behind the scenes.



## The magic makers

Say hi to your new besties, your **Tour Consultant** and **EF Experience Specialist**. Together, they make up your personal EF Travel Team. Each of these experts has a specialized skill set, but their goal is the same: making sure you get individualized traveler support and have the best tour ever.



## The travel sidekick

Meet your **Tour Director**, your rock on tour. As trained guides who speak the language of travel (and navigate the local language as well), no one is better equipped to lead the way. Frankly, they're the best part of any EF trip.



## The parent whisperer

Consider our **EF Traveler Support Specialists** human search engines for all things EF. They'll work with families to answer any what-ifs and how-tos, from questions about payment plans to documenting dietary preferences.



# The hometown hero

This could be you someday! Spread out all across the U.S., our **Global Education Ambassadors** are teachers who've led plenty of EF tours, and they're eager to share their expertise. Want to talk with one who's close by? We'll connect you (https://www.eftours.com/support#gea-cta).

# Get a closer look

Go behind the scenes and meet the people who bring your EF tour to life.



**Learn about your EF Travel Team**                                                                4:52



**Meet our amazing Tour Directors**                                      5:43

# The team behind your team

In addition to your incredible EF Travel Team and Tour Director, there are even more people building your EF tour from the ground up. Some call them our Education Team, Market Development Directors, Tour Experience Managers, and Flights Coordinators—we just call them the dream builders.

Discover what they do(https://blog.eftours.com/article/who-builds-your-ef-tour-behind-the-scenes/)

# Easier for you, every step of the way

You don't know it yet, but our people are already working hard to provide you with a better educational tour experience than you can get anywhere else. From the logistics genius in Zurich who artfully balances city highlight stops to the EF Traveler Support Specialist in Boston perfecting parent communication plans, consider our team *your* team from the get-go.



### ① The way, way before

- Market Development works with the Education Team to design trips that align with your classroom
- Sourcing & Contracting searches for on-tour partners for lodging and activities, while Flights Coordinators research the best routes to and from your closest airport
- Tour Consultants help pick the best tour for your students and support you with student sign-ups



### ② Preparing for takeoff

- Speak with your EF Experience Specialist for tips, reminders, updates, and anything else you may need
- Connect with Global Education Ambassadors (who are also teachers!) who've done all this before
- Point families toward Traveler Support for the questions you can't answer



### ③ On the ground

- Your Tour Director takes care of your group from the moment you clear customs
- Your Tour Experience Manager reads your evaluations in real time to check that everything's running smoothly
- Safety & Incident Response is on standby 24/7 to ensure a train strike or a sprained ankle won't slow things down



### ④ Back home again

- Your Tour Consultant can help build an ongoing travel program at your school
- Market Development and the Tour Experience Team use your feedback to make your trip even better next time

## Say hi anytime

We love being friend-zoned. Plus, we've got experienced Group Leaders who want to meet you and help answer all your questions about student travel.

Plan a phone date()

**We're here to help**

Let's chat 💬 (https://www.eftours.com/contact-us#chatwithus-a354035d-36806720-e25a5e1e-4b6de862-0a365dc8-c5fea13c-52a63fd5)

Contact us (https://www.eftours.com/contact-us)

Help Center (https://www.eftours.com/help-center)

**Learn more**                                                                                    ⌄

**Other EF brands**                                                                               ⌄

**Stay connected**



(https://www.instagram.com/eftours/?(https://tiktok.com/@eftours/)(https://facebook.com/eftours/)(https://pinterest.com/eftours/)(https://youtube.com/eft
hl=en)



© Signum International AG 2025. All rights reserved.

Privacy Policy and Legal Notices (/legal/privacy-policy/)

# EXHIBIT 8

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


L.F.,                              :
                                   :
       PLAINTIFF                   :
                                   : CIVIL ACTION - LAW
       V                           :
                                   : NO. 4:23-CV-01038 KM-DFB
EF EDUCATIONAL TOURS,EF            :
EDUCATIONAL FIRST                  :
INTERNATIONAL, LTD., EF            :
INSTITUTE FOR CULTURAL             :
EXCHANGE, INC., EF EDUCATION       :
FIRST INTERNATIONAL, LTD.,         :
DIEGO MANUEL TAYLOR, JENNIFER      :
TAYLOR AND JOHN DOES I-V,          :
                                   :
       DEFENDANTS                  : JURY TRIAL DEMANDED
```

```
       VIDEOTAPED
       DEPOSITION OF: LYNZEE FALLGATTER

       TAKEN BY:        EF DEFENDANTS

       BEFORE:          TAMMY J. BAKER, REPORTER
                        NOTARY PUBLIC
       DATE:            JANUARY 9, 2025, 10:04 A.M.
       PLACE:           McNEES, WALLACE & NURICK, LLC
                        100 PINE STREET
                        HARRISBURG, PENNSYLVANIA
```

