# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| L.F. | : | **CIVIL ACTION LAW** |
| **Plaintiff** | : | |
| | : | **NO. 4:23-cv-01038-MWB** |
| **vs.** | : | **(Hon. Karoline Mehalchick)** |
| | : | |
| **EF Educational Tours,** | : | **JURY TRIAL** |
| **EF Education First International** | : | **DEMANDED** |
| **Ltd.,** | : | |
| **EF Institute for Cultural Exchange,** | : | |
| **Inc.,** | : | |
| **EF Education First International,** | : | |
| **Ltd., Switzerland,** | : | |
| **Diego Manuel Taylor,** | : | |
| **Jennifer Taylor** | : | |
| **Defendants** | : | |

## PLAINTIFF'S RESPONSE/COUNTERSTATEMENT TO THE STATEMENT OF MATERIAL FACTS OF DEFENDANTS EF EDUCATIONAL TOURS, EF EDUCATION FIRST INTERNATIONAL, LTD. (US), EF INSTITUTE FOR CULTURAL EXCHANGE, INC., EF EDUCATION FIRST INTERNATIONAL, LTD. (SWISS), ANDJENNIFER TAYLOR

Plaintiff, L.F., by and through her counsel, Hill & Associates, P.C., hereby responds and sets forth her Counterstatement to the Statement of Material Facts of Defendants EF Educational Tours, EF Education First International, LTD. (US), EF Institute for Cultural Exchange, Inc., EF Education First International, Ltd. (Swiss), and Jennifer Taylor (Doc. 98 – Doc. 100) in support of her Response in Opposition to the Movants' Motion for Summary Judgment. Plaintiff submits that there exist genuine issues of material fact that preclude the entry of judgment as matter of law and respectfully requests that the Motion be denied in its entirety.

1. Admitted.  By way of further response, the General Terms and Conditions, attached as Exhibit "A", Bates EF00000002-00000009, provide as follows:

"All tours are operated outside of the U.S. by EF Education First International, LTD., Switzerland. EF Institute for Cultural Exchange, Inc., is a marketing service provider for that company and is referred herein **together with EF Education First International, LTD., as 'EF'".**

Exhibit A, p. EF00000002.  As such, when the General Terms and Conditions impose responsibilities and obligations on "EF", they refer to **both** the Defendant EF Education First International, Ltd. ("Defendant EF Education First") and Defendant EF Institute for Cultural Exchange, Inc. (Defendant EF Institute). According to Megan Allen, the EF Defendants' designee, Defendant EF Education First role is to coordinate the logistics on the ground for the tours.  See Deposition of Megan Allen, attached as Exhibit B, 25:25-26:12. As a youth serving organization, Defendant EF Education First owes a duty to its participants to comply with industry safety standards for such organizations given the known problem of youth-on-youth sexual violence.  See Report of Elizabeth L. Jeglic, Ph.D., pp. 5-6, Part II, and p. 8, Conclusion 2, attached as Exhibit "C".  Defendant EF Education First breached its duty to provide reasonable security and safety for Plaintiff by failing to have basic protective measures in place to prevent

2

harm, providing inadequate monitoring and supervision of a vulnerable population in a high-risk environment, and failing to provide oversight to ensure staff adhered to established safety protocols.  See Report of Russell Kollins, pp. 4-9, attached as Exhibit "D".

2. Admitted that this is the content of the self-serving Affidavit of Megal Allen given in support of this Motion for Summary Judgment.  However, when Ms. Allen was presented for her deposition on January 3m 2025,m as a corporate designee for this entity, she testified that she has never been employed by that entity, she did not know when the entity was formed, how many employees it had, where it was incorporated, or whether any of that entities' employees were on the subject tour.  Exhibit B, 17:6-8; 25:15-26:12.  When asked whether there were any other EF entities were involved in the sale or operation of the tour at issue, Ms. Allen, the corporate designee on the subject, stated "I'm not an expert on the entity setup, so I'd refer further question to our general counsel."  Exhibit B, 69:17-25.  The lack of transparency of the corporate designee is indicative of the lack of transparency the company showed to the participants and their parents on this tour.

3. Denied as stated.  It is denied that Defendant EF Institute is merely a

"marketing service provider" for the tours in question as suggested by the Moving Defendants.  To the contrary, Defendant EF Institute's role is not so limited.  By way of further response, according to the General Terms and Conditions, as well as the deposition of EF designee, Megan Allen, Defendant EF Institute does more than just "market" the tour.  "EF", which again includes not only Defendant EF Education First but Defendant EF Institute as well, exercises and retains the following powers for the Tours: 1) consolidates groups while on the tour, Exhibit A, EF00000002, Group Travel; 2) modifies the itineraries as needed while the tour is taking place, Exhibit A, EF00000002, Group Travel; 3) receives and processes the applications and fees for the tours, Exhibit A, EF00000002, Enrollment; 4) dictates the eligibility for the tours, Exhibit A, EF00000003, Can Children Under 11 go on the Tour; 5) makes travel arrangements for those on the tour, Exhibit A, EF00000003, Flight Information; 6) handles final room assignments while on the tour, Exhibit A, EF00000004, Rooming; Exhibit B, 32:3-14; 7) reserves the power to change the booking conditions with immediate effectiveness and without notice, Exhibit A, EF00000008, Other Terms and Conditions; and 8) sets "Rules of the Road", which must be complied with or the travelers face dismissal, Exhibit A, EF00000008, EF's

4

Rules of the Road.  According to Ms. Allen, EF also has the power to remove students from the tour.  Exhibit B, 42:14-19.  In addition, Defendant Jennifer Taylor, the assigned group leader for the Pennsylvania group on the subject tour and mother of Defendant Diego Taylor, testified at a deposition.  Her transcript is attached as Exhibit "I".  Defendant J. Taylor explained that Defendant EF Institute leads the group leaders through the process of organizing the tour.  Exhibit I, 16:8-15.  Defendant EF Institute provides the group leaders with all the particulars for the tour.  Exhibit I, 39:21-40:15.  Defendant EF Institute provides the catalog from which the tours are selected.  Exhibit I, 19:10-20:3.  Defendant EF Institute selects the hotels.  Exhibit I, 21:12-18.  Defendant EF Institute selects the transportation to be used during the tour.  Exhibit I, 21:23-22:2.  Defendant EF Institute determines the rooms at the hotels for the tour.  Exhibit I, 22:3-10; 33:3-16.  Defendant EF Institute determines the price and handles the billing.  Exhibit I, 28:12-23.  Defendant EF Institute communicates directly with the tour participants, and participates in zoom meetings.  Exhibit I, 32:5-17; 76:20-77:13.  Defendant EF Institute provides training to the group leaders, and requires them to completes checklists prior to going on the tours.  Exhibit I, 35:7-23; 38:22-39:13; 67:2-14.  Defendant EF Institute provides the "Rules

5

of the Road" to follow.  Exhibit I, 41:10-19.

