# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **L.F.** | : | **CIVIL ACTION LAW** |
| **Plaintiff** | : | |
| | : | **NO. 4:23-cv-01038-MWB** |
| **vs.** | : | **(Hon. Karoline Mehalchick)** |
| | : | |
| **EF Educational Tours,** | : | **JURY TRIAL** |
| **EF Education First International** | : | **DEMANDED** |
| **Ltd.,** | : | |
| **EF Institute for Cultural Exchange,** | : | |
| **Inc.,** | : | |
| **EF Education First International,** | : | |
| **Ltd., Switzerland,** | : | |
| **Diego Manuel Taylor,** | : | |
| **Jennifer Taylor** | : | |
| **Defendants** | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RESPONSE IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF EF DEFENDANTS AND JENNIFER TAYLOR

# **TABLE OF CONTENTS**

I.    COUNTERSTATEMENT OF FACTS

   a.  EF Educational First International, Ltd., and EF Institute for Cultural Exchange, Inc., collectively the "EF Defendants", are Youth Serving Organizations

   b.  The Group Leaders and Tour Directors of the EF Educational Tours are within the Control of the EF Defendants

   c.  The EF Defendants Made Representations Regarding the Safety of the Participants on the Tour

   d.  The EF Defendants, and their Group Leaders and Tour Directors for whom they are vicariously liable, failed to provide safety, security, and supervision for the participants on this Tour

   e.  As a result of the lack of safety, security, and supervision, Plaintiff was sexually assaulted

   f.  There is no enforceable signed Release and Waiver

II.   COUNTERSTATEMENT OF ISSUES INVOLVED

   a.  Whether Massachusetts Law Governs

   b.  Whether Genuine Issues of Material Fact Exist Precluding the Entry of Judgment based on the Release

   c.  Whether Genuine Issues of Material Fact Exist Precluding the Entry of Summary Judgment on the Contract Claim.

   d.  Whether Genuine Issues of Material Fact Exist Precluding the Entry of Summary Judgment on the Negligence Claims.

III.    <u>ARGUMENT</u>

    a.  Standard of Review

    b.  Choice of Law

    c.  The Release is Unenforceable

        i.  Genuine issue of material fact exists as to whether the Release was in effect

       ii.  Even if in effect, there are genuine issues of material fact as to whether the Release is enforceable

    d.  Contract Claim and Misrepresentation

    e.  Negligence Claims

    f.  Third Party Criminal Acts

    g.  EF Educational Tours

    h.  EF Education First, International, Ltd.

IV.    <u>CONCLUSION</u>

TABLE OF AUTHORITIES

**Cases**

*Ajemian v. Yahoo! Inc.*, 987 N.E.2d 604 (Mass. App. Ct. 2013) ............................16

*Boston Five Cents Sav. Bank v. Brooks*, 309 Mass. 52, 55, 34 N.E.2d 435 (1941) 20

*Brigade Leveraged Capital Structures Fund LTD v. Pimco Income Strategy Fund,* 995 N.E.2d 64, 69, 2013 Mass. LEXIS 707, 11 (Supreme Judicial Court of Mass. 2013) ............................................................................24

*Chatman v. City of Johnston,* 131 Fed. Appx. 18, 20, 2005 U.S. App. LEXIS 8675, 5 (3d Cir. 2005).....................................................................13

*Chow v. Merrimack Mut. Fire Ins. Co.,* 987 N.E.2d 1275, 1280, 2023 Mass. App. LEXIS 84, 11-12 (Appeals Court of Mass. 2013)................................................27

*Clarke v. Ames,* 165 N.E. 696, 697 (Mass. 1929)......................................................19

*Commerce Bank & Trust Co. v. Hayeck*, 709 N.E.2d 1122, 1126 (Mass. App. Ct. 1999) ..............................................................................20

*Cormier v. Cent. Mass. Chapter of Nat. Safety Council*, 620 N.E.2d 784, 786 (Mass. 1993) ..............................................................................19

*Crocker v. Townsend Oil Co.*, 979 N.E.2d 1077, 1080 (Mass. 2012)....................22

*CSX Transp., Inc. v. Mass. Bay Transp. Auth.*, 697 F. Supp. 2d 213, 226 (D. Mass. 2010) ..............................................................................19

*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018) ............................17

*Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4 (1975)..................................14

*Erie v. Railroad Co. v. Tompkins*, 304 U.S. 64(1938)..............................................14

*Feeney v. Dell Inc.,* 454 Mass. 192, 199–200, 908 N.E.2d 753 (Mass. 2009)........22

*Freni v. Uber Techs.,* 2021 Mass. Super. LEXIS 444, 4-5 (Sup,. Ct. of Mass. 2021) ...............................................................................................................28

*Goodman v. City of Philadelphia,* 2025 U.S. App. LEXIS 21729, 5-6 (3d Cir. 2025) ..................................................................................................13

*Griffith v. United Air Lines Inc.*, 203 A.2d 796 (Pa. 1964) .............................. 14, 15

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d. Cir 2007)...........................14

*Henry v. Mansfield Beauty Academy, Inc.,* 233 N.E.2d 22 (Mass. 1968) ..............22

*Jupin v. Kask*, 497 Mass. 141, 146, 849 N.E.2d 829 (2006) ...................................26

*Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1048 (Mass. 2021).....................16

*Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941) ...............................14

*Lechmere Tire & Sales Co. v. Burwick,* 277 N.E.2d 503 (Mass. 1972)..................19

*Lomax v. Nationwide Mut. Ins. Co.*, 964 F.2d 1343, 1345 (3d Cir. 1992) ..............14

*MacFarlane's Case,* 115 N.E.2d 925 (Mass. 1953)................................................19

*Marks v. Redner's Warehouse Markets.*, 136 A.3d 984, 987 (Pa. Super. 2016).....15