```
          Magna Legal Services
             866-624-6221
            www.MagnaLS.com
```



Page 20

MS. AYERS:  Same objection.

(Question read.)

THE WITNESS:  I did not think that I was breaking any rules by exiting my room, no.

BY MR. ALLEN:

Q.  Did you think you were breaking any rules by going to Diego's room?

A.  I was not planning on going to his room.

Q.  How did you end up at his room?

A.  Because he pulled me into his room.

Q.  We'll get to that.  How did you get to the vicinity of his room.

A.  I left my room.

Q.  And what time did you leave your room?

A.  I can't remember.  It was sometime around midnight.

Q.  So you left your room around midnight and you walked to Diego's room?

A.  His room was right next door to my room.

Q.  But you walked to his doorway, correct?

A.  I walked outside of my room.

Q.  Okay.  And what did you tell your roommates -- did you tell them where you were going?

A.  I told them I would be right back.  Yes, I told them I was going to meet someone in the hallway.



Page 21

Q.  Did you tell them who you were meeting?

A.  They knew who I was meeting, yes.

Q.  How did they knew you were meeting?

A.  Because I told them.

Q.  That was my question.

A.  Okay.

Q.  Did you tell them who you were meeting?

A.  Yes.

Q.  And who were they?

A.  Anjelina and Annabelle.

Q.  You told them you were leaving your room to meet Diego?

A.  Yes, I told them I was meeting him in the hallway.

Q.  Okay.  And you told them you'd be right back?

A.  Yes.

Q.  At any time to your knowledge did they come looking for you on that morning of June 26th?

A.  No.

Q.  To your knowledge?

A.  To my knowledge no.

Q.  Did you tell anyone else that you were leaving your room around midnight on June 26th to meet Diego?

A.  No, I did not.

Q.  Did you tell your group leader?



Page 26

students in the hallway?

A.   There were students in the lobby, but there were no students in the hallway.

Q.   You didn't have a view of the lobby, did you?

A.   I did, yes.

Q.   But there was nobody else in the hallway?

A.   No.

Q.   What students were in the lobby?

A.   I don't remember which ones.

Q.   Were they from your group?

A.   I can't remember.  I believe they were from the other group.

Q.   Do you know how many students?

A.   A few, like two, three.

Q.   And it was open, so you had a view of the lobby?

A.   Yeah, I could see.

Q.   And could you yell down?

A.   I could, yes.

Q.   Yeah, okay.  When did you first think you were in danger on the morning of June 26th?

A.   When the door closed.  When he closed the door.

Q.   So you just testified before that he grabbed you?

A.   Yes, but it wasn't --

Q.   Let me -- is that true, he grabbed you?

A.   Yes.


MAGNA
LEGAL SERVICES

Page 27

Q.  And he grabbed you in the hallway, correct?

A.  Yes, but it wasn't like -- I wasn't too alarmed by it.

Q.  How did he grab you?

A.  Just like a normal grab.

Q.  I don't know what a normal grab is, how did he grab?

A.  I wasn't resisting to it essentially is what I'm saying.

Q.  So you didn't resist him grabbing you and taking you into his room?

MS. AYERS:  Objection to form.

THE WITNESS:  No.

BY MR. ALLEN:

Q.  What did you answer?

A.  I didn't think that it was aggressive.

Q.  My question is did you resist?

A.  No, I did not.

Q.  So how did he grab you?

A.  Just like normal.

Q.  Well I don't know what --

A.  With normal force.

Q.  What part of the body did he grab?

A.  My wrist.

Q.  One wrist?  Two wrists?



Page 28

A.  I believe it was one.

Q.  So he took your wrist?

A.  Yes.

Q.  And he took you into his bedroom?

A.  Yes.

Q.  But not in an alarming way to you?

A.  No.

Q.  You weren't scared at that point?

A.  I wasn't scared, no.

Q.  You weren't alarmed?

A.  I was cautious but I was not alarmed.

Q.  Okay.  You didn't yell for help?

A.  No, I did not.

Q.  You certainly could have yelled for help if you felt in danger, correct?

A.  Correct.

Q.  And you didn't?

A.  Nothing was preventing me.

Q.  And you didn't?

A.  I did not.

Q.  And as you just testified there were people in earshot of you, correct?

A.  To the best of my memory.  I'm not 100 percent, sure, but yes.

Q.  Didn't you tell me you saw people in the open


**MAGNA**
**LEGAL SERVICES**

Page 29

lobby below?

A.  To the best of my memory.  Again, that was two and a half years ago, I can't fully remember.

Q.  But you do remember that you weren't frightened when he took you into the room?

A.  At that point in time no, I was not.

Q.  Okay.  Go ahead.

A.  Sorry.  The only thing that I was scared of was I did say like this is a bad idea, I want to go back to my room because I was scared that I was going to get in trouble.

Q.  Why would you get in trouble?

A.  Because I knew that I shouldn't be going into his room.

Q.  So you then -- when you went into his room you knew you were breaking a rule?

A.  That's what I said.  I said it I knew it would be unacceptable if I went into his room.

Q.  So you knew you were breaking -- you knew you were doing something you weren't supposed to do?

A.  Essentially, but it wasn't necessarily my choice.

Q.  What do you mean it wasn't necessarily your choice?

A.  He kind of pulled me in there.

Q.  You just told me you weren't scared or you didn't



Page 30

yell for help.

A.   To -- I did -- I did sort of -- yes, I did sort of -- to answer your question, yes, I did -- I did know I was breaking the rule, yes.

Q.   And you went into his room voluntarily, is that true?

A.   Yes.

Q.   Now who was in the room when you went in the room?

A.   I'm not sure who it was, but it was one of his roommates.

Q.   So there was another human in the room?

A.   There was, yes.

Q.   Do you know his name?

A.   I do not.

Q.   How big was the room?

A.   It was -- I don't know how to describe it.  It was enough to fit two beds.

Q.   So there were two -- the room was big enough for two beds, correct?

A.   Yeah.  I mean one of them was a pull-out bed and the other was a normal queen size bed.

Q.   And there was someone in one of those beds other than Diego, correct?

A.   Yes.



Page 32

at that point?

A.  Yes.

Q.  Did you scream?

A.  No.

Q.  Why not?

A.  For a number of reasons.  First, I was scared; he's stronger than me.  Second, I was also scared of getting in trouble.  I didn't want to get kicked off of the trip, so those were two things.  And again, I was scared and I tend to freeze and get really silent when I'm scared.

Q.  There was a person sleeping right there, did you attempt to wake them up?

A.  No, because I believed that they were friends.

Q.  So -- but you felt in danger and you didn't scream or you didn't try to wake up the other human being in the room?

A.  I did not.  That was just my way of -- that's what I do when I'm scared.

Q.  And at this point you were standing up, correct?

A.  I was, yes.

Q.  Fully clothed?

A.  Yes.

Q.  And nothing of a sexual -- sexual nature had occurred at that point?



Page 37

Q. Okay. So within 30 seconds you guys were making out?

A. Yes.

Q. And how long did that making out last?

A. Probably about 20 seconds. It didn't last very long.

Q. It didn't last very long?

A. To my memory it did not last very long, no, but the times may not -- that's just -- that's just how long I remember it being.

Q. Okay. And when that ended -- let me ask you this question and we'll work backwards. From the time you entered Diego's room to the time you left his room, how long a time -- how long were you in that room that night to the best of your memory?

A. To the best of my memory it was about three to four hours.

Q. So you were in his room for three to four hours?

A. Yes.

Q. And during that three or four hours you never yelled, correct, for help?

A. I did not.

Q. You never banged on the wall?

A. I did not.

Q. You never tried to -- to leave?



Page 38

A.  I tried to leave, yes.

Q.  You did?

A.  Yes, I did.

Q.  When did you try to leave?

A.  When I first got in and then at some point when I was on the bed.

Q.  Did you get up off the bed?

A.  Yes, I tried.

Q.  No, no, my question is were you able to get off the bed?

A.  No, I wasn't.

Q.  Why?

A.  Because I was being -- because I would be pulled back down.

Q.  Okay.  But you didn't yell?

A.  No.

Q.  You didn't alert the other person in the room?

A.  No, I did not.

Q.  But you were there for three to four hours?

A.  Yes, it was about that time.

Q.  And no one came looking for you?

A.  No.

Q.  And everybody in your room knew you were going to meet Diego, correct?

A.  Yes, they did.



Page 44

Q.    Did you ever sit with him on the bus?

A.    From what I can remember, no.

Q.    Okay.  And at that time -- how old are you today?

A.    Eighteen.

Q.    So you were what, 16 at that time --

A.    Yes.

Q.    -- fifteen?

A.    Sixteen.

Q.    Okay.  Sophomore in high school?

A.    Yes.  I was going to be a junior, so...

Q.    Okay.  So you were in between your sophomore and junior year?

A.    Yes.

Q.    And as I said to you, we're going to invade some of your personal space unfortunately.

A.    That's fine.

Q.    It's not fine, it's necessary.

A.    Yes.

Q.    At that time did you have -- have had sexual experiences?

A.    Only on-line.  So no, not in real life.

Q.    Okay.  Can you describe that?

A.    Well okay, so I had a long-distance boyfriend.  I mean he wasn't really a boyfriend, but I met him through a mutual friend and the only time I have had experience


MAGNA
LEGAL SERVICES

Page 60

were on one, it probably would have been Zoloft.

Q. Okay. But you don't have a clear memory of when -- when was the last time you took Zoloft?

A. The last time I took Zoloft was probably in 2023. I stopped taking it myself. Like I made the decision to, my psychiatrist didn't -- didn't make that decision.

Q. Okay. Why did you do that?

A. Because I didn't think it was really doing anything for me and I thought that my anxiety could be overcome without that. And also I thought that that was causing depression, so I went off of it myself.

Q. How's your mental health now?

A. It's a lot -- it's better than it was back then because I have been taking measures to ensure that it is.

Q. Like what?

A. I have been going out more. I have been doing more physical activity. I have been -- I have had a better diet. I have had a better relationship with my family. Been moving on from the past.

Q. Now you mentioned that you might have had some text messages or snap messages or some social media -- and I include text messages as social media -- about oral sex before June of 2022, correct?

A. Yeah, most likely.



Page 70

Q.  And you continued on with the tour for a while after this incident?

A.  So the day after this incident we went to a new city and that's as far as I continued.  Because after that, that's when everything happened with the hospital, the police station, and then my dad came -- met us in the next city.  And my dad and I went back to Madrid and then back home.

Q.  First you went to Madrid and if I'm correct you went to Paris?

A.  Oh, yes, we went to Paris for our overlay --

Q.  Yeah.

A.  -- for our flight, yes.

Q.  Let's go over that timeline for a second.  The attack supposedly took place early 6/26, correct?

A.  Yes.

Q.  June 26th.

A.  Yes.

Q.  From what you tell me the allege attack occurred from like 12 to 4 a.m.?

A.  Correct.

Q.  And from reading certain documents I'm lead to believe that after 4 a.m. you went back to your room --

A.  Yes.

Q.  -- correct?



Page 71

A.   Correct.

Q.   And you went to sleep?

A.   For about one hour, yes.

Q.   I didn't ask how long.

A.   Yes.

Q.   You went back to sleep.

A.   I did.

Q.   And did you have any conversations with your roommates?

A.   They were all asleep, so no, I did not.

Q.   Well at some point they woke up?

A.   Yes.

Q.   Did you have any conversations with them about the night before?

A.   I did not.

Q.   Nobody said where were you?

A.   No.

Q.   Nobody said you were gone for four hours, what happened?

A.   No.

Q.   Nobody said what happened between you and Diego?

A.   They did not, no.

Q.   You are telling me you were rooming with two other women of your age, high school sophomores, almost juniors?



Page 72

A. We were -- yeah. So Annabelle was a year older than me.

Q. What?

A. Annabelle was a year older than me. Anjelina was my age, yes.

Q. So you are in a bedroom with three contemporary young teenage girls, correct?

A. Correct.

Q. You went to a boy's room for four hours, correct?

A. Yes.

Q. And you woke up with them, correct?

A. Correct.

Q. And you were all sitting in the room?

A. Correct.

Q. And your testimony under oath is nobody asked how did it go last night? What happened last night? Where were you for four hours? Nobody asked?

A. That is my testimony, yes, nobody asked. We immediately woke up, we woke up pretty late, and we immediately had to pack, go down to breakfast and then come back up and leave.

Q. So nobody said -- nobody was curious?

A. No. From -- from my best memory nobody asked.

Q. And none of the other of your friends asked how did last night go?



Page 73

A.    No.

Q.    Nobody cared?

MS. AYERS:    Objection, form.    Calls for speculation.

BY MR. ALLEN:

Q.    You may answer.

A.    Only those two knew and those two did not ask about it the next morning.

Q.    And you at that point when you got up the next morning, did you feel you had been raped?

A.    Yes.

Q.    Do you still -- do you feel today that you were raped?

A.    Yes.

Q.    How do you define rape?

A.    Saying no and it happening anyway.    Doing something against my consent.

Q.    Do you think you contributed to the situation that lead to the night -- the early morning of 6/26?

A.    No.

Q.    You don't think you did anything wrong?

A.    No.

Q.    Have you thought about that?

A.    I've thought a lot about this whole situation, yes.



MAGNA
LEGAL SERVICES

Page 74

Q. And you don't think you did anything wrong?

A. I think no means no.

Q. And when did you say no?

A. At the beginning, in the middle and at the end.

Q. We'll come back to that. Now let's go back to the two girls that see no evil, speak no evil, hear no evil, never asked a thing, correct?

A. Correct.

MS. AYERS: Objection to form.

BY MR. ALLEN:

Q. Did anyone else ask you anything?

A. No.

Q. And when --

A. They -- sorry. To the best of my memory they did not ask anything. And if they did, it wasn't anything significant because I don't remember it.

Q. Were you surprised that no one asked?

A. No. They were asleep when I got back. I assumed they went to sleep the second I left, so they probably didn't even notice I was gone. But I don't know that for a fact, so...

Q. When you came back to your room were you fully clothed?

A. I was, yes.

Q. By the way, was any of your clothes destroyed or



Page 75

-- or altered in any way?

A.  I wouldn't say destroyed or altered.

Q.  There were no -- nothing was ripped, correct?

A.  No.

Q.  Nothing was damaged?

A.  No.

Q.  In fact, when the police -- your bra, your underwear your dress, whatever you were wearing was in perfect shape, correct?

A.  Yes.

Q.  So the attack neither impacted your clothing or you physically, correct?

A.  I did have bruises.

Q.  You did?

A.  Yes.

Q.  How come the hospital didn't note any bruising on you?

A.  To my memory they did but --

Q.  Have you looked at the hospital record?

A.  I haven't looked at it in two years, no.

Q.  You looked at it two years ago?

A.  I did.

Q.  And did you notice that they never mentioned --

A.  I remember --

Q.  Let me finish the question and I'll let you



MAGNA
LEGAL SERVICES

Page 97

kind of -- I kind of followed, yes.

Q. Did he pull you in or did he guide you in?

A. It -- it was kind of a mix of both. It wasn't extremely forceful.

Q. You could have walked away if you wanted to?

A. Yes.

Q. Now -- when he took your arms outside in the hallway, was it one arm? Two arms?

A. I think it was -- I think it was one.

Q. Now you said in text you told him you didn't want to go into his room?

A. Yes.

Q. Do you have those texts?

A. I don't.

Q. Where are they?

A. I don't have them. They're --

Q. Where are they?

A. I don't know where they are. They're --

Q. Have you looked for them?

A. I can't access them unless I do a whole thing where I download my information and it's this whole process.

Q. Why didn't you do that?

A. Well I know that they have been accessed.

Q. They have? So someone has those text messages



Page 111

Just take the microphone off, walk over, check and come back. We don't have to go through the whole spiel.

THE WITNESS: My apologies.

BY MR. ALLEN:

Q. No apology necessary.

A. No, my phone is off.

Q. It was mine, I told you.

Now could you read to yourself Interrogatory No. 2, Answer No. 2, please, to yourself? You had checked out EF before you went on this trip with some friends and associates, correct?

A. I did not.

Q. Oh, Morgan did. Morgan's your grandmother?

A. My mom.

Q. Your mother did, okay. But you did have a cousin who had gone on a similar trip, right?

A. Yes, I believe so.

Q. And did you talk to her?

A. I did not talk to her.

Q. So you didn't know background on this trip, your mother -- you left to it your mother?

A. I did, yes.

Q. Okay. And -- but did you have -- did you participate in Zoom calls with your teacher?

A. Yes, I did.



Page 112

Q. And were you -- you got your passport?

A. Correct.

Q. And if you go to Paragraph 5 can you read the last sentence out loud?

A. Would it be No. 5 last sentence?

Q. Answer No. 5, last sentence, subject to.

A. Okay. Subject to and without waiver of said objection, prior to Lynzee leaving on the trip, the only verbal communication Plaintiffs had with EF was their agent, employee, servant and/or representative, Mr. Arriaga, as described in response to Interrogatory No. 3 above.

Q. Right. Now you spoke to Mr. -- how do you say it, Arriaga?

A. Arriaga.

Q. Arriaga?

A. Yes.

Q. And he was your teacher?

A. He was a teacher at my school, but he was not my teacher at the time.

Q. But you knew him as a teacher?

A. Yes.

Q. And you had a couple of Zoom meetings with him about this trip?

A. Yes, we did.



Page 124

Q. Overall?

A. Like yes, it is true.

Q. Do you think overall is sufficient in a court?

A. It is true, but there are a few inaccuracies.

Q. Such as?  Do you remember?

A. I don't remember what they are, but I knew that I -- I know what they are if you came across them.  It's nothing significant, but I can't remember what they are exactly.

Q. Now in this Complaint you refer to Diego as a sexual predator.

A. I did not refer -- I did not say that.

Q. This was brought on your behalf.

A. Well those words did not come out of my mouth.

Q. Pretty strong words, correct?

A. They are, but I did not say that.

Q. But this is your Complaint.

A. Those words did not come out of my mouth, though.

Q. They came out of somebody's mouth on your behalf, correct?

A. Correct.

Q. In your Complaint?

A. Yeah.

Q. Do you think Diego is a sexual predator?

A. I think anybody who performs sexual acts against


MAGNA
LEGAL SERVICES

Page 125

someone who did not give consent could be classified as one.

Q.   Do you?

A.   I do.

Q.   Do you think someone that exchanges nude photos with a minor on-line is a sexual predator?

A.   If they're above 18, yes.

Q.   What if they're not above 18?

A.   If the other -- if they both give consent then they're not sexual predators.

Q.   You don't think like a 16-year-old sending you naked pictures of him on-line is a sexual predator?

A.   If I give him consent then no, he's not.

Q.   And do you think EF knew that Diego was, in your opinion, a sexual predator?

A.   I don't know what they thought.

Q.   Well in this Complaint you say assigned you an unsupervised hotel room that was directly next to an unsupervised sexual predator on the same trip.

A.   Well I never said that.

Q.   It's in your Complaint, ma'am.

A.   Well I don't know -- I'm not -- first of all, I'm not EF Tours.  Second of all -- so I don't know what they would have thought.

Q.   You say your room was unsupervised, your room.



Page 126

Do you think your room was unsupervised?

A.   I mean most of our rooms were unsupervised.

Q.   Well do you think you should have had a chaperone in every room?

A.   I'm not saying that, no.

Q.   What are you saying?

A.   I'm just saying we were free to do whatever we wanted essentially.  We could even leave the hotel if we wanted to, that's how --

Q.   You think your group leader said you could leave the hotel?

A.   He never said we could, but there was a lack of supervision and there were students who were leaving the hotel.

Q.   But you know that you were under the supervision of the group leader, correct?

A.   That's what they said.

Q.   Okay.  So they told you you were under the supervision of the group leader?

A.   Yes.

Q.   Okay.  You understand -- you don't think there should be security guards on every floor of the hotel, do you, watching you?

A.   I don't know what there should be.

Q.   Okay.  So you don't know?



Page 134

A.  I think -- I was undressed but no, it didn't show anything.

Q.  Do you have that picture?

A.  I don't have it.

Q.  When did you see it?

A.  When he took it.

Q.  Did he show you the picture?

A.  Yes.

Q.  Just so we a clear, you knew it was against the rules to have intercourse or sex with other students on the trip?

A.  I don't remember that being explicitly said; however, I'm sure at the time I did know that you could probably get kicked off of the trip for doing it.

Q.  So you knew it was something that wasn't allowed?

A.  I think that I knew that.

Q.  Yeah, I mean -- it didn't -- not everything's in rules.  You knew that you weren't allowed to commit murder on the trip, but it wasn't in the rules.

A.  Right.  Well that's two very different things.

Q.  No, but you knew in the same sense that it was -- sex was something that was not included in this trip?

A.  If you were discovered in somebody else's room at the time I believe I knew that that was, you know, an issue, so...



Page 135

Q.  And you said you could get kicked off the trip for it, didn't you?

A.  Yeah.

Q.  Okay.  So you knew it was a rule?

A.  If I didn't know, then I assumed.

Q.  But you may have actually known?

A.  I may have.  I don't remember.

Q.  Who was supervising you on the trip?

A.  Arriaga and his -- I believe his niece or someone related to him.

Q.  Miss Fallgatter --

A.  Yes.

Q.  -- you went into his room and you were against the wall or -- was your back against the wall or was his?

A.  Mine was.

Q.  And you guys were making out, correct?

A.  At some point.

Q.  So let's -- at that point you're making out with him, correct?

A.  Correct.

Q.  And you're fully dressed?

A.  Yes, I am.

Q.  And what were you wearing, by the way?

A.  I was wearing a black dress -- yeah, I was



Page 137

Q.   And the wall is right next to you?

A.   The wall that was next to me is a wall that leads outside, yes.

Q.   You could have banged on the wall, could you not?

A.   The wall that lead outside?

Q.   You could have banged on the wall?

A.   Essentially yes, I could have.

Q.   And you never did?

A.   No, I didn't.

Q.   You could have yelled?

A.   I could have.

Q.   You never did?

A.   I didn't.

Q.   You could have yelled for his roommate, correct?

A.   Correct.

Q.   You never did?

A.   No.

Q.   And at this point you had all your clothes on?

A.   I did.

Q.   Okay.  And you never yelled, banged or made any attempt to leave the room, did you?

A.   For certain reasons, no, I did not.

Q.   I didn't ask that question.

A.   No, I did not.

Q.   You never got off the bed, did you?



Page 138

A.   I attempted to but no, I did not.

Q.   You attempted -- did you actually attempt to get off the bed?

A.   I actually attempted to, yes.

Q.   And what happened?

A.   I was held down.

Q.   How was he -- how were you held down?

A.   I was pulled down by my arms.

Q.   Okay.  But you were fully dressed?

A.   Yes.

Q.   How -- at the time you had intercourse the first time, how -- were you undressed when you had intercourse the first time?

A.   I cannot remember.  I know at some point I was undressed, but I don't remember when it was.

Q.   When you say undressed, what do you mean?

A.   Like I had nothing on.

Q.   Nothing on.  When you had intercourse the first time, were you undressed?

A.   I don't remember.

Q.   And when you had intercourse the second time, were you undressed?

A.   Most likely, yes.

Q.   Okay.  And when you had intercourse the third time, were you undressed?



Page 139

A.  Yes, most likely.

Q.  And you said that the timeframe was three to four hours?

A.  It was, yes.

Q.  And so you had intercourse three times?

A.  Yes.

Q.  In three to four hours?

A.  Yes.

Q.  What did you do in between?

A.  Just lay on the bed.

Q.  Talking?

A.  A little bit of that and then a little bit of just like silence.

Q.  Were you cuddling?

A.  I can't remember.  I don't think so.

Q.  Were you --

A.  I think we were just laying next to each other. I wouldn't say I was cuddling.

Q.  You were lying naked next to this man, correct?

A.  Correct.

Q.  Probably three hours doing nothing, correct?

A.  Yeah, because whenever I tried to get up I would be pulled back down.

Q.  How many times did you try to get up?

A.  A good amount of times.


MAGNA
LEGAL SERVICES

Page 140

Q.   That doesn't answer the question.

A.   I don't know how many times.

Q.   You said every time you tried to get up, you got pulled down?

A.   Yes.

Q.   But you never yelled?

A.   I didn't.

Q.   Someone's pulling you down on a bed, you're stark raving naked and you never yelled?

A.   Well that was my fear response.

Q.   Fear --

A.   I didn't know what to do in that type of situation.  He's a lot stronger than me.  So yes, I did not yell.

Q.   But there was a roommate right there?

A.   There was.

Q.   And you didn't yell?

A.   No, I didn't.

Q.   And you didn't bang on the --

A.   I did not.

Q.   Didn't bang on the wall?

A.   No, I did not.

Q.   Now at any time during this three to four hours did Diego fall asleep?

A.   I don't remember.



Page 142

A.  Yes.

Q.  And where did the results of the orgasm --
according to the medical records --

A.  It was on my stomach.

Q.  He never had an orgasm inside you, is that
correct?

A.  No.

Q.  That's not correct?

A.  No.  It is correct.  Sorry.  My apologies.

Q.  Don't apologize.  It's a difficult subject, I
know that.  So don't apologize.  And it was on your
chest?

A.  It was either on my chest or my stomach, but I
remember -- I remember at least one of them being on my
stomach.  I'm not sure if two of them were or if one of
them was on my stomach and another on my chest.

Q.  Okay.  So what happened to that?

A.  I believe it was like -- what happened to it on
there?  I believe it was wiped off.

Q.  With what?

A.  I can't remember with what.

Q.  Isn't it a fact he got up and got a towel for
you?

A.  Yeah, that's probably right.

Q.  And you never got up at that point and tried to



Page 143

leave?

A.  Again, I was really scared so no, I did not.

Q.  Never tried to wake up his roommate at that point?

A.  I didn't, no.

Q.  And, in fact, he did that three times, didn't he?

A.  He did, yes.

Q.  And all those three times he never -- you never made any move to alert someone to your predicament?

A.  There are many things that I would have done differently, but at the time no.

Q.  Okay.

A.  I was very scared.  That's how I dealt with the situation.

Q.  Okay.  Now you said the first two times the results of the orgasm were on your stomach and your chest, correct?

A.  Uh-huh, yes, yes.

Q.  And what about the third time?

A.  The third time I believe was in my mouth.  Well I know that it was.  I don't believe, sorry.

Q.  Don't say sorry.  Did you cooperate with that?

A.  It -- I felt that I didn't have a choice.

Q.  That wasn't my question, though?

A.  By cooperate what do you mean?



Page 148

now?  And I was pulled back down.  And so I just laid there for a little bit.  He was laying there.  And then after a while I think he fell asleep a little bit, so I got up to leave.  And then -- and then at that point it was about 4 a.m. or whatever time -- whatever time it was.

Q.  So it's your testimony under oath here today that he was asleep when you left?

A.  He wasn't asleep.  He was like partially asleep, but once I got up to leave, he got up, too.  He didn't get up off of the bed, but he was awake.

Q.  So it's your testimony he didn't walk out in the hall with you?

A.  No, he did not.

Q.  You're sure of that?

A.  I'm positive.

Q.  And are you positive that at all times the three to four hours that you were in that room that he never fell asleep?

A.  I don't remember him falling asleep, no.

Q.  But is it possible?

A.  Again, I'm not saying that he didn't.

Q.  Okay.  Now, you said you were in there three to four hours?

A.  Yes.



Page 149

Q.   The sexual acts, one, two and three, if you combine them all, how much time do you think they took?

A.   Probably two hours -- again, I can't remember the details.

Q.   You think that the three acts of intercourse took two hours?

A.   I don't remember how long it took.

Q.   Okay.

A.   I don't know.  No, two hours is probably -- two hours isn't right but I don't remember how long it was.

Q.   Would you agree with me the majority of time in the room was not sexual?

A.   Yes, I would agree.

Q.   You were just hanging out?

A.   I wouldn't say hanging out.  I felt that I really had no choice.

Q.   I understand how you felt, but you guys were just lying there talking or whatever?

A.   I was lying there, yes.

Q.   Naked?

A.   For some of it.  For some of it I was clothed.

Q.   Once you became naked you stayed naked until you left, correct?

A.   Yes, yes.

Q.   And you clearly were naked when the semen was on


MAGNA
LEGAL SERVICES

Page 150

your chest or stomach, correct?

A. Correct.

Q. So you were naked during the whole sexual act?

A. Yes.

Q. How long after you came in the room did you become naked?

A. Probably like five minutes or less. It could have been less. I don't remember.

Q. So for all intents and purposes you were naked for about three hours?

A. Yeah, probably. That sounds about right.

Q. And none of your clothes were ripped, damaged, torn or anything?

A. They weren't ripped or damaged, no.

Q. And other than a bruise the size of a quarter on your right -- maybe -- what did you say, left, left inner thigh?

A. It was my left inner thigh.

Q. And other than a bruise you weren't physically damaged?

A. Yeah, I remember partial bruising on my wrists, but I don't know if those were documented. So other than that, no. No part of me was damaged. I was in pain; but again, I don't think it was anything that was documented.



Page 157

prolific user?

A. No I definitely didn't post anything on there about that.