4. Admitted.

5. Admitted in part, denied in part.  It is admitted that Defendant EF Education First operates the tours.  It is denied that Defendant EF Institute's role is purely one of "marketer".  Plaintiff incorporates by reference the response to Nos. 3 and 4 above.

6. Admitted only that this is the mission statement that EF makes public on its website.  Denied, however, that the mission of EF is not also financially motivated.  By way of example, Defendant Jennifer Taylor testified that she has repeatedly told the EF Defendants that the combining of different groups was problematic because of concerns over other students' behavior and her not knowing what the other group leaders rules were; however, the EF Defendants refused to change their practice because it would be too expensive.  Exhibit I, 60:18-61:24.  Of course, it would not cost the EF Defendants anything to establish safety rules that applied to all group leaders and to have those rules communicated and enforced for all groups instead of having no established rules and allowing each group leader to create his or her own. This lack of established safety policies and protocols for their tours is a breach of the industry standard for youth serving organizations.  Exhibits

C, D.

7. Admitted. By way of further response, as recognized in the General Terms and Conditions, tours are open to children as young as 6 years old. Exhibit A, EF00000003, Can Children Under 11 go on the Tour. Notably, the requirements for group leaders are *only* that the individual be 21 years of age and pass background checks. Exhibit B, 39:24 – 40:4. This is actually a terrifying fact given that the EF Defendants set no required ratios between the number of participants assigned to a leader, and the EF Defendants set no limitations to the group size, Exhibit B, 33:16-24, and that according to the EF Defendants group leaders are *solely* responsible for the wellbeing, supervision, and discipline of the participants on the tour. Exhibit B, 37:14 – 38:6; 39. According to the EF Defendants, it is up to the group leaders whether curfews are set. Exhibit B, 37. Also, the EF Defendants have no rules regarding sexual conduct on the tours. Exhibit B, 38. The EF Defendants have no rules regarding nightly room checks for children on the tour. Exhibit B, 39. The EF Defendants do not require group leaders to provide the EF Defendants with the rules that the group leaders do create for their groups for review or approval by the EF Defendants. Exhibit B, 40-41. The EF Defendants do not collect the Traveler Health and Medical Profiles

for the participants form the group leaders. Exhibit B, 46. The EF Defendants do not require the group leaders to use the resources that the EF Defendant shave available on their website for them. Exhibit B, 48-49. The EF Defendants do not track whether the group leaders have accessed any of the resources on the website available for them prior to the tours. Exhibit B, 50. The EF Defendants do not require the group leaders complete safety training. Exhibit B, 53. The safety video available by the EF Defendants for the group leaders is "optional". Exhibit B, 55. The failure to have appropriate security and safety measures in place is precisely why this incident occurred. Exhibit C, pp. 5-6, Part II, and p. 8, Conclusion 2; Exhibit D, pp. 4-9.

8. Admitted in part, denied in part. It is admitted that Defendant EF Education First operates the tours. It is denied that Defendant EF Institute's role is purely one of "marketer". Plaintiff incorporates by reference the response to Nos. 1, 3 and 4 above.

9. Denied that the EF Defendants are "travel service providers". To the contrary, they are youth serving organizations. "EF", which again includes not only Defendant EF Education First but Defendant EF Institute as well, exercises and retains the following powers for the Tours: 1) consolidates

8

groups while on the tour, Exhibit A, EF00000002, Group Travel; 2) modifies the itineraries as needed while the tour is taking place, Exhibit A, EF00000002, Group Travel; 3) receives and processes the applications and fees for the tours, Exhibit A, EF00000002, Enrollment; 4) dictates the eligibility for the tours, Exhibit A, EF00000003, Can Children Under 11 go on the Tour; 5) makes travel arrangements for those on the tour, Exhibit A, EF00000003, Flight Information; 6) handles final room assignments while on the tour, Exhibit A, EF00000004, Rooming; Exhibit B, 32:3-14; 7) reserves the power to change the booking conditions with immediate effectiveness and without notice, Exhibit A, EF00000008, Other Terms and Conditions; and 8) sets "Rules of the Road", which must be complied with or the travelers face dismissal, Exhibit A, EF00000008, EF's Rules of the Road.  According to Ms. Allen, EF also has the power to remove students from the trip.  Exhibit B, 42:14-19.

10. Admitted that the EF Defendants do not own the hotels, buses, or museums. They do, however, own and operate the tours.  Plaintiff incorporates her response to Nos. 1, 3, and 4 above.

11. Admitted that the tours are marketed to schools and teachers, denied that the motivation for the teachers is purely educational.  By way of further

response, the EF Defendants entice the teachers to recruit students for the tours financially as their individual trips are paid for based on the number of students who attend.  Exhibit B, 33:6-14.  Moreover, it is not a requirement that the group leader be a teacher.  Exhibit B, 39:24 – 40:4.  The requirements for group leaders are only that the individual be 21 years of age and pass background checks.  Exhibit B, 39:24 – 40:4.  This is actually a terrifying fact given that there are no ratios between the number of participants assigned to a leader, and there are no limitations to the group size, Exhibit B, 33:16-24, and that the tours are open to children as young as 6, Exhibit A, EF00000003, Can Children Under 11 go on the Tour, and that according to Defendant EF these group leaders are solely responsible for the wellbeing, supervision, and discipline of the participants on the tour.  Exhibit B, 37:14 – 38:6.  The failure to have appropriate security and safety measures in place is precisely why this incident occurred.  Exhibit C, pp. 5-6, Part II, and p. 8, Conclusion 2; Exhibit D, pp. 4-9.

12. Denied as speculative given the variation in travel costs on a daily basis. Further denied as being relevant to this Motion.