*Melville v. Am. Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978).................14

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017).....................................16

*NSTAR Elec. Co. v. Veolic Energy N. Am. Holdings, Inc.*, 2019 Mass. Super., LEXIS 7, 15, 35 Mass. L. Rep. 463 (Super. Ct. of Mass. 2019)..........................26

*Perez v. Garcia,* 2024 U.S. Dist. LEXIS 46528, 2-3 (1st. Cir. 2024)......................26

*Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016)............... 16, 17

*Sharon v. City of Newton*, 769 N.E.2d 738, 744–48 (Mass. 2002) .........................22

*Universal Underwriters Ins. Co. v. Swenson,* 2024 U.S. Dist. LEXIS 70627, 4 (M.D. Pa. 2024) ........................................................................................................13

*Zavras v. Capeway Rovers Motorcycle Club, Inc.*, 687 N.E.2d 1263 (Mass. Ct. App. 1997) ................................................................................................................19

## Statutes

Restatement (2d) of Conflicts Section 188 ...............................................................14

Restatement (Second) of Contracts Section 164 (1) (1981) ....................................20

## Rules

Fed.R.Civ.P. 56 .......................................................................................................13

## I.      COUNTERSTATEMENT OF FACTS1

## A. The "EF Defendants" are Youth Serving Organizations

The EF Defendants do not own any hotels, buses, or museums.  SOF, ¶ 10. They are youth serving organizations that operate international tours for students. SOF, ¶¶ 6, 7, 12.  Tours are open to children as young as 6 years old.  RSOF, ¶ 7. The only requirements for the group leaders are that they are 21 years of age and pass background checks.  RSOF, ¶ 7.  There are no restrictions on group size, no restrictions on ratios between students and group leaders, and no requirement that the group leaders submit the rules that they are going to impose on the participants, beyond the Rules of the Road set by the EF Defendants, to the EF Defendants for review or approval.  RSOF, ¶ 7.

The General Terms and Conditions of the EF Defendants provide as follows:

> "All tours are operated outside of the U.S. by EF Education First International, LTD., Switzerland. EF Institute for Cultural Exchange, Inc., is a marketing service provider for that company and is referred herein **together with EF Education First International, LTD., as 'EF'".**

RSOF, ¶ 1.  As such, when the General Terms and Conditions impose responsibilities and obligations on "EF", they refer to **both** the Defendant EF Education First International, Ltd. ("Defendant EF Education First") and

---

1 Citations to RSOF refer to the Plaintiff's Response to the Statement of Facts.

Defendant EF Institute for Cultural Exchange, Inc. (Defendant EF Institute).

Defendant EF Institute is not merely a "marketing service provider" for the tours as suggested by the Moving Defendants.  RSOF, ¶ 3.  Defendant EF Institute's role is not so limited.  The EF Defendants exercise and retain the following powers for the Tours: 1) consolidate groups while on the tour; 2) modify the itineraries as needed while the tour is taking place; 3) receive and process the applications and fees for the tours; 4) dictate the eligibility for the tours; 5) make travel arrangements for those on the tour; 6) handle final room assignments while on the tour; 7) reserve the power to change the booking conditions with immediate effectiveness and without notice; and 8) set "Rules of the Road", which must be complied with or the travelers face dismissal.  RSOF, ¶ 3.  The EF Defendants also have the power to remove students from the tour.  RSOF, ¶ 3.

Regarding the consolidation of groups, the group leaders from the two groups never spoke before arriving in Spain, had never exchanged student behavior documents/rules/contracts, did not even know what each leader had in place as far as rules went, and did not discuss room assignments for the combined group. RSOF, ¶ 74. Ms. Taylor did not believe the combining of the groups was safe for behavioral reasons and voiced her concerns to the EF Defendants **who refused to change** the practice because of cost savings.  RSOF, ¶¶ 73, 74. There are other ways that the EF Defendants operate the tour and control the group leaders.

2

Defendant Jennifer Taylor explained that Defendant EF Institute leads the group leaders through the process of organizing the tour, and providers all of the particulars. RSOF, ¶ 3. Defendant EF Institute provides the catalog from which the tours are selected. RSOF, ¶ 3. Defendant EF Institute selects the hotels and the transportation to be used. RSOF, ¶ 3. Defendant EF Institute determines the rooms at the hotels. RSOF, ¶ 3. Defendant EF Institute determines the price and handles the billing. RSOF, ¶ 3. Defendant EF Institute communicates directly with the tour participants and participates in zoom meetings. RSOF, ¶ 3. Defendant EF Institute provides training to the group leaders and requires them to complete checklists. RSOF, ¶ 3. Defendant EF Institute provides the "Rules of the Road" to follow. RSOF, ¶ 3. There are private tour options for additional money, the decision for the private tour is not up to the group leaders. RSOF, ¶ 19. To the contrary, the decision is up to the participants who either want to pay or not. Furthermore, the EF Defendants reserve the power to combine the private group with other groups for excursions. RSOF, ¶ 19.

As youth serving organizations, the EF Defendants owe a duty to their participants to comply with industry safety standards for such organizations given the known problem of youth-on-youth sexual violence. RSOF, ¶ 1. The EF Defendants breached their duty to provide reasonable security and safety for Plaintiff by failing to have basic protective measures in place to prevent harm,

3

providing inadequate monitoring and supervision of a vulnerable population in a high-risk environment, and failing to provide oversight to ensure staff adhered to established safety protocols.  RSOF, ¶ 1.

### B. The Group Leaders and Tour Directors are within the Control of the EF Defendants

There is ample evidence in this case that the EF Defendants exercised control over how the group leaders and tour directors performed their jobs such that a jury could find that the EF Defendants are liable for the group leaders' and tour directors' failure to exercise reasonable care for the safety, security, and supervision of the Plaintiff.  RSOF, ¶ 20.