Q. How about during the trip to Spain, did you post anything to Instagram?

A. Yeah, I posted like pictures of the scenery, some of our -- I could have posted some of our group photos as well.

Q. How about Snapchat?

A. Same thing with that.

Q. Okay. Did you post images? Did you post texts? Did you post both?

A. Probably both.

Q. Okay. All right. And you said those -- those accounts still exist, I mean you can get to them?

A. Yeah, they still exist, yeah.

Q. And you could get to them?

A. Yes, you can.

Q. So going to the issue of rules, early on this morning you had said that one of your complaints was that this whole situation could have been avoided if the rules had been enforced. Do you recall giving that testimony?

A. I do recall that, yes.

Q. Who was responsible for making the rules in your


MAGNA
LEGAL SERVICES

Page 158

opinion?  Was it EF?  Was it Mr. Arriaga?

A.  I believe EF was responsible for making the for -- the rules, sorry.  And Mr. Arriaga, the group leaders, are responsible for enforcing them.

Q.  And where do you form that belief?

A.  That's just I...just -- common sense.  I don't know.

Q.  So during the Zoom meetings you had with Mr. Arriaga and the other members of the California group prior to the trip, did he explain to you that there were going to be some rules that were going to be enforced?

A.  Yes.

Q.  What were those rules?

A.  I can't remember what they were exactly.

Q.  Did it have to do with curfew?

A.  It -- it was probably -- again, I can't give you an exact answer but I believe he said something about, you know, not leaving the hotel after curfew; perhaps not even leaving your room after curfew, but I'm not sure about -- I'm not sure about these rules.

Q.  Okay.  Well then more recently you said there was a lack of supervision; no rules whatsoever, you were free to do whatever you wanted to, even leave the California hotel.  Were you talking about the California group or the Pennsylvania group?



MAGNA
LEGAL SERVICES

Page 159

A.   I was talking about my group specifically.

Q.   Okay.  So was it Mr. Arriaga who should have enforced those rules that you just described as probably not leaving the hotel, probably the curfew, would it have been the California group?

A.   Yeah, talking about my respective group.  I noticed the other group do things they shouldn't do; but talking about my group, yes, Arriaga was responsible for my group.

Q.   Did Mr. Arriaga have you guys sign a contract of conduct or anything like that?

A.   I am unsure.

Q.   You said -- I apologize for the interruption.

A.   That's okay.

Q.   Were you finished?

A.   Yes.

Q.   Okay.  You said you were -- various instances you were afraid of being kicked off the tour.  How did you know that was even an option?

A.   Well I don't know if I knew, but I just -- again, I used my common sense and I just -- I assumed that if I was caught in somebody else's room that I wasn't permitted to be in, that I would face consequences such as being kicked of off of the trip.  I wasn't for -- I didn't know that for a fact, though.


MAGNA
LEGAL SERVICES

Page 171

A.   That would be my mistake.  Like of course it's been on multiple platforms that we've done that and I've deleted certain accounts.  Like he had Skype for a while because he got his phone taken away, so he could only use Skype on his computer and I think I still have that account but I haven't had Skype downloaded for a long time.  So there could very well still be things on there.  But everything that I've seen I have deleted.

Q.   Okay.  So when you were 14 and these -- these video exchanges began, why?  What prompted you to do it?

A.   Just because I really liked him.  And he wanted them, so I wanted to give them to him.  So...

Q.   That's the second individual you've identified as really liking --

A.   Yeah.

Q.   -- and wanting to satisfy him, is that --

A.   Correct.

Q.   -- correct?

A.   I've liked multiple people, yes.

Q.   Well you said earlier that you engaged in certain conduct because quote, I liked him and I tried to adhere to him.  Do you recall giving that testimony?

A.   Yeah, I do remember that.

Q.   Okay.  Who was that towards?

A.   That wasn't towards anyone specific.  That was



Page 172

regarding -- like if I had ever talked about a certain topic and I said if I did, that would be the context that I talked about it in.

Q.   And I believe you testified earlier that, you know, from the time you guys left the airport and merged with the Pennsylvania group, that you and Diego were flirting?

A.   From the time we got to the museum to the time -- for about two days, yes.

Q.   So you were flirting?

A.   Yes.

Q.   You liked him?

A.   I wouldn't say I liked -- I wouldn't say I had a crush on him but I would say yeah, I mean like we were flirting, yes.

Q.   Did you flirt with everybody on the tour?

A.   No.

Q.   Just him?

A.   Essentially, yes.

Q.   Okay.

A.   Because he was the only one flirting with me.

Q.   Kind of like the guy you really liked that you wanted, to use your word, adhere to?

A.   That was a little bit different.

MS. AYERS:   Objection to the form.   You can



Page 184

Q.   Okay.  Paragraph 34, the allegation is almost immediately when the groups were consolidated by EF Defendants, Defendant Diego Taylor began aggressively pursuing L.F. in a manner of initiating unwelcome advances, following her and making unwelcome comments about her appearance and presentation, which advances L.F. repeatedly and verbally refused.  Is that a true statement?

A.   So can you repeat the first half of it, like when this...

Q.   Almost immediately when the groups were consolidated.

A.   Okay.

Q.   So you were flirting for two days?

A.   Yes.

Q.   And then on day three the events happened and Diego was taken off the tour, correct?

A.   Correct.

Q.   So where is this period of time where he's instigating unwelcome advances, following you and making unwelcome comments about your appearance and presentation if you were actively flirting?

A.   So it was -- I was flirting at first, but then it -- it kind of -- I kind of died down and it was -- continued like.  So I would be with my friends and then



Page 185

he would come up to me and I can't remember what they were, but make certain comments.

And then even my friend Aiden noticed, he was like -- he was like oh, he's using me as a segue to talk to you. And they all -- they all noticed that he was like acting interestingly towards me. Like overly -- overly flirtatious.

Q. Kind of like Alex did with you to show actual interest in you?

A. It's a little bit different.

Q. How about anyone else, any of your other partners?

A. Again, that's -- that's a little bit different. And the second someone makes me uncomfortable, I stop talking to them.

MR. ALLEN: Hmm.

MR. SCHWARTZ: You got that?

THE WITNESS: Well also we grow over time, grow and mature, so...

BY MR. SCHWARTZ:

Q. So looking at the interrogatories that I do believe you have in front of you, in Paragraph 6, your answer, there was quite a bit of dialogue with you and Attorney Allen about the use of the word strangely and you conceded that's not your word, correct?



MAGNA
LEGAL SERVICES

Page 187

identified as one of the strange behaviors that he was in the hotel looking at your door?

A.   Yes.

Q.   Okay.   Wasn't his door right next to yours?

A.   Yes.

Q.   Did you guys have tour buddies, somebody you were supposed to be with at all times, not supposed to go anywhere by yourself?

A.   No, we didn't have designated tour buddies.

Q.   So the California group didn't.   Do you know if the Pennsylvania group had tour buddy designations?

A.   They might have.   I don't know any -- I don't know what they did regarding that.

Q.   Did you hear anybody throughout the tour say so and so will be there because we're tour buddies?

A.   No.

Q.   Did you ever notice that the Pennsylvania group seemed to always go in pairs?

A.   I did not notice that.

Q.   And Diego did have a roommate?

A.   Yes, he did.

Q.   And if Pennsylvania had a tour buddy requirement that they're not supposed to go anywhere alone, would it be unusual for Diego to be waiting for his -- his roommate to come out to go to breakfast?



Page 199

classes?

A.   I took one psychology class, it was AP psychology in --

Q.   In high school?

A.   In high school.  However, that's just a basic fact that everybody handles fear differently.

Q.   Okay.  And you would agree with me that prior to June of 2022 you had been seeing counselors for mental health issues, correct?

A.   Correct.

Q.   And those mental health issues included anxiety?

A.   Correct.

Q.   And major depressive -- depression?

A.   Yes.

Q.   And suicidal ideation?

A.   Yes.

Q.   Since prior to 2020, correct?

A.   Prior to 2020 -- sorry.  Yeah, 2020.  It was for anxiety specifically I believe.

Q.   You had a suicidal ideation plan effective in 2020?

A.   Yes, in 2020 I did.

Q.   Were you having problems in school prior to 2022?

A.   No, not really.  Only due to COVID.  I didn't do very well during distance learning, but that's really



Page 200

the only struggle I had prior to 2022.

Q.   To the best of your knowledge has anyone ever called you a hypochondriac?

A.   My mom has called me a hypochondriac before, but that's about it.

Q.   Has anyone ever told you that you have a tendency to exaggerate factual scenarios?

A.   When I was younger my mom would tell me that.

Q.   What is younger?

A.   Like a kid.

Q.   In my eyes you're still a kid.  What -- what are we talking about?

A.   Like, you know, eight through -- eight through 12, eight through 13.  And not necessarily situations, more so being sick.  I was a hypochondriac when it came to being sick when I was a kid because I was a major germ-a-phobe.

Q.   Okay.  All the way back in October of 2019 you were on Zoloft?

A.   I was.

Q.   You actually attended outpatient treatments, Simi Valley?

A.   Yes, I did.

Q.   Did you have any inpatient?

A.   No.


MAGNA
LEGAL SERVICES

Court.

BY MR. ALLEN:

Q.   Now after the incident -- you have pictures the day after, correct?

A.   Correct.

Q.   And we've produced them here, correct?

A.   Correct.

Q.   So you were enjoying the trip that day; or at least it appears you were?

A.   To the best of my ability, yes, it certainly appears that way; but you can't see what's going on inside of my head through a picture.

Q.   And after the incident did you send anybody nude pictures again?  When was the first time --

A.   Right after --

Q.   Not right after.  When was the first time after the incident?

A.   I can't remember.

Q.   But there were nude pictures at some point?

A.   At some point probably, but I don't know.

Q.   You were for two days flirting with Diego, correct?

A.   A little bit, yes.

Q.   You've testified --

A.   Correct.  Yes I have.



Page 221

Q. -- a million times?

A. Correct, yes.

Q. Would you have sent him a nude picture if he asked?

A. No.

Q. Why?

A. Because I was -- I just knew him and...

Q. You sent nude pictures to someone you had never met?

A. Right. Well this is why, because I was on a trip with him, right, and to me at the time, I thought that it would have -- if he would have asked me this is how I would have thought, it would make things awkward for the next few days that we're on this trip and I don't want that to happen. And I also don't want him to show it to other people on the trip and then -- yeah, that's why I would not have sent him a picture.

Q. But you were flirting with him?

A. Yes.

Q. Continually throughout the trip until the incident occurred?

A. Correct.

Q. And you said in this deposition under oath when someone makes me uncomfortable I stop talking to them. Didn't you say that minutes ago?


MAGNA
LEGAL SERVICES

Page 222

A.   That's -- that's my -- that's my current self talking.  Back then I was a lot different.

Q.   But you didn't stop talking to Diego?

A.   No, I didn't.

Q.   You didn't stop flirting with Diego?

A.   I dealt with things a lot differently than I would now.

Q.   That wasn't my question, was it?

A.   No.

Q.   My question was you never stopped flirting with Diego -- Diego until the incident?

A.   No.

Q.   Maybe I asked it wrong.  Will you agree with me that you never stopped flirting with Diego until the incident?

A.   Yes, I agree with you.

Q.   And that picture -- can I see those two? Exhibits 5 and 6.  Five and six --

A.   Yes.

Q.   -- were uploaded on July 1, 2022, correct?

A.   Correct.

Q.   So you still had fond memories of the trip on July 1, 2022, and you were keeping pictures of it?

A.   Well those were all of my friends right there so -- I was answering your question.  Those are all of my



MAGNA
LEGAL SERVICES

Page 226

Q.  How could it have happened if you didn't go in his room?

A.  Because I -- again, like I said, it's not only on my account.

Q.  I didn't ask that.  But if you had not voluntarily gone into his room, if you had not voluntarily left your room after curfew and had not voluntarily gone into his room breaking the rules, this incident would not have occurred.

A.  Yes.

MR. ALLEN:  I have nothing further, thank you.

MR. SCHWARTZ:  No further questions.

THE VIDEOGRAPHER:  We are going off the record at 3:33 p.m. eastern concluding File 5 in the deposition of Lynzee Fallgatter for today.

(Whereupon, the deposition was concluded at 3:33 p.m.)



# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Trenton Fallgatter, on behalf of his natural and biological minor child, L.F., | : | CIVIL ACTION LAW |
| & | : | NO. 4:23-cv-01038-MWB |
| Morgan Ash, on behalf of her natural and biological minor child, L.F. | : | |
| Plaintiffs | : | JURY TRIAL |
| | : | DEMANDED |
| | : | |
| vs. | : | |
| | : | |
| | : | |
| EF Educational Tours, | : | |
| EF Education First International, Ltd., | : | |
| EF Institute for Cultural Exchange, Inc., | : | |
| EF Education First International, Ltd., | : | |
| Switzerland, | : | |
| Diego Manuel Taylor, | : | |
| Jennifer Taylor, & | : | |
| John Does I-V | : | |
| Defendants | : | |

**PLAINTIFFS' RESPONSES TO INTERROGATORIES PROPOUNDED BY
DEFENDANTS EF INSTITUTE FOR CULTURAL EXCHANGE AND EF EDUCATION
FIRST INTERNATIONAL , LTD.**

Plaintiffs Trenton Fallgatter, on behalf of his natural and biological minor child, L.F., &

Morgan Ash, on behalf of her natural and biological minor child, L.F., by and through their

counsel, Hill & Associates, P.C., hereby respond to the Interrogatories Propounded by

Defendants EF Institute for Cultural Exchange and EF Education First International , Ltd. as

follows:

**INTERROGATORIES**

1.      Please state your full name, date of birth, and address.

**Lynzee Fallgatter**
**3/5/2006**
**5243 Corte Estima, Apt. 71**
**Camarillo, CA 93012**

**Trenton Fallgatter**
**7/29/84**
**5243 Corte Estima, Apt. 71**
**Camarillo, CA 93012**

**Morgan Ash**
**8/29/85**
**963 Palmer Ave**
**Camarillo, CA 93010**

2.      Please state how you first learned of the EF Defendants' educational tours, specifically including the June 2022 educational tour of Spain and the Basque Country (the "EF Spain Tour") and describe in detail the steps you took thereafter for L.F. to participate in the EF Spain Tour.

**Lynzee was first given information about the trip at school, Rancho Campana High School, through an email to the best of her recollection. Lynzee showed the information to her mom, Morgan Ash, and they were interested.  Morgan then reached out to Lynzee's paternal grandmother, Martha Ward, who is knowledgeable about travel and education. Ms. Ward said she knew people who had gone on similar types of trips and agreed it would be a good experience for Lynzee.  Morgan also spoke to her boss at Ventura County Medical Center who had a daughter that went on a trip with Education First a year oir two before and had a positive experience, very secure, housing very safe, security on each floor, and girls and boys on different floors.  Lynzee also had a cousin who had gone on a similar trip prior and had a good experience.  Lynzee, her mom, and Lynzee's dad, Trent, were all in agreement for Lynzee to go.**

3.      Please identify and describe in detail any written representations, promises, reassurances, or other written information which you relied upon in making the decision to send your minor daughter, L.F., on the EF Spain Tour.

**Morgan, Trent and Lynzee participated in zoom calls at various times with the "leader" from their school group Mr. Arriaga, and had several conversations with him as well.  He gave information about what was going to be happening, and answered the Plaintiffs'**

questions, including confirming that the trip was secure, that the housing was monitored with a chaperone on each floor and that girls and boys were separated by floor.  Since Mr. Arriaga had gone on the trip previously, he had a great deal of information and gave the Plaintiffs much reassurance.  Mr. Arriaga also sent group emails to those going on the trip about deadlines and getting paperwork in, but most of the specific discussions about the trip details were verbal/zoom.  Plaintiffs watched You Tube  on places the trip would visit, Morgan and Lynzee were on the EF website reading about the trip often, reading reviews, and other families' experiences.  Morgan also went on Reddit to look at reviews.  Plaintiffs thought it was a reputable company, knew it had been around for years, knew of others through Trent's side of the family that had been on an EF trip, and also of her boss's daughter having gone on such a trip before.

4.      Please identify and describe in detail the sign-up and enrollment process for L.F.'s participation on the EF Spain Tour.

**Morgan completed online documents through the EF website to do the enrollment.  Trent, Morgan, and Lynzee helped Lynzee get her passport.**

5.      Please identify and describe in detail every communication you, or L.F., had with the EF Defendants, or any Group Leader, relating to L.F.'s participation on the EF Spain Tour.

**Objection to the form of the question as it is vague as to the timeframe being inquired about.  Further, we object to that extent that Defendants consider the group leader not part of the EF Defendants, Plaintiffs object.  Subject to and without waiver of said objection, prior to Lynzee leaving on the trip, the only verbal communication Plaintiffs had with EF was with their agent, employee, servant, and/or representative, Mr. Arriaga as described in response to Interrogatory No. 3 above.**

6.      Please describe in detail L.F.'s experience on the EF Spain Tour prior to June 27, 2022.

**Objection. This interrogatory is vague, overly broad, and ambiguous with regard to**

specifically what is being asked via the use of the word "experience" and also the timeframe being covered.  Subject to and without waiver of said objection, when Lynzee left for the EF Spain Trip she was excited.  Initially she was making friends, specifically with three of the boys and two of the girls from her school, who she knew beforehand but was not "friends" with beforehand more like acquaintances.  Some of these "new friends" were in different grades than Lynzee.  Lynzee sat with some of these other students on the flight to Spain.  Once they arrived, the newly formed friend group was having fun hanging out, and getting to know each other better.  Lynzee was feeling excited and having fun right from the start.  The first place the trip went, straight from the airport, was the museum.  The airport transitions were smooth.  The California group had met the Pennsylvania group in the Madrid airport and they had combined to travel in the same buses to the museum.  Lynzee though the museum was interesting and fun.  Her first interaction with Defendant Diego Taylor was at the museum when he began acting strangely toward her, which conduct is detailed in the Complaint, which is incorporated herein by reference.  In the time that Lynzee was on the trip, there were threats of discipline made by the EF staff to the group about not drinking or doing drugs, but those rules were not enforced and people were drinking and smoking on the trip.  Nothing was discussed by the EF staff about the boys and girls in the groups dating or having sexual contact with one another.

7.      Please describe in detail L.F.'s memory of June 26, 2022 and June 27, 2022, and state in chronological order, every action L.F. took during those days.

**Objection. This interrogatory is vague, overly broad, and ambiguous.  Lynzee's first interaction with Defendant Diego Taylor was at the museum when he began acting strangely toward her, which conduct is detailed in the Complaint, which is incorporated herein by reference.**

8.      Please describe in detail every action L.F. took from the time she left Diego Taylor's hotel room on June 27, 2022, until she left the police station in Burgos, Spain on June 28, 2022.

**When Lynzee left Defendant Deigo Taylor's room, she went back to her room and tried to go to sleep. She slept about an hour, as best as she can estimate. Lynzee got up, packed and went to breakfast with her friends. She saw Defendant Deigo who approached her and said "good morning". The group of students got on the bus and headed to Burgos. While in Burgos at a shopping center/plaza with her friends, Lynzee finally told them what happened. Specifically, she told Johnny, Tanner, Aidan, and Annabelle. Her friends encouraged her to report the incident, but Lynzee did not want to and did not know what to do. She was upset and scared. Lynzee was crying and Aidan gave her his sunglasses so people would not know she was crying. She could not eat or even sit at the dinner so she returned to her room and Julia came to check on her. Lynzee then told Julia what had happened and Julia went and got Mr. Arriaga. Mr. Arriaga came to Lynzee's room and she told him what happened and he went and got the EF Tour Guide, Eduardo, who also came to the room. Lynzee was then taken to the hospital. Mr. Arriaga, Julia, and Eduardo accompanied her to the hospital, which was traumatic for Lynzee. She was interviewed about the incident which she described to hotel staff as set forth in the Complaint, which is incorporated herein by reference, examined, given many medications that she did not understand, that made her feel sick for days, and tasted horribly, she felt violated and not in control all over again. Immediately from the hospital, a police car took Lynzee to the police station. Mr. Arriaga and Julia went with Lynzee to the police station. At the police station, she was exhausted and heavily medicated. Lynzee kept falling asleep from exhaustion and medication. She had difficulty even keeping her head up, they kept giving her Dr. Pepper but it did not help and she was not even able to hold it, dropping it on the floor. Mr. Arriaga was translating for her.**

9.    Please identify and describe in detail every communication L.F. had from the time she left Diego Taylor's hotel room on June 27, 2022, until she left the police station in Burgos, Spain on June 28, 2022.

**Objection. This interrogatory is vague, overly broad and ambiguous, with regard to the subject matter of the communication being sought, and the participants of the communications being sought. Subject to and without waiver of said objections, see**

**preceding response.**

10.     Please describe in detail what occurred at the University Hospital of Burgos (Hospital Universitario de Burgos) in Burgos, Spain once L.F. arrived there on June 27, 2022.

**See response to no. 8 above, as well as the hospital records produced.**

11.     Please identify and describe in detail every communication L.F. had at the University Hospital of Burgos (Hospital Universitario de Burgos) in Burgos Spain, from her arrival until her departure, on June 27, 2022.

**Objection. This interrogatory is vague, overly broad and ambiguous, with regard to the subject matter of the communication being sought, and the participants of the communications being sought.   Subject to and without waiver of said objections, see response to no. 8 above.**

12.     Please describe in detail what occurred at the police station in Burgos, Spain once L.F. arrived there on June 28, 2022.

**See response to No. 8 above.  Lynzee initially was in a waiting room for awhile, and then went into the office.  Mr. Arriaga went in there and translated.  She was exhausted and her head kept falling.  They gave her Dr. Pepper to keep awake, but she dropped it.  The kept repeating questions about what happened and she repeated to them what she had said at the hospital and what is contained in the Complaint.  Mr. Arriaga kept translating.  They knew she was under the influence of medications and had just come from the hospital.**

13.     Please identify and describe in detail every communication L.F. had at the police station in Burgos Spain, from her arrival until her departure, on June 28, 2022.

**See responses to Nos. 8 and 12 above.**

14.     Please describe in detail every action you took from the time you were made aware of L.F.'s allegations against Diego Taylor, until you arrived in Spain.

**While Lynzee was hospital, Morgan was called by someone named Tara from EF and told to pull over as she knew Morgan was driving.  Tara then gave Morgan the details of the event.  Morgan called Trent who came to Morgan's home.   Morgan and Trent then spoke with Mr. Arriaga about the incident.  Megan from EF was then in touch to set up Trent's itinerary for the flight to go get Lynzee.  Lynzee was permitted to stay on the tour if she wanted to but she just wanted to come home.  Trent was also communicating with Tori from EF who was the European contact for EF, to the best of his recollection, whereas Megan was here in the U.S.  Itinerary information about the travel has been produced.**

15.     Please identify and describe in detail if you, or L.F., spoke with, or cooperated with, any member of the Juvenile Division of the Provincial Prosecution Office for Burgos or any member of the Spain Justice Department. Paper attached had that name on it, but they did not speak with anyone from that office.

**It is unclear who was with what office while Trent and Lynzee were in Spain; however, Trent was told at some point that he had to file another police report because Lynzee was a minor and to press charges he needed to file another report.  There was also some communication about whether the police report had to be filed in Madrid instead of in Burgos because the incident happened in Madrid. There seemed to be some confusion among the officials about where the report had to be filed, and Plaintiffs were adamant about making certain the charges were pressed.  The day after the hospital, Lynzee had gone to the courthouse with Mr. Arriaga and Julia and had to talk to someone who wanted clarification about some of the details of the incident, revisions were made to the report to the best of Lynzee's understanding.  Lynzee was told that Defendant Diego Taylor was saying that the sexual intercourse was consensual.  Went to another police station a couple days later in Madrid, and Trent was there to press charges.  EF tours had a female translator meet Trent there, (Pillar).  The officials there said the charges had already been filed and nothing more was needed.  It was explained that Defendant Diego Taylor would**

**be held for 24 hours and then released because he was a minor. They said a court date would be set but that they did not expect him to return for it and he would just likely be detained if he ever tried to enter Spain again.**

16.     Please identify and describe in detail every communication you, or L.F., had with any member of the Juvenile Division of the Provincial Prosecution Office for Burgos or any member of the Spain Justice Department.

**See preceding response.**

17.     Please identify and describe in detail every judicial event or court proceeding that you, or L.F., attended in any capacity relating to L.F.'s allegations against Diego Taylor and describe in detail the outcome of that judicial event or court proceeding.

**See preceding response.**

18.     Please identify every communication, excluding attorney-client communications, that you, or L.F., had after June 27, 2022, until present, relating to L.F.'s allegations against Diego Taylor.  For each communication, please describe: (a) the date and time of the communication; and (b) the mode of the communication.

**Objection. This interrogatory is vague, overly broad and ambiguous, with regard to the subject matter of the communication being sought, and the participants of the communications being sought.   Subject to and without waiver of said objections, upon return to the U.S., Lynzee spoke with her former boyfriend Lawrence about the incident, as well as a friend Ava.  However, to Ava, Lynzee merely said that something bad happened and that she had to leave the trip early.  Lynzee has also spoke to her medical providers about the incident.  Those records have been and are being produced as more become available.**

19.     Please identify and describe in detail every communication you had with the EF Defendants, from the time you learned of L.F.'s allegations against Diego Taylor, until present. For each communication, please describe: (a) the date and time of the communication; (b) the mode of the communication; and (c) the subject of the communication.

**EF did not continue to communicate with Plaintiffs once they returned to the U.S. other than to check that they returned safely, to the best of Plaintiffs' recollection.  In addition, Plaintiffs sought legal representation and so conversations directly with EF ceased for that reason as well.**

20.     Please provide an itemized calculation of damages you and L.F. suffered as a result of the L.F.'s allegations against Diego Taylor which are referenced and alleged in the Complaint.

**Economic damages include the cost of the travel involved in the retrieval of Lynzee, and the loss of the money for Lynzee having to leave the trip early, as well as medical copays for treatment related to the incident. The costs of these items, to the extent that they are currently available, are identified on the attached documents.  Plaintiffs reserve the right to supplement this response as additional evidence of the costs incurred are being located.**

21.     Please identify all person(s) that you have retained as an expert witness who you may use at trial.  For each expert, identify: (a) the expert witness's written report; (b) a complete statement of all opinions the expert witness will express and the basis and reasons for them; (c) the facts or data considered by the expert witness in forming their expert opinions; (d) any exhibit that the expert witness will use to summarize or support their expert opinions; (e) the expert witness's qualifications, including a list of all publications authored by the expert witness in the previous ten (10) years; (f) a list of all other cases in which, during the previous four (4) years, the expert witness testified as an expert at trial or by deposition; and (g)  a statement of the compensation to be paid for the expert witness's study and testimony in the case.