13. Denied as stated.  Contrary to the claim of the EF Defendants, the group leaders are not "running" the tours.  "EF", which again includes not only

10

Defendant EF Education First but Defendant EF Institute as well, exercises and retains the following powers for the Tours: 1) consolidates groups while on the tour, Exhibit A, EF00000002, Group Travel; 2) modifies the itineraries as needed while the tour is taking place, Exhibit A, EF00000002, Group Travel; 3) receives and processes the applications and fees for the tours, Exhibit A, EF00000002, Enrollment; 4) dictates the eligibility for the tours, Exhibit A, EF00000003, Can Children Under 11 go on the Tour; 5) makes travel arrangements for those on the tour, Exhibit A, EF00000003, Flight Information; 6) handles final room assignments while on the tour, Exhibit A, EF00000004, Rooming; Exhibit B, 32:3-14; 7) reserves the power to change the booking conditions with immediate effectiveness and without notice, Exhibit A, EF00000008, Other Terms and Conditions; and 8) sets "Rules of the Road", which must be complied with or the travelers face dismissal, Exhibit A, EF00000008, EF's Rules of the Road.  According to Ms. Allen, EF also has the power to remove students from the trip.  Exhibit B, 42:14-19.  Defendant EF Institute leads the group leaders through the process of organizing the tour.  Exhibit I, 16:8-15.  Defendant EF Institute provides the group leaders with all the particulars for the tour.  Exhibit I, 39:21-40:15.  Defendant EF Institute provides the catalog from which the

tours are selected.  Exhibit I, 19:10-20:3.  Defendant EF Institute selects the hotels.  Exhibit I, 21:12-18.  Defendant EF Institute selects the transportation to be used during the tour.  Exhibit I, 21:23-22:2.  Defendant EF Institute determines the rooms at the hotels for the tour.  Exhibit I, 22:3-10; 33:3-16.  Defendant EF Institute determines the price and handles the billing.  Exhibit I, 28:12-23.  Defendant EF Institute communicates directly with the tour participants, and participates in zoom meetings.  Exhibit I, 32:5-17; 76:20-77:13.  Defendant EF Institute provides training to the group leaders, and requires them to completes checklists prior to going on the tours.  Exhibit I, 35:7-23; 38:22-39:13; 67:2-14.  Defendant EF Institute provides the "Rules of the Road" to follow.  Exhibit I, 41:10-19.

14. Admitted.  By way of further response, however, the EF Defendants reserve the right to modify the itineraries as needed while the tour is taking place, Exhibit A, EF00000002, Group Travel.

15. Admitted that information sessions are held, denied that the EF Defendants do not participate in them.  To the contrary, EF Defendant representative participate in some of the zooms.  Exhibit I, 76:20-77:13; Dep. of Morgan Ash, Exhibit "F", 36:6-39:11.  By way of further response, the EF Defendants receive and process the applications and fees for the tours,

12

Exhibit A, EF00000002, Enrollment.

16. Admitted.

17. Admitted.

18. Admitted that the EF Defendants reserve the power to consolidate groups on tours. Exhibit A, EF00000002, Group Travel.  Defendant Jennifer Taylor explained in her deposition that she had concerns over safety when groups were combined because she does not know the behaviors of the other students, and she does not know what rules the other group leader has in place, and that she expressed those concerns to EF Defendants on multiple occasions.  Exhibit I, 60:18-61:24. As explained by Security Expert Russell Kollins, this combining of groups without any systems in place to ensure the group leaders communicated about rules and enforcement of rules, was a breach of the EF Defendants' duty to exercise due diligence with regard to organizational safety standards.  Exhibit D, p. 5, ¶ 2.  The EF Defendants needed to have adequate training, policies and procedures in place to prevent the known risk of youth on youth sexual violence, and they had **none**. Exhibit D, p. 8; Exhibit B, 49:6-50:10, 53:11-18, 55:4-24. This combining of groups while on tour without any structure, policies, and procedures in place increased the risk of harm to students such as L.F., who was sexually

assaulted by another student after their groups were combined.

19. Admitted that there are private tour options for additional money, denied that the decision for the private tour is up to the group leaders. To the contrary, the decision is up to the participants who either want to pay the additional cost or not. Furthermore, the EF Defendants reserve the power to combine the private group with other groups for certain excursions. Exhibit A, EF00000002, Private Groups.

20. Admitted that the EF Defendants *claim* that the group leaders have 100% of the responsibility for student safety, supervision, and discipline on the tour. Exhibit B, 37:14 – 38:6, 39:15-23, 41:11-21. According to Ms. Allen, the EF Defendants do not even require the group leaders provide the EF Defendants with proposed Rule he group leaders are going to implement for review or approval. Exhibit B, 40:12-41:21. Denied, however, that the EF Defendants are not responsible for the student participants' safety. The EF Defendants retain control over the room assignments, Exhibit A, EF00000004, Rooming; Exhibit B, 32:3-14, and set "Rules of the Road", which must be complied with or the travelers face dismissal, Exhibit A, EF00000008, EF's Rules of the Road. The EF Defendants also have the power to remove students from the tour. Exhibit B, 42:14-19. Further

denied that this averment by the Moving Defendants that the group leaders are solely responsible is legally true. As a youth serving organization, Defendant EF Education First owes a duty to its participants to comply with industry safety standards for such organizations given the known problem of youth-on-youth sexual violence. See Report of Elizabeth L. Jeglic, Ph.D., pp. 5-6, Part II, and p. 8, Conclusion 2, attached as Exhibit "C". Defendant EF Education First breached its duty to provide reasonable security and safety for Plaintiff by failing to have basic protective measures in place to prevent harm, providing inadequate monitoring and supervision of a vulnerable population in a high-risk environment, and failing to provide oversight to ensure staff adhered to established safety protocols. See Report of Russell Kollins, pp. 4-9, attached as Exhibit "D". Furthermore, the group leaders are agents of the EF Defendants and, as such, the EF Defendants may be held vicariously liable for their failure to use reasonable care. *Chow v. Merrimack Mut. Fire Ins. Co.*, 987 N.E.2d 1275, 1280, 2023 Mass. App. LEXIS 84, 11-12 (Appeals Court of Mass. 2013). The decision of whether the employer has sufficient control over the agent to render the employer liable is a question of fact for the jury. *Id.* There is ample evidence in this case that the EF Defendants exercised control over how the group leaders

performed their jobs such that a jury could find that the EF Defendants are liable for the group leaders failure to exercise reasonable care.  For example, the EF Defendants provide the group leaders with the booking conditions for the participants.  Exhibit B, 21:15-22:9.  The EF Defendants tell the group leaders how to make room assignments.  Exhibit B, 36:11-16; Exhibit A, EF00000004, Rooming.  The EF Defendants provide the group leaders with backpacks that they are required to give to the students, which include a safety guide for the tour, as well as wristbands that the group leaders are required to give to the participants to utilize with EF emergency information on them, as well as a safety card that they are required to give to the students for the students to use while on tour.  Exhibit B, 62:14-63:7; 64:21-65:3.  The EF Defendants require that the group leaders enforce the EF Defendants "Rules of the Road", Exhibit A, EF00000008, Rules of the Road.  These EF Rules control certain aspects of how the group leaders perform their roles in supervising and disciplining the participants.  For example, the EF Rules state that all scheduled activities are mandatory.  Exhibit A, EF00000008, Rules of the Road, No. 1. The EF Rules provide the procedures for allowing students to leave the tour to visit friends or family through the use of EF documents, including a Tour Leave Form. Exhibit A, EF00000008, Rules of