The EF Defendants provide the group leaders with wristbands, safety cards, and backpacks that they are required to give to the students, which include a safety guide.  RSOF, ¶ 20.  The EF Defendants require that the group leaders enforce the EF Defendants "Rules of the Road". RSOF, ¶ 20.  The EF Rules control certain how the group leaders perform their roles in supervising and disciplining the participants.  RSOF, ¶ 20.  The EF Rules state that all scheduled activities are mandatory, and provide detailed procedures for allowing students to leave the tour to visit friends or family through the use of EF documents, including a Tour Leave Form. RSOF, ¶ 20.  The EF Rules prohibit members of the opposite sex from being in rooms, and prohibit smoking, hitchhiking, or driving and renting any vehicles. RSOF, ¶ 20.  The EF Rules govern the costs for calls and personal expenses by the

4

participants.  RSOF, ¶ 20.  The EF Rules prohibit the consumption of alcohol to persons under 18 and set limits for those over the age of 18, and govern the payment of damages to hotels. RSOF, ¶ 20.  These Rules established by EF are required to be enforced by the group leaders and if they are not followed participants may be asked to leave by the group leader or by the EF Defendants. RSOF, ¶ 20.  Contrary to the claim of the EF Defendants, the group leaders are not "running" the tours.  RSOF, ¶ 13.

The EF Defendants compensate the teachers to recruit students for the tours financially as their individual trips are paid for based on the number of students who attend.  RSOF, ¶ 11.  In this instance, the group leaders from the two groups never spoke before arriving in Spain, had never exchanged student behavior documents/rules/contracts, did not even know what each leader had in place as far as rules went, and did not discuss room assignments for the combined group. RSOF, ¶ 74. Ms. Taylor did not believe the combining of the groups was safe for behavioral reasons and repeatedly voiced her concerns to the EF Defendants who refused to change the practice because of cost savings.  RSOF, ¶¶ 73, 74. There are other ways the EF Defendants controlled the group leaders as well.

The EF Defendants exercises and retain the following powers for the Tours: 1) consolidates groups while on the tour; 2) modifies the itineraries as needed while the tour is taking place; 3) receives and processes the applications and fees

5

for the tours; 4) dictates the eligibility for the tours; 5) makes travel arrangements for those on the tour; 6) handles final room assignments while on the tour; 7) reserves the power to change the booking conditions with immediate effectiveness and without notice; and 8) sets "Rules of the Road". RSOF, ¶ 3. The EF Defendants also have the power to remove students from the tour. RSOF, ¶ 3.

There is ample evidence in this case that the EF Defendants exercised control over how the tour directors performed their jobs such that a jury could find that the EF Defendants are liable for the tour director's failure to exercise reasonable care. For example, pursuant to the Tour Director Agreement, the Tour Director must "implement the tour as sold to EF Customer's", "communicate regularly by verbal briefing or posting tour information posters", "organize and suggest free-time activities", "provide orientation to all destinations visited", "help EF implement emergency procedures", help EF impart safety information, rectify safety concerns, conduct and submit daily hotel safety checks", "discuss concerns and elevate to EF", "ensure customers complete tour evaluations by the end of the tour." RSOF, ¶ 21. The EF Defendants also dictate that the Tour Directors "reconfirm tour arrangements listed in itinerary provided by EF". RSOF, ¶ 21. The EF Defendants limit the Tour Director from making any separate arrangements themselves for transportation. RSOF, ¶ 21.

C. **The EF Defendants Made Representations Regarding the Safety of the Participants on the Tour**

6

The EF Defendants explained that the groups could be combined and that the genders would be separated by floors.  RSOF, ¶ 41.  The EF Defendants represented that the genders would be separated, and members of the opposite sex would not be in one another's rooms.  RSOF, ¶ 46.  This was not true.

The following statements, representations, and promises were made by the EF Defendants to lure families into sending their minor children abroad with them but which statements were not fulfilled: 1) that the students' safety was EF's number one priority; 2) that the students' safety is of the utmost importance to EF; 3) EF takes necessary steps to help keep groups as healthy and safe as possible; 4) that EF has health and safety protocols; 5) that safety and happiness are EF's top priorities and that EF has a travel and safety guide that makes international travel safe, secure, and memorable; and 6) that EF and group leaders work together to keep group safe and that EF provides training sessions and training videos to its group leader. RSOF, ¶ 55.  Plaintiff and her family relied on these statements and entrusted Plaintiff into the custody and control of the EF Defendants.  Exhibit H, 45:12-46:7.

D. **The EF Defendants, and their Group Leaders for whom they are vicariously liable, failed to provide safety, security, and supervision for the participants**

Tours are open to children as young as 6 years old.  RSOF, ¶ 7.  The

requirements for group leaders are *only* that the individual be 21 years of age and pass background checks. RSOF, ¶ 7. This is actually a terrifying fact given that the EF Defendants set no required ratios between the number of participants assigned to a leader, and the EF Defendants set no limitations to the group size, RSOF, ¶ 7, and that according to the EF Defendants group leaders are *solely* responsible for the wellbeing, supervision, and discipline of the participants on the tour. RSOF, ¶ 7. According to the EF Defendants, it is up to the group leaders whether curfews are set. RSOF, ¶ 7. Also, the EF Defendants have no rules regarding sexual conduct on the tours. RSOF, ¶ 7. The EF Defendants have no rules regarding nightly room checks for children on the tour. RSOF, ¶ 7. The EF Defendants do not require group leaders to provide the EF Defendants with the rules that the group leaders do create for their groups for review or approval by the EF Defendants. RSOF, ¶ 7. The EF Defendants do not collect the Traveler Health and Medical Profiles for the participants form the group leaders. RSOF, ¶ 7.