**Objection. This interrogatory calls for expert information prematurely. The same will be provided in accordance with the Court's scheduling Order.**

22.     Please identify all person(s) who were witnesses to any occurrence, events, facts or circumstances concerning any of the allegations in the Complaint, specifically including the identities and addresses of L.F.'s five friends who L.F. informed of her allegations against Diego Taylor the day after the alleged incident occurred.  For each person, describe in detail the information that person is known or is believed to possess and the person's home address.

**Johnny Mirones- address unknown. Lynzee told this individual what transpired the day following.  He witnessed some of Defendant Diego's behavior leading up to the incident.**

**Aiden Compton: address unknown. Lynzee told this individual what transpired the day following. He witnessed some of Defendant Diego's behavior leading up to the incident.**

**Annabelle Atkins: address unknown. Roommate who was aware Minor L.F. was stepping out of the room. Lynzee told this individual what transpired the day following. She witnessed some of Defendant Diego's behavior leading up to the incident.**

**Tanner Kinsley: address unknown. Lynzee told this individual what transpired the day following. He witnessed some of Defendant Diego's behavior leading up to the incident.**

**Julia Rodriguez (presumed minor): address unknown. Lynzee told this individual what transpired the day following, and Julia was with Lynzee throughout some of the events following the reporting of the incident as set forth in the preceding interrogatory responses. She witnessed some of Defendant Diego's behavior leading up to the incident.**

**Anjelina Salas: other roommate of Lynzee She was not aware of the incident until about 2 months later. She witnessed Defendant Diego's behavior leading up to the incident.**

**Lawrence Mancini: Lynzee's former boyfriend. He was not on the trip. Lynzee informed him of the incident about 2 days after.**

**HILL & ASSOCIATES, P.C.**
/s/*Susan B. Ayres*

_____
**SUSAN B. AYRES, ESQUIRE**
**1700 MARKET STREET, SUITE 3150**
**PHILADELPHIA, PA 19103**
**PHONE: 215-567-7600**
**FACSIMILE: 215-525-4311**
**SUE@HILLJUSTICE.COM**

Date: 12/13/23

# EXHIBIT 10



# EXHIBIT 11

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---o0o---

TRENTON FALLGATTER, on behalf )

of his natural and biological )

minor child, L.F., and MORGAN )

ASH, on behalf of her natural )

and biological minor child,   )

L.F.,                         )

                              )

          Plaintiffs,         ) NO. 4:23-CV-01038 KM-DFB

                              )

              vs.             )

                              )

EF EDUCATIONAL TOURS, EF      )

EDUCATION FIRST INTERNATIONAL,)

et al.,                       )

                              )

          Defendants.         )

_____)

REMOTE DEPOSITION OF MORGAN ASH

TUESDAY, APRIL 29, 2025

REPORTED BY:

MARY JACKSON

CSR 8688

JOB NO. 1323945



Page 29

leader for the tour?

A.    Yes, it was.

Q.    And what were you -- what was your first information about the tour?

A.    Just the pamphlets that you guys have and basic, you know, what the teacher tells and then I did my own research from your website.  My manager at work her, both daughters actually, within the past five years had gone on EF tours.  I reached out to Lynzee's grandmother, Martha Walda (phonetic), Trenton's mother, and she was familiar with EF tours.  So I said okay, we're going with EF tours.  That's the research I did.

Q.    Did you get information about the tour from Mr. Arriaga before you signed up?

A.    Oh, yes, yes.  We had meet -- he had a couple meetings.  We went in and did -- he had a whole PowerPoint presentation, answered a bunch of questions.  Yeah, we did a lot of research before we actually signed up.

Q.    Do you know whether he had been a group leader before for EF tours?

A.    I believe so, yes.  Yeah, yeah, he was.

Q.    Do you remember how many meetings you went to before you signed up?

A.    Two.  We did two Zoom meetings.



Page 32

A.    Oh, sorry.  I don't know what I'm doing.  I work hands-on in the medical field.  I'm not great with Zoom meetings.

Q.    Not a problem.  I am going to bring you to a couple of places here.  So to your memory, do you recall that Lynzee's group from California was combined with another group on the tour?

A.    Yes.

Q.    And did you have an understanding that that was a possibility given the different sizes of the groups that were involved?

A.    Yes.

Q.    Okay.  So you knew that, like, the group from California might be combined with another group of students?

A.    Yes.

Q.    Okay.  When you were signing Lynzee up for the tour, did Mr. Arriaga go over any rules for behavior or conduct for the students?

A.    Yes.

Q.    Do you remember what some of those were?

A.    Not off the top of my head, no.

Q.    Do you recall seeing in this brochure that I'm sharing with you, Exhibit No. 1, the EF Rules of the Road that are shown here?



Page 34

personalized website with information about the tour?

A. Yes, I had an app.

Q. Okay. Do you still have access to that?

A. No, I do not. I could figure it out, maybe, if I had time, but I do not.

Q. What was on that app?

A. I believe just the itinerary.

Q. Did Lynzee also have that on her phone?

A. I believe so. I can't say yes or no. I want to say yes, but I'm unsure now that I think about it. I can't remember.

Q. Did you personally go through the rules of the road for the tour with Lynzee?

A. We did in one of the meetings, yes with Mr. Arriaga. Sorry, I was just scrolling down a little bit and messed that up.

Q. That's okay. Do you need to, like, zoom out so you see more?

A. I was just scrolling more down on four. I'm going to stop touching it because I'm messing it up. I apologize again.

Q. You don't need to apologize. If you want to see a different part of it, I highlighted a couple portions, or just points in this just to direct attention to it. So, No. 3 it says, "You are expected



Page 35

to respect the nightly curfew that your group leader may set for your own safety and security.  Room checks will be conducted at the group leader's discretion.  Visitors or group members of the opposite sex are not permitted in your room."  Do you see where I read that?

A.    Uh-huh.  Yes, yes.

Q.    Was that something you discussed with Lynzee before the tour?

A.    Yes.

Q.    And what did you talk with her about that?

A.    We talked about that, that exact thing.  That that's not to happen and I told her because my -- I've heard of some children that do drink and get drugs, you know, party because they can when they're younger.  I said, please for the love of God stay away from that stuff.  You'll get kicked off, arrested in a foreign country.  I made it very dramatic to Lynzee about everything.

Q.    So Lynzee was aware there was going to be a curfew and that she was expected to abide by the curfew while she was on the tour?

A.    Yes.

MS. AYRES:  Objection to form.

BY MS. THORVALDSEN:

Q.    And Lynzee was aware that that rule about the



Page 36

curfew was for her safety, right?

A.   Yes.

MS. AYRES:   Object to form.   You can answer.

THE WITNESS:   Yes.

BY MS. THORVALDSEN:

Q.   Did you discuss with Lynzee the -- like, the gender separation policy as in, you know, girls were not supposed to go into boys' rooms and vice versa?

A.   Under my understanding, there would not be any boys or girls in the same level.   It would be separated by gender on floors.   I never was under the understanding that Lynzee would be in the same floor as other genders.

Q.   So my question was more did you discuss that policy with her, that boys and girls were not supposed to be entering each other's rooms on the tour?

A.   Yeah.   She went through it with -- yeah, yes.

Q.   She understood that that was a rule and breaking the rule could result in her getting dismissed from the tour?

MS. AYRES:   Objection to form, but you can answer.

THE WITNESS:   Yes.

BY MS. THORVALDSEN:

Q.   And now you said that you had an understanding



Page 37

that girls and boys would be separated on different levels; is that right?

A.   Yes.

Q.   Where did you gain that understanding?

A.   We were told from Mr. Arriaga and there was another person on one -- it was an EF tour -- it was on a question, Zoom call.  I can bring up emails -- if I can find them, I don't know if I can, but it was just told that that was how it was.  That's what my manager had told me with her daughters, that they both had different -- boys and girls were not allowed on the same floor.  That was one of my hugest concerns actually going into this.  And that -- I had two other parents tell me they had tours where they were separated.

Q.   You just said that was one of your hugest concerns.  Why was that?

A.   Because I don't think boys and girls should be on the same floor unless there's an armed security guard by each room because of the way teenagers act.

Q.   Are you being hyperbolic when you say armed security?

A.   I'm sorry, that -- I believe that there should be -- yeah, boys and girls should be separated.  If not, there should be a security guard on each floor making sure there's order because children do test limits, no



Page 38

matter what you tell them.  No matter how good they are, you always have bad ones, you have good ones, you have experimental ones.  I thought it would be a lot more security than there was, absolutely 100 percent.  I was led to believe something different on the security part. I would never let her go, knowing her next door neighbor was 16, 17-year-old boy, unless I was in the room with her.  One hundred percent not.

Q.    Lost my train of thought, I'm sorry.  Oh, you had mentioned when you were speaking a moment ago, some emails that you said you might be able to find.  What emails were you referring to?

A.    I just -- Zoom links which I probably don't have because I know I've -- well, it was still this computer.  For the EF tour meetings prior to, you know, question and answers, going over the brochures.  I know one of them there was a representative from EF tours answering questions.  One of the questions was -- and it was by myself and a couple other parents -- the separation of boys and girls.  And so our understanding -- because there was another mother and I that really wanted to go, but couldn't get time off work.  And we were really concerned about that and so that was a huge, huge issue with me that I tried to -- I got as much information that I could on -- and I was



Page 39

comfortable with what I was given.

Q.    Can you point to anything in writing that said that girls and boys would be separated on floors?

A.    I was just assured that's what it was.  And it kind of seems like common practice.  I couldn't think of a scenario where they would be mixed gender under the ruling of their high school chaperone.  That seems like a lot to put on a high school chaperone.  I just listened to what previous people had done and trusted that the EF tour and everybody else's experiences were honest and true and I went with that.

Q.    Did you discuss, before Lynzee went on the tour, your concerns about boys and girls being together and, you know, the potential for some kind of sexual activity between them?

A.    Absolutely.  We discussed it in one of our meetings.  That was that.  We discussed it, it would be put to rest, it would be okay.  I discussed it with Lynzee.  I didn't need to keep harping on it.  It was very well understood.  All of our concerns were put to rest, so we thought.

Q.    I'm specifically asking about your conversation with Lynzee.

A.    Yes.

Q.    What did you tell Lynzee about this policy?



Page 40

A.   I don't -- I can't speak what I said exactly, but she was there during all conversations.  She knows my rules as a parent.  I know how her respect levels work.  It's just a common understanding we have.

Q.   So when you say your rules as a parent, what rule did she understand when she was going on this tour?

A.   As in:  Don't do drugs, don't drink, don't do anything with boys, don't go alone with boys, because bad things can happen, don't leave the group.

Q.   Okay.  So those are the rules you discussed with her and told her you expected her to follow?

A.   Yes.

Q.   When you said her level of respect, what do you mean by that?  What was your anticipated level of respect from Lynzee in terms of following the rules that you set?

A.   To follow them.

Q.   And did you let her know of potential consequences if she didn't?

A.   I didn't, no.

Q.   Did you discuss the EF policy, that if the student participants broke some of these rules of the road, they could be sent home and they wouldn't get a refund?

A.   Lynzee doesn't -- she's -- I can't stress this


MAGNA
LEGAL SERVICES

Page 47

pictures -- I can't remember if the pictures were sent or she showed me when she got here. Everything kind of blurs together at that point. I know at one point, though, she did tell me she met Diego. She thought he was like really cute or (audio cutting out) and then they went on a tour, and he was really pushy with her, trying to grab her hand.

She explained that to me. You know, just mom, daughter talking. I'm like, okay. Well, you know, just watch yourself. Watch how you conduct yourself. My thing is always how you conduct yourself and how you look. That was our thing. She's like, I know. I'm having so much fun, blah. They were having so much fun. I'm like, all right, Sis, just go have fun. She did mention she felt very uncomfortable at one point in the museum. He kept trying to hold her hand. She didn't like that. So I said, stay away from him. Stay away from him or tell someone. Hey, excuse me -- tell him, hey dude stay away from me, you know. I remember I said stand up for yourself. She doesn't want to cause any issues. I said you have to say something. She's like okay. If it gets bad, I'll tell my friends, whatever. After that she's like, we're having the best time of our life. We're scootering and that was the last I heard from her. I was going to go to work and she was going


MAGNA
LEGAL SERVICES

Page 48

to do something, and that was the last I had heard from her until the EF tour liaison contacted me.

Q.   So you did cut out a little bit.  Right at the beginning of when you started talking about Diego.  So I missed part of what you said.  You said that she thought Diego was cute and then you said something else that -- you cut out and we weren't able to hear that part.

A.   When she -- they all met up and he was going to go on a tour of a building, a museum with them.  He wasn't going to be in their group.  Oh, my God.  He's cute, he's so nice.  Blah, blah, blah.  I'm like, okay, cool, great.  Like the whole group, she's like mom they're so group, our group they're great.  That's when they had went to the tour.

He was in their group and she had mentioned he made her feel uncomfortable because he kept trying to hold her hand.  And that's when I said, Lynzee, then tell someone.  You have to tell someone.  Tell him to back off you.  Tell your leader, tell your friend. She's like, well, maybe I'm just -- I don't know.  I'm having so much fun, could be really nervous and blah, blah, blah.  I'll let you know.  I'll figure it out. That's just how we talk.  She's like, I have to assess the situation.  She gets overwhelmed in certain areas and yeah, we talked about that.



Page 49

Then we touched base.  They were going to dinner.  She was having a good time.  They were riding scooters.  I don't think Diego at that point.  That was the last I had heard from her.

MS. AYRES:  Can we take a break at some point.  Before you get too far into -- just because I don't want to interrupt --

MS. THORVALDSEN:  Yep.

MS. AYRES:  Segments.  We've been going for about an hour.

MS. THORVALDSEN:  Yeah.

MS. AYRES:  Not now.

MS. THORVALDSEN:  Now is fine.  You want to take ten minutes or.

MS. AYRES:  I think that's a good idea.

MS. THORVALDSEN:  Okay.

MS. AYRES:  All right.  Thank you.

MS. THORVALDSEN:  Okay.

BY MS. THORVALDSEN:

Q.  Okay.  That was actually a good natural breaking point.  I would like to talk about the incident.  So just to, again, like frame what we're talking about.  Morgan, when you were home in California and Lynzee was in Spain, were you notified by someone that some incident had happened involving Lynzee?



Page 57

happened.  No.  She did not want to be there.  She was completely traumatized.  She's like, how am I going to go -- this was a chance of a lifetime for me to experience something and I just got raped in a hotel room.  I can't go have fun.  I want to go home.  She was completely traumatized.

Q.  Did you understand that Diego was being sent home?

A.  I had no understanding of anything at that time.

Q.  Did Lynzee tell you that she went to Diego's room on the night of the incident?

A.  No.

Q.  Did you learn that at some point?

A.  Yes.

Q.  How did you learn that?

A.  Through all the conversations that have been had.

Q.  So do you understand that Lynzee was breaking the rules by going out of her room after curfew and going into a boy's room?

A.  Yes.  Lynzee was breaking the rules.  I don't believe Lynzee had 100 percent say in breaking said rules.

Q.  Did you have any involvement in the police or



Page 66

following the incident in Spain?

A.    I don't remember.

Q.    Are you aware of -- sorry, lost my train of thought again there.

Can you point to statements that you feel were made by EF or its representatives in advance of signing Lynzee up for the tour that were not true?

A.    Not off the top of my head.

Q.    In this civil lawsuit that we're here about today, one of the defendants that you've named was Mrs. Taylor, who's a group leader, correct?

A.    What do you mean?

Q.    So in this lawsuit you filed, you filed it against EF Educational Tours, EF Education First International, Limited, Diego Taylor and Jennifer Taylor.  Do you understand that those are the defendants?

A.    Yes.

Q.    And Jennifer Taylor was a group leader, correct?

A.    Yes.

Q.    What do you think that Jennifer Taylor did wrong in this lawsuit?

A.    I just can't imagine any mother of any teenager completely being okay with boys and girls



# **EXHIBIT 12**

Page 1

        IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


L.F.,                                :
                                     :
        PLAINTIFF                    :
                                     : CIVIL ACTION - LAW
        V                            :
                                     : NO. 4:23-CV-01038 KM-DFB
EF EDUCATIONAL TOURS, EF             :
EDUCATIONAL FIRST                    :
INTERNATIONAL, LTD., EF              :
INSTITUTE FOR CULTURAL               :
EXCHANGE, INC., EF EDUCATION         :
FIRST INTERNATIONAL, LTD.,           :
DIEGO MANUEL TAYLOR, JENNIFER        :
TAYLOR AND JOHN DOES I-V,            :
                                     :
        DEFENDANTS                   : JURY TRIAL DEMANDED



        VIDEOTAPED
        DEPOSITION OF: TRENTON FALLGATTER

        TAKEN BY:      EF DEFENDANTS

        BEFORE:        TAMMY J. BAKER, REPORTER
                       NOTARY PUBLIC

        DATE:          JANUARY 10, 2025, 9:53 A.M.

        PLACE:         McNEES, WALLACE & NURICK, LLC
                       100 PINE STREET
                       HARRISBURG, PENNSYLVANIA



        Magna Legal Services

           866-624-6221

          www.MagnaLS.com




A. Yes, we -- her and -- myself and her mother split custody 50/50; however, she does spend more time at my residence.

Q. And is her mother's name Morgan Ash?

A. Correct.

Q. And, sir, were you involved in the sign-up process for this trip?

A. I don't believe I signed anything. That was more her mother doing. I wasn't -- I did not sign anything.

Q. You did not sign anything?

A. No. Her mother signed all the documents.

Q. Okay. Besides signing, were you involved at all?

A. I prepared Lynzee for her passport. I took her to a passport appointment and got her passport. That was my role.

Q. So you -- just so we have a record here, we just want to make the record clear, you did not read any of the sign-up material from EF regarding this trip?

A. I did not.

Q. So have you seen it at all?

A. I have not.

(General Terms and Conditions produced and marked Exhibit No. 1.)

BY MR. ALLEN:

Q. Let me just, so we're clear here, I'm going to



Page 22

Q.   So you felt it was important to hold someone accountable?

A.   Yes, absolutely.

Q.   And so -- accountable for the attack?

A.   For my daughter being raped, yes.

Q.   Well what do you think someone did wrong that lead to --

A.   Well --

Q.   -- besides -- taking Diego Taylor out of the picture --

A.   Okay.

Q.   -- putting him aside.  Other than Diego Taylor, who do you think is accountable for your daughter's being sexually attacked?

A.   Well obviously EF Tours for failure to provide a safe environment for my teenage daughter.

Q.   Okay.  So what did EF Tours do wrong?

A.   Well they didn't provide a safe place for my daughter.  I mean that's self-explanatory, but...

Q.   Let's get to the specifics, though.  You have no problem -- the hotel was safe, correct?

A.   Was the hotel safe?

Q.   Yes.  Was it?

A.   I wasn't there.  I don't know.

Q.   Well what did --



MAGNA
LEGAL SERVICES

A.   That's my word.

MR. ALLEN:  Did you say you're -- can you read back his previous answer.

(Answer read.)

BY MR. SCHWARTZ:

Q.   Now you said you attended one Zoom meeting with Mr. Arriaga regarding the trip before Lynzee left for Spain, correct?

A.   Correct.

Q.   How long did that meeting last?

A.   15 minutes or so.

Q.   Did --

A.   It was short.

Q.   Sorry.  Did Mr. Arriaga use slides during the Zoom meeting?

A.   I can't remember to be honest.

Q.   Did Morgan Ash attend that meeting as well?

A.   She did.  We were -- yes.

Q.   And during the meeting you described some what I'll call travel logistics, where you're meeting at the airport, that kind of stuff, correct?

A.   Basics, yes.

Q.   Did Mr. Arriaga open the floor to any questions from parents?

A.   I can't recall.



Q. Did you ask any questions?

A. I don't remember.

Q. Did Miss Ash ask any questions?

A. I don't remember.

Q. Was Lynzee on that call?

A. She was.

Q. Okay.  Did she ask any questions?

A. I don't believe so.  I can't recall.

Q. All right.  Do you recall whether or not Mr. Arriaga during that presentation either verbally discussed basic rules or expected conduct of the students during the trip or had slides outlining what was going to be expected of the students during the trip?

A. I can't recall the -- the content of the -- the meeting.

Q. Had Lynzee ever traveled internationally before?

A. No.

Q. And you've testified you haven't?

A. No, I haven't -- I haven't testified that.  I said I've never been to Europe.

Q. Europe, okay.

A. Correct.

Q. You've never been to Europe?

A. Correct.



Page 38

Q.  Do you know if Morgan Ash has ever been to Europe?

A.  She I don't believe has.

Q.  Okay.  So this was something new to you, Miss Ash and --

A.  Yes.

Q.  -- Lynzee?

A.  Yes.

Q.  And despite the fact that this was going to be a first for your daughter, you don't have any recollection as to whether there was any discussion about rules or codes of conducts or anything that would apply to the students?

A.  Correct.

Q.  And I think you said that you never had any discussions with Lynzee about the facts of what happened, correct?  Is that a fair statement?

A.  That's fair.

Q.  You were concerned enough as a parent to get on a flight and go to Spain to see if she's okay, but you weren't concerned enough to ask any questions about what happened, how it happened, why it happened, is that your testimony?

MS. AYERS:  Objection to form.  You can answer.



Page 41

Spain?

A. The conversation between Morgan and I was typically over the phone. If there were any text messages, I don't -- I don't recall.

Q. Okay. Have you ever been asked to produce those text messages?

A. I believe so. If I had any, then I would have forwarded them to my attorney -- or Lynzee's attorney, rather.

Q. Did you text with Lynzee at any time while you were on your way to Spain or once you got to Spain?

A. I can't recall. If I had it was more of a -- travel plans and when I would be there and, you know, tell her that I love her and I'm sorry this happened to her, things like that. But that was about it if anything at all.

Q. Okay. Because I mean you -- you say you were concerned enough to get on a flight to go to Spain --

A. Of course.

Q. -- but I have not seen any texts between you and Lynzee directly indicating your anticipated arrival, your arriving in Spain, coordinating where you're going to meet, checking to see how she was. I haven't seen any of the those texts.

A. True.



# EXHIBIT 13



‹ Help Center: Safety

# Safety policies & procedures

Lea este artículo en español

Based on our experience, we have developed the following policies and guidelines to ensure that students are safe and secure throughout the tour. Upon arrival, the Tour Director will review safety precautions specific to your tour. However, it's critical that students understand these rules in advance and behave accordingly while abroad. With cooperation and considerate behavior from each and every traveler, the tour is sure to be a safe and memorable one.

## *EF's safety policies*

**Alcohol**
EF does not allow travelers under the age of 18 to consume alcohol on tour. The Group Leader might wish to prohibit alcohol consumption by all travelers, regardless of age, and if so they will ask travelers to sign a Prohibiting Beer & Wine form. Excessive drinking or consumption of hard liquor by anyone in the tour group will result in disciplinary action, including immediate dismissal from the tour at the traveler's expense.

**Hotel safety**
Please be aware that every person in a hotel room may not have a room key. When students receive their room assignment, they should designate a key holder or plan to leave their key at the reception desk when they are not in their room. Remember that their hotel door should remain locked at all times, both when they leave the room and when they are inside. Because the type of fire safety systems provided will vary between hotels, travelers should read the fire safety instructions in their hotel room and be sure to know where the nearest fire exits are located. Some hotel rooms may not have phones, so travelers should know where they can find their Group Leader and Tour Director at all times. The Tour Director will review safety policies while on tour, and it's important that all travelers pay close attention.

**Traffic and transportation safety**
Travelers should keep in mind that traffic patterns and behaviors can be very different abroad than at home. Cars might drive on the opposite side of the road, so travelers should always look both ways before crossing the street. Don't forget to look right! Travelers should pay special attention at intersections, use pedestrian crosswalks whenever possible and always wear a seat belt on tour buses if available. In many cities there are hourly bicycle rentals readily available. Travelers should not partake in these rentals since helmets are not provided and they are not part of an organized, guided bike tour.

**Swimming**
Travelers may have the opportunity to swim in an ocean, a lake, a river or a hotel pool. In most cases, there may not be a lifeguard on duty. Swimming will only be allowed in EF-designated areas and with the permission and knowledge of the Group Leader. If there is any question about the conditions or safety in the area, they should stay out of the water. If students decide to swim at any point during the tour, they should be sure to swim with a group of friends and to follow all swimming area rules.

**Free time activities**
Some tours may include some free time. However, this does not necessarily mean that students are free to do whatever they like without restriction. Travelers should always stay with others and not go anywhere alone. The Group Leader is responsible for supervision of the group at all times. EF only allows travelers to participate in EF-sanctioned optional excursions or other EF-approved activities suggested by the Tour Director. Please note that the Global Travel Protection plan does not cover activities that are not sanctioned by EF.

L.F. 0472

# Related Articles

 Hotels & accommodations on tour

 Safety guidelines for travelers

**We're here to help. Call us:**

*Teachers and Group Leaders*

*800-637-8222*

*Students and Parents*

*800-665-5364*

---

## Careers at EF

*View Opportunities*

## Resources

*Help Center*

*How It Works*

*About EF*

*Blog*

*Customer Reviews*

## Stay connected

    

---

## Other EF tour brands

*EF Explore America*

*EF Study Abroad*

*EF Tours for Girls*

*EF Educational Tours Canada*

*EF Ultimate Break*

*EF Go Ahead Tours*

L.F. 0473

# EXHIBIT 14

 **EDUCATIONAL TOURS**

MENU ☰

‹ Help Center: Safety

## Safety guidelines for Group Leaders

Lea este articulo en español

Throughout the years, we've found that teachers know best how to care for their students. That's why Group Leaders work closely with their Tour Director as the point person for each traveler's safety and conduct.

*Prior to tour, the Group Leader is responsible for:*

**Setting expectations for good behavior**
It's a Group Leader's responsibility to maintain appropriate traveler conduct while on tour. Before departure, they set clear expectations for travelers' behavior (curfew, rules regarding drinking, etc.). They also take disciplinary action should there be any infractions of these rules.

**Meeting with chaperones and other Group Leaders**
Prior to tour, Group Leaders should meet with their chaperones from the group to discuss their roles and responsibilities. On arrival day, they will meet with the other Group Leaders on tour to discuss their objectives for the trip, as well as rules and regulations. Discussing plans together and addressing any questions or concerns daily promotes cohesion within the larger group.

**Being familiar with medical histories**
Group Leaders need to be aware of their travelers' medications and health concerns. They should collect this information before tour using the Traveler Health & Medical Profile form.

*On tour, the Group Leader is responsible for:*

**Supervision of the group at all times**
The Group Leader (or a designated responsible adult) must accompany the group at all times, including during meals, sightseeing excursions and optional excursions on tour.