the Road, No. 2. The EF Rules prohibit members of the opposite sex from being in rooms. Exhibit A, EF00000008, Rules of the Road, No. 3. The EF Rules prohibit smoking. Exhibit A, EF00000008, Rules of the Road, No. 4. The EF Rules prohibit hitchhiking and the driving or renting of any motor vehicle. Exhibit A, EF00000008, Rules of the Road, No. 5. The EF Rules govern the costs for calls and personal expenses by the participants. Exhibit A, EF00000008, Rules of the Road, No. 6. The EF Rules prohibit the consumption of alcohol to persons under 18 and set limits for those over the age of 18. Exhibit A, EF00000008, Rules of the Road, No. 7. The EF Rules govern the payment of damage to hotels. Exhibit A, EF00000008, Rules of the Road, No. 9. These Rules established by EF are required to be enforced by the group leaders and if they are not followed the participants may be asked to leave the tour by the group leader or by the EF Defendants. Exhibit A, EF00000008, Rules of the Road; Exhibit B, 42:14-19.

21. Admitted only that the EF Defendants identify these tour directors as independent contractors, however, it is denied that the EF Defendants are not vicariously liable for the tour directors' failure to use reasonable care in the performance of their duties given the control that the EF Defendants maintain over how the tour directors perform their jobs. *Chow v.*

*Merrimack Mut. Fire Ins. Co.*, 987 N.E.2d 1275, 1280, 2023 Mass. App. LEXIS 84, 11-12 (Appeals Court of Mass. 2013).  The decision of whether the employer has sufficient control over the agent to render the employer liable is a question of fact for the jury.  Id.  There is ample evidence in this case that the EF Defendants exercised control over how the tour directors performed their jobs such that a jury could find that the EF Defendants are liable for the tour director's failure to exercise reasonable care.  For example, pursuant to the Tour Director Agreement, the Tour Director must "implement the tour as sold to EF Customer's", "communicate regularly by verbal briefing or posting tour information posters", "organize and suggest free-time activities", "provide orientation to all destinations visited", "help EF implement emergency procedures", help EF impart safety information, rectify safety concerns, conduct and submit daily hotel safety checks", "discuss concerns and elevate to EF", "ensure customers complete tour evaluations by the end of the tour."  See Tour Director Agreement, attached as Exhibit "E", p. 2, 2.2a.i-viii.  The EF Defendants also dictate that the Tour Directors "reconfirm tour arrangements listed in itinerary provided by EF" Exhibit E, p. 3, 2.2b.i.  The EF Defendants limit the Tour Director from making any separate arrangements themselves for transportation.  Exhibit E,

p. 3, 2.2b.ii.  The EF Defendants require the Tour Directors to complete EF documentation after the tour, and require them to provide an accounting and receipts for expenses.  Exhibit E, p. 3, 2.2c.

22. Admitted that this language appears in the General Terms and Conditions, Exhibit A, EF00000008.  Denied that Plaintiff or her parents were advised of the contents of the Booking Conditions.  There is no signed document, Plaintiff's mother does not recall the document or having discussed the contents of any contract, she only recalls receiving an itinerary and going over the "Rules of the Road" with the group leader.  Exhibit F, 33:13-34:7, 41:15-23,, 42:6-18; Exhibit H, 7:6-15.  Denied further that this language controls the responsibilities of the EF Defendants in this action. It is denied that Defendant EF Institute is merely a "marketing service provider" for the tours in question as suggested by the Moving Defendants. Under Massachusetts law, the words of a contract must be considered in the context of the entire contract rather than in isolation.  *Brigade Leveraged Capital Structures Fund LTD v. Pimco Income Strategy Fund*, 995 N.E.2d 64, 69, 2013 Mass. LEXIS 707, 11 (Supreme Judicial Court of Mass. 2013). "Contract language is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which

19

meaning is the proper one." Id.  Describing Defendant EF Institute in the contract as "only" a marketing services provider" but then elsewhere in the contract giving it powers and responsibilities on the tour, creates ambiguity over what the term "marketing service provider" actually means.  As such, the conduct of the parties must be examined.  Afterall, "the conduct of the parties after the signing of the agreement is indicative of their intent; there is no surer way to find out what the parties meant, than to see what they have done."  Id. 995 N.E.2d at 69-70, 72, 2013 Mass. LEXIS 707 at 12, 14, 19-20.  Defendant EF Institute's role is not so limited as Moving Defendants claim.  By way of further response, according to the General Terms and Conditions, as well as the deposition of EF designee, Megan Allen, Defendant EF Institute does more than just "market" the tour.  "EF", which again includes not only Defendant EF Education First but Defendant EF Institute as well, exercises and retains the following powers for the Tours: 1) consolidates groups while on the tour, Exhibit A, EF00000002, Group Travel; 2) modifies the itineraries as needed while the tour is taking place, Exhibit A, EF00000002, Group Travel; 3) receives and processes the applications and fees for the tours, Exhibit A, EF00000002, Enrollment; 4) dictates the eligibility for the tours, Exhibit A, EF00000003, Can Children

Under 11 go on the Tour; 5) makes travel arrangements for those on the tour, Exhibit A, EF00000003, Flight Information; 6) handles final room assignments while on the tour, Exhibit A, EF00000004, Rooming; Exhibit B, 32:3-14; 7) reserves the power to change the booking conditions with immediate effectiveness and without notice, Exhibit A, EF00000008, Other Terms and Conditions; and 8) sets "Rules of the Road", which must be complied with or the travelers face dismissal, Exhibit A, EF00000008, EF's Rules of the Road.  According to Ms. Allen, EF also has the power to remove students from the tour.  Exhibit B, 42:14-19.