The EF Defendants do not require the group leaders to use the resources that the EF Defendant share available on their website for them. RSOF, ¶ 7. The EF Defendants do not track whether the group leaders have accessed any of the resources on the website available for them prior to the tours. RSOF, ¶ 7. The EF Defendants do not require the group leaders complete safety training. RSOF, ¶ 7. The safety video available by the EF Defendants for the group leaders is

8

"optional". RSOF, ¶ 7.  The failure to have appropriate security and safety measures in place is precisely why this incident occurred.  RSOF, ¶ 7.

EF Defendants reserve the power to consolidate groups on tours. RSOF, ¶ 18.  Defendant Jennifer Taylor explained in her deposition that she had concerns over safety when groups were combined because she does not know the behaviors of the other students, and she does not know what rules the other group leader has in place, and that she expressed those concerns to EF Defendants on multiple occasions.  RSOF, ¶ 18. As explained by Security Expert Russell Kollins, this combining of groups without any systems in place to ensure the group leaders communicated about rules and enforcement of rules, was a breach of the EF Defendants' duty to exercise due diligence with regard to organizational safety standards.  RSOF, ¶ 18. The EF Defendants needed to have adequate training, policies and procedures in place to prevent the known risk of youth on youth sexual violence, and they had **none**.  RSOF, ¶ 18. This combining of groups while on tour without any structure, policies, and procedures in place increased the risk of harm to students such as L.F., who was sexually assaulted by another student after their groups were combined.  Exhibit C, D.

In addition to having insufficient rules governing safety, security, and supervision, the rules that were in place were unclear and repeatedly broken by participants.  RSOF, ¶ 40.  The Holiday Inn Express, where the assault took place,

9

was not safe for the students on the tour as it was unsupervised, students were coming and going all hours of the night, students were drinking and doing drugs, students were in each others rooms for hours going undetected.  RSOF, ¶ 81. There were no hall monitors assigned or adults assigned to rooms between the rooms assigned to the girls and boys, the genders were not separated by hotel wings or floors. RSOF, ¶ 86. According to the General Terms of Conditions, the EF Defendants "handle final rooming assignments for all travelers.  RSOF, ¶ 87. We make rooming assignments based on the sex identified on your passport."  The EF Defendants select the hotels and determine the number of rooms at each hotel. RSOF, ¶ 87. This accommodation was without question within the control of the EF Defendants.

E. <u>**As a result of the lack of safety, security, and supervision, Plaintiff was sexually assaulted**</u>

Plaintiff refused to attend the move night with Defendant Diego Taylor, who then started looking under the door into Plaintiff's room and banging on the door, eventually, Plaintiff agreed to meet him in the hallway so that she could tell him to stop bothering her.  He was in his underwear, took her hands, and pulled her into his room.  RSOF, ¶ 105. Plaintiff was scared of getting into trouble for being in Defendant Deigo Taylor's room, a place she did not want to be, and a place she did not intent to be.  RSOF, ¶¶ 108, 116. She was pushed against the wall and was

trying to leave and could not.  RSOF, ¶¶ 108, 116. Plaintiff could not leave once in the room because she was held against the wall. RSOF, ¶ 113.  Once pulled to the bed she was held down on the bed and pulled back into the bed when she tried to get up.  RSOF, ¶¶ 113, 116.  Plaintiff repeatedly said no, the intercourse was against her will, and she cried during the event.  RSOF, ¶ 120.  After the assault, Plaintiff was taken to the hospital where she was interviewed, examined, received medical treatment, and then was taken to the police station where she was again interviewed. RSOF, ¶ 134.

As explained by Expert Jeglic, Plaintiff's behavior in not screaming, banging on the walls, or alerting the assailant's friend in the room, is not inconsistent with sexual assault victims.  RSOF, ¶¶ 115, 123, 124.

F. **There is no signed Release and Waiver**

Moving Defendants have not produced any signed Release and Waiver in this case.  RSOF, ¶ 32.  No such signed document exists.  Moreover, Ms. Ash has no recollection of signing such a document. RSOF, ¶¶ 27, 32, 33, 48-55.  There is no question that the Moving Defendants believed it had been signed as they allowed Plaintiff to go on the trip; however, the signed document has not been produced.  RSOF, ¶ 33.  There is no evidence it was ever discussed, signed, or that Plaintiff's parents assented to it.

11

## II.    <u>COUNTERSTATEMENT OF THE ISSUES INVOLVED</u>

A. Whether Massachusetts Law Governs

B. Whether Genuine Issues of Material Fact Exist Precluding the Entry of Judgment in Favor based on the Release

C. Whether Genuine Issues of Material fact Exist Precluding the Entry of Summary Judgment on the Contract Claim.

D. Whether Genuine Issues of Material fact Exist Precluding the Entry of Summary Judgment on the Negligence Claim.

## V. <u>ARGUMENT</u>

### a. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A genuine issue of material fact exists if the evidence is such that a reasonable jury could find for the non-moving party. *Universal Underwriters Ins. Co. v. Swenson*, 2024 U.S. Dist. LEXIS 70627, 4 (M.D. Pa. 2024). A fact is material only if it might affect the outcome of the suit under the applicable law. <u>Id.</u>

When considering the evidence presented by the parties, the record is reviewed in the light most favorable to the non-moving party. *Goodman v. City of Philadelphia*, 2025 U.S. App. LEXIS 21729, 5-6 (3d Cir. 2025). Inconsistencies in testimony and evidence are useful in making credibility determinations but are not proper considerations for summary judgment. *Chatman v. City of Johnston*, 131 Fed. Appx. 18, 20, 2005 U.S. App. LEXIS 8675, 5 (3d Cir. 2005). Credibility determinations, weighing evidence, drawing inferences from facts and evidence, are jury functions, not those of the Court in ruling on Motions for Summary Judgment. *Id.*

**b. Choice of Law**

A federal court sitting in diversity applies the substantive law of the applicable jurisdiction. *Lomax v. Nationwide Mut. Ins. Co.*, 964 F.2d 1343, 1345 (3d Cir. 1992) (citing *Erie v. Railroad Co. v. Tompkins*, 304 U.S. 64(1938)). To decide what jurisdiction's law applies, this Court is to apply Pennsylvania's choice-of-law rules because this Court sits in Pennsylvania. *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4 (1975) (discussing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)). The  Third Circuit has predicted that the Court would apply the rule of *Griffith v. United Air Lines Inc.*, 203 A.2d 796 (Pa. 1964) to decide choice-of-law questions. *E.g. Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d. Cir 2007).