**Assisting with room assignments**
The Tour Director may need the Group Leader's help upon arrival at each hotel as traveler rooming configurations may change from one hotel to the next.

**Checking attendance and "counting heads"**
Group Leaders will ensure that all travelers are accounted for. This might include having travelers count off or divide into smaller buddy groups.

**Staying behind in an emergency**
In the case of illness, accident, lost passport or anything that causes a traveler to remain behind, the Group Leader must stay with this traveler. They also must ensure that the rest of the group is accompanied by a responsible adult. If there are no other adults, the entire group will stay behind.

# Related Articles

 Group Leaders

L.F. 0478

 Health & medical needs

 Rooms & roommates

 Tour Directors

## We're here to help. Call us:

*Teachers and Group Leaders*

*800-637-8222*

*Students and Parents*

*800-665-5364*

## Careers at EF

*View Opportunities*

## Resources

*Help Center*

*How It Works*

*About EF*

*Blog*

*Customer Reviews*

## Stay connected

    

## Other EF tour brands

*EF Explore America*

*EF Study Abroad*

*EF Tours for Girls*

*EF Educational Tours Canada*

*EF Ultimate Break*

*EF Go Ahead Tours*

L.F. 0479

*EF Gap Year*



Education First

© 2023 EF Education First

Careers | *Privacy policy and legal notices*

L.F. 0480

 **EDUCATIONAL TOURS**

MENU ≡

# We're here to help

## Teachers and Group Leaders

Whether you're thinking about leading a tour or simply have questions, we're here to help.

 Click here to chat with us

 800-637-8222

 Teacher and Group Leader Inquiries

## Parents and Students

Are you a parent or student? We'll help you find answers to all of your questions—just let us know what you need.

 Click here to chat with us

 800-665-5364

 Parent and student inquiries

## North America Offices

With offices in Boston, Denver and Austin, our doors are always open so you can drop in for a visit.

 **EF Center Boston**
Two Education Circle,
Cambridge, MA 02141

 **EF Center Denver**
2373 15th St. Suite 400
Denver, Colorado 80202

 **EF Center Austin**
1221 S. Congress Street, Suite 400
Austin, TX 78704

L.F. 0481

## We're here to help. Call us:

*Teachers and Group Leaders*

*800-637-8222*

*Students and Parents*

*800-665-5364*

---

## Careers at EF

*View Opportunities*

## Resources

*Help Center*

*How It Works*

*About EF*

*Blog*

*Customer Reviews*

## Stay connected

    

---

## Other EF tour brands

*EF Explore America*

*EF Study Abroad*

*EF Tours for Girls*

*EF Educational Tours Canada*

*EF Ultimate Break*

*EF Go Ahead Tours*

*EF Gap Year*

---



Education First

© 2023 EF Education First

L.F. 0482

# EXHIBIT 15

Jennifer Taylor
March 04, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| L.F., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| Vs. | : | |
| | : | NO. |
| EF Educational Tours, EF | : | 4:23-cv-01038- |
| Education First | : | MWB |
| International, Ltd., | : | |
| EF Institute for Cultural | : | |
| Exchange, Inc., | : | |
| EF Education First | : | |
| International, Ltd., | : | |
| Switzerland, Diego Manuel | : | |
| Taylor, Jennifer Taylor, | : | |
| & John Does I-V, | : | |
| | : | |
| | : | |
| Defendants | : | |

- - -

TUESDAY, MARCH 4, 2025

- - -

Remote deposition of JENNIFER

TAYLOR, beginning at 3:32 p.m., before Samantha

Napolitan, a Professional Reporter, and Notary

Public.

- - -

Jennifer Taylor
March 04, 2025

Chad been married?

A.      26 years.

Q.      Do you have children?

A.      We do.

Q.      How many?

A.      Children?

Q.      Yes.

A.      Two.

Q.      And what are their names and ages?

A.      Diego is 20 and Natalia will be 18 next week or two weeks I guess.  Soon.

Q.      Fair enough.  When did you first -- do you recall what year you first heard of the EF Institute For Cultural Exchange?

A.      I suppose I have always known as a Spanish teacher what EF was, but I took my first trip as a chaperone in 2004.

Q.      How many trips in total have you gone on through EF -- through the EF Institute For Cultural Exchange?

A.      I believe nine.  Mostly, I know that I have taken over 200 students abroad.

Q.      Okay.  And you believe that was

on about nine separate trips?

A.        Yeah, nine or ten.  I don't quite recall.  I did lose track after five.

Q.        Okay.  And you mentioned that your first trip was as a chaperone in 2004. Did your role at some point going on these trips change from chaperone to something else?

A.        Yes.  Yes.  I eventually changed to leading the tour.

Q.        And do you recall how many -- do you recall how many -- sorry.  I don't know how that's happening.  Sorry about that.

Do you recall how many tours you have been on as a leader?

A.        So 2015, '17, '19, also '18, '22.  So six or seven that I was the leader.

Q.        Okay.  And when was the last tour you took as a leader?

A.        That would have been the summer of 2023.

Q.        And are you -- do you have any tours currently planned through EF that you're going on as a leader?

A.        Currently not right now.

of somebody else and always kept very aware of

everything that needed to be done.

Q.      Do you know who your liaison

was, and even if that had changed, who your

liaisons were for this June 2022 trip that is

at issue?

A.      I do not know.

Q.      You -- now, I understand that

your husband Chad was also on this particular

trip; is that right?

A.      Yes.

Q.      Had he gone on other EF Tours as

well?

A.      Yes.

Q.      Do you know how many EF Tours

Chad had gone on prior to the June 2022 tour?

A.      Give me a second to think.  To

the best that I can remember, would be five.

Q.      So this would have been his

sixth in June of 2022?

A.      Well, I was counting my '23

trip.  So prior to that -- so that would have

been, I guess, then his 4th.  Oh, 5th because

I'm going -- sorry.

native Spanish -- a native Spaniard, and they tell you this is -- these are the keys that we have and that it was my responsibility to pass them out to the rooms I have been given.

Q.    Pass them -- I'm sorry.  I just want to make sure I heard you.  Pass them out to the rooms you had been given, is that what you said?

A.    Yes.  So, for example, if I was given five hotels rooms, it was my responsibility to divide five hotel -- my students amongst five hotel rooms.  Sometimes they are double.

Q.    So is the assignment of the hotel rooms something that you did once you arrived in Spain in June of 2022?

A.    Yes.

Q.    And did you receive all of those keys for all of the various hotels at once or when you got to each different location you got that hotel's?

A.    Upon arrival to that hotel, you found out the number of rooms.  Sometimes three people per room, sometimes four people per

Jennifer Taylor
March 04, 2025

room.  So, it becomes a mathematical equation to try to make sure each time you get there.

Q.      So is it fair to say that the room assignments are not done until you arrive at the particular hotel?

A.      That is correct.

Q.      And were you the only person who made the decision about where to assign rooms?

A.      For my group, yes.

Q.      And was there any particular method to who got assigned to which room when you assigned the rooms at the various hotels?

A.      I allow students to choose one, two and three people that they feel comfortable rooming with.  And then depending on the situation, whether I have doubles, triples, quads, sometimes I have all three, I work out which I think will be the most comfortable for my students.

Q.      What about with regard to which room, like, meaning which room number a student goes into -- was there any method to your determination as to which student would go into which room?

Jennifer Taylor
March 04, 2025

how things ended, I don't quite recall.

Q.      Let me show you a document that
we -- I marked ahead of time as Taylor-1.  This
is the booking conditions for the trip.  Are
you able to see that on the screen?

A.      Very tiny.

Q.      I'm trying to make it bigger.

MR. ALLEN:  Can we see the Bates
stamps, please.

MS. AYRES:  Yeah, hang on.  It
is Bates stamped EF2 through EF9.

MR. ALLEN:  Okay.

MS. AYRES:  That's the end of
it.

MR. ALLEN:  Thank you.

- - -

(Whereupon, Taylor-1 was marked
for identification.)

- - -

BY MS. AYRES:

Q.      My first question is just you
see the document on the screen.  I want to make
sure I'm sharing it properly.

A.      I'm seeing it, yes.

Jennifer Taylor
March 04, 2025

A.      No.

Q.      Did you have -- how many leaders were -- leaders were assigned to your group for this June 2022 tour?

MR. ALLEN:  Objection.

(Crosstalk.)

BY MS. AYRES:

Q.      Yeah.  In the same role as you.

MR. ALLEN:  Excuse me.  Object to the form.

MS. AYRES:  I'm rephrasing it.

MR. ALLEN:  I had not got my objection out yet.

BY MS. AYRES:

Q.      How many people were there in the same role as you for your group on this June 2022 tour?

MR. ALLEN:  Object.  Go ahead.

THE WITNESS:  I am the only leader.

BY MS. AYRES:

Q.      Okay.  Did you have any chaperones for this tour?

A.      No.

Q.        What was your husband's role, if any, on this tour?

A.        His job was to do room checks for boys at night.

Q.        And who assigned him that role?

A.        I did.

Q.        Did you have any other nonstudents, other than the tour guide, with you in your group for this tour other than you and your husband?

A.        I always invite my friend who is a nurse to come along on our tours since I have no knowledge of such things.

Q.        And is her name Kristin?

A.        Yes.

Q.        Did Kristin have any assignments from you on this tour?

A.        Other than if someone was sick, I might say could you go check on them.  We were in COVID, so there was a lot of fear of that.

Q.        So when you transitioned from the chaperone role to the group leader role, which I understand happened around 2015, was

Jennifer Taylor
March 04, 2025

in person meeting with someone from the EF

Institute.

MR. ALLEN:  Object to the form.

I object to the word working.  You may

answer.

THE WITNESS:  So when -- it was

never in person, but every time there

would be a tour, I would always have a

very lengthy conversation with someone

from EF going over all of the

particulars.  Of course, as time went on

and I became -- I mean, I feel that I am

pretty good at it.  That less and less --

the meetings would be shorter because

there was less to discuss.

BY MS. AYRES:

Q.    And were those telephone

conversations or Zoom meetings or something

else?

A.    Never face.  It was always

telephone, maybe Zoom.  But I think most of the

time they were telephone conversations.

Q.    Did you receive any type of

training from the EF Institute for your role as

a chaperone when you first started back in 2004?

A.    No.  We had -- we received -- that would have been the responsibility of the tour leader at the time.  And so, of course, she, at the time who was running our tour, she made sure that her chaperones understood our -- the responsibilities that she felt were important.  I'm not sure that it was from EF.

Q.    Did the EF Institute ever provide you with any types of rules or regulations that you needed to enforce for the students on your tour?

A.    Yes.  They have various things online of various articles and handouts that are at our disposable that we also send out via mail saying things, like, "EF Rules of the Road" I believe one of them is called.  Things you should never do when you are abroad.

Q.    How about with regard to curfews -- did EF -- did the EF Institute set a specific curfew for your students on your tour?

A.    No.

Q.    Did they require that you set a

Jennifer Taylor
March 04, 2025

curfew for the students on your tour?

A.          There was never a set curfew. Of course, depending -- I have traveled several times.  Depending on our leader, the native that was there, they would sometimes suggest, "Hey, we are getting up early.  It's an early bus ride.  It might be best to get -- that they go to sleep."  But it was more suggestions, never rules.

Q.          On this particular tour, did you as the group leader have a curfew for the students in your group?

A.          Yes.

Q.          What was it?

A.          Each night varied.

Q.          Each night varied based on what your plans were for the following day?

A.          And based on when we got back to the hotel.  Because it would be impossible to set a curfew because the tour is constantly changing.  So we have to be flexible.

Q.          Did the EF Institute provide you with any rules or regulations with regard to establishing hallway supervision at the hotels

Jennifer Taylor
March 04, 2025

for the students in your group?

MR. ALLEN:  Object to the form.

THE WITNESS:  I'm sorry, can you say that again.

BY MS. AYRES:

Q.       Yeah, sure.  Did the EF Institute provide you with any rules or regulations that you were required to enforce for the students in your group specific to hallway supervision at the hotels?

MR. ALLEN:  Object to the form.  You may answer.

THE WITNESS:  No.

BY MS. AYRES:

Q.       Did the EF Institute ever provide with you any rules or regulations that you were required to enforce with the students in your group relative to room checks during the night at the hotels where you were staying?

A.       No.

Q.       You mentioned that you gave your husband the assignment of performing room checks on the boys' rooms at the hotel during the trip; correct?

Jennifer Taylor
March 04, 2025

A.      Correct.

Q.      What was the specific room check that he was supposed to perform on this trip?

A.      So my students -- each student signed a contract saying and that they recognize that after their room was checked, that the door was not supposed to be opened and no one was supposed to leave the room.  So when my husband would stop in, usually, for example, let's say, room check is midnight.  We say, you need to be in your rooms, you know.  In this case, Mr. Taylor would be coming by to the boys' rooms to be checking the room at midnight, be ready.  And then he would make sure everyone was in the room, talk to them briefly.  How was your day?  Did you have fun?  Even though we saw them the whole day.  It was more of just a comfort check to make sure that they were all okay.  And it was, have a nice evening.  And once the door shut, they were -- they knew that -- we made sure that -- we wanted the parents to know -- and this was our personal decision -- that when their children said to goodnight to us and we saw them, they

Jennifer Taylor
March 04, 2025

screen?

A.       Yes.

Q.       You mentioned during one of your earlier answers, a student contract that your students in your group had to sign.  Is this exhibit that contract?

A.       It is that contract.

Q.       And did you prepare this contract?

A.       Yes.

Q.       And did you come up with the content of this contract on your own?

A.       Yes.

MR. ALLEN:  Object to form.  You can answer.

THE WITNESS:  Sorry.

MR. ALLEN:  You can answer unless I tell you not to answer, but I'm objecting for the record to the form of that last question -- on your own.

THE WITNESS:  So this is the behavior contract that each student received.  I do believe that this was -- this was a fluid document in that there

Jennifer Taylor
March 04, 2025

were more items that were added over the years based on experiences that I had.

So as things change and as, you know, if I -- if we were going somewhere that was not on an airplane, that would not be -- the airplane behavior would have been removed.

BY MS. AYRES:

Q.     Sure.

A.     So it's fluid to go along with the tour, but I do believe that this was several tours and trips in the making.  So I could not say that it is all my own work, but I approved all of it.

Q.     Were there resources available to you through the EF Institute in terms of coming up with rules and regulations for your students on your tour?

MR. ALLEN:  Object to the form.
You may answer.

THE WITNESS:  I would not --

MR. ALLEN:  Go ahead.

THE WITNESS:  As far as specific forms, there were, I believe, some you

Jennifer Taylor
March 04, 2025

their room assignments as they were literally

entering the rooms?

        A.        Yes.  Usually, everyone gets in

a circle around and I will announce their name,

I will hand them the key, and off they go.

        Q.        Do you recall who Diego's

roommate was on this tour?

        A.        Well, in that particular hotel,

I -- yes.  But, as I said, they -- the

roommates change.  Sometimes they stay in a

double, a triple, a quad.  It's always fluid.

        Q.        Who was his roommate in that

particular hotel?

        A.        Nick Sheculski [SIC].

        Q.        Did you say Nate?

        A.        Nick -- Nicholas.

        Q.        I'm sorry.

        A.        It's okay.

        Q.        Were all of the students on your

tour students at the school where you work?

        A.        I believe on that particular

tour, yes.  They're always -- they are always a

student or someone I have either had previously

-- they are always students I know.  They are

Jennifer Taylor
March 04, 2025

Q.      Do you recall how many students were in the California group that was combined with your group?

A.      I believe around the same number as we had.  Maybe less.

Q.      Do you recall how many group leaders there were in the California group?

A.      I'm not sure the distinction of leaders versus adults.

Q.      Do you recall how many adults there were with the California group that was combined with your group?

A.      I know of at least three.

Q.      I think you said -- did you ever have -- do you recall ever having any conversations with Lindsay Fallgatter?

A.      Not any other than I would with any other teenager.  Nothing personal.  Just hola.

Q.      Do you recall ever exchanging any written communication with her?

A.      No.

Q.      I want to take a look at a few other documents here, see if we can just, kind

Jennifer Taylor
March 04, 2025

one thing -- the wording I remember is rules of the road.  Very general things about travel safety when you travel anywhere.

- - -

(Whereupon, Taylor-7 was marked for identification.)

- - -

BY MS. AYRES:

Q.        What I marked as Taylor-7, which is what was marked as 6 during the Megan Allen deposition, says at the top here, "Safety guidelines for group leaders."

Do you see that?  This is a three-page exhibit.  I think the second and third page are just other links, but I just want you to see all three pages.

A.        Uh-uh.

Q.        Do you recall ever seeing these safety guidelines for group leaders before?

A.        I am sure -- I'm not sure that I have seen it on a paper copy, but definitely on the EF website has come a long way to make everything very accessible on their website. At one time, I probably received a paper copy,

Jennifer Taylor
March 04, 2025

contacted you tell you the name of the

individual from the other group making the

allegations?

A.      No.

Q.      Prior to receiving that call,

had you noticed your son spending any time

specifically with a person from the California

group on your tour?

A.      My son is social, so he was with

-- he would interact with the other students,

but specifically certain students, no.  We were

together.

Q.      When you say we were together,

are you -- who is the we you are talking about?

A.      So there was inevitable overlap

between our groups when we would be on a bus,

when we would be in museums, and my son is not

antisocial so he was always social talking to

other people.

Q.      Did you see him -- prior to

receiving this call from the gentleman from the

EF Institute, did you see your son spending any

-- did you notice that your son was spending a

particular amount of time with any girls from

Jennifer Taylor
March 04, 2025

conversations with him that night in the middle

the night?

A.      No.  I also -- they were brief

because there was a lot of hustle, but yes.

Q.      All right.  When -- after your

husband and your son moved to the other hotel,

did your receive any -- when did you receive --

when is the next time you received information

about the allegation?

A.      The hearing.  I suppose it's

called a hearing.  The court when we were all

in front of a judge.

Q.      Okay.  At any time before

getting in front of that judge, did you learn

the nature of the allegations being made

against your son?

A.      Prior to being in the room with

the judge, the defense attorney did meet me and

we did have a conversation.

Q.      Was this conversation with the

defense attorney and the hearing in front of

the judge the following day that you received

that call from the EF gentleman?

A.      I believe that I was informed

Jennifer Taylor
March 04, 2025

MR. ALLEN:  No.  Don't imagine.

Did he tell you?

THE WITNESS:  I --

MR. ALLEN:  Don't guess.

THE WITNESS:  Specifically telling me, I'm not sure that he said how I came to know how that reunion occurred.

BY MS. AYRES:

Q.      Did he tell you where they had sex?

A.      Yes.

Q.      And where did he tell you?

A.      He specifically did not tell me the details.  I found out the details when we were in the court hearing.

Q.      Did he, your son, ever tell you where he and Lindsay had sex?

A.      Specifically to me, no.  I found out that information from the court hearing.

Q.      I see.  But when you say from the court hearing, did the information come from your son during the court hearing?

A.      It did.

Q.      Okay.  Did you ever have any

Jennifer Taylor
March 04, 2025

conversations with your son's roommate about

the allegations being made against your son?

A.      So specifically the allegations,

I did not.  Later when he -- I had a

conversation with Nick and I said, do you have

any idea what this could be about?  Because at

this point, Diego was in custody and I was not

-- I was very confused.  I truly believe that

there was a big misconception.

MR. ALLEN:  Just tell her what

you said to Nick.  That's all.  Don't

volunteer.

THE WITNESS:  I said to him, do

you have any idea what this could be

about?

BY MS. AYRES:

Q.      And what did he say?

A.      No.

Q.      At any point, did Nick, your

son's roommate, ever provide any information to

you about what happened between your son and

Lindsay?

A.      Never.

Q.      Are you aware of Nick ever

Jennifer Taylor
March 04, 2025

providing any information to anyone about what happened between your son and Lindsay?

A.      I am not aware.

Q.      Did you have a specific conversation with your son about the -- about the sex that he and Lindsay had?

A.      Afterwards specifically about the nature of the sex, no.

Q.      Did you have any further detailed conversation with him about his sexual activity with Lindsay?

A.      Other than what were you thinking, as a parent would have input.

Q.      And what did he say?

A.      He was very apologetic.

Q.      Did you ask him if Lindsay at any time during their sexual activity said no?

A.      Well, I had both -- I was privy to hearing her side of the story and then his side of the story in the hearing.  So I did not ask questions.  And when my son said the -- his side of the story that day during the trial or whatever it is called, I believed my son.

Q.      So is the only version of -- is

Jennifer Taylor
March 04, 2025

the only details that you heard from your son
about the sexual encounter that he had with
Lindsay those details that he shared during the
court hearing?

A.        Yes.

Q.        Outside of that court hearing,
you never explored the topic with him?

A.        Other than saying -- when he
said that he was -- that he was falsely
accused, I believed my son and I stood behind
him 100 percent.

Q.        What was the resolution of the
hearing or trial that you went to?  What was
your understanding as to what happened at the
end of that?

A.        That because she had -- in
Spain, I recognize that the law is, if you
accuse someone of rape, you're automatically
taken for a rape kit.  The defense attorney had
explained that there was no validity in her
claims.  And so when -- at the end of the
hearing or whatever they call that particular
--

COURT REPORTER:  I think Mr.

Jennifer Taylor
March 04, 2025

Allen is -- he was on mute.

MR. ALLEN:  Yeah.  Now I'm not.

Do not tell -- you can say what you seen,

but don't say what the defense attorney

told you.  Okay?

THE WITNESS:  So --

BY MS. AYRES:

Q.        Let me just ask the question

again more clearly so that you know what I'm

asking for.

What was your understanding of

what happened to the charges against your son

at the conclusion of that proceeding that you

were at?

A.        There were no charges filed.

They gave him his passport and said enjoy the

rest of your trip.

Q.        Did you rejoin your group after

that?

A.        Yes.

Q.        And did you stay for the rest of

the tour?

A.        I did.

Q.        And you have been on other EF

Jennifer Taylor
March 04, 2025

Tours since?

A.        Yes.

Q.        Did your son and your husband go home after that?

A.        Yes.

Q.        Has your husband or son been on any additional EF tours?

A.        My husband, yes.  My son, no.

Q.        Okay.  I want to go back to an exhibit that I had marked as, I think it was 11.  This is -- sorry, I have to move the picture here so I can see.

These are e-mails, again, that were Bates stamped 91 -- EF91 through EF93.  At the bottom here, there is an e-mail from Meg Allen to you dated June 29th of 2022 and, it says there, in the third sentence, "We got some new information very recently that I wanted to discuss with you."

Do you see that?

A.        I do.

Q.        Do you remember what new information Meg Allen had received on or about June 29, 2022 that she wanted to discuss with

# **EXHIBIT 16**

# STUDENT BEHAVIOR CONTRACT

**Dear Parents/Guardians/Student(s),**

     **Please carefully read and discuss the following contract.  After reading each heading, sign at the bottom to show that you have a complete understanding of this contract.**

## BEHAVIOR _____

I will be responsible for my own belongings and my own money.
I will maintain a cooperative and flexible demeanor and treat other travelers with respect and understanding.
I will stay with the group and not wander off on my own.
I will follow the buddy system put in place by the chaperones.
I will be an aware and active tourist at all times.
I will maintain and open mind and positive attitude throughout the trip.
I will try my best to use Spanish at all times.
I **will not** get any tattoos and/or body piercings while on tour.
I **will refrain** from all sexual conduct.
I **will not** hitchhike, drive or rent any motor vehicle.
I **will not** use inappropriate language.

## HOTEL BEHAVIOR _____

I will honor the curfew set in place by Mrs. Taylor for EACH NIGHT.
I will make sure to have the hotel name, number, and closest metro/subway station with me at all times.
I will know the hotel room number of Mrs. Taylor in each city.
I will report to breakfast each morning at the assigned time.
I **will not** enter the hotel room of the opposite sex at any time.
I **will not** leave the hotel under any circumstances without the group.
I **will not** disturb other guests in the hotel:  loud noises, music, TV, running, etc.
I **will not** leave the hotel room after bed checks.

## AIRPLANE BEHAVIOR _____

I will sit in my assigned seat when I board the plane.
I will always be polite and think of others.
I will be respectful of other passengers.
I **will not** pester the flight attendants or my neighbor.

## ILLEGAL SUBSTANCES POLICY _____

I **will not** drink alcohol, smoke, or take illegal substances.
I **will not** buy alcohol, tobacco products, or illegal substances.

## INAPPROPRIATE ITEMS _____

I **will not** bring or buy weapons, pornography, matches, lighters, and/or fireworks.
I **will not** have any unacceptable items anywhere in my luggage (tweezers, metal nail file, scissors, knives, etc.)

## THEFT AND VANDALISM _____

**I will** at all times respect all property.
 -Ex.  Airplane, bus, hotel rooms, airports, subways, restaurants, sites, bathrooms, other's possessions
I **will not** shoplift.

## MEDICATION _____

EF-00000176

I **will not** take medication without advising Mrs. Taylor.

## MONEY & PASSPORT                                                      _____

I will always secure my money and passport on my body so it cannot be stolen.
I will take full responsibility for my money & passport.
I **will never** leave my money or passport in the hotel.
I **will never** ask anyone else to watch my money or hold my passport except Mrs. Taylor.

## DAILY ROUTINE                                                         _____

I will maintain good hygiene while on tour.
I will make shower arrangements with my roommates **in order to be prompt**.

## ROLL CALL                                                             _____

I will remain quiet throughout roll call/head count even after my name is called.
I will take the roll call/head count seriously as it ensures the overall safety of the group.
I **will not** answer for anyone else.

## WATCH/PHONE                                                           _____

I will wear a watch at all times.
I will be conscious of the time.

## PROBLEMS

I will **IMMEDIATELY** inform Mrs. Taylor if a problem arises.

**PLEASE INITIAL EACH SECTION AND SIGN ONE COPY TO RETURN TO MRS. TAYLOR BY**
## JUNE 6, 2022, RETAIN THE OTHER COPY FOR YOUR FILES.

We, _____ and _____
　　　　　　**Name of traveler**　　　　　　　　　　　　　**Name of parent/guardian**
understand and agree to the preceding behavioral contract. Failure to follow the contract may lead to removal from the trip. In the event that Mrs. Taylor removes my son/daughter from the trip, I will immediately purchase an airline ticket for the next available flight home so that he/she can return as soon as possible. I will also be responsible for any chaperone's traveling costs associated with an early departure (transportation and accommodation). I will abide by any decision made by an EF Tour Guide and/or chaperones. If I receive **MORE THAN ONE** In-School Suspension, this school year, I **WILL NOT** be permitted to go on the trip. I understand I will be responsible for all cancellation fees as a result.

_____        _____
Signature of traveler　　　　　　Date　　　　　　　Signature of parent/guardian　　　　　　Date

EF-00000177

# **EXHIBIT 17**

                IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
                     NO.  4:23-cv-01038-MWB

L.F.                             )    VIDEOTAPE DEPOSITION
                Plaintiff   )
                                 )    UPON ORAL EXAMINATION
     - vs -                      )
                                 )    OF
EF EDUCATIONAL TOURS, EF )