23. Admitted.

24. Admitted.

25. Admitted.

26. Admitted.

27. Admitted in part, denied in part. It is admitted that Plaintiff was enrolled in the program by her parents. It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. See Deposition of Morgan Ash, attached as Exhibit "F", 33:13-34:7; 41:15-23; deposition of Trent Fallgatter, Exhibit "H", 7:6-15.  It is

admitted that Morgan Ash, Plaintiff's mother, was the primary contact listed on the booking details for the Plaintiff. Exhibit 10 to the Motion, EF00000001. It is denied, however, that Plaintiff's father, Trent Fallgatter, was uninvolved.  To the contrary, Plaintiff's father was also involved in the review of documents, and the decision and preparation for the tour.  Exhibit F, 42:6-9; deposition of Plaintiff, Exhibit "G", 104:15-17; Exhibit H, 7:6-15; 8:21 – 9:8; 36:6-11.

28. Admitted.

29. Admitted.

30. Admitted.

31. Denied as stated.  To the contrary, Mr. Fallgatter testified that the meeting was attended by him, Morgan Asdh, and Plaintiff, that the meeting was short lasting about 15 minutes, that the meeting was proctored by Plaintiff's teacher, Mr. Arriaga, and that the meeting covered the basics of travel logistics.  Exhibit H, 36:6-22.

32. Denied as no such signed document exists, has been provided by the Defendants, or is in the possession of Plaintiff or her parents.  Moreover, Ms. Ash has no recollection of signing such a document. Exhibit F, 42:6-18.

33. Denied as no such signed document exists, has been provided by the

Defendants, or is in the possession of Plaintiff or her parents.  Moreover, Ms. Ash has no recollection of signing such a document. Exhibit F, 42:6-18. It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. Exhibit F, 33:13-34:7; 41:15-23; Exhibit H, 7:6-15.  Clearly, the EF Defendants believed that the document had been signed based on the screenshot of the computer produced in discovery, Exhibit 10 to the Motion, EF00000001, and, therefore, permitted Plaintiff to go on the tour.  Regardless, the signed document has not been produced.

34. Denied.  The citation by Moving Defendant to Ms. Ash's deposition is **inaccurate**.  Ms. Ash never testified to receiving the booking conditions.

35. Admitted.

36. Admitted, as to the Rules of the Road.  Denied as to any Release relied upon by the Moving Defendants.  It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. Exhibit "F", 33:13-34:7; 41:15-23; Exhibit "H", 7:6-15.

37. Admitted as to the content of the document.  By way of further response,

23

according to Ms. Allen, EF has the power to remove students from the tour. Exhibit B, 42:14-19.

38. Admitted as to the content of the document.

39. Admitted.

40. Denied that Ms. Ash can testify as to what Plaintiff knew or did not know. According to Plaintiff, the rules on the tour were unclear and repeatedly broken by participants. Exhibit F, 86:23-87:13l; Exhibit G, 23:5-24:5, 126:1-127:15.

41. Denied as stated it is unclear what "representations" Moving Defendants are referring to in this averment. According to Plaintiff, the rules on the tour were unclear and repeatedly broken by participants. Exhibit F, 86:23-87:13l; Exhibit G, 23:5-24:5, 126:1-127:15. Ms. Ash, Plaintiff's mother, was certain that the EF Defendants explained that the groups could be combined, Exhibit F, 32:9-16, and that the genders would be separated by floors. Exhibit F, 36:6-39:11.

42. Admitted. Ms. Ash, Plaintiff's mother, was certain that the EF Defendants explained that the genders would be separated by floors. Exhibit F, 36:6-39:11.

43. Admitted.

44. Admitted.  By way of further response, representatives from the EF Defendants also participated in the zoom meetings.  Exhibit F, 38:9 – 39:11; see also deposition of Jennifer Taylor, Group Leader for the Pennsylvania Group and mother of Defendant Diego Taylor, attached as Exhibit "I", 76:20-77:13.

45. Denied.  To the contrary, Ms. Ash testified that an EF representative was on the zoom call where this separation of genders was discussed and that they assured the parents that the boys and girls would be on different floors.  Exhibit F, 36:6-39:11.

46. Denied.  The documents clearly state that the EF Defendants will handle room assignments and that the boys and girls will be separated.  Exhibit A, EF00000004, Rooming.  Thereafter, a zoom meeting was held with a representative of the EF Defendants, who explained that this meant that the girls and boys would be on different floors, which was consistent with what Plaintiff's mother had discovered in talking to prior participants.  Exhibit F, 36:6-39:11.

47. Admitted that zoom meetings were held and that EF Defendants had a representative attended those meetings. Exhibit F, 36:6-39:11; Exhibit "I", 76:20-77:13.  Further admitted that the basics/logistics of travel were

25

covered in the zoom meetings. Exhibit H, 36:6-22.  Denied that the Rules were clear.  According to Plaintiff, the rules on the tour were unclear and repeatedly broken by participants.  Exhibit F, 86:23-87:13l; Exhibit G, 14:17-15:21; 22:5-21; 23:5-24:5, 126:1-127:15.

48. Admitted as to the contents of the document; however, denied that Ms. Ash signed same.  It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. Exhibit "F", 33:13-34:7; 41:15-23; Exhibit "H", 7:6-15.  No such signed document has been provided by the Defendants, or is in the possession of Plaintiff or her parents.  Moreover, Ms. Ash has no recollection of signing such a document. Exhibit F, 42:6-18. Further denied that the Release contained in the cited document bars the claims herein.

49. Admitted as to the contents of the document; however, denied that Ms. Ash signed same.  It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. Exhibit "F", 33:13-34:7; 41:15-23; Exhibit "H", 7:6-15.  No such signed document has been provided by the Defendants, or is in the possession of

Plaintiff or her parents.  Moreover, Ms. Ash has no recollection of signing such a document. Exhibit F, 42:6-18. Further denied that the Release contained in the cited document bars the claims herein.

50. Admitted as to the contents of the document; however, denied that Ms. Ash signed same.  It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. Exhibit "F", 33:13-34:7; 41:15-23; Exhibit "H", 7:6-15.  No such signed document has been provided by the Defendants, or is in the possession of Plaintiff or her parents.  Moreover, Ms. Ash has no recollection of signing such a document. Exhibit F, 42:6-18. Further denied that the Release contained in the cited document bars the claims herein.

51. Admitted as to the contents of the document; however, denied that Ms. Ash signed same.  It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. Exhibit "F", 33:13-34:7; 41:15-23; Exhibit "H", 7:6-15.  No such signed document has been provided by the Defendants, or is in the possession of Plaintiff or her parents.  Moreover, Ms. Ash has no recollection of signing

such a document. Exhibit F, 42:6-18. Further denied that the Release contained in the cited document bars the claims herein.