The Third Circuit interprets *Griffith* to look to the factors outlined in § 188 of the Restatement (2d) of Conflicts: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

However, the Third Circuit interprets *Griffith* to also include "interests analysis." *Id.* at 231 (citing *Melville v. Am. Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978)). "This analysis requires more than a 'mere counting of contacts.' Rather, we must weigh the contacts on a qualitative scale according to their

14

relation to the policies and interests underlying the [particular] issue." *Id.* (internal citations omitted).

For choice-of-law questions concerning tort actions, the Pennsylvania Supreme Court has adopted Sections 145 and 146 of the Restatement (2d) of Conflicts. *See Marks v. Redner's Warehouse Markets.*, 136 A.3d 984, 987 (Pa. Super. 2016) (citing *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 801–06 (Pa. 1964)). The factors relevant are:

(a) the place of the injury;

(b) the place of the conduct causing the injury;

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship between the parties is centered.

*Id.* at 988.

The incident occurred in Spain.  The contract was written in Massachusetts and contains a choice of law provision selecting Massachusetts.  Plaintiff is from California.  Defendant EF Institute is from Massachusetts. Defendant EF First is Swiss. Defendants Jennifer Taylor and Diego Taylor are from Pennsylvania.  Certainly, the United States has a greater interest in the conflict between the parties than Spain.  Given the remaining factors, Plaintiff concedes that Massachusetts law applies to both the contract and tort claims.

15

### c. The Release is Unenforceable

#### i. Genuine issue of material fact exists as to whether the Release is in effect

[T]he fundamentals of online contract formation [are not] different from ordinary contract formation. *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1048 (Mass. 2021) (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). In *Kauders*, the Supreme Judicial Court adopted the two-part test that the intermediate Appeals Court applied in *Ajemian v. Yahoo! Inc.*, 987 N.E.2d 604 (Mass. App. Ct. 2013). "[F]or there to be an enforceable contract, there must be both [1] reasonable notice of the terms and [2] a reasonable manifestation of assent to those terms." *Kauders*, 159 N.E.3d at 1049.

As to the first prong, a consumer has "reasonable" notice if she has "actual notice" by reviewing the contractual terms. *Id.* at 1049. There is no evidence that Plaintiff or her parents had actual notice of the Release language. A consumer may also have reasonable notice without actual notice. *Id.* Whether such notice is "reasonable" is "clearly a fact-intensive inquiry." *Id.* (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017)). Determinations of fact are dependent upon the credibility of the witnesses, the weighing of the evidence, and the inferences from facts, all of which is within the province of the jury as the fact finder. Consideration must be given to the "form of the contract," "the nature, including the size, of the transaction, whether the notice conveys the full scope of the terms

16

and conditions, and the interface by which the terms are being communicated." *Id.* at 1049–50 (citing *Sgouros*, 817 F.3d at 1034). Moving Defendants, whose burden it is to establish the existence of this Release have not provided facts regarding the formation of this contract. As such, there is a genuine issue of material fact regarding the existence and enforceability of this Contract.

For Internet transactions, the specifics and subtleties of the 'design and content of the relevant interface' are especially relevant in evaluating whether reasonable notice has been provided." *Id.* at 1050 (citing *Meyer*, 868 F.3d at 75). The Supreme Judicial Court looks to "the clarity and simplicity of the communication of the terms": "Does the interface require the user to open the terms or make them readily available? How many steps must be taken to access the terms and conditions, and how clear and extensive is the process to access the terms?" *Id.* at 1050 (citing *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018)). "Ultimately, the offeror must reasonably notify the user that there are terms to which the user will be bound and give the user the opportunity to review those terms." *Id.*

The Movant has not established that the Plaintiff or her parents were given reasonable notice of this Release. RSOF, ¶¶ 27, 33, 48-55. Moreover, to the extent that such evidence has been presented, Plaintiff and her parents deny familiarity with this document or its terms and, therefore, there is a genuine issue

17

of material fact as to whether such reasonable notice was given precluding judgment as matter of law. RSOF, ¶¶ 27, 33, 48-55.

As to the second prong of a manifestation of assent, the Court looks to "the specific actions required to manifest assent." *Id.* at 1050. Where a user must "expressly and affirmatively manifest assent to an online agreement by clicking or checking a box that states that the user agrees to the terms and conditions," mutual assent generally exists. *Id.* Without such express agreement, "courts must again carefully consider the totality of the circumstances, and assent may be inferred from other actions the users have taken. Where the connection between the action taken and the terms is unclear, or where the action taken does not clearly signify assent, it will be difficult for the offeror to carry its burden to show that the user assented to the terms." *Id.* at 1051.

Again, the Movants, who bear the burden on this issue, have not established that the Plaintiff or her parents manifested assent to this Release. RSOF, ¶¶ 27, 33, 48-55. Moreover, to the extent that such evidence has been presented, Plaintiff and her parents deny familiarity with this document or its terms and, therefore, there is a genuine issue of material fact as to whether such reasonable notice was given precluding judgment as matter of law. RSOF, ¶¶ 27, 33, 48-55.