EDUCATION FIRST             )    DIEGO MANUEL TAYLOR
INTERNATIONAL, LTD., EF    )
INSTITUTE for CULTURAL     )
EXCHANGE, INC., EF         )
EDUCATION FIRST            )
INTERNATIONAL, LTD.,       )
SWITZERLAND, DIEGO MANUEL)
TAYLOR, JENNIFER TAYLOR &)
JOHN DOES I-V              )
                Defendants )
------------------------)

                     TRANSCRIPT OF VIDEOTAPE

DEPOSITION, taken by and before KATHLEEN M. RIGBY,

Professional Reporter and Notary Public, via Zoom

Teleconference, on Wednesday, March 19, 2025,

commencing at 10:18 a.m.



Page 24

was in that she went to?

A.        No.

Q.        Do you know the city that she lived in?

A.        No.

Q.        Have you ever been suspended in school?

A.        No.

Q.        Does your mom teach at your high school?

A.        Yes.

Q.        What does your mom teach?

A.        Spanish.

Q.        Do you have any siblings?

A.        Yes.

Q.        How many?

A.        One.

Q.        How old?

A.        Seventeen.

Q.        Boy or girl?

A.        Sister.

Q.        Have you ever been arrested?

A.        No.

Q.        Have you ever had a job?

A.        Multiple.

Q.        Tell me about them.  What have you --
where have you worked and what have you done?  Just



Page 60

day one at the airport.  Tell me what happens.

A.        We land and we get there.  And the bus shortly after picks us up.  And while we're boarding, the California group makes their way onto the bus as well.

Q.        Okay.

A.        And --

Q.        And so Cali and -- California and PA, you're all on the same bus at the same time?

A.        Yes.

Q.        It's the first time they see you; first time you see them?

A.        Yes.

Q.        And it's the first time you notice the plaintiff, Ms. Fallgatter?

A.        Yes.

Q.        Did you have any interaction with her that day?

A.        Yes.

Q.        And that interaction was what you spoke about earlier when you complimented her on the way that she looked and what she had on; is that fair?

A.        Yes.

Q.        Okay.  Then tell me about the next



Page 61

interaction you had on day one, if there was any.

A.        We went on a tour.  And I believe, if I remember correctly, we went to a museum.  And that was where I first had that larger interaction with the plaintiff.

Q.        And tell me about that interaction with the -- with -- with the plaintiff.

A.        We just walked around in a very well-known art museum.  And I was with a few of my friends in our group, in a small group of around two or three, and she was with the same, and just kind of mingling around with each and every group trying to get to know each other while also admiring the art work.

Q.        I'm sorry, could you say that one more time?  I couldn't hear you.

A.        We visited a museum.  And we separated our groups into roughly smaller groups of around two or three.  And while wandering the art exhibits, trying to get to know each and every other member of the separate group more.  And so just hearing their conversations and occasionally bumping into her group and talking to her and her friends as well.



Page 63

yes, dinner.

Q.        Were you sitting next to her at dinner?

A.        I was sitting close to her, in proximity.

Q.        Okay.  But were you sitting next to her?

A.        No.

Q.        Okay.  But you were sitting at the same table with her?

A.        It was an elongated table like this one. And I believe she was at the head of the table and I was roughly around where this chair is here (indicating).  So it's somewhat separating us.

Q.        How many other people were at that table?

A.        The entire group.

Q.        So I don't know how many that is.

A.        I believe 30 or 40 --

Q.        Okay.

A.        -- rough estimate.

Q.        So -- so you're sitting at a table -- so your third interaction with Ms. Fallgatter was you're sitting at a table with 30 or 40 other students.  And did you have a personal one-on-one conversation with her, or was it general group conversation?

A.        It was a mixture of one-on-one and general



MAGNA
LEGAL SERVICES

conversation still trying to get to know each other.

Q.      Okay.  Tell me about that one-on-one conversation.  What did you talk about?

A.      Just more simple getting to know you high school stuff, around the same things that we were talking about earlier --

Q.      Okay.

A.      -- and sharing pictures that we had taken.

Q.      Pictures you had taken where?

A.      At the museum and just around and on the bus.

Q.      Were those pictures of each other?

A.      Anything and everything.  Of the street life, of the art work, of the group photos that we posed for, solo pictures, scenery, anything and everything.

Q.      Okay.  So nothing personal.  These were -- are these tourist pictures?  Pictures that a tourist would take?

A.      Exactly.  We are tourists.

Q.      Okay.  All right.  So back at the table, you're having general conversation, nothing personal, sharing tourist pictures.  I guess other



Page 66

MR. HILL:  Forget it.  Nothing.

BY MR. HILL:

Q.       All right.  So -- strike that.

So here's my question:  You said at the table she recommended you follow her on Snapchat?

A.       Yes.

Q.       What is Snapchat?  That's like Instagram?

A.       It's another social media service closely related to Instagram.  It's similar kind of.

Q.       What's the difference?

A.       The pictures that you send go away after a certain amount of time.

Q.       So what you share on Snapchat is time sensitive?

A.       Yes.

Q.       So if I send you -- not -- you know what I'm saying.  So if -- if your mother sends your father a picture, it's going to go away in six hours?

A.       It could go away at whatever convenience.  It could go away immediately.  It could go away in 24 hours or a week.

Q.       You said -- who sets the time of how long before it goes away?



Page 68

A.        It's a platonic thing.  So you have to accept the request.  So if I followed her, she would have to accept it, and then we would become friends.

Q.        All right.  So it's something --

A.        Same thing if you were making a private Facebook.  You would have to accept that person.

Q.        All right.  Yeah.  Talk in Facebook terms because the lawyers here can understand that.  Even we can understand that.

Okay.  So you said it's like a private Facebook?

A.        Yes.  That person would have to accept and then you would be able to smart communication with that person.

Q.        Okay.  So -- all right.  So you have this basic conversation, you share tourist pictures, you -- you exchange Snapchat?

A.        Not at that moment.  Not at that current moment, but, yes, later we did exchange socials.

Q.        Okay.  When you exchanged socials, was it at that table or was it later on?

A.        It was later on in our hotel rooms.

Q.        Okay.  All right.  You said you exchanged



Page 69

socials later on on day one.  At whose hotel room?

A.        At -- just everyone's hotel.  In the hotel.

Q.        Oh, in the -- you weren't in a room, you were just in the hotel?

A.        I was in my room and she was in her room.

Q.        So how do you exchange if she's not next to you?

A.        She was next to me.  Her room was located next to mine.  And she AirDropped a photo that told me to add her social media.

Q.        Jesus Christ.  All right.  Wait.  She Air -- her room was right next to your room?

A.        Yes.

Q.        Like literally like right next door?

A.        Yes.

Q.        Like the only thing separating you is a wall?

A.        Yes.

Q.        And she was able to AirDrop a picture of herself through the wall to your phone?

A.        Yes.

Q.        How did she know where to send it, though?

A.        It appears as you message.  So it will say



Page 70

like the name -- the device name, so mine was my name and then -- so it's Diego's phone.  So she had to select Diego's phone.  And I had to accept it and it appeared on my camera roll.

Q.    All right.  So she sent you a picture. What was the picture of, her face?

A.    Yes.  It was of her laying in her bed with the caption of AMOS and then her handle for Snapchat.

Q.    Do you have what that looks like?

A.    You should have it, I believe.  It is evidence that we submitted.

Q.    Okay.  The picture that she sent, is it -- is it -- is it like a normal picture that someone would send or would you consider that like a sex picture or something else?

A.    It was of her in a nightgown in her bed.

Q.    Could you see her full body?

A.    No.

Q.    Okay.  So what could you see in the picture, just her face?

A.    I could see part of her face, part of her chest, and like the outfit that she was wearing, the fact that she was laying in bed and kind of


MAGNA
LEGAL SERVICES

Page 71

posing.

Q.      Okay.  So she sends you that, you accept it.  What do you do?

A.      I add her on Snapchat.

Q.      Okay.  All right.  That's day one. Anything -- any other interactions?

A.      No.

Q.      Day two, tell me about the interactions.

A.      We had begun another art -- we had begun a morning walk throughout the park with both groups. And so we had begun talking more.  The groups had become more mixed becoming more friends with each other.  And we joined and did another museum tour.

Q.      Day one how many people -- who came to your room day one?

A.      No one other than my parents and Nick.

Q.      What time did your parents come to your room?

A.      They came around the time of curfew that they set.  They did final bed checks.  So probably anywhere from 9 o'clock at night -- probably around there, estimate.

Q.      9:00 until when?

A.      9:00 until 10:00 as an estimate.



Page 72

Q.        Okay.  So on day one, your parents came to
your room between 9:00 and 10:00?

A.        Yes.

Q.        Okay.  They came together or separately?

A.        My dad came in the room.  My mom stayed at
the door.

Q.        Okay.  Were -- were -- teen tour members
of opposite sex, were they all on the same floor?

A.        Yes.

Q.        And they were in rooms right next to each
other?

A.        Yes.

Q.        Was there a hall monitor that sat in
the -- in the hallway at any point in time?

A.        It's a hotel, so no.  The only closest one
would be the concierge desk --

Q.        Okay.

A.        -- which was down the hall.

Q.        Okay.  All right.  So my -- I get that.
But my question is:  At any point in time -- I know
it was in a hotel -- was there a hall monitor who
sat in the hallway on this floor?

A.        No.

Q.        Okay.  Do you know if your parents went to



Page 73

Lynzee's room on day one?

A.       They did not.

Q.       Who went to your room on day two other than you and Mr. -- what's his name again?

A.       Shakowski?

Q.       -- Shakowski?

A.       No one --

Q.       Day two, who else?

A.       No one, again, other than my parents and maybe two -- one or two other male friends.

Q.       What time did your parents go to your room on day two?

A.       Bed check.

Q.       What time was that, between 9:00 and 10:00 sometime?

A.       Around that same time, yes.

Q.       Okay.  And no hall monitor on day two; right?

A.       No.  We are traveling in the eyes of I believe my mom.  We are teenagers and we can handle ourselves.

Q.       But I'm not asking why.  And I understand that's your mom and I understand you want to protect your mom.  I get that.  But I just need you


MAGNA
LEGAL SERVICES

Page 77

Q.        Like their -- their -- you know, their body parts, breasts, their hips, their thighs, their stomachs, their faces, any talk of that?

A.        No.

Q.        Any talk of making out with any of them or hooking up with --

A.        No.

Q.        -- any of them between you or any of the other boys that were on that trip that you recall?

A.        No.

Q.        Okay.  What does the word consent mean to you?

A.        It means to me the ability to say yes to something, to give affirmative action to proceed with anything.  And that can be removed at any point in time.

Q.        Before June -- before the -- strike that.

          New question.  Before this incident on June 26, 2022, how would you describe Ms. Fallgatter's interest in you?

A.        Just very flirty between the both of us.

Q.        What did she do that was very flirty?

A.        Again, already complimenting us, myself and the other members of both genders, and that --



compliment your smile again, because she had done that the day before, or did she compliment your smile again?

A.      Not that I remember, no.

Q.      Okay.  So she complimented your outfit while you were in the park.  Anything else that you remember?

A.      No.

Q.      Okay.  And so after the park, tell me any other personal interactions that you had.

A.      We went to a museum, both groups and we separated into two groups.  And I got matched with the group from Las -- from California.

Q.      All right.  And so that I'm complete, on day two, you guys are at the park.  You said she complimented your outfit, but you can't think of anything else that she complimented you on.  You can't think of any other personal interaction or conversation that you had at the park; correct?

A.      Correct.

Q.      And then later on you go to the -- you go to the museum.  And when you guys are at the museum, you split up in groups and you wind up with the group from California?



Page 87

fair?

A.      Yes.

Q.      Day three, tell me about this.

A.      On day --

Q.      Go ahead.  When do you have any personal interaction with Ms. Fallgatter?

A.      Day three we woke up and we were separated by groups.  The Pennsylvania tour did something different than the California group and so they were absent for the majority of the day.  So I did not get a chance to really conversate with the plaintiff --

Q.      Okay.

A.      -- until that night.

Q.      Okay.  So day three, is it fair to say you had no personal interaction or no personal communication with her whatsoever?

A.      True, other than social media.

Q.      Okay.  And tell me what the social media interactions were about on day three.

A.      This is when the conversation started to become more sexual in nature.

Q.      Okay.  Tell me about those.

A.      Just about like our experiences with



A.        Yes.

Q.        Did the contract establish boundaries that you were not to cross?

A.        Yes.

Q.        Did you ignore those boundaries and cross that -- and do what you weren't supposed to do per the contract?

A.        Some, yes.

Q.        All right.  Let's talk about day four.  I'm sorry.  We're still on day three; right?  I'm sorry.  We're still on day three.  You were talking about she invited you to someone else's room, you didn't want to go because in part -- strike that.

New question.  On day three your testimony has been that Ms. Fallgatter invited you to another room with her.  And this other room had girls in it; right?

A.        It had both, male and female.

Q.        Males and females.  And you didn't go in part because you thought it might be too late for you to go.  And by too late, you mean around midnight?

A.        Yes, but mainly also the secondary reason that I provided of --



Q.        Right, but I'm saying in part.  I know about the secondary reason.  But I'm saying in part was because it was too late.  That was part of reason you testified to; right?

A.        Yes.

Q.        Okay.  Now -- so you don't go.

          What is your next interaction with Ms. Fallgatter?

A.        It was still over text messaging.

Q.        Okay.

A.        When I invited her over to my room.

Q.        You invited her to your room.  And what time did you invite her to your room?

A.        Roughly shortly after that conversation.

Q.        Which was what time?

A.        Around 11:30 approximately until midnight.

Q.        Okay.  All right.  So let's take -- let's take a break right there, because that's probably like the first half of the deposition.

          So I'm going to stop at 11:30 to, you said, 12 o'clock on day three you invite her to your room?

A.        Yes.

Q.        All right.  That probably marks the first



MAGNA

LEGAL SERVICES

two, three, and four, and he was consistent on visiting your room on all -- wait a minute. I"m sorry. Strike that.

We can agree that your father was consistent on visiting your room every night on day one, day two, and day three?

A.     Yes.

Q.     Okay. And he did it every night between 9:00 and 10:00?

A.     Around that time, yes.

Q.     Approximately.

And it was your father, I guess, because it was a boy -- a males' room, and not your mother?

A.     Yes.

Q.     And he would visit your room that one time each of those days, that day one, day two, three, and that's it, that one time; right?

A.     Yes, approximately.

Q.     Okay.

A.     Maybe my room a little bit more, because I am his son and I had -- we shared some supplies, like razors and like shaving cream and --

Q.     Okay. All right. So is it fair to say that your father came to your room between 9:00 and



MAGNA
LEGAL SERVICES

Page 103

10:00 every day for check in consistently day one, day two, day three, but there were times when he would come to your room a few times for like shaving things or something that he needed from you because you were his son?

A.      Yes.

Q.      Okay.  Okay.  Bear with me one second, please.

Earlier I believe I asked you if Ms. Fallgatter was a virgin.  And you told me yes, and she had told you that she was a virgin; correct?

A.      Correct.

Q.      Okay.  And -- and I believe you had told me that you believed, and you still believe, that before that night, she was a virgin; correct?

A.      Yes, correct.

Q.      Okay.  The night that this incident happened in your room, were you worried about getting caught?

A.      Yes.

Q.      What, if anything, did you do about it even though you were worried about getting caught? What did you do about that?

A.      I waited until after the bed checks and



everything were done.

Q.        So your father came in around 9:00 to 10:00.  And then after your father checked on you, that's when you went out and got her to come into your room; is that fair?

A.        Correct.

Q.        Was there a group leader during this time?

A.        When, during the nighttime?

Q.        Yes.

A.        It was my mother as normal.

Q.        All right.  Take me to -- so after this incident happened on June 26th in your hotel room, the next morning, you wake up; right?

A.        Yes.

Q.        Okay.  Does she contact you after -- after you wake up that morning?

A.        No.

Q.        Does she attempt to contact you through social media?

A.        No.

Q.        Does she knock on your room door?

A.        No.

Q.        Does she say anything to you whatsoever?

A.        No.


MAGNA
LEGAL SERVICES

Page 120

over was so that she could come lay in your bed and cuddle with you; fair to say?

A.    And watch a movie, yes.

Q.    Watch a movie and cuddle?

A.    Yes.

Q.    All right.  So she comes in, you talk for a minute, you start to kiss, you get an erection. Then what happens?

A.    We move towards my pull out coach bed.

Q.    Did you pull out -- did you have to pull it out, the bed, or did you just lay on the couch, or was it already pulled out?

A.    It was already pulled out, because we had been staying there for multiple days before.

Q.    Did she ever tell you to take your penis and put it inside of her?

A.    I do not remember.

Q.    Did you have anal sex with her or just vaginal?

A.    Just vaginal.

Q.    Did you go down on her first -- oh, strike that.

       New question.  Did you have oral sex with her first or did she have oral sex with you first?



A.          I had oral sex with her first.

Q.          While you were having oral sex with her, did she ever have an orgasm?

A.          I do not remember.

Q.          While you were having oral sex with her, do you remember what she was saying to you?

A.          That she liked it.  And she had her hands on my hair and was playing with my hair.

Q.          Was she moaning while this was happening?

A.          Quietly, yes.

Q.          She was quietly moaning and telling you that she liked it?

A.          Yes.

Q.          Were her legs spread wide open while you were going down on her or having -- I don't -- strike that.

Let's -- I don't want to say going down on her.  By the way, do people still say -- do young people say that?

A.          Say what?

Q.          Going down on somebody?  Does that mean --

A.          It's a very informal way of saying it, but yes.

Q.          All right.



Page 122

MR. SCHWARTZ:  Mr. Hill.

MR. HILL:  Yes.

MR. SCHWARTZ:  Mr. Hill, just for clarity on the record, can we just agree that instead of saying having oral sex with, can we just say performing oral sex on?

I know it may be verbiage, but, you know, if he's performing oral sex on her, that's a pretty definitive description rather than saying having oral sex with.  That could be giving or receiving.

MR. HILL:  All right.  That's fair.  I will -- I will -- I'll make sure that we're clear as to who's passing and who's catching.

MR. SCHWARTZ:  Understood. Thank you.

MR. HILL:  That's fair.

BY MR. HILL:

Q.     So while -- okay.  So at this point she's on your couch, her legs are spread wide open while you're -- while you are giving her oral sex.



Page 123

Did you take her underwear off?

A.    She took her underwear off.

Q.    And she's playing in your hair, she's moaning quietly, and she's telling you she's liking it?

A.    Yes.

Q.    Are her legs straight up in the air?

A.    No.  They were wrapped around my head.

Q.    And how long did this go on for?

A.    Anywhere approximately between 5 to 25 minutes.

Q.    After this happened, then what happened?

A.    And then we performed vaginal sex.

Q.    Okay.  So you performed oral sex on her for possibly up to 25 minutes, and then you have vaginal sex.  And by that you mean you took your penis and put it inside of her?

A.    Yes.

Q.    Did you use a condom?

A.    No.

Q.    Did you ever ejaculate?

A.    Yes.

Q.    You know what I mean by ejaculate; right?

A.    I do.



Q.        All right.  Like the kids call it like --
I hate to use this word, but to come?

A.        Yes.  Very informal term, but yes.

Q.        Did you come inside of her?

A.        No.

Q.        Where did you come?

A.        On her stomach and then I cleaned it up
and then on her butt and then I cleaned up as well.

Q.        How did you clean it up?

A.        I went to the bathroom and grabbed like a
towel or toilet paper.

Q.        And then what happened?

A.        And then we laid together for a little
bit.  And then shortly after, I would approximate
30 minutes afterwards, we performed sex again.

Q.        Tell me what happened.

A.        As to what?

Q.        You said you performed sex again.  You
stuck your penis inside of her again?

A.        Yes.

Q.        And did you come again?

A.        Yes.

Q.        And where did you come, inside of her?

A.        No.  During no time did I come inside of



her.

Q.      All right.  Where did you come the next time, the second time?

A.      Again, either on her stomach or on her butt and then I went and I cleaned it up.

Q.      Again?

A.      Yes.

Q.      Okay.  So that's twice you're saying you put your penis in her, you came on her stomach or someplace else on her body and you cleaned it up.

        Did you have sex a third time?

A.      Yes.

Q.      Okay.  And then you came again?

A.      Yes.

Q.      Any of these times did she have an orgasm?

A.      Very possibly.

Q.      But do you know if she did or not?  If you don't know, it's fine.

A.      I do not remember, no.

Q.      Okay.  So you came on her -- you -- you -- you put your penis inside of her the third time, you came again on her stomach or on her butt.  And then what happened?

A.      I cleaned it up again.



Q.        You cleaned it up again.  Was there a fourth time?

A.        Yes.

Q.        You -- you put your penis inside a fourth time?

A.        Yes.

Q.        And you came again?

A.        No.

Q.        You didn't come a fourth time?

A.        No.

Q.        What happened the fourth time?

A.        We stopped and we laid in bed.

Q.        Okay.  And then that was it?

A.        We laid in bed, yes.  And then after a short while, I asked her to leave.

Q.        Okay.  So you come -- she comes -- she comes in your room.  You guys kiss after about a minute.  You go have oral sex on her.  You then have -- you then put your penis in her.  You have sex.  You come on her body.  You clean it.

You then have sex with her a second time by putting your penis inside of her.  You come a second time and come on her body.  You go, you clean it.



Page 127

Then a third time you put your penis in her again. You come the third time on side of her -- on her body and you clean it.

The fourth time you go, you put your penis inside of her, but you're unable to come the fourth time.

Then you -- you just lay there for a second. How long do you lay there, about half an hour, something like that?

A.    Around that, yes.

Q.    About half an hour. And then you ask her to leave?

A.    Yes.

Q.    Okay. And that was essentially what happened that night?

A.    Yes.

Q.    Okay. And I didn't miss anything; right?

A.    No.

Q.    Okay. All right. Did you ever put your fingers in her vagina?

A.    Yes.

Q.    What did you do with your fingers?

A.    I fingered her.

Q.    Did you ever put your finger in her -- in



doing this?

A.        No.

Q.        Did she ever tell you that I want to go back to my room?

A.        No.

Q.        How did you learn of the accusations that Lynzee is making against you?

A.        I had gone through the entire next day. And then at night my dad came in my room and got me.

Q.        And what did he say?

A.        He pulled me into his room with my mom. And my mom was on the phone with EF and that is how I was aware of the allegations that were presented.

Q.        The porn that you say that you would watch on your phone starting when you were 15, were any of the -- and you said this was heterosexual porn; right?

A.        Yes.

Q.        Were any of the girls young girls?  And by young girls, I mean around 18 years of age, or 18 or older?

A.        Yes.

Q.        Did you enjoy the porn?


MAGNA
LEGAL SERVICES

A.        Yes.

Q.        So your father pulls you into his room and he tells you about these allegations.  And then what?

A.        They were busy making plans for my arrangements, because EF had informed my mom that I could no longer stay on the trip, and that I had to leave the hotel immediately.

Q.        And where did you go?

A.        We went to a secondary hotel.

Q.        Who did you go to the secondary hotel with?

A.        My father.

Q.        And he stayed there with you?

A.        Yes.

Q.        Until when?

A.        Until the police came to get me.

Q.        Did the police arrest you?

A.        Yes.  I was put in handcuffs.

Q.        Were charges brought against you in Spain?

A.        No.

Q.        And after that night, you never attempted to contact -- strike that.

          After that night she left your room, you



never attempted to communicate with her again; correct?

A.    I sent her a good morning message on Snapchat to no response, so I stopped contact shortly afterwards.

Q.    Okay.  The next morning you sent her a Snapchat message that said good morning?

A.    Yeah.  And asked her how she slept.

Q.    Okay.  And you didn't get a response?

A.    True.

Q.    And did you then sent -- you then sent a follow-up response?

A.    They were at the same time.  It was good morning and how did you sleep.

Q.    Right.  So you sent a communication that said good morning.  How did you sleep.  She didn't respond to that; right?

A.    True.

Q.    And then you never sent another communication to her; correct?

A.    Correct.

Q.    And you're saying -- and that was the next morning.  Around what time did you send that Snapchat?



Page 139

A.          Around 7:45, 8 o'clock in the morning.

Q.          Okay.  And your father told you about the allegations that you had raped her.  He told you that that night around 7:00, 8:00, 9:00, 10:00?  What time?

A.          At approximately midnight.

Q.          Okay.

A.          And the accusations were not that I raped her.  It was that I sexually assaulted her.

Q.          Okay.  How many of these trips have you ever gone on?

A.          One.

Q.          All right.  So tell me about consent.  What is consent to you?  What does it mean?

A.          The ability to say yes or no to something that could be done to you.  And then that can be removed at any point in time.

Q.          All right.  So I'm going to read some of the accusations that she says.  She says that you pulled her into her room.

            Are you saying she's lying if she says that?

A.          Yes.

Q.          She says she went to meet you in the



Page 140

hallway.  Is that true, or are you saying that she's lying?

A.      That is true.

Q.      Okay.  So she went to meet you in the hallway outside of both of your rooms?

A.      Yes.

Q.      And you met her in the hallway outside of your rooms?

A.      Yes.

Q.      And you said that was about midnight?

A.      Around that time, yes.

Q.      Okay.  Do you know if it was before midnight or after midnight?

A.      I do not remember.

Q.      Okay.  So it could be -- it could have been between 11:00 and 12:00?

A.      Yes.

Q.      She says when she met you in the hallway, that there were other people in the hallway.  Is that true?

A.      That's not true.

Q.      Could you see other people, though?  Like wasn't this on the first floor?  You could see -- could you see the front desk?



# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TRENTON FALLGATTER, on behalf     :
on his natural and biological minor child,     :
L.F., and MORGAN ASH, on behalf of     :     CIVIL ACTION LAW
her natural and biological minor child, L.F.     :
    :
    Plaintiffs     :
    :
    :     NO. 4:23-CV-01038 MWB
    v.     :     (Hon. Matthew W. Brann)
    :
EF EDUCATIONAL TOURS,     :
EF EDUCATION FIRST     :
INTERNATIONAL, LTD., EF INSTITUTE     :     Complaint Filed 6/22/2023
FOR CULTURAL EXCHANGE, INC., EF     :
EDUCATION FIRST INTERNATIONAL,     :
LTD. (SWISS), DIEGO MANUEL     :
TAYLOR, JENNIFER TAYLOR, and     :     JURY TRIAL DEMANDED
JOHN DOES I-V.     :
    :
    Defendants     :

## DEFENDANTS EF EDUCATION FIRST INTERNATIONAL, LTD. (SWISS) AND EF INSTITUTE FOR CULTURAL EXCHANGE, INC.'S ANSWERS TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

Defendants EF Education First International, Ltd (Swiss), and EF Institute for Cultural Exchange, Inc., ("EF Defendants") hereby provide these answers to Plaintiffs Trenton Fallgatter, on behalf of his natural and biological minor child, L.F., and Morgan Ash, on behalf of her natural and biological minor child, L.F.'s (collectively "Plaintiffs") second set of interrogatories in accordance with Rule 33 of the Federal Rules of Civil Procedure.