52. Admitted as to the contents of the document; however, denied that Ms. Ash signed same.  It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. Exhibit "F", 33:13-34:7; 41:15-23; Exhibit "H", 7:6-15.  No such signed document has been provided by the Defendants, or is in the possession of Plaintiff or her parents.  Moreover, Ms. Ash has no recollection of signing such a document. Exhibit F, 42:6-18. Further denied that the Release contained in the cited document bars the claims herein.

53. Admitted as to the contents of the document; however, denied that Ms. Ash signed same.  It is denied that the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents. Exhibit "F", 33:13-34:7; 41:15-23; Exhibit "H", 7:6-15.  No such signed document has been provided by the Defendants, or is in the possession of Plaintiff or her parents.  Moreover, Ms. Ash has no recollection of signing such a document. Exhibit F, 42:6-18. Further denied that the Release

28

contained in the cited document bars the claims herein.

54. Admitted as to the contents of the document.

55. Denied. One such example is that the participants would be separated by gender and hotel floors. Exhibit F, 36:6-39:11. Additional examples include the following statements that EF makes to lure families into sending their minor children abroad with them but which statements were not fulfilled: 1) that the students' safety was EF's number one priority, see Exhibit "J", EF00000013; 2) that the students' safety is of the utmost importance to EF, see Exhibit "K", EF00000014; 3) EF takes necessary steps to help keep groups as healthy and safe as possible, see Exhibit "L", EF00000017; 4) that EF has health and safety protocols, see Exhibit "M", EF00000018; 5) that safety and happiness are EF's top priorities and that EF has a travel and safety guide that makes international travel safe, secure, and memorable, see Exhibit "N", EF00000019 and EF00000021; and 6) that EF and group leaders work together to keep group safe and that EF provides training sessions and training videos to its group leaders, see Exhibit "O", EF00000022.

56. Admitted.

57. Admitted.

58. Admitted.

59. Denied that these other adults were "part" of the group. According to Ms. Taylor, she was the only group leader, there were no chaperones, and this was a large group of between 22-25 students. Exhibit I, 37:15-24; 53:16-19; 53:24-55:4.

60. Denied as stated. The information sessions by Ms. Taylor also involved EF Defendant representatives. Exhibit I, 76:20-77:13.

61. Admitted.

62. Admitted that this was her testimony, denied that the EF Defendants have ever produced such signed documents. Denied that they were used, signed or enforced.

63. Admitted as to the contents of the Student Behavior Contract provided by Ms. Taylor. Denied that they were used, signed or enforced.

64. Admitted as to the contents of the Student Behavior Contract provided by Ms. Taylor. Denied that they were used, signed or enforced.

65. Admitted that this was her testimony, denied that the EF Defendants have ever produced such signed documents. Denied that they were used, signed or enforced.

66. Denied as stated. According to the General Terms of Conditions, Exhibit A,

EF00000004, Rooming, the EF Defendants "handle final rooming assignments for all travelers.  We make rooming assignments based on the sex identified on your passport."  The EF Defendants select the hotels, and determine the number of rooms at each hotel.  Exhibit I, 21:12-18; 22:3-10; 33:3-16.

67. Admitted that the EF Defendants do not establish curfews.

68. Admitted. Denied that unenforced and random, irregular curfews are reasonable under the circumstancs.

69. Admitted only that this was Ms. Taylor's testimony.  Denied that the room checks actually occurred as evidenced by the fact that Plaintiff was inside Defendant Diego Taylor's hotel room for several hours without anyone even noticing. Considering the credibility of witnesses, weighing their testimony, and resolving credibility conflicts are the function of the jury, not the Court when determining Motions seeking judgment as a matter of law.  *Perez v. Garcia*, 2024 U.S. Dist. LEXIS 46528, 2-3 (1st. Cir. 2024).  Further denied that such 9 pm room checks for teenagers studying abroad are reasonable under the circumstances.

70. Admitted that this was Ms. Taylor's testimony.  Denied that the Rules on the tour were followed or enforced. Exhibit F, 86:23-87:13l; Exhibit G, 23:5-

24:5, 126:1-127:15. Further denied that such 9 pm room checks for teenagers studying abroad are reasonable under the circumstances.

71. Admitted.

72. Admitted.

73. Denied. Ms. Taylor testified she did not know the distinction between adults and leaders in the California Group, but believed there were at least three adults. Exhibit I, 62:1-13. It is unclear whether this meant students over the age of 18. In any event, Ms. Taylor did not believe the combining of the groups was safe for behavioral reasons and voiced her concerns to the EF Defendants who refused to change the practice because of cost savings. Exhibit I, 60:18-61:24.

74. Admitted. By way of further response, the group leaders from the two groups never spoke before arriving in Spain, had never exchanged student behavior documents/rules/contracts, did not even know what each leader had in place as far as rules went, and did not discuss room assignments for the combined group. Exhibit I, 58:1-23. Ms. Taylor did not believe the combining of the groups was safe for behavioral reasons and voiced her concerns to the EF Defendants who refused to change the practice because of cost savings. Exhibit I, 60:18-61:24.

75. Admitted.

76. Admitted. By way of further response, Plaintiff testified Defendant Diego Taylor was being overly flirtatious at the museum.  Exhibit G, 114:15-115:3.

77. Admitted that this was Diego Taylor's testimony.

78. Admitted that this was Diego Taylor's testimony.

79. Admitted that this was Diego Taylor's testimony.

80. Admitted.

81. Denied as stated.  The Holiday Inn Express was not safe for the students on the tour as it was unsupervised, students were coming and going all hours of the night, students were drinking and doing drugs, students were in each others rooms for hours going undetected.  Exhibit F, 86:23-87:13l; Exhibit G, 23:5-24:5, 126:1-127:15.

82. Admitted that the EF Defendants did not own, operate or control the hotel; however, they did control and operate the tour the group leader, and the students on the tour.

83. Denied as stated.  According to the General Terms of Conditions, Exhibit A, EF00000004, Rooming, the EF Defendants "handle final rooming assignments for all travelers.  We make rooming assignments based on the sex identified on your passport."  The EF Defendants select the hotels, and

determine the number of rooms at each hotel.  Exhibit I, 21:12-18; 22:3-10; 33:3-16.

84. Admitted.

85. Admitted.

86. Admitted.  By way of further response, there were no hall monitors assigned or adults assigned to rooms between the rooms assigned to the girls and boys, the genders were not separated by hotel wings or floors.

87. Denied as stated.  According to the General Terms of Conditions, Exhibit A, EF00000004, Rooming, the EF Defendants "handle final rooming assignments for all travelers.  We make rooming assignments based on the sex identified on your passport."  The EF Defendants select the hotels, and determine the number of rooms at each hotel.  Exhibit I, 21:12-18; 22:3-10; 33:3-16.  These accommodations were without question within the control of the EF Defendants.