> ii. <u>Even if in effect, there is a genuine issue of material fact as to whether the Release is enforceable</u>

"In this Commonwealth a right which has not yet arisen may be made the

18

subject of a covenant not to sue or may be released." *Cormier v. Cent. Mass. Chapter of Nat. Safety Council*, 620 N.E.2d 784, 786 (Mass. 1993) (citing *MacFarlane's Case,* 115 N.E.2d 925 (Mass. 1953)). A party may generally release another "from liability for his own negligence and that of his agents and servants." *Id.* (quoting *Clarke v. Ames,* 165 N.E. 696, 697 (Mass. 1929)). However, "any doubts about the interpretation of the release must be resolved in the plaintiff's favor." *Id.* (citing *Lechmere Tire & Sales Co. v. Burwick,* 277 N.E.2d 503 (Mass. 1972)). In addition, a release generally may not apply to a party's gross negligence but rather only "ordinary negligence." *CSX Transp., Inc. v. Mass. Bay Transp. Auth.*, 697 F. Supp. 2d 213, 226 (D. Mass. 2010) (predicting that the Supreme Judicial Court would adopt the rule of *Zavras v. Capeway Rovers Motorcycle Club, Inc.*, 687 N.E.2d 1263 (Mass. Ct. App. 1997) barring releases of gross negligence).

The facts of this case are such that a reasonable jury may find that the Moving Defendants' conduct in failing to provide any safety, security, and supervision to the teenagers in their control was grossly negligent. As such, the Release relied upon by Moving Defendants would not apply to such a finding.

A number of other principles also render this Release unenforceable. A release may not be "procured by deceit or fraud or under duress." *Cormier*, 620 N.E.2d at 786. "One party cannot enforce a contract against another whose

19

signature he has procured by fraud or fraudulent representations, which induced the signer reasonable to believe and understand that the instrument was substantially different from what it really was." *Commerce Bank & Trust Co. v. Hayeck*, 709 N.E.2d 1122, 1126 (Mass. App. Ct. 1999)(citing *Boston Five Cents Sav. Bank v. Brooks*, 309 Mass. 52, 55, 34 N.E.2d 435 (1941) and Restatement (Second) of Contracts Section 164 (1) (1981)).  To establish fraud in the inducement the common law elements of deceit must be established, which include misrepresentations of material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying.  *Id.*

In this instance, to the extent that the Release is deemed in effect, it was procured by deceit by the Moving Defendants.  Moving Defendants repeatedly provided assurances that safety and security of the student participants was their priority.  The EF Defendants explained that the groups could be combined and that the genders would be separated by floors.  RSOF, ¶ 41.  The EF Defendants represented that the genders would be separated, and members of the opposite sex would not be in one another's rooms.  RSOF, ¶ 46.  This was not true.

Moreover, the parole evidence rule does not apply when the complaining party alleges fraud in the inducement.  *Id.*  The following statements, representations, and promises were made by the EF Defendants to lure and induce families into sending their minor children abroad with them and were reasonably

20

relied upon by these families, but which statements were not fulfilled: 1) that the students' safety was EF's number one priority; 2) that the students' safety is of the utmost importance to EF; 3) EF takes necessary steps to help keep groups as healthy and safe as possible; 4) that EF has health and safety protocols; 5) that safety and happiness are EF's top priorities and that EF has a travel and safety guide that makes international travel safe, secure, and memorable; and 6) that EF and group leaders work together to keep group safe and that EF provides training sessions and training videos to its group leader. RSOF, ¶ 55.

Parents relied upon Moving Defendants promises and representations in placing their children in the care of Moving Defendants. Without such promises, Plaintiff would not have gone on this tour, her parents would not have allowed her to go on this tour, and the Moving Defendants knew that, which is precisely why they make these promises to unsuspecting families. If families knew that, in fact, Moving Defendants provide ZERO safety, security and supervision of the student participants, provided ZERO safety policies, protocols, training, or supervisions to the tour directors or guide leaders, accepted ZERO responsibility for the conduct or misconduct of their tour directors or guide leaders, Moving Defendants would promptly be out of business.

A release may be invalid as against public policy. *See CSX Transp., Inc.*, 697 F. Supp. 2d at 226 (explaining the general rule that contracts against public

21

policy are unenforceable in the context of considering a release) (citing *Feeney v. Dell Inc.,* 454 Mass. 192, 199–200, 908 N.E.2d 753 (Mass. 2009)). Or public policy may require a heightened "knowing and voluntary" waiver standard that specifically describes certain, important claims. *See, e.g.*, *Crocker v. Townsend Oil Co.*, 979 N.E.2d 1077, 1080 (Mass. 2012) (applying that rule to Wage Act claims).

A release can be against public policy for a variety of reasons. A release may not "shield a defendant from responsibility for violation of a statutory duty." *Zavras*, 687 N.E.2d at 1265 (citing *Henry v. Mansfield Beauty Academy, Inc.,* 233 N.E.2d 22 (Mass. 1968)). The intermediate Court of Appeals has also found that a release may not apply "where there is an obvious disadvantage in bargaining power so that the effect of the contract is to put a party at the mercy of the other's negligence." *Id.* Other public policies can also provide exceptions to the general enforceability of releases. See, e.g., *Sharon v. City of Newton*, 769 N.E.2d 738, 744–48 (Mass. 2002) (considering various public policies in ultimately rejecting a claim that a release was contrary to public policy).

This is not about releasing the Defendants from negligence for something they did but ultimately did poorly and caused injury. This is about releasing the Defendants from negligence for SIMPLY NOT DOING what they promised they do, what the parents relied on them to do when signing the release. The risk to the youth traveling with this company overseas is too great not to hold them

22

accountable for their unsafe, unsecure, and unsupervised trips.  Enforcing the subject release for the claims asserted by the Plaintiff would violate public policy. Minors are a vulnerable population.  When companies in big business decide to take custody of minors and take them overseas, they have certain responsibilities. Asking the families of those minors to release them from negligence requires more than a hidden release form on an online platform.  It requires notice, discussion, understanding, initialing, signing.  This online contract and release was neither explained, discussed, presented, or signed by the Plaintiff or her parents.  The overbreadth of the Release and its attempted application to minors requires that there be an understanding among the parties as to what claims they are relinquishing for their minor children.  There is no question that there is a disparity of bargaining power between the Moving Defendnats and parents sending their children on excursions where the Moving Defendants have promised that they would be safe, secure, and supervised.