### ANSWERS

### INTERROGATORY NO. 1:

In June 2022, what written rules, regulations, guidelines, or protocols were in place concerning housing group members of the opposite sex while on the EF Tours, including room assignments, room checks, hallway monitors, chaperones, curfews, etc.? Produce copies

1

of same.

**ANSWER NO. 1:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 1 on the grounds it is overly broad and vague insofar as it is not limited to the EF Spain Tour in which LF participated in June 2022.

Subject to and without waiving their objections, the EF Defendants' General Terms and Conditions (the "Booking Conditions"), which were read and electronically signed by Plaintiffs, stated the EF handles final rooming assignments for all travelers and will make rooming assignments based on the sex identified on each traveler's passport. The EF Defendants' Booking Conditions stated that "[s]tudents will room in triples or quads with others of the same sex from the entire tour group. This means that students from different schools may room together. EF uses hotels with rooms that contain two double beds (beds for two people). Two students are expected to share a bed. . . . Students may request twin accommodations (a hotel room with two single beds) by submitting the name of their roommate. . . ." The EF Defendants' Booking Conditions have been produced and are identified as EF-00000002 – EF-00000009.

EF's Rules of the Road, contained within the Booking Conditions, further provides:

> 3.      You are expected to respect the nightly curfew that your Group Leader may set for your own safety and security. Room checks will be conducted at the Group Leader's discretion. Visitors or group members of the opposite sex are not permitted in your room.

In addition, as to the tour at issue in this case, Defendant Jennifer Taylor, the Group Leader for the Pennsylvania group, had all students in the Pennsylvania group participating on the EF Spain Tour sign a Student Behavior Contract which required, among other things, students to acknowledge and agree that they would honor the curfew set in place by Jennifer Taylor each night, would not enter the hotel room of the opposite sex at any time, would not leave the hotel under any circumstances without the group, would not leave the hotel room after bed checks, and would refrain from all sexual conduct. A parent and guardian of the traveling student was also required to sign the Student Behavior Contract prior to the departure of the trip. A true and accurate copy of Defendant Jennifer Taylor's Student Behavior Contract for the EF Spain Tour is produced and identified as EF-0000176 – EF-0000177.

**INTERROGATORY NO. 2:**

In June 2022, what non-written rules, regulations, guidelines, or protocols were in place concerning housing group members of the opposite sex while on the EF Tours, including room assignments, room checks, hallway monitors, chaperones, curfews, etc.? Describe same and how it was communicated to group members.

2

**ANSWER NO. 2:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 2 on the grounds it is overly broad and vague insofar as it is not limited to the EF Spain Tour in which LF participated in June 2022.

Subject to and without waiving their objections, Group Leaders have discretion with respect to setting curfews, checking rooms, and monitoring hallways. The Tour Director on the June 2022 educational tour of Spain and the Basque Country (the "EF Spain Tour"), Eduardo Martin, received the list of the available hotel rooms from the hotel and gave the list of available hotel rooms to the Group Leaders. Defendant Taylor completed a room chart to assign the available hotel rooms to the adults and students from the Pennsylvania group. The hotel rooms on the EF Spain Tour were given to Mr. Martin and Defendant Taylor based on the hotel's availability which almost certainly could not accommodate room blocks, rooms grouped in certain hotel wings, or rooms all on the same floor. Consistent with the written rules, students were assigned to same-gender rooms.

Answering further, Defendant Jennifer Taylor set a curfew each night of the EF Spain Tour which largely depended on the activities scheduled for the day. Defendant Taylor would verbally instruct her Pennsylvania group of the curfew for that night during a group meeting and would send a text message or WhatsApp message if there was a change to the curfew for that night, which was very rare. During the EF Spain Tour, Defendant Taylor personally conducted room checks on the female students in the Pennsylvania group by knocking on the students' door, entering the students' room, ensuring the students were present in the room, briefly chatting about the day's activities, and then leaving the students' room. Defendant Taylor's husband, Chad Taylor, conducted room checks for the male students in the Pennsylvania group. The room checks were performed on each night of the EF Spain Tour. Defendant Taylor did not personally monitor the hallways of the hotel or assign other hallway monitors of the hotel. The students were expected to follow the Rules of the Road in the Booking Conditions and the Student Behavior Contract, and the consequence for not doing so would include being sent home at their parents' expense, with no refund, a powerful disincentive to breaking the rules.

**INTERROGATORY NO. 3:**

Who was responsible for making the hotel room assignments in Madrid for the 2022 Spain

Tour that L.F. and Defendant Diego Taylor were on?

**ANSWER NO. 3:**

The EF Defendants booked the hotel rooms for the EF Spain Tour in advance of the trip. The Tour Director, on the EF Spain Tour, Eduardo Martin, received the list of the available hotel rooms from the hotel and gave the list of available hotel rooms to the Group Leaders. The Group Leaders on the EF Spain Tour assigned the hotel rooms to adults and students on the EF Spain Tour in accordance with the Booking Conditions and the accommodation requests made by each participant.

3

**INTERROGATORY NO. 4:**

Were L.F. and Defendant Diego Taylor assigned to hotel rooms next to each other in Madrid

while on the 2022 Spain tour? If so, why?

**ANSWER NO. 4:**

Plaintiff L.F. and Defendant Diego Taylor were each assigned in hotel rooms with other same-sex tour participants. Plaintiff L.F. and Defendant Diego Taylor's hotel rooms were adjacent to each other at the Holiday Inn Express in Madrid, Spain on the EF Spain Tour. Defendant Jennifer Taylor assigned hotel rooms to the adults and students for her Pennsylvania group and Evelio Arriaga assigned hotel rooms to the adults and students for his California group. Plaintiff L.F. and Defendant Diego Taylor's hotel rooms were adjacent but did not have direct access between the two rooms and both rooms opened into the hotel's common hallway. The EF Defendants and Defendant Jennifer Taylor did not violate any law, regulation, standard of care, or the terms of the Booking Conditions by assigning Plaintiff L.F. and Defendant Diego Taylor into adjacent hotel rooms.

**INTERROGATORY NO. 5:**

Who were the group leader(s), tour director(s), and chaperone(s) for the 2022 Spain tour

on which L.F. and Defendant Diego Taylor were enrolled? Identify them by name,

address, employer, position/title, and responsibilities on the tour.

**ANSWER NO. 5:**

Defendant Jennifer Taylor acted as the Group Leader for the Pennsylvania Group on the EF Spain Tour. Defendant Jennifer Taylor resides at 5761 New Berwick Highway, Bloomsburg, PA 17815. Defendant Jennifer Taylor works at Central Columbia High School as an instructor. As a Group Leader on the EF Spain Tour, Defendant Jennifer Taylor was responsible for choosing and scheduling the tour, providing information to participants about the EF Spain Tour, answering questions about itineraries, payment, packing, and travel for the Pennsylvania Group. As a Group Leader, Defendant Jennifer Taylor was also responsible for supervising participants, setting expectations as to participants' behavior, setting and explaining rules and consequences, and working with other Group Leaders and Tour Directors to discuss rules and procedures, making hotel room assignments, and taking attendance of the Pennsylvania Group.

After Plaintiff L.F. made her rape accusation on June 28, 2022, Defendant Jennifer Taylor stayed with her son, Defendant Diego Taylor, in Madrid, Spain to facilitate the Spanish law enforcement process and assist Defendant Diego Taylor address the accusation. As a result, Kristen Ikeler took over as the Group Leader for the Pennsylvania Group and acted as the Group Leader until Defendant Jennifer Taylor was able to rejoin the EF Spain Tour. As a Group Leader on the EF Spain Tour, Kristen Ikeler was responsible for supervising

4

participants, setting expectations as to participants' behavior, setting and explaining rules and consequences, and working with other Group Leaders and Tour Directors to discuss rules and procedures, making hotel room assignments, and taking attendance of the Pennsylvania Group after June 28, 2022.

Evelio Arriaga acted as the Group Leader for the California Group on the EF Spain Tour. Evelio Arriaga is a teacher at Rancho Campana High School, which is located at 4235 Mar Vista Drive, Camarillo, CA.  As a Group Leader on the EF Spain Tour, Evelio Arriaga was responsible for choosing and scheduling the tour, providing information to participants about the tour, answering questions about itineraries, payment, packing, and travel for the California Group.  Mr. Arriaga was responsible for choosing and scheduling the tour, providing information to participants about the tour, answering questions about itineraries, payment, packing, and travel for the Pennsylvania Group.  As a group leader, Evelio Arriaga was also responsible for supervising participants, setting expectations as to participants' behavior, setting and explaining rules and consequences, and working with other Group Leaders and Tour Directors to discuss rules and procedures, making hotel room assignments, and taking attendance of the California Group.

Eduardo Martin acted as the Independent Tour Director for the EF Spain Tour.  As an Independent Tour Director, Eduardo Martin was responsible for coordinating the logistics for the EF Spain Tour and assisting the Group Leaders as needed.  After Plaintiff L.F. made her rape accusation against Defendant Diego Taylor on June 28, 2022, the EF Defendants split up the Pennsylvania Group and the California Group.  After the split of the groups, Eduardo Martin only acted as the Independent Tour Director for the California Group on the EF Spain Tour.  After the split of the groups on June 28, 2022, Serena Avila acted as the Independent Tour Director for the Pennsylvania Group on the EF Spain Tour. As an Independent Tour Director, Serena Avila was responsible for coordinating the logistics for the EF Spain Tour and assisting the Group Leaders as needed.

## INTERROGATORY NO. 6:

Identify the individuals from EF assigned to manage, operate, oversee, staff and handle emergencies both domestically and internationally on the 2022 Spain Trip on which L.F. and Defendant Diego Taylor were enrolled, including their names, addresses, employers, positions/titles, job descriptions, and whether they still are employed by E.F.

## ANSWER NO. 6:

**OBJECTION:**  The EF Defendants object to Interrogatory No. 7 on the grounds that it is compound and as such is vague and ambiguous.

Notwithstanding and without waiving the foregoing objection,

Megan Allen
Vice President of On Tour Support

5

EF Institute for Cultural Exchange, Inc.
Two Education Circle
Cambridge, MA 02141
Ms. Allen may be contacted through the undersigned counsel.

Kelsey Colt
Director, Safety and Incident Response
EF Education First International, Ltd. (Swiss)
Selnaustrasse 30
CH-8001 Zurich
Ms. Colt may be contacted through the undersigned counsel.

In addition, Carla Gottschall, Josh Harendorf, and Tory Mitchell may have assisted Meg Allen and Kelsey Colt in coordinating and organizing logistics for the EF Spain Tour after Plaintiff L.F. made her rape accusation on June 28, 2022.

**INTERROGATORY NO. 7:**

Please identify what role, by employer, position/title and job responsibilities, the following individuals had relative to the 2022 Spain trip on which L.F. and Defendant Diego Taylor were enrolled, if these individuals were uninvolved in that program, please so state:

        a.       Joseph Flaherty

        b.       Kennedy Spencer

        c.       Victoria Gerwig

        d.       Zach Wolfe

        e.       Sofia Belgari

        f.       Celina Quach

        g.       Megan Allen

        h.       Kelsey Colt

        i.       Tory

        j.       Pillar

**ANSWER NO. 7:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 7 on the grounds that it is overly broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the

6

case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, please refer to Answer No. 6.

Further answering, for the California Group on the EF Spain Tour the following individuals assisted in coordinating the EF Spain Tour:

- Joseph Flaherty – Tour Consultant;
- Victoria Gerwig – Sales Director.

For the Pennsylvania Group on the EF Spain Tour the following individuals assisted in coordinating the EF Spain Tour:

- Kennedy Spencer – Tour Consultant;
- Zach Wolfe – Sales Director.

In addition, the following individuals worked on travel arrangements relative to EF tour programs, including the EF Spain Tour:

- Sofia Belgari – Travel Allocations;
- Celina Quach – Travel Operations.

Tory Mitchell assisted Megan Allen with respect to incident response and Pillar Rivilla was an emergency Tour Director who stepped in to assist after LF's alleged incident.

Each of these individuals may be contacted through counsel.

**INTERROGATORY NO. 8:**

What was the "nightly curfew" referred to in EF's Rules of the Road, paragraph 3, Bates EF-00000008, for the students on the 2022 Spain trip on which L.F. and Defendant Diego Taylor were enrolled, and describe when and in what manner that curfew conveyed to the participants?

**ANSWER NO. 8:**

Defendant Jennifer Taylor set a curfew each night of the EF Spain Tour which largely depended on the activities scheduled for the day. Defendant Taylor would verbally instruct her Pennsylvania group of the curfew for that night during a group meeting and would send a text message or WhatsApp message if there was a change to the curfew for that night, which was very rare. Defendant Taylor is not certain of the curfew for the night of the alleged incident; however, the customary curfew was 11:30 P.M. for most days on the EF Spain Tour.

**INTERROGATORY NO. 9:**

Describe what "room checks" were conducted during the 2022 Spain Trip on which L.F. and

7

Defendant Diego Taylor were enrolled as referenced in EF's Rules of the Road, paragraph 3, Bates EF-00000008, including who conducted them, how often they were conducted, whether they were documented, and when they were conducted for the dates of June 25, 2022, June 26, 2022, and June 27, 2022.

**ANSWER NO. 9:**

Please see Answer No. 2.

**INTERROGATORY NO. 10:**

Describe what steps were taken to ensure participants did not have visitors or group members of the opposite sex in their rooms, which according to EF's Rules of the Road, paragraph 3, Bates EF-00000008, was not permitted.

**ANSWER NO. 10:**

Please refer to Answers No. 8 – 9.  Further answering, if participants failed to conform to the Booking Conditions' Rules of the Road, as set forth by EF-00000002 – EF-00000009, then participants on the EF Spain Tour risked dismissal from the tour including being sent home from the tour at their own expense with no refund for the missed tour portion.

**INTERROGATORY NO. 11:**

Identify EF's written policies, written rules of the road, or other written regulations that address sexual contact between group members while on the tour, and produce a copy of same.

**ANSWER NO. 11:**

The EF Defendants' Booking Conditions' Rules of the Road, Paragraph 3 states in relevant part that "[v]isitors or group members of the opposite sex are not permitted in your room." Please refer to the document produced and identified as EF-00000008.

**INTERROGATORY NO. 12:**

Identify EF's non-written policies, non-written rules of the road, or other non- written regulations that address sexual contact between group members while on the tour, and describe how same were communicated to group members.

8

**ANSWER NO. 12:**

Please refer to Answer No. 11.

**INTERROGATORY NO. 13:**

Identify all materials used to train, educate and/or instruct group leaders about their

responsibilities during their assigned tours for the tours offered in the summer of 2022, and

produce a copy of same, including all materials reflecting that these materials were reviewed,

understood, and implemented by Evelio Arriaga and Jennifer Taylor.

**ANSWER NO. 13:**

**OBJECTION:**  The EF Defendants object to Interrogatory No. 13 on the grounds that it is overly broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, the EF Defendants have many available resources for training, educating, and instructing Group Leaders. These include, but are not limited to articles such as:

- Safety guidelines for Group Leaders, available at https://www.eftours.com/help-center/safety/group-leader

- The Group Leader's role, available at https://www.eftours.com/help-center/the-basics/group-leaders

First-time group leaders are provided with an international training tour and/or virtual training. Virtual trainings are available at https://www.eftours.com/virtual-training-program#webinars. In addition, experienced Group Leaders are available to answer questions and provide assistance.

**INTERROGATORY NO. 14:**

Provide a copy of the applications/enrollments forms completed by L.F. and Defendant

Deigo Taylor, and any and all attachments, that were submitted and that resulted in these

individuals being accepted as group members on the 2022 Spain Tour.

**ANSWER NO. 14:**

The EF Defendants refer Plaintiffs to the documents produced by the EF Defendants, specifically the documents identified as EF-00000001 – EF-00000010, in accordance with Rule 33(d) of the Federal Rules of Civil Procedure.

9

**INTERROGATORY NO. 15:**

Identify what, if any, character reference materials or information were requested for

potential group members during the application/enrollment process, such as recommendation

letters, transcripts, school disciplinary records, etc., and provide copies of those items that

were submitted by L.F. and Defendant Deigo [sic] Taylor.

**ANSWER NO. 15:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 15 on the grounds that it is overly
broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the
case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules
of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, Defendant Jennifer Taylor
requested that students who applied to participate in the EF Spain Tour respond to a medical
questionnaire. This was not a school-sponsored trip. However, to the extent students had known
disciplinary histories, they would not have been permitted to join the trip.

**INTERROGATORY NO. 16:**

Identify all steps were taken by EF to ensure the safety of the students on the 2022 Spain Tour

and to put into action EF's statement that "Student safety is our number one priority" as

indicated on EF-00000013.

**ANSWER NO. 16:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 15 on the grounds that it is overly
broad, and unduly burdensome for the EF Defendants to identify "all steps" taken to ensure
student safety on a particular tour. The EF Defendants have many policies, procedures, staff,
training, insurance programs and other resources which are utilized to foster student safety.

Notwithstanding and without waiving the foregoing objection, without limitation, some of the
steps taken by the EF Defendants to ensure the safety of students on the 2022 Spain Tour are
explained in the training materials identified in Answer No. 13 and see Answer No. 2. Please also
see the Rules of the Road and Student Behavior Contract.

**INTERROGATORY NO. 17:**

Identify all steps were taken by EF to ensure the safety of the students on the 2022 Spain Tour

and to put into action EF's statement that "Your safety is of the utmost important (sic) to us"

10

as indicated on EF-00000014.

**ANSWER NO. 17:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 17 on the grounds that it is overly broad, and unduly burdensome for the EF Defendants to identify "all steps" taken to ensure student safety on a particular tour. The EF Defendants have many policies, procedures, staff, training, insurance programs and other resources which are utilized to foster student safety.

Notwithstanding and without waiving the foregoing objection, please refer to the training materials identified in Answer No. 13 and Answer No. 16.

**INTERROGATORY NO. 18:**

Identify all steps that were taken by EF to "help keep [the] groups as healthy and safe as possible" on the 2022 Spain Trip and to put into action this statement of EF appearing on EF-00000017.

**ANSWER NO. 18:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 18 on the grounds that it is overly broad, and unduly burdensome for the EF Defendants to identify "all steps" taken to ensure student safety on a particular tour. The EF Defendants have many policies, procedures, staff, training, insurance programs and other resources which are utilized to foster student safety.

Notwithstanding and without waiving the foregoing objection, please refer to the training materials identified in Answer No. 13 and Answer No. 16.

**INTERROGATORY NO. 19:**

Identify what was submitted, including all fees paid, to "earn" the World Travel & Tourism Council's Safe Travels stamp and a Tourcare stamp from the United States Tour Operators Association as mentioned on EF-00000017, and produce a copy of these awards.

**ANSWER NO. 19:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 19 on the grounds that it is overly broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, the "Safe Travels" stamp from the WTTC relates to health and hygiene in light of the COVID pandemic. Likewise, the Tourcare stamp from the United States Tour Operators Association relates to health and hygiene in light of

11

the COVID pandemic.

**INTERROGATORY NO. 20:**

Did you report to the World Travel & Tourism Council and/or United States Tour Operators

Association that a minor group member reported being raped by another group member on

the 2022 Spain tour? If so, provide a copy of what was submitted.

**ANSWER NO. 20:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 20 on the grounds that it is overly broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, the EF Defendants deny that a rape occurred on the EF Spain Tour. Further answering, the EF Defendants did not report the alleged incident to these trade associations.

**INTERROGATORY NO. 21:**

Prior to June 2022 have you ever submitted any data or statistics to the World Travel & Tourism

Council and/or United States Tour Operators Association about the number and type of claims of

injury reported by group members on your tours? If so, provide a copy of what was submitted.

**ANSWER NO. 21:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 21 on the grounds that it is overly broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, the EF Defendants deny that a rape occurred on the EF Spain Tour. Further answering, the EF Defendants did not report the alleged incident to these trade associations.

**INTERROGATORY NO. 22:**

Identify and produce a copy of all "safety protocols" and "comprehensive safety measures" in place

in June 2022 that are "standard on every EF tour" as referred to in EF- 00000018.

**ANSWER NO. 22:**

12

**OBJECTION:** The EF Defendants object to Interrogatory No. 22 on the grounds that it is overly broad, and unduly burdensome for the EF Defendants to identify "measures" taken to ensure student safety on a particular tour as the circumstances that could be presented on any particular tour necessarily vary widely.

Notwithstanding and without waiving the foregoing objection, the EF Defendants have many policies, procedures, staff, training, insurance programs and other resources which are utilized to help foster student safety. Please refer to the training materials identified in Answer No. 13 and Answer No. 16.

## INTERROGATORY NO. 23:

Describe the Safety and Incident Response Team, including how many people make up the team, how many tours the team covers at once, whether there is more than one such team, and who was on the Safety and Incident Response Team assigned to the 2022 Spain Trip.

## ANSWER NO. 23:

**OBJECTION:** The EF Defendants object to Interrogatory No. 23 on the grounds that it is overly broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, the Safety and Incident Response ("SIR") team provides 24/7 support to on-tour incidents and emergencies worldwide. Headquartered in Zurich, Switzerland, the SIR team was comprised of ten (10) individuals as of June 2022. The SIR team is not assigned to a specific educational tour but provides team coverage in the event of an alleged incident. The SIR team provides on-call support to all tours that are currently traveling at a given time, which varies day by day. Members of the SIR team at the time were Carla Gottschall, Kelsey Colt, Mike Luzano, Rogemif Fuentes, Anita Seibet, Monaco Zumsteg, Amy Advani, Jose Martinez Mandiche, Victoria Recoppa, and Eva Markovic.

## INTERROGATORY NO. 24:

Identify all actions taken by the Safety and Incident Response Team upon learning that L.F. was raped by another group member, including who took the action and when it was taken, and produce any documents related to same.

## ANSWER NO. 24:

After being made aware of L.F.'s rape accusation on June 28, 2022, the SIR team informed Defendant Jennifer Taylor of the allegations and instructed Defendant Jennifer Taylor that her son, Defendant Diego Taylor, should leave the hotel in Burgos, Spain. Following this, the SIR team communicated with Plaintiff Morgan Ash to make flight arrangements for Plaintiff Trenton

13

Fallgatter to fly from Los Angeles, California to Bilbao, Spain. In addition, the SIR Team split the California Group from the Pennsylvania Group for the remainder of the EF Spain Tour and organized travel logistics for each of the groups to continue on the EF Spain Tour. The SIR team assisted in coordinating the travel arrangements for Plaintiff L.F. and the five (5) other students from the California Group who stayed with Plaintiff L.F. in Burgos, Spain after she made her rape accusation against Defendant Diego Taylor.

**INTERROGATORY NO. 25:**

Identify the written record retention policy of the Safety and Incident Response Team relative

to claims of injuries, including but not limited to sexual assaults, taking place on EF tours,

and produce a copy of that policy.

**ANSWER NO. 25:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 25 on the grounds that it is overly broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, there is no written record retention policy specific to documentation made by the Safety and Incident Response team because, in June 2022, the team utilized an Incident Response Tool to document notes relative to an on-tour incident that are preserved in the system.

**INTERROGATORY NO. 26:**

Identify the non-written record retention policy of the Safety and Incident Response Team relative

to claims of injuries, including but not limited to sexual assaults, taking place on EF tours, and

produce a copy of that policy.

**ANSWER NO. 26:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 26 on the grounds that it is overly broad, vague, not relevant to any party's claim or defense, not proportional to the needs of the case, and exceeds the scope of permissible discovery under Rules 26 and 33 of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, Defendants cannot produce a copy of a "non-written" policy.

**INTERROGATORY NO. 27:**

Identify the "new information" referred to in Megan Allen's email of June 29, 2022, to

14

Defendant Jennifer Taylor at 6:01 pm, including what the new information was and how it

was obtained and from whom it was obtained.

**ANSWER NO. 27:**

The "new information" referred to was the information explained in the email from Megan Allen to Jennifer Taylor sent Wednesday, June 29, 2022 7:23 PM, produced as EF-00000091.

**INTERROGATORY NO. 28:**

Identify the "screenshot" referred to in Megan Allen's email of June 29, 2022, to Defendant Jennifer

Taylor at 4:07:20 AM and produce a copy of same.

**ANSWER NO. 28:**

The screen shot is a picture of a Spanish court document that Defendant Jennifer Taylor emailed to Josh Harendorf, an employee for worked for Meg Allen. Mr. Harendorf forwarded that e-mail to Meg Allen. The "screenshot" of the Spanish court document has been produced by the EF Defendants and is identified as EF-00000108.

**INTERROGATORY NO. 29:**

Was Defendant Diego Taylor ever interviewed by EF, or anyone on EF's behalf, about the incident?

If so, identify who conducted the interview, when the interview was conducted, what was said, and

produce a copy of same if recorded or written.

**ANSWER NO. 29:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 29 on the grounds that it seeks information prepared in anticipation of litigation and is protected from disclosure as attorney work-product, or as constituting the mental impressions, conclusions, opinions, or legal theories of the EF Defendants' attorneys, or as constituting trial preparation materials and exceeds the scope of permissible discovery under Rule 26(b)(3) of the Federal Rules of Civil Procedure.

Notwithstanding and without waiving the foregoing objection, no.

**INTERROGATORY NO. 30:**

Was Defendant Jennifer Taylor ever interviewed by EF, or anyone on EF's behalf, about the

incident? If so, identify who conducted the interview, when the interview was conducted, what was

said, and produce a copy of same if recorded or written.

15

**ANSWER NO. 30:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 30 on the grounds that it seeks information prepared in anticipation of litigation and is protected from disclosure as attorney work-product, or as constituting the mental impressions, conclusions, opinions, or legal theories of the EF Defendants' attorneys, or as constituting trial preparation materials and exceeds the scope of permissible discovery under Rule 26(b)(3) of the Federal Rules of Civil Procedure. The EF Defendants further object to Interrogatory No. 30 on the grounds that it seeks information that is protected by the attorney-client privilege.

Notwithstanding and without waiving the foregoing objection, counsel for the EF Defendants interviewed Jennifer Taylor. Those communications are privileged.