88. Admitted that this was her testimony.  Denied that this actually occurred.  No documentation of rooms checks were provided, no written policies or procedures for these rooms checks were produced, and Plaintiff was in Defendant Diego Taylor's on the night in question for hours without being noticed.  Considering the credibility of witnesses, weighing their testimony,

and resolving credibility conflicts are the function of the jury, not the Court when determining Motions seeking judgment as a matter of law. *Perez v. Garcia*, 2024 U.S. Dist. LEXIS 46528, 2-3 (1st. Cir. 2024).

89. Admitted.

90. Admitted that Plaintiff sent a photograph of herself, denied that it was suggestive as implied by the Movants. Further denied that sending a picture of herself entitles Defendant Taylor to have sex with her against her will.

91. Admitted. By way of further response, it is denied that sending messages to someone about another girl entitled that person to have sex with you against your will.

92. Admitted that the two teenagers continued flirting during the trip. It is denied that because Plaintiff flirted with Defendant Taylor, Defendant Taylor is entitled to have sex with her against her will.

93. Admitted that this was Defendant Diego Taylor's testimony.

94. Admitted that this was Defendant Diego Taylor's testimony. Denied that this actually occurred. No documentation of such rooms checks were provided, no written policies or procedures for these rooms checks were produced, and Plaintiff was in Defendant Diego Taylor's on the night in question for hours without being noticed. Considering the credibility of witnesses, weighing

their testimony, and resolving credibility conflicts are the function of the jury, not the Court when determining Motions seeking judgment as a matter of law. *Perez v. Garcia*, 2024 U.S. Dist. LEXIS 46528, 2-3 (1st. Cir. 2024).

95. Admitted that this was Defendant Diego Taylor's testimony.

96. Admitted that the two teenagers flirted during the trip in the days leading to the assault. It is denied that because Plaintiff flirted with Defendant Taylor, Defendant Taylor is entitled to have sex with her against her will.

97. Admitted.

98. Admitted.

99. Denied that the citation to Ms. Ash's testimony is accurate. Ms. Ash did not testify that Plaintiff did not tell group leaders, in fact, Ms. Ash testified that she told Plaintiff to report it to group leaders.

100. Admitted that this was Defendant Jennifer Taylor's testimony.

101. Admitted that this was Defendant Diego Taylor's testimony. Denied that this actually occurred. No documentation of such rooms checks were provided, no written policies or procedures for these rooms checks were produced, and Plaintiff was in Defendant Diego Taylor's on the night in question for hours without being noticed. Considering the credibility of witnesses, weighing their testimony, and resolving credibility conflicts are

the function of the jury, not the Court when determining Motions seeking judgment as a matter of law. *Perez v. Garcia*, 2024 U.S. Dist. LEXIS 46528, 2-3 (1st. Cir. 2024).

102.    Admitted that this was Diego Taylor's testimony.

103.    Admitted that this was Defendant Diego Taylor's testimony. Denied that this actually occurred.  No documentation of such rooms checks were provided, no written policies or procedures for these rooms checks were produced, and Plaintiff was in Defendant Diego Taylor's on the night in question for hours without being noticed.  Considering the credibility of witnesses, weighing their testimony, and resolving credibility conflicts are the function of the jury, not the Court when determining Motions seeking judgment as a matter of law. *Perez v. Garcia*, 2024 U.S. Dist. LEXIS 46528, 2-3 (1st. Cir. 2024). Further denied that this was reasonable under the circumstances.

104.    Admitted. It is denied that this discussion entitled Defendant Taylor to have sex with Plaintiff against Plaintiff's will.

105.    Denied.  To the contrary, Plaintiff refused to attend the move night, Defendant Diego Taylor then started looking under the door into Plaintiff's room and banging on the door, eventually, Plaintiff agreed to meet him in

the hallway so that she could tell him to stop bothering her.  He was in his underwear, took her hands, and pulled her into his room.  Exhibit G, 20:6-10; 95:22 – 97:4; 116:13-20; 188:1-11.

106.    Admitted that this was Defendant Diego Taylor's testimony. Denied that this actually occurred.  No documentation of such rooms checks were provided, no written policies or procedures for these rooms checks were produced, and Plaintiff was in Defendant Diego Taylor's on the night in question for hours without being noticed.  Considering the credibility of witnesses, weighing their testimony, and resolving credibility conflicts are the function of the jury, not the Court when determining Motions seeking judgment as a matter of law.  *Perez v. Garcia*, 2024 U.S. Dist. LEXIS 46528, 2-3 (1st. Cir. 2024).

107.    Admitted.  Denied that this entitled Defendant Diego Taylor to have sex with Plaintiff against her will.

108.    Denied as stated.  Plaintiff was scared of getting into trouble for being in Defendant Deigo Taylor's room, a place she did not want to be, and a place she did not intent to be.  Exhibit G, 29:3-24.  She was pushed against the wall and was trying to leave and could not.  Exhibit G, 31:11-23.

109.    Admitted.

110.    Admitted.

111.    Admitted.  Despite the fact that there were "curfews", the rules were not followed or enforced and there were people in the lobby of the hotel in the middle of the night.

112.    Admitted. Denied that this entitled Defendant Diego Taylor to have sex with Plaintiff against her will.

113.    Denied as stated.  Plaintiff could not leave once in the room because she was held against the wall. Exhibit G, 31:11-23; 33. Once pulled to the bed she was held down on the bed and pulled back into the bed when she tried to get up.  Exhibit G, 38:4-14.

114.    Denied as it is unclear what/whose "rules" are being referred to herein, ie. EF Defendants' rules, Mr. Arriaga's rules, Ms. Taylor's rules, Ms. Ash's rules, it is not clear to what this averment refers.

115.    Admitted.  As explained by Expert Jeglic, Plaintiff's behavior in not screaming is not inconsistent with sexual assault victims.  Exhibit C, pp. 3-4, 7-8. Furthermore, to the extent that this averment implies consent by Plaintiff it is denied.  Plaintiff said no, at the beginning middle and end of the encounter; the sexual intercourse she endured was against her will. Exhibit G, 73:9-74:4. She cried during the event and yet it continued.

Exhibit G, 131:23-132:15.