### d.  Contract Claim and Misrepresentations

For the reasons set forth above, the Release does not preclude the contract claims of Plaintiff as a matter of law.

Under Massachusetts law, the words of a contract must be considered in the context of the entire contract rather than in isolation.  *Brigade Leveraged Capital Structures Fund LTD v. Pimco Income Strategy Fund*, 995 N.E.2d 64, 69, 2013

23

Mass. LEXIS 707, 11 (Supreme Judicial Court of Mass. 2013). "Contract language is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Id.*

Describing Defendant EF Institute in the contract as "only" a marketing services provider" but then elsewhere in the contract giving it powers and responsibilities on the tour, creates ambiguity over what the term "marketing service provider" actually means. As such, the conduct of the parties must be examined. Their contract was not to provide transportation, it was to provide a safe, secure, and supervised international experience.

Defendant EF Institute's role is not so limited as Moving Defendants claim. By way of further response, according to the General Terms and Conditions, as well as the deposition of EF designee, Megan Allen, Defendant EF Institute does more than just "market" the tour. There are genuine issues of material fact regarding the actions and inactions of the Moving Defendants and their agents and whether those actions and inactions were a contributing cause to Plaintiff's harm. The EF Defendants explained that the groups could be combined and that the genders would be separated by floors. RSOF, ¶ 41. The EF Defendants represented that the genders would be separated, and members of the opposite sex would not be in one another's rooms. RSOF, ¶ 46. This was not true.

24

The following statements, representations, and promises were made by the EF Defendants to lure families into sending their minor children abroad with them but which statements were not fulfilled: 1) that the students' safety was EF's number one priority; 2) that the students' safety is of the utmost importance to EF; 3) EF takes necessary steps to help keep groups as healthy and safe as possible; 4) that EF has health and safety protocols; 5) that safety and happiness are EF's top priorities and that EF has a travel and safety guide that makes international travel safe, secure, and memorable; and 6) that EF and group leaders work together to keep group safe and that EF provides training sessions and training videos to its group leader. RSOF, ¶ 55. Notwithstanding these promises, representations, and assurances, the Moving Defendants did not have any safety, security, or supervision policies, procedures, or protocols in place.

The Holiday Inn Express where this assault took place was not safe for the students on the tour as it was unsupervised, students were coming and going all hours of the night, students were drinking and doing drugs, students were in each others rooms for hours going undetected. RSOF, ¶ 81.

### e. Negligence Claims

For the reasons set forth above, the Release does not preclude the negligence claims of Plaintiff as a matter of law.

Whether reasonable care has been exercised under the circumstances is

within the special province of the jury and may not be resolved by summary judgment. *NSTAR Elec. Co. v. Veolic Energy N. Am. Holdings, Inc.*, 2019 Mass. Super., LEXIS 7, 15, 35 Mass. L. Rep. 463 (Super. Ct. of Mass. 2019)(citing *Jupin v. Kask*, 497 Mass. 141, 146, 849 N.E.2d 829 (2006)). Considering the credibility of witnesses (fact and expert), weighing their testimony, and resolving credibility conflicts are the function of the jury, not the Court when determining Motions seeking judgment as a matter of law. *Perez v. Garcia*, 2024 U.S. Dist. LEXIS 46528, 2-3 (1st. Cir. 2024).

As a youth serving organization, Defendant EF Education First owes a duty to its participants to comply with industry safety standards for such organizations given the known problem of youth-on-youth sexual violence. RSOF, ¶ 1. The evidence has established that Defendant EF Education First breached its duty to provide reasonable security and safety for Plaintiff by failing to have basic protective measures in place to prevent harm, providing inadequate monitoring and supervision of a vulnerable population in a high-risk environment, and failing to provide oversight to ensure staff adhered to established safety protocols. RSOF, ¶ 1.

Also, the group leaders are agents of the EF Defendants and, as such, the EF Defendants may be held vicariously liable for their failure to use reasonable care. *Chow v. Merrimack Mut. Fire Ins. Co.*, 987 N.E.2d 1275, 1280, 2023 Mass. App.

26

LEXIS 84, 11-12 (Appeals Court of Mass. 2013).  The decision of whether the employer has sufficient control over the agent to render the employer liable is a question of fact for the jury.  *Id.*  There is ample evidence in this case that the EF Defendants exercised control over how the group leaders performed their jobs such that a jury could find that the EF Defendants are liable for the group leaders failure to exercise reasonable care.  For example, the EF Defendants provide the group leaders with the booking conditions for the participants.  RSOF, ¶ 20.  The EF Defendants tell the group leaders how to make room assignments.  RSOF, ¶ 20. The EF Defendants provide the group leaders with backpacks that they are required to give to the students, which include a safety guide for the tour, as well as wristbands that the group leaders are required to give to the participants to utilize with EF emergency information on them, as well as a safety card that they are required to give to the students for the students to use while on tour.  RSOF, ¶ 20.  The EF Defendants require that the group leaders enforce the EF Defendants "Rules of the Road". RSOF, ¶ 20.  These EF Rules control certain aspects of how the group leaders perform their roles in supervising and disciplining the participants.  For example, the EF Rules state that all scheduled activities are mandatory.  RSOF, ¶ 20.  The EF Rules provide the procedures for allowing students to leave the tour to visit friends or family through the use of EF documents, including a Tour Leave Form. RSOF, ¶ 20.  The EF Rules prohibit

27

members of the opposite sex from being in rooms.  RSOF, ¶ 20.  The EF Rules

prohibit smoking.  RSOF, ¶ 20.  The EF Rules prohibit hitchhiking and the driving

or renting of any motor vehicle.  RSOF, ¶ 20.  The EF Rules govern the costs for

calls and personal expenses by the participants.  RSOF, ¶ 20.  The EF Rules

prohibit the consumption of alcohol to persons under 18 and set limits for those

over the age of 18.  RSOF, ¶ 20.  The EF Rules govern the payment of damage to

hotels.  RSOF, ¶ 20.  These Rules established by EF are required to be enforced by

the group leaders and if they are not followed the participants may be asked to

leave the tour by the group leader or by the EF Defendants.  RSOF, ¶ 20.