**INTERROGATORY NO. 31:**

Describe all communications anyone from EF or on behalf of EF had with any of the Plaintiffs about the incident from the moment it was first reported up to the present including who was involved in the communication, when the communication took place, and the content of the communication.

**ANSWER NO. 31:**

The EF Defendants refer Plaintiffs to the documents produced by the EF Defendants, specifically the documents identified as EF-00000028 – EF-00000089, in accordance with Rule 33(d) of the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 32:**

Describe all communications anyone from EF or on behalf of EF had with any of the Taylor Defendants about the incident from the moment it was first reported up to the present including who was involved in the communication, when the communication took place, and the content of the communication.

**ANSWER NO. 32:**

**OBJECTION:** The EF Defendants object to Interrogatory No. 32 on the grounds that it seeks information prepared in anticipation of litigation and is protected from disclosure as attorney work-product, or as constituting the mental impressions, conclusions, opinions, or legal theories of the EF Defendants' attorneys, or as constituting trial preparation materials and exceeds the scope of permissible discovery under Rule 26(b)(3) of the Federal Rules of Civil Procedure. Defendants further object on the grounds of the joint defense and/or common interest privilege.

16

Notwithstanding and without waiving the foregoing objection, the EF Defendants refer Plaintiffs to the documents produced by the EF Defendants, specifically the documents identified as EF-00000090 – EF-00000107, in accordance with Rule 33(d) of the Federal Rules of Civil Procedure.

## VERIFICATION

I, William Dunn, under the penalties of perjury, verify that the foregoing answers are true and correct to the best of my knowledge, information and belief, based upon reasonable investigation and inquiry.

_____

By: William Dunn, General Counsel

Dated: March 15, 2024

As to Objections,

LAWSON & WEITZEN, LLP

By: _____
Jeffrey P. Allen (Admitted *Pro Hac Vice)*
MA BBO 015500
Attorney for Defendants EF
Educational Tours, EF
Education First International, Ltd., EF
Institute for Cultural Exchange, Inc.,
EF Education First International, Ltd.
(Swiss), and Jennifer Taylor

88 Black Falcon Avenue
Suite 345
Boston, MA 02210
Tel: (617) 439-4990
Fax: (617) 439-3987
jallen@lawson-weitzen.com

McCORMICK LAW FIRM

By: _____
Brian J. Bluth

17

## VERIFICATION

I, William Dunn, under the penalties of perjury, verify that the foregoing answers are true and correct to the best of my knowledge, information and belief, based upon reasonable investigation and inquiry.

*William Dunn*
_____
By: William Dunn, General Counsel


Dated: March 14, 2024

As to Objections,

LAWSON & WEITZEN, LLP

By: /s/ Jeffrey P. Allen
_____
Jeffrey P. Allen (Admitted *Pro Hac Vice*)
MA BBO 015500
Attorney for Defendants EF Educational Tours, EF Education First International, Ltd., EF Institute for Cultural Exchange, Inc., EF Education First International, Ltd. (Swiss), and Jennifer Taylor

88 Black Falcon Avenue
Suite 345
Boston, MA 02210
Tel: (617) 439-4990
Fax: (617) 439-3987
jallen@lawson-weitzen.com

McCORMICK LAW FIRM

By: /s/ Brian J. Bluth
_____
Brian J. Bluth
PA 87432
Attorney for Defendants EF Educational Tours, EF Education First International, Ltd., EF Institute for Cultural Exchange, Inc.,

18

EF Education First International, Ltd.
(Swiss), and Jennifer Taylor

835 West Fourth Street
Williamsport, PA 17701
(570) 326-5131
(570) 601-0768 (fax)
bbluth@mcclaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing DEFENDANTS EF EDUCATION FIRST INTERNATIONAL, LTD. (SWISS) AND EF INSTITUTE FOR CULTURAL EXCHANGE, INC.'S ANSWERS TO PLAINTIFFS' SECOND SET OF INTERROGATORIES were served on March 14, 2024, by delivering a copy of same via first-class mail and e-mail to:

Susan Ayres, Esq.
Hill & Associates, P.C.
1700 Market Street, Suite 1350
Philadelphia, PA 19103
sue@hilljustice.com

Edwin A. Schwartz, Esq.
McNees Wallace & Nurick, LLC
100 Pine Street, P.O. Box 1166
Harrisburg, PA 17108
eschwartz@mcneeslaw.com

Christopher A. McAlpin

19

# EXHIBIT 19

Docusign Envelope ID: 63E4D0FB-B4E4-4A98-A78D-DC19188CEBAD

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| L.F. | : | |
| | : | CIVIL ACTION LAW |
| Plaintiff | : | |
| | : | NO. 4:23-CV-01038 MWB |
| v. | : | (Hon. Karoline Mehalchick) |
| | : | |
| EF EDUCATIONAL TOURS, | : | |
| EF EDUCATION FIRST | : | |
| INTERNATIONAL, LTD., EF INSTITUTE | : | Complaint Filed 6/22/2023 |
| FOR CULTURAL EXCHANGE, INC., EF | : | |
| EDUCATION FIRST INTERNATIONAL, | : | |
| LTD. (SWISS), DIEGO MANUEL | : | |
| TAYLOR, JENNIFER TAYLOR, and | : | JURY TRIAL DEMANDED |
| JOHN DOES I-V. | : | |
| | : | |
| Defendants | : | |

## DECLARATION OF JENNIFER TAYLOR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I, Jennifer Taylor, make the following declaration under penalty of perjury:

1.    The following declaration is made based on my own personal knowledge.

2.    At all relevant times, I have been a teacher at Central Columbia High School in Bloomsburg, Pennsylvania.

3.    I was a Group Leader for an EF Educational Tour of Spain and the Basque Region in June 2022 (the "Tour").

Docusign Envelope ID: 63E4D0FB-B4E4-4A98-A78D-DC19188CEBAD

4. I led a group of twenty-four (24) students from Pennsylvania for the Tour (the "Pennsylvania Group").

5. My husband, Chad Taylor, and my adult friend, Kristin Ikeler, also accompanied the Pennsylvania Group on the Tour.

6. My son, Diego Taylor was a student traveler on the Tour. He was seventeen (17) years old at the time of the Tour.

7. Prior to the Tour, I conducted information sessions for the students and their parents.

8. During the information sessions, we went over the Rules of the Road in EF's Booking Conditions and Parents Guide to ensure that students knew what behavior was required of them.

9. When I enrolled Diego in the Tour, I signed Booking Conditions electronically.

10. In addition, I required all students including my son, to read and sign a Student Behavior Contract. The document labeled EF-00000176 is a true and correct copy of the Student Behavior Contract I used for the Tour.

11. The Pennsylvania Group arrived in Madrid, Spain, on June 24, 2022.

12. The Pennsylvania Group met with another group  of students from California (the "California Group") led by Evelio Arriaga at the Madrid airport.

Docusign Envelope ID: 63E4D0FB-B4E4-4A98-A78D-DC19188CEBAD

13.    The two groups were combined for the Tour, The California Group and Pennsylvania Group were combined for the Tour, meaning that they shared a tour bus, were booked at the same hotels, and were scheduled for some of the same activities, such as museums and meals.

14.    Both groups went from the Madrid airport to the Prado Museum in Madrid.

15.    That night, June 24, 2022, both groups were booked to stay at a Holiday Inn Express in Madrid.

16.    On arrival, I assigned rooms to the Pennsylvania Group and the leader of the California Group assigned rooms to his group.

17.    It was not a possibility to assign all students of different genders to different floors of the hotel. The rooms given by the hotel would not have allowed for that.

18.    I have been a Group Leader on at least six EF Educational Tours. There is no policy that requires Group Leaders to assign girls and boys to different floors of the hotels at which we stay.

19.    Between arrival in Madrid and when I learned that L.F. had accused my son of sexual assault, I remained with the Pennsylvania Group at all times.

20.    During that time, I did not observe any concerning or inappropriate interactions between Diego and L.F.

21.    L.F. never expressed to me that Diego was making her uncomfortable.

22.    No one else from either group ever expressed to me that Diego was making L.F. or anyone else uncomfortable or acting inappropriately.

23.    Prior to L.F. making accusations against Diego, I was not aware of any reason to be concerned about Diego acting inappropriately towards another participant on the Tour.

24.    Diego knew and understood the applicable curfew and rules about remaining in his room after room checks at night. I was not aware of him ever breaking those rules before.

25.    On the evening of the incident involving Diego and L.F. that gave rise to this lawsuit, I had set a curfew for the Pennsylvania Group, and my husband and I personally checked to make sure that each student in our group was in their assigned room at the time of curfew.

26.    I was not aware of any disturbance or problem at the hotel on the night of June 26, 2022. The first time I was informed of a problem was the following night when I was awoken in the middle of the night and learned that a student from the California Group had made allegations against my son, Diego.

27.    I dismissed Diego from the Tour after the incident involving L.F. because he had broken the Student Behavior Contract. He returned to Pennsylvania.

Docusign Envelope ID: 63E4D0FB-B4E4-4A98-A78D-DC19188CEBAD

I, Jennifer Taylor, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed on July 1, 2025

Signed by:

E289A2E7AA2B45D...

7/2/2025

Jennifer Taylor

# EXHIBIT 20

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Trenton Fallgatter, on behalf of his** | : | **CIVIL ACTION LAW** |
| **natural and biological minor child, L.F.,** | : | |
| **&** | : | **NO. 4:23-cv-01038-MWB** |
| **Morgan Ash, on behalf of her natural** | : | |
| **and biological minor child, L.F.** | : | **JURY TRIAL** |
| **Plaintiffs** | : | **DEMANDED** |
| | : | |
| **vs.** | : | |
| | : | |
| | : | |
| **EF Educational Tours,** | : | |
| **EF Education First International, Ltd.,** | : | |
| **EF Institute for Cultural Exchange, Inc.,** | : | |
| **EF Education First International, Ltd.,** | : | |
| **Switzerland,** | : | |
| **Diego Manuel Taylor,** | : | |
| **Jennifer Taylor, &** | : | |
| **John Does I-V** | : | |
| **Defendants** | : | |

**PLAINTIFF'S RESPONSES TO INTERROGATORIES PROPOUNDED BY
DEFENDANT DIEGO TAYLOR**

Plaintiffs **Trenton Fallgatter, on behalf of his natural and biological minor child,**

**L.F., & Morgan Ash, on behalf of her natural and biological minor child, L.F.** , by and

through their attorneys, Hill & Associates, P.C., hereby respond to Interrogatories propounded by

Defendant Diego Taylor as follows:

**GENERAL RESPONSES AND OBJECTIONS**

Each of Plaintiff's responses, in addition to any specifically stated objections, is

subject to and incorporates the following general responses and objections.  The assertion of

the same, similar, or additional objections, or a partial response to any individual request

does not waive any of the Plaintiff' general responses and objections.

1.      The following responses reflect the current state of the Plaintiffs' knowledge, understanding and belief respecting matters about which inquiry has been made.  The Plaintiff expressly reserves the right to supplement or modify these responses with such pertinent information as they may hereafter discover or as may be informed by the opinions of experts retained by the parties to testify in the trial of this matter, and will do so to the extent required by the Federal Rules of Civil Procedure.  The Plaintiff expressly reserves the right to rely on, at any time, including trial, subsequently discovered documents and/or materials that have been produced promptly upon discovery.

2.      The Plaintiff objects to any interrogatory that seeks information constituting or containing information concerning communications between the Plaintiff and her counsel, which are protected by the attorney-client privilege.

3.      The Plaintiff objects to any interrogatory that seeks information constituting or containing information prepared in anticipation of or as a result of litigation or which is otherwise protected by the work product doctrine or any other available privilege or protection.

4.      The inadvertent provision of information or the production by the Plaintiff of documents containing information protected from discovery by the attorney-client privilege, work product doctrine or any other applicable privilege, shall not constitute a waiver of such privileges with respect to that information or those or any other documents.  In the event that inadvertent production occurs, the Defendant shall return all inadvertently produced documents to the Plaintiff upon request, and/or shall make no use of the contents of such information or documents nor premise any further discovery on information learned therefrom.

5.      The Plaintiff objects to any interrogatory to the extent that it purports to impose upon them any obligation beyond those imposed by the Federal Rules of Civil Procedure, including, but not limited to, any interrogatory that exceeds the scope of FederalRules of Civil Procedure.

6.      The Plaintiff objects to these interrogatories to the extent that they are overbroad, unduly burdensome, vague, ambiguous, confusing, require speculation to determine their meaning or use imprecise specifications of the information sought.

7.      The Plaintiff objects to any interrogatory to the extent that it seeks information neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

8.      The Plaintiff objects to any interrogatory as unduly and unnecessarily burdensome to the extent that it seeks information that is matter of public record, already in the Defendant's possession, or otherwise readily available to the Defendant, and, therefore, may be accessed and obtained by the Defendant with less burden than the Plaintiff can identify and provide requested information.

9.      None of the objections or responses contained herein is an admission concerning the existence of any documents or materials, the relevance or admissibility of any documents, materials or information, or the truth or accuracy of any statement or characterization contained in Defendant's Interrogatories. The Plaintiff's written responses are made without waiving, but, on the contrary, expressly reserving: (a) the right to object, on the grounds of competency, privilege, relevancy, materiality or any other proper grounds, to the use of the information provided herein, in whole or in part, in any subsequent proceeding in this action or any other action; (b) the right to object on any and all grounds, at any time, to other discovery requests involving or relating to the subject matter of these requests; and (c) the right at any time to revise, correct, add or clarify any of the responses provided herein.

10.     The Plaintiff objects to any interrogatory to the extent it is a contention interrogatory.  The Plaintiff object to any such interrogatory on the grounds that it is premature in light of the present stage of discovery.  The Plaintiff expects to receive further documents through discovery that will concern and provide information responsive to such interrogatories.  Because Federal Rules of Civil Procedure imposes a duty of supplementation, complying with such interrogatories would require the Plaintiff to continually supplement their responses each time they receive an additional document or information concerning the subject or contention on which the interrogatory seeks

information.   Doing so would cause the Plaintiff to suffer unnecessary burden and expense and would not serve to narrow the issues that are in dispute. Accordingly, in response to any such contention interrogatory, the Plaintiff will provide a response encompassing the current state of their knowledge, belief, and understanding, but reserve the right to supplement their interrogatory response at the conclusion of discovery, both as to the merits of this action and with respect to experts designated to testify at trial.

11.     The Plaintiff states that the answer to many of the Defendant's interrogatories may, in substantial part, be derived or ascertained from the Plaintiff's records as well as documents produced by the Defendant in discovery.   The burden of deriving or ascertaining the answer to such interrogatories from such records and documents is substantially the same for the Defendant, the Plaintiff will respond to such interrogatories by identifying the documents and records from which the answer may be ascertained. Responsive documents and records in the Plaintiff's possession are identified by bates number.  To the extent that the Defendant does not have in their possession such documents bearing identified bates numbers, the Plaintiff will provide such bates-numbered documents to the Defendant.

12.     Unless otherwise indicated, the Plaintiff will not provide information encompassed by her general responses and objections or by her specific objections set forth below.

## INTERROGATORIES

1. Identify all persons with knowledge or information relating to the allegations or events at issue in the Complaint or its subject matter, and for each such person, describe in detail such person's knowledge or information.

**ANSWER: See Plaintiffs' response to Jennifer Taylor's interrogatory number 17.**

2. Identify all persons that L.F. communicated with, during and after the trip, regarding the allegations contained in paragraphs 34-42 of the Complaint.

**ANSWER: See Plaintiffs' response to Jennifer Taylor's interrogatory number 17.**

3. Identify the two minor travelers in the hallway noted in paragraph 38 of the Complaint.

**ANSWER: 38 refers to L.F. and Diego Taylor.**

4. Please identify and describe in detail every communication (verbal and electronic) you had with Diego Taylor between June 25, 2022 and June 28, 2022. For each communication, describe the method in which the communication occurred, the substance of the communication, who was present and/or participated in such communication and the date and time of the communication.

**ANSWER:**

1. **June 24th- Both student groups arrive at the museum in Madrid. Diego begins speaking to L.F.'s schoolmates, and to her. They exchange small talk. Diego asks L.F. to be his "partner" to walk around the museum. L.F. agrees. While walking around, Diego states to the affect of "If this is you on a bad day I'd love to see you on a good one" following L.F.'s comment about feeling gross after getting off a long flight. Diego continues small talk and is flirty during the remainder of the tour. At the hotel later that day Diego asks for L.F.'s Snapchat. L.F. does not disclose at**

this time. L.F. learns that her room is next to his and airdrops her snapchat photo and username.

Diego flirts with L.F. via snapchat.

On this day, or the next, Diego states via snapchat something to the affect of him wanting someone to cuddle with in Spain.  L.F. does not recall how she responded to that statement the first time he made it. This type of sentiment is mentioned more than once, and ultimately, L.F. communicates that either of them going to the other person's room is a bad idea, and that she would not do it. At some point she adds him on Instagram, but does not recall the specific day.

2.  June 25- Diego approaches L.F. and her schoolmates several times to make conversation, and to flirt with L.F.  L.F. does not recall the substance and specifics of these conversations. L.F. recalls her schoolmate Aiden telling her that he observed that Diego was using him as a segue to talk to L.F., and that he was behaving oddly toward her.
Diego continues to contact L.F. via Snapchat. L.F. does not recall the substance of these interactions, and notes that the cuddling comments may have happened on June 25th but she is not certain.

3.  June 26- Diego continues interacting with L.F.'s friends and her. That evening, L.F. recalls Diego persistently trying to persuade LF to meet up with him and to come to his room. L.F. recalls Diego trying to lure L.F. into her friend's room who was having a "movie night" with other friends. L.F. told him that she did not want to go to his room, stating that it was a bad idea. Following his relentless invitations, L.F. agrees to meet Diego in the hallway. L.F. was greeted by Diego in his underwear, where he proceeded to pull her into his room. See Complaint for additional details pertaining to this interaction.

4.  June 27- That morning, L.F. and Diego briefly interact with one another and L.F. makes it clear that she is upset. She blocks him on Snapchat. Later that day, she unfriended/unfollowed him on Instagram.

5. Identify all social media accounts held by L.F. and/or used between June 2022 and the date the instant action was commenced.  For each account, please identify: the user name for the account and the last time each account was accessed.

**ANSWER:  Objection. This interrogatory seeks information that is irrelevant. Plaintiff ceased contact with the Defendant, and her use of her social media thereafter is private and irrelevant. Subject to and without waiver of the same, see the social media handles below, both in use at the time of the incident.**

**Snapchat: llynz_jfall**

**Instagram: lynzjfall**

6. Identify all social media previously accounts held by L.F. that are now inactive but were active from June 25, 2022 until the date the instant action was commenced.

**ANSWER:  Accounts identified above are current.**

7. Identify all correspondence Plaintiffs (Trenton Fallgatter and Morgan Ash) had with any medical professionals regarding L.F from June 27, 2022 to the present.

**ANSWER: See records produced under prior cover. Plaintiffs reserve the right to supplement this response.**

8. Identify all persons that assisted in drafting the responses to these interrogatories.


**ANSWER: Plaintiff.**


                                 **HILL & ASSOCIATES, P.C.**

                                 */s/Susan B. Ayres*


                                 _____

                                 **SUSAN B. AYRES, ESQUIRE**
                                 **1700 MARKET STREET, SUITE 3150**
                                 **PHILADELPHIA, PA 19103**
                                 **PHONE: 215-567-7600**
                                 **FACSIMILE: 215-525-4311**
                                 **SUE@HILLJUSTICE.COM**

Date: January 23, 2024

# EXHIBIT 21

# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

L.F.,                                    :
      Plaintiff                        :
                                         :
    v.                                   :    No. 4:23-CV-01038-MWB
                                         :
EF Educational Tours, EF Education       :
First International, Ltd., EF Institute  :    JURY TRIAL DEMANDED
for Cultural Exchange, Inc., EF          :
Education First International, Ltd.,      :
Diego Manuel Diego, Jennifer Diego,      :
John Does I-V                            :
                                         :
      Defendants

## DEFENDANT DIEGO MANUEL TAYLOR'S INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Defendant Diego
Manuel Taylor. ("Diego") makes the following initial disclosures.

### Prefatory Statement

Diego's disclosures are based on information available to him and represents
a good faith effort to identify information that Diego reasonably believes may be
used to support its claims.  Diego does not represent that these initial disclosures
identify every document, tangible thing, or witness possibly relevant to this action.

Additionally, Diego does not waive the right to object at any time on the basis
of privilege, work-product immunity, relevance, undue burden or any other valid
objection to producing any witness, document, or tangible thing referenced in these

initial disclosures. Diego reserves the right to object to the admissibility at trial of any information contained or referenced in or derived from these initial disclosures. Diego reserves the right to supplement, amend, or modify these or any later disclosures based on information learned during the course of discovery or otherwise.

## Witness Disclosures

The following individuals are likely to have discoverable information that Diego may use to support its claims in this matter:

1.    Nick Shukausky:   Diego's roommate on the night of alleged incident, Nick Shukausky has knowledge of facts concerning what happened on the night of the alleged incident.

2.    Solea Heredia:    A student from Plaintiff's class. Solea Heredia has knowledge of facts regarding Plaintiff and Diego's relationship.

The witnesses listed above may have additional information concerning any matter relevant in this lawsuit. Diego reserves the right to call other witnesses and will timely supplement its disclosures should the identity of other witnesses become known. Additionally, Diego reserves the right to call any witnesses listed by any party in this matter.

## Document Disclosures

Diego may use the following categories of documents to support its claims in this matter. Diego may have physical and/or electronic copies of these documents or may come into possession of them through the discovery process:

1.    The pleadings, briefs, and other filings in this matter, along with any exhibits attached thereto.

2.    Any documents produced by any of the parties in this action.

3.    Screenshots from Diego's cell phone. (Attached).

Diego reserves the right to use other documents to support its claims in this matter and will supplement its disclosures should other documents become known.

## Insurance Agreements

Diego does not have any insurance that would cover a judgement against him.

McNEES WALLACE & NURICK LLC

By: _____
          Edwin A.D. Schwartz
          I.D. No. 75902
          John Arose
          I.D. No. 318868
          100 Pine Street, P.O. Box 1166
          Harrisburg, PA 17108
          (717) 232-8000

Dated:  August 21, 2024            *Attorneys for Defendant Diego Taylor*

3





1. u asked for it yesterday and i was bored

2. i don't mean to get into ur business but the girl from my group you've been hanging with, you guys seem to like each other and i'm 99% sure she has a bf. u can do whatever but i thought maybe you should know but yeah mb



## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date a true and correct copy of

the foregoing document was served via e-mail and first-class mail upon:

Susan B. Ayres, Esquire
1700 Market Street, Suite 3150
Hill & Associates, P.C.
Philadelphia, PA 19103
Sue@Hilljustice.com

Jeffrey P. Allen, Esq.
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Ste. 345
Boston, MA 02210
jallen@lawson-weitzen.com

McNEES WALLACE & NURICK LLC

By: _____
     Edwin A.D. Schwartz
     I.D. No. 75902
     John Arose
     I.D. No. 318868
     100 Pine Street, P.O. Box 1166
     Harrisburg, PA 17108
     (717) 232-8000

Dated: August 21, 2024      *Attorneys for Defendant Diego Taylor*

# EXHIBIT 22

**JR LANGUAGE**
TRANSLATION SERVICES, INC.

P: 585.935.7144 • F: 585.486.1033 • 2112 Empire Blvd. Suite 1C • Webster, New York 14580 • WWW.JRLANGUAGE.COM

## CERTIFICATE OF ACCURACY

This is to **CERTIFY** that the attached translation from <u>Spanish</u> into <u>English</u> is a true, accurate and faithful representation of a copy of the original that was submitted, to the best of our translator's training and ability, who is fluent in the language and qualified to translate.

To which we set our hand and seal

_____

Yuisa Gonzalez-Rivera
Date: 08/07/2023

Signed by: JR Language Translations
Time: 2023-08-07 15:50:12 UTC



**JR Language Translations, Inc.** ata
Member of the American Translators Association No. **259340**

[logo, JUSTICE DEPARTMENT]
**SECT. MINORS PROVINCIAL PROSECUTOR'S OFFICE OF BURGOS**

**Address**: C/ FEDERICO OLMEDA S/N
**Phone**: 947 28 40 21/24/22    **Fax**: 947 28 40 33


**Equipment/user**: MPG
**Model**: 030200 GENERAL PUBLIC PROSECUTOR'S NOTICE

COPY

**MIG**: 09059 77 2 2022 0000243

**EXR REFORM FILE 0000115 /2022**

**Originating procedure**: PRELIMINARY PROCEEDINGS 0000216 /2022


**MINOR(S)**: DIEGO MANUEL TAYLOR

**PROSECUTOR'S DECREE**        In BURGOS, on the twenty-eighth day of June, two thousand and twenty-two.

Taking into account that the nature of the facts and the personal and social circumstances of the minor, and in accordance with the provisions of art. 17.5 of the Organic Law, it is NOT advisable to request the Court to order preventive custody as provided in art. 28 of Organic Law 5/2000, and therefore the minor is to be released immediately.

Notify this resolution to the interested party DIEGO MANUEL TAYLOR, the legal representative, and the counsel assisting him. And bring this resolution to the attention of the authorities that are holding him in custody.

It is sent and signed by the Hon.


PUBLIC PROSECUTOR FOR MINORS


The dissemination of the text of this resolution to parties not involved in the proceedings under which it has been issued may only be made after removal of the personal data contained therein, and with full respect for the right to privacy, the rights of persons requiring a special duty of protection or the guarantee of anonymity of the victims or injured parties, where appropriate.

The personal data included in this decision may not be transferred or communicated for purposes contrary to the law.



# SECC. MENORES FISCALIA PROVINCIAL DE BURGOS

Domicilio: C/ FEDERICO OLMEDA S/N
Teléfono: 947 28 40 21/24/22   Fax: 947 28 40 33

Equipo/usuario: MPG
Modelo: 030200 OFICIO GENERICO FISCALIA

NIG: 09059 77 2 2022 0000243

## EXR EXPEDIENTE DE REFORMA 0000115 /2022

Procedimiento origen: DILIGENCIAS PRELIMINARES 0000216 /2022

MENOR/ES: DIEGO MANUEL TAYLOR

**DECRETO DEL FISCAL**      En BURGOS a veintiocho de junio de dos mil veintidós.

Teniendo en cuenta que la naturaleza de los hechos y las circunstancias personales y sociales del menor y de conformidad con lo que establece el art. 17.5 de la Ley Orgánica, NO aconsejan la solicitud al Juzgado de medida cautelar privativa de libertad del art. 28 de la Ley Orgánica 5/2000, póngase inmediatamente en libertad al menor.

Notifíquese al interesado DIEGO MANUEL TAYLOR, al representante legal y al Letrado que le asiste la presente resolución. Y póngase la misma en conocimiento de la fuerza que lo custodia.

Lo manda y firma S.I.

El FISCAL DE MENORES

La difusión del texto de esta resolución a partes no interesadas en el proceso en el que ha sido dictada sólo podrá llevarse a cabo previa disociación de los datos de carácter personal que los mismos contuvieran y con pleno respeto al derecho a la intimidad, a los derechos de las personas que requieran un especial deber de tutelar o a la garantía del anonimato de las víctimas o perjudicados, cuando proceda.

Los datos personales incluidos en esta resolución no podrán ser cedidos, ni comunicados con fines contrarios a las leyes.