116.     Denied as stated.  Plaintiff agreed to meet him in the hallway so that she could tell him to stop bothering her.  He was in his underwear, took her hands, and pulled her into his room.  Exhibit G, 20:6-10; 95:22 – 97:4; 116:13-20; 188:1-11. Plaintiff was scared of getting into trouble for being in Defendant Deigo Taylor's room, a place she did not want to be, and a place she did not intent to be.  Exhibit G, 29:3-24.  Plaintiff could not leave once in the room because she was held against the wall. Exhibit G, 31:11-23; 33.  Once pulled to the bed she was held down on the bed and pulled back into the bed when she tried to get up.  Exhibit G, 38:4-14.

117.     Admitted.

118.     Admitted that Plaintiff did not scream.  As recognized by Expert Jeglic, Plaintiff's behavior in not screaming is not inconsistent with sexual assault victims.  Exhibit C, pp. 3-4, 7-8.  Plaintiff testified that she did not scream when she was scared, she froze.  Exhibit G, 32:3-19. Furthermore, to the extent that this averment implies consent by Plaintiff it is denied.  Plaintiff said no, at the beginning middle and end of the encounter; the sexual intercourse she endured was against her will.  Exhibit G, 73:9-74:4.  She cried during the event and yet it continued.  Exhibit G, 131:23-132:15.

119.    Admitted.

120.    Denied as stated.  Plaintiff did not voluntarily "stay" in Defendant Deigo Taylor's room.  Plaintiff could not leave once in the room because she was held against the wall. Exhibit G, 31:11-23; 33. Once pulled to the bed she was held down on the bed and pulled back into the bed when she tried to get up.  Exhibit G, 38:4-14.  Furthermore, to the extent that this averment implies consent by Plaintiff it is denied.  Plaintiff said no, at the beginning middle and end of the encounter; the sexual intercourse she endured was against her will.  Exhibit G, 73:9-74:4. She cried during the event and yet it continued.  Exhibit G, 131:23-132:15.

121.    Denied as stated.  Plaintiff did not voluntarily "stay" in Defendant Deigo Taylor's room.  Plaintiff could not leave once in the room because she was held against the wall. Exhibit G, 31:11-23; 33. Once pulled to the bed she was held down on the bed and pulled back into the bed when she tried to get up.  Exhibit G, 38:4-14.

122.    Admitted that Plaintiff did not scream.  As recognized by Expert Jeglic, Plaintiff's behavior in not screaming is not inconsistent with sexual assault victims.  Exhibit C, pp. 3-4, 7-8.  Plaintiff testified that she did not scream when she was scared, she froze.  Exhibit G, 32:3-19.

123.    Admitted that Plaintiff did not bang on the walls.  As recognized by Expert Jeglic, Plaintiff's behavior in not screaming is not inconsistent with sexual assault victims.  Exhibit C, pp. 3-4, 7-8.  Plaintiff testified that she did not scream when she was scared, she froze.  Exhibit G, 32:3-19.  Furthermore, to the extent that this averment implies consent by Plaintiff it is denied.  Plaintiff said no, at the beginning middle and end of the encounter; the sexual intercourse she endured was against her will.  Exhibit G, 73:9-74:4. She cried during the event and yet it continued.  Exhibit G, 131:23-132:15.

124.    Admitted that Plaintiff did not alert the **friend** of the assailant's who was in the room.  As recognized by Expert Jeglic, Plaintiff's behavior in not screaming is not inconsistent with sexual assault victims.  Exhibit C, pp. 3-4, 7-8.  Plaintiff testified that she did not scream when she was scared, she froze.  Exhibit G, 32:3-19. Furthermore, to the extent that this averment implies consent by Plaintiff it is denied.  Plaintiff said no, at the beginning middle and end of the encounter; the sexual intercourse she endured was against her will.  Exhibit G, 73:9-74:4. She cried during the event and yet it continued.  Exhibit G, 131:23-132:15.

125.    Denied as stated.  Plaintiff did not voluntarily "stay" in Defendant

Deigo Taylor's room. Plaintiff could not leave once in the room because she was held against the wall. Exhibit G, 31:11-23; 33. Once pulled to the bed she was held down on the bed and pulled back into the bed when she tried to get up. Exhibit G, 38:4-14.

126.    Admitted that Plaintiff eventually left Defendant Taylor's room.

127.    Admitted.

128.    Admitted.

129.    Admitted.

130.    Admitted.

131.    Admitted that this was the testimony of Defendant Diego Taylor.

132.    Admitted that this is what Defendant Jennifer Taylor says occurred.

133.    Admitted.

134.    Admitted. By way of further response, Plaintiff was taken to the hospital where she was interviewed, examined, received medical treatment, and then was taken to the police station where she was again interviewed. Exhibit G, 86-90.

135.    Admitted that this was Defendant Jennifer Taylor's testimony.

136.    Admitted.

137.    Admitted that this is what Defendant Jennifer Taylor says occurred.

138.    Admitted that this is what Plaintiff said in her testimony.  Denied that leaving her room means she deserved to be raped.

139.    Denied as the conduct between the two leading up to the assault should have raised concern for the Moving Defendants' agents, given the Defendant Taylor's overly aggressive manner in pursuing Plaintiff, standing outside her door, looking under her door, knocking on her door until she came out.

140.    Denied as the conduct between the two leading up to the assault should have raised concern for the Moving Defendants' agents, given the Defendant Taylor's overly aggressive manner in pursuing Plaintiff, standing outside her door, looking under her door, knocking on her door until she came out.

141.    Admitted.

142.    Denied. One such example is that the participants would be separated by gender and hotel floors. Exhibit F, 36:6-39:11.  Additional examples include the following statements that EF makes to lure families into sending their minor children abroad with them but which statements were not fulfilled: 1) that the students' safety was EF's number one priority, see Exhibit "J", EF00000013; 2) that the students' safety is of the utmost

44

importance to EF, see Exhibit "K", EF00000014; 3) EF takes necessary steps to help keep groups as healthy and safe as possible, see Exhibit "L", EF00000017; 4) that EF has health and safety protocols, see Exhibit "M", EF00000018; 5) that safety and happiness are EF's top priorities and that EF has a travel and safety guide that makes international travel safe, secure, and memorable, see Exhibit "N", EF00000019 and EF00000021; and 6) that EF and group leaders work together to keep group safe and that EF provides training sessions and training videos to its group leaders, see Exhibit "O", EF00000022.

**HILL & ASSOCIATES, P.C.**

By:  */s/Susan B. Ayres*
     SUSAN B. AYRES, ESQ.
     PA Identification No. 87562
     1700 Market Street, Ste. 3150
     Philadelphia, PA  19103
     (215) 567-7600
     Sue@Hilljustice.com

     Attorney for Plaintiff

Date: September 17, 2025