### f.  Third Party Criminal Acts

Moving Defendants also argue that this assault constitutes an unforeseeable

criminal act for which they bear no liability.  Under Massachusetts case law, one

does not owe others a duty to take action to rescue or protect them from conditions

one has not created.  *Freni v. Uber Techs.,* 2021 Mass. Super. LEXIS 444, 4-5

(Sup,. Ct. of Mass. 2021).  The law generally provides that this no-duty rule

extends to the criminal acts of third parties; however, a recognized exception to

this rule exist. *Id.* A duty to protect against harm caused by the conduct of a third

person will arise when there exists a special relationship between a defendant and a

plaintiff such that the defendant reasonably could foresee that he would be

expected to take affirmative action to protect the plaintiff and could anticipate

harm to the plaintiff from the failure to do so. In the commercial setting, such a special relationship has been found to exist between colleges and matriculating students, and between hoteliers and their guests. *Id.*

First, Moving Defendants created this situation. Plaintiff should never have been put in this position. It is entirely foreseeable that teenagers of the opposite sex, in a foreign country, require supervision. It is entirely foreseeable that something could happen if you please teenagers of the opposite sex in abutting hotel rooms without any adult supervision. These children are immature and vulnerable. It is foreseeable that teenagers may experiment, push boundaries, and could find themselves in situations where they did not intend to be and do not know what to do once there. Youth on youth sexual assault in the context of youth serving organizations was a well know problem in the industry by the time of this tour. The EF Defendants knew that these student participants required supervision, they simply failed to provide it. The EF Defendants created the opportunity for this harm by not having rules, not enforcing rules, placing teenagers of the oppose sex in hotel rooms next to each other without any adult supervision.

Second, because of the special commercial relationship between plaintiff and Moving Defendants, which is not dissimilar to universities and their students, Moving Defendants should have recognized that they would be expected to take affirmative action to keep their student participants safe, secure, and supervised.

29

These are children, in the custody and control of the Moving Defendants, in a foreign country. The parents had repeatedly been promised that their children would be looked after by Moving Defendants and they were not. It was entirely foreseeable to the Moving Defendants that if these teenagers were not supervised, they could be harmed. As such, because they created the opportunity for the harm, and because they were in a special relationship with the Plaintiff, Moving Defendants owed Plaintiff a duty to protect her from this harm

### g. EF Educational Tours

Plaintiff does not contest the dismissal of EF Educational Tours, a fictitious name.

### h. EF Education First International, Ltd. is a proper Defendant.

As recognized by the Moving Defendants, and as stated in the General Terms and Agreement, EF Education First International, Ltd., is the operator of the subject tour and a proper Defendant. SOF, ¶ 1; RSOF, ¶ 1.

The General Terms and Conditions provide as follows:

> "All tours are operated outside of the U.S. by EF Education First International, LTD., Switzerland. EF Institute for Cultural Exchange, Inc., is a marketing service provider for that company and is referred herein **together with EF Education First International, LTD., as 'EF'".**

RSOF, ¶ 1. As such, when the General Terms and Conditions impose responsibilities and obligations on "EF", they refer to **both** the Defendant EF

30

Education First International, Ltd. ("Defendant EF Education First") and Defendant EF Institute for Cultural Exchange, Inc. (Defendant EF Institute).

To the extent that Moving Defendants self-serving Declaration by Ms. Allen reflects that EF Education First International, Ltd., Switzerland, and EF Education First International, Ltd., are one in the same, Plaintiff does not oppose identifying this Defendant only once.

## VI.    CONCLUSION

For the foregoing reasons, and those set forth in the Response to the Statement of Material Facts, incorporated herein by reference, Plaintiff respectfully requests that this Honorable Court deny the Moving Defendants' Moton for Summary Judgment.

**HILL & ASSOCIATES, P.C.**

By:    */s/Susan B. Ayres*
**SUSAN B. AYRES, ESQ.**
**PA Identification No. 87562**
**1700 Market Street, Ste. 3150**
**Philadelphia, PA  19103**
**(215) 567-7600**
**Sue@Hilljustice.com**

Attorney for Plaintiff

Date: September 17, 2025

31

## CERTIFICATION OF WORD COUNT

In accordance with Local Rule 7.8(b)(2) and the Court's Order dated June 2, 2025 permitting the parties to file briefs in support of and/or in opposition to Motions for Summary Judgment not exceed 7,500 words or thirty (30) pages, I, Susan B. Ayres, hereby certify that the herein brief, excluding the caption, signature block, table of contents, and table of authorities, is 7,344 words.

HILL & ASSOCIATES, P.C.

/s/Susan B. Ayres

SUSAN B. AYRES, ESQUIRE
1700 MARKET STREET, SUITE 3150
PHILADELPHIA, PA 19103
PHONE: 215-567-7600
FACSIMILE: 215-525-4311
SUE@HILLJUSTICE.COM
ATTORNEY FOR PLAINTIFF, L.F.

Date: September 17, 2025

1