Exhibit F, Plaintiff

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---o0o---

TRENTON FALLGATTER, on behalf )
of his natural and biological )
minor child, L.F., and MORGAN )
ASH, on behalf of her natural )
and biological minor child, )
L.F., )
)
        Plaintiffs, ) NO. 4:23-CV-01038 KM-DFB
)
           vs. )
)
EF EDUCATIONAL TOURS, EF )
EDUCATION FIRST INTERNATIONAL,)
et al., )
)
        Defendants. )
_____)

REMOTE DEPOSITION OF MORGAN ASH

TUESDAY, APRIL 29, 2025

REPORTED BY:

MARY JACKSON

CSR 8688

JOB NO. 1323945



IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---o0o---

TRENTON FALLGATTER, on behalf )
of his natural and biological )
minor child, L.F., and MORGAN )
ASH, on behalf of her natural )
and biological minor child,    )
L.F.,                          )
                               )
          Plaintiffs,          ) NO. 4:23-CV-01038 KM-DFB
                               )
              vs.              )
                               )
EF EDUCATIONAL TOURS, EF       )
EDUCATION FIRST INTERNATIONAL,)
et al.,                        )
                               )
          Defendants.          )
_____)

REMOTE DEPOSITION OF MORGAN ASH, taken with all parties appearing remotely via Zoom videoconference, on Tuesday, April 29, 2025, at 9:57 a.m. Pacific Time, before Mary Jackson, Certified Shorthand Reporter, in and for the State of California.



Exhibit F, Plaintiff

Page 3

                    A P P E A R A N C E S

For the Plaintiffs:

         SUSAN AYRES, ESQUIRE

         HILL & ASSOCIATES, P.C.

         1700 Market Street, Suite 1350

         Philadelphia, Pennsylvania 19103

         215.567.7600

         sue@hilljustice.com


For the Defendants EF Educational Tours and EF Education
First International Limited :


         KARA THORAVLDSEN, ESQUIRE

         LAWSON & WEITZEN

         88 Black Falcon Avenue, Suite 345

         Boston, Massachusetts 02210

         617.439.4990

         kthoravldsen@lawson-weitzen.com


For the Defendant Diego Taylor:

         EDWIN A. SCHWARTZ, ESQUIRE

         MCNEES WALLACE & NURICK LLC

         100 Pine Street

         Harrisburg, Pennsylvania 17108

         717.232.8000

         eschwartz@mcneeslaw.com



Exhibit F, Plaintiff

Page 4

INDEX

Examination By                                                    Page

Ms. Thorvaldsen                                                  5, 72

Mr. Schwartz                                                        85

----oOo----

EXHIBITS

Number                                                           Page

Exhibit 1    EF Educational Tours brochure                         30

Exhibit 2    Plaintiffs' Responses to                              85
             Interrogatories Propounded by
             Defendants, EF Institute for
             Cultural Exchange and EF Education
             First International, Limited



Exhibit F, Plaintiff

Page 5

REMOTE, TUESDAY, APRIL 29, 2025

9:57 a.m.

P R O C E E D I N G S

THE COURT REPORTER:  Good morning.  My name is Mary Jackson.  My CSR license number is 8688.

MORGAN ASH,

having been first duly sworn, was

examined and testified as follows:

MS. THORVALDSEN:  Before we get started.  Do we want to put the usual stipulations on the record?

MS. AYRES:  We'll just reserve for read and sign, but otherwise, that's fine.  The other usual stipulations are fine.

MS. THORVALDSEN:  Okay.

EXAMINATION

BY MS. THORVALDSEN:

Q.    So, hi.  My name is Kara Thorvaldsen.  As your attorney just noted, I am the attorney for EF Educational Tours and EF Education First International Limited.

Have you ever been deposed before?

A.    Yes.

Q.    You have.  How many times?

A.    I believe once.  It was with the hospital I



Exhibit F, Plaintiff

Page 6

work with.

Q.   Oh, so in connection with your work?

A.   Yes.

Q.   Do you remember what kind of a case it was?

A.   I witnessed an incident.

Q.   So I'm sure your attorney has filled you in on how this should go, but just for the record, so we're all on the same page, just run over sort of the ground rules for a deposition.  As you know, there's a court reporter who's going to transcribe everything that anybody on this call says.  So I'm going to ask you to try to let me finish my question before you start answering, and by the same token, I'll try to let you finish your answer before I ask my next question.  Okay?

A.   Yes.

Q.   If you haven't finished your answer, please let me know.  I'm happy to -- happy to let you finish. Sometimes we talk over each other, especially on Zoom, and I don't intend to do that.

     The other thing is if you could try to keep your answers verbal so that noises like uh-huh, or shrugs, or shaking of the head, don't -- those don't come across well in a transcript, okay?

A.   Okay.

Q.   If you need a break at any time, let us know,



Exhibit F, Plaintiff

Page 7

you know, whether it's to get a drink of water or for whatever reason.  The only thing that I would ask is if you want to go off the record that you just answer a question that's pending before we go off, okay?

A.   Okay.

Q.   If I ask you anything where you don't understand my question or, you know, for example, you don't know what I'm getting at, please feel free to ask me to clarify my question.  If you answer, I'll assume you understood what I was asking and keep going.  Okay?

A.   Okay.

Q.   Okay.  Could you please provide your full name and address for the record?

A.   Morgan Lenzi Ash, and my address is 963 Palmer Avenue, Camarillo, California 93010.

Q.   For the record, do you spell "Lenzi" the same way that your daughter spells?

A.   No.  It's L-E-N-Z-I.

Q.   Okay.  Thanks.  You mentioned work.  What do you do for a living, Morgan?

A.   I'm a respiratory therapist.

Q.   Where is that?

A.   Ventura County Medical Center.

Q.   How long have you worked there?

A.   Thirteen years in October.



Exhibit F, Plaintiff
Page 8

Q.   Have you always been a respiratory therapist?

A.   For the past 13 years, yeah.

Q.   What were you doing before that?

A.   I was -- I was waiting tables and bartending. I was so young, and then I decided I had to do something really quick that would provide for myself and L█████, so I did that in Arizona, and I loved it.  So -- still doing it.

Q.   Did you to go to school for a degree for that?

A.   Yes, in Arizona.

Q.   Okay.  What's the degree?

A.   This is an associates of science, so it would be your basic, like, nursing respiratory and then goes on after that.

Q.   So you have -- just, I didn't totally understand.  You have an associate's degree; is that right?

A.   Uh-huh, that's right, yeah.

Q.   Okay.

A.   Associate of Science.

Q.   Got it.  And are you currently married?

A.   No.  Yes, I am currently married, excuse me. By law, I am currently married.  We are separated.

Q.   Okay.  What's your husband's name?

A.   Logan Ash.



Q.    And when were you married to him?

A.    We got married in 2014.  We separated approximately six years ago.

Q.    So you're not currently living together --

A.    No.

Q.    -- is that right?

A.    Yes.

Q.    Who do you live with currently?

A.    Myself.

Q.    Does L███████ live with you full or part-time?

A.    Yes.  She kind of -- she's wherever her heart desires between myself and her dad, she's more with me now.  She hadn't been back to her dad's for a while.  She's a 19-year-old.  She's, you know back and forth wherever she's the happiest at the moment.

Q.    And were you and L██████'s father married at one point?

A.    Yes, we were.

Q.    What's his name?

A.    Trenton Fallgatter.

Q.    And when were you married to him?

A.    Oh, my goodness, 2004 -- 2003 to 2010.  I know we got divorced in 2010.  I can't remember when we got married.  I know it was before L██████ was born.  She was born in 2005, so -- she was born in 2006, excuse me.  So



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 10

it was 2005, I believe, him and I got married.  I can't remember that exact date to be honest.  I apologize.

Q.   Not a problem.  I should have said this at the beginning, if there's a question and you don't know, that you can just let me know, that's fine.  I'm just trying to get some background information I'm not trying to test your memory?

A.   We did divorce or finalize in 2010.

Q.   So would L███ have been about four years old when you divorced?

A.   Yes.

Q.   Okay.  And how was the divorce, amicable or acrimonious?

A.   It was amicable.  We were young.  We had no idea what we were doing.  Our parents handled it.  It was very easy.

Q.   Is L███ the only child that you had with Trenton Fallgatter?

A.   Yes.

Q.   Do you have any other children?

A.   I do.  I have a son Lincoln Ash.

Q.   And how old is Lincoln Ash?

A.   He's nine.

Q.   Does he sometimes live with you?

A.   Yeah, we do 50/50.



Exhibit F, Plaintiff
Page 11

Q.   And that's Trenton's; is that right?

A.   (Shaking head.)

Q.   Excuse me, Logan's?

A.   Logan's son, yes.

Q.   I apologize.  I'm so sorry.  When you were first divorced from L█████'s father, how did your custody arrangement go?

A.   I had full custody.

Q.   You had full custody?  How long did that last?

A.   We never changed it.  It was full legal sole and it was 50/50 visitation, and it never changed.  He always was allowed to see her whenever.  We never had issues.  It was pretty easy.  I don't think we ever stuck to any -- I just wanted full legal sole so I could do all her medical in Arizona.  He was still in Bakersfield at the time.  We didn't want to have to deal with any issues of him being out of state and such so that's why we did that.

Q.   I understand.  When did you move back to California?

A.   I want to say 2012.  I moved for this job.

Q.   Oh, I see.  So about 13 years ago you finished your degree, you got this job, and you moved to California?

A.   Yes.



Exhibit F, Plaintiff

Page 12

Q. Okay. Other than, you know, I'm focusing on L█████ now, other than you and her father, are there other significant family relationships that she has?

A. My mother.

MS. AYRES: Objection to form, but you can answer.

THE WITNESS: My mother -- what was that.

MS. AYRES: I just put an objection to the form of her question on the record, but you can go ahead and answer.

THE WITNESS: Oh, okay. Just like people that L█████'s close to? I know her dad has a very huge family and she's close with all of them. My family's a little smaller. So significant, she would have my mother and my uncle. But other than that, no.

BY MS. THORVALDSEN:

Q. What was L█████ like as a child, personality wise?

A. Very shy, very sweet. She was in a princess dress 24 hours a day. Every single picture I have of her, is in a princes dress with a bunch of jewelry on and pigtails. And she loved animals.

Q. Was L█████ a good student, did she like school?

A. Yes, she would get nervous. She got a lot of



Exhibit F, Plaintiff
Page 13

anxiety around big crowds, that was always a thing.  So that's why this tour was a huge thing for us for her to overcome -- come to.  She always did very well, no issues.  It was surprising.

Q.    What was surprising?

A.    Off comment, sorry.  My dad always told me because I was an ornery child and L███████ was so -- I thought I would get a lot harder to deal with, I was blessed with her.

Q.    I see what you're saying.

A.    Yeah.

Q.    Did L██████ as a -- so I'm sort of thinking like the middle school, high school age, did L██████ get involved with sports and extracurricular activities?

A.    Not so much.  We did -- we did basketball for a while.  It wasn't -- no, she didn't get involved -- she did a couple things.  She did law, she was doing the debate team and then there were a couple little things she did, but not long-term, no.

Q.    Did she play an instrument, or do art, or anything like that?

A.    She did on the side.  She would practice piano on the side.  Her dad did lessons with her for a while. She did art in-home.  She did art in high school as basic classes.  She loved that.  She did theater one



Exhibit F, Plaintiff
Page 14

year, extracurricular, but no sports.  We didn't stick to those.

Q.   Did L████ have any issues in high school with respect to discipline?

A.   No.  She was embarrassed to have anybody look at her, so she never wanted to draw attention to herself, period.

Q.   Okay.  So no history of, you know, detentions or suspicions or anything at school?

A.   She did get a detention a few times the last year she was here in Camarillo due to her missing school.  And her dad and I missed a couple times, just clearing it, and that's what that -- it was a lack of us clearing her tardies or absences.

Q.   Just to clarify that I understand.  So she had some detentions because she had unexcused absences from school in her senior year?

A.   Yes.  No, it was her junior year.  Those are the only detentions that I know of.

Q.   Is L████ currently attending school?

A.   Yes.  She's at Moorpark Junior College.

Q.   Is that full-time?

A.   Yes.

Q.   And is she working at all?

A.   She is.  She just recently got hired last week



Exhibit F, Plaintiff

Page 15

at a pet food -- a little pet food boutique wash center here in Camarillo.

Q. Okay. Did -- growing up did L█████ ever have any learning issues, like, learning disabilities or ADHD or any educational issues like that?

A. No.

Q. And did she ever have an individual education plan or special services in school?

A. No.

Q. At some point, did L█████ start seeing a mental health counselor?

A. Yes.

Q. When did that start?

A. Oh, my gosh, I don't remember. It was right around when COVID was very active. I remember that because I had just -- I want to say 2020. Yeah, I want to say right around 2020 or 2021. It was during COVID when everybody was quarantined and she was highly depressed. That's when we first started seeking help for her. Just not being in school, I worked 39 days straight at one point. It was wild.

Q. I'm sure as a respiratory therapist you were in demand during that time period because of the nature of COVID; is that right?

A. Yeah, and she was just very bummed about that.



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff
Page 16

It was 2021 when she first saw a therapist.

Q.   So I mean, I understand that you're not a mental health professional, but she's your daughter, so you have probably some insight.  Did you associate L███████'s depression with specifically the COVID issues?

A.   Yes.  Yeah, I think it's basic teenage issues and then being quarantined, not seeing anybody, not being able to keep up with classes because it's all online.  I was never home and we don't have a lot of family in the area.  So it was just very -- just a sad time for her.  She was super scared too.  She's a germaphobe, so she didn't want to leave the house.  And then me working, she didn't want to see me.  It was a weird time for her.  But she made it through.

Q.   During that time period, was it just you and L███████ living together or was there anybody else living with you at that point?

A.   My son off and on also, and she would also stay with her dad when I was working a lot because he lived in Camarillo at the time down the street.  So it was between both of us, but no, nobody's lived with me since I've left my husband.

Q.   Okay.  Do you know whether or excuse me -- let me start over.

You mentioned some depression and I think



Exhibit F, Plaintiff

Page 17

earlier you mentioned that L⬛⬛⬛ had some issues with anxiety. Does she take any treatment for that?

A. No. We, at one point, like I said, she saw -- she spoke off and on to therapists throughout since I'd say 2020, and since then, now, she does everything naturally. We've gotten on a good plan for her, diet wise, school wise, working. She's got very healthy friends in her life. She's really active now outside, and so as of now, she -- she's not doing -- she's journaling and we're thinking about her getting back in to see a therapist, once or twice a month just to check in. But we're not having any issues that are outstanding that I can touch base on right now.

Q. Okay. So she's not seeing a therapist currently. Is she on any medication?

A. No, she's not on any medication. She hasn't seen a therapist, I want to say it was about two to three months ago. I can't remember. I don't have that exact answer for you. It was recent.

Q. Do you remember who that was?

A. Oh my goodness, not off the top of my head. I have a whole list, and I don't have it with me currently, but not off the top of my head. I could not tell you her name.

Q. I'm going to see if I can jog your memory at



Exhibit F, Plaintiff

Page 18

all.  We have some records from Coronado Counseling, is that the one she's recently seen?

A.   That was Julia, I believe, and that was the -- not the most recent.  There was a male and I can't think of his name off the top of my head.

Q.   I don't think I've seen any male therapist name.  So we can follow up outside of the deposition about that.

A.   Okay.  Yeah.

Q.   Did L████, did she want to go see a counselor when she was experiencing depression in 2020?

A.   No, she didn't.  The thought of it scared her. She thought if she saw a counselor, she was crazy.

Q.   And did she participate in an intensive outpatient program around that time frame?

A.   No.

Q.   Do you recall her going to a place called Aspire Counseling?

A.   Yes, she did.  You are correct.  She did.

Q.   Okay.

A.   She did.

Q.   Sorry, I didn't mean to interrupt you.

A.   No, it's okay.  It was different term.  I was thinking of something else, something that had happened with her stepsister at the time also.  Yes, she did.



MAGNA
LEGAL SERVICES

That was because she really didn't want to go to one. She was just like, I couldn't get through to her. She seemed super sad. We enrolled her in this. It was, I think, three times a week, hour sessions. And then parents would sit through the sessions and have, like -- it was like a group therapy for parents and teens, and so we did that for a few months with her. Her dad and I both took turns and that helped so much, connect her to be able to talk to us, that we were able to leave that program. And it was just her not being able to talk to us. She was scared to tell us anything because she's very worried about how she is judged and her character. All the time it makes her crazy. She doesn't want to do wrong. So that to her, you have depression or you need to see a therapist, she thought, well, I'm crazy. She didn't want to let anybody know. It was honestly typical teenage things, self-image, trying to figure out life, parents, whatnot, how to communicate that.

If I move a lot, I have two disks that are bulging in my lower back on the verge of herniation again. That's why I sat in this chair, so I can move around. I apologize.

Q. I don't want you to be uncomfortable, so if you need to take a break and stand up walk and around, please let us know.



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 20

A.    I might have to at one point.  Not there yet.

Q.    Just let us know.

A.    Okay.

Q.    Did L██████ have any history of suicidal ideation?

A.    I don't know if that's -- well, it was a -- no, no.  She never once said, I want to die, I want to kill myself.  And I know that's the exact terms for ideation or thinking about it.  Hers was just, I don't want to be in my situation because we went through extreme -- I work with a lot of -- I work in the pediatric intensive care unit.  So me as a parent, anytime I hear anything, I'm like, we're seeing a therapist, we're seeing a doctor.  This is not going anywhere without supervision, these thoughts, these feelings.  Sometimes I overreact, maybe.  Because I've seen so many horrible things happen.  And lots of suicide attempts by teenagers.  And I don't want to be the one to take something not seriously.  So there's been a couple times she'd, I don't like the situation I'm in, I just don't want to be here.  I don't want to die, but I don't want to be here.  I don't know if a therapist would list that as suicidal ideation.  I've never heard her say she wants to do it, has plans to do it.  I've never been scared that she would, I think.  We



Exhibit F, Plaintiff
Page 21

were pretty open to each other.  I had her in pretty intense therapy and we were watching her pretty well.  I know she got pretty down, but yeah, I don't want to speak on that and say yes or no, I guess.  Does that make sense?

Q.   Just asking for your perception of things, so.

A.   She was pretty -- at some points, I know later on, after progressing further past 2021, you know, there were some events that happened and she got very, very depressed.  And very, I think, suicidal at that point. But leading up to that, no, never.

Q.   What events are you referring to?

A.   I don't know how to word this.  Sue?

Q.   Sue can't really help you?

A.   I know.  The allegations, everything.  I don't know how to use the correct words.  I know -- what we're here for.

Q.   So just frame it, if you want to talk about the incident that happened with Diego together in Spain in June of 2022, if you want for shorthand, we can refer to that as the incident or alleged incident, if that works.

A.   Please, yes.

Q.   Okay.

A.   It's really hard for me to say certain things.


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff
Page 22

I don't want to say certain things incorrectly, but, yes the incident. Since the incident, I know there was times she absolutely felt suicidal. I was very scared for her safety, being alone; but prior to that we had no issues.

Q. And how did you become aware of those feelings that L██████ was having after the incident?

A. I could just tell at first. She lost every ounce of her personality. Her eyes are like -- excuse me. Her eyes are crystal blue and they would -- they had no color to them. I just knew she wouldn't eat. She wouldn't talk. She's tiny. She became so malnourished. She wouldn't get out of bed. It was awful. And finally she started talking to a therapist and they talked to me as a mandated reporter and, you know, I'm a mandated reporter. She's coming to you telling you, I have to -- she really wants to do these things and we got her seeing this lady, and I took some time off work to stay with her. So yeah, she finally opened up to me after that. But she spiraled pretty quickly afterwards.

Q. You need to take a minute?

A. No, I'm okay. I hardly talk about it because I get so emotional. It's just the initial sometimes, just saying some words are really hard.



Exhibit F, Plaintiff
Page 23

Q.    What was the time frame that you observed L████ going through what you just described?

A.    I'd say right after it happened up until, oh man, up until probably she came -- she moved in with her dad off and on, after that, because he wasn't working as much and I was working a bunch.  And her little brother, my son Lincoln, is on the autism spectrum, so he's really annoying to be around.  So she kind of gravitated more towards her dad's.  And I would say up until she was still pretty depressed until she moved back here almost full-time her senior year.  And she just -- I don't know if it's matured or just, you learn and you grow, she finally just said, like, I'm done feeling this way.  I have to move on.  And she just met new people and she's not living in the past.  She pushes herself.  She's like, I can't let this define me.  We've done some work together.  She's finally -- last year she graduated 2023, '24, so up until right in that area.

Do you mind if I take a drink really quick?

Q.    Of course not.  Go ahead.  You okay to keep going?

A.    Yeah.

Q.    Okay.

MS. AYRES:  Morgan, you can take a drink while she's asking a question.  You don't have to ask



MAGNA

LEGAL SERVICES

Exhibit F, Plaintiff

Page 24

permission to do that.

THE WITNESS:  I have my water here just in case.

MS. AYRES:  That's totally fine.

THE WITNESS:  I'm sitting here looking at it, like, I'm so thirsty.

BY MS. THORVALDSEN:

Q.  Like I said, I don't want you to be uncomfortable and you're doing most of the talking, so definitely, you know, drink as you need it.

A.  Thank you.

Q.  Do you have any, on either side, family history of mental illness?  When I say either side, I meant, like, L█████'s maternal or paternal side.

A.  Her dad, no.  I have diagnosed ADHD.

Q.  What about earlier generations?  Are you aware of any kind of mental illness in the family?

A.  I don't know my dad's side of the family.  He was in foster care his whole life, so I never met his family.  Then my mother's side, no.  And then I know Trenton was also adopted, so his parents, that we know very well, would not reflect on the mental health side.

Q.  I'm going to shift gears.  I don't want it to seem abrupt.  I want to talk about L█████'s online presence.  When did she first get a smartphone?



Exhibit F, Plaintiff
Page 25

A.    I do not remember the exact date, year.

Q.    Do you remember about what grade or, like, what age she was approximately?

A.    Ten -- I want to say, like, mid seventh grade. I remember at one point she took the bus in seventh grade or there was something.  She went on a field trip, something and I decided, okay, this is the time for her to have one.  I believe that was it.

Q.    And was she allowed to use social media on her phone right away or did you hold off?

A.    No, she wasn't allowed to do anything on her phone but text message and make phone calls.

Q.    How long did that last?

A.    Probably until high school.

Q.    And were you monitoring her cell phone usage when she was in seventh, eighth, ninth grade?

A.    Yes, seventh and eighth.  Ninth is when she would go back and forth.  Passwords become involved, apps -- I still don't know if I know all the apps. There's so much now.

Q.    Were you aware of L█████ having, you know, like online relationships with boys in high school?

A.    I know she had lot of friends and she talked to her friends and -- boys and girls through social media from high school, yes.



Q.    Would you, like, look at her messaging and actually log on to her phone and look at her social media messaging or WhatsApps or Snapchat history in high school?

A.    No.

Q.    When did L█████ first start dating?

A.    Well, I know -- I don't -- I guess that term is used very loosely.  I know she had talked to this boy that she met through a group of friends, that she talked to online.  She had never met him in person and they were dating, and her dad and I were completely aware of it.  We touched base with his parents.  But they had never met and so that was dating to her.  To me, when did she actually start dating, last year this -- the very end of last year, the boy she's dating now, Kayden, whom she's brought to the house, we met his parents.  They're actually dating, but online boyfriend, girlfriend, I don't know.  I don't -- I can't tell you that.

Q.    Do you know when L█████ first became sexually active?

A.    To my knowledge she was not sexually active until the incident.

Q.    And is that something that the two of you speak about, like, L█████'s romantic or sex life at all?


MAGNA
LEGAL SERVICES

A.   She was not comfortable speaking about it for a while.  She still really -- sex is not an easy subject for her.  It's never been.  We do speak a lot more openly about it now, but no, it's not all out there.  But we do have a common understanding.  She can talk to me about anything medical wise, there's -- yes, I guess you can say we talk about it.

Q.   And I know this is really personal, do you know if she's sexually active with her current boyfriend?

A.   No, she is not.  That is 100 percent sure.

Q.   Is there a reason that you're so certain of that?

A.   Yes.

Q.   What's that?

A.   Medical.

Q.   It's medical?

A.   Yes.

Q.   Again, I'm sorry this is very personal, but could you elaborate?

A.   I would like to not.  No, not at the time.

Q.   Can I ask, though, does it have anything to do with the incident?

A.   We're not sure yet.  She has to see a couple doctors.  We're going to a couple OB/GYNs.  She's having



Exhibit F, Plaintiff
Page 28

a lot of issues.  We haven't concluded anything yet, so I don't want to say anything yet, but yes, we have a few doctor's appointments lined up.  She's been having some issues.  It could be a plethora of things.  I don't want to say it's this or that.  It's just she's having a lot of woman issues at the moment that we're trying to get taken care of, and I don't have any exact answers yet.

Q.  All right.  So I'm going to shift gears again, just as a warning, so I'm not so abrupt, to talk about the actual EF Educational tour.  Just for common reference, is it okay if I refer to it as the tour?

A.  Yes.

Q.  The trip to Spain that she took?

Are you familiar with the different EF entities that are involved in this lawsuit or with the tour?

A.  No.

Q.  How did you first become aware of the tour to Spain that L███████ went on?

A.  From her Spanish teacher.

Q.  Do you know who that was?

A.  Arriaga, if I'm pronouncing that correctly.  I believe that's Arriaga, yeah.  A-R-R-I-A-G-A, Mr. Arriaga.

Q.  Was that the same person that was her group



Exhibit F, Plaintiff
Page 29

leader for the tour?

A.    Yes, it was.

Q.    And what were you -- what was your first information about the tour?

A.    Just the pamphlets that you guys have and basic, you know, what the teacher tells and then I did my own research from your website.  My manager at work her, both daughters actually, within the past five years had gone on EF tours.  I reached out to L█████'s grandmother, Martha Walda (phonetic), Trenton's mother, and she was familiar with EF tours.  So I said okay, we're going with EF tours.  That's the research I did.

Q.    Did you get information about the tour from Mr. Arriaga before you signed up?

A.    Oh, yes, yes.  We had meet -- he had a couple meetings.  We went in and did -- he had a whole PowerPoint presentation, answered a bunch of questions.  Yeah, we did a lot of research before we actually signed up.

Q.    Do you know whether he had been a group leader before for EF tours?

A.    I believe so, yes.  Yeah, yeah, he was.

Q.    Do you remember how many meetings you went to before you signed up?

A.    Two.  We did two Zoom meetings.



Q.    And was that with Mr. Arriaga and other parents, or was it just one-on-one or something else?

A.    Other parents also.

MS. THORVALDSEN:  I'm just going to -- bear with me a second.  I wanted to pull up an exhibit to show you.  I'm going to share my screen.  Hopefully, you'll be able to see what I'm looking at in a second.

(Whereupon Exhibit No. 1 was marked for identification.)

BY MS. THORVALDSEN:

Q.    So Morgan, I just shared my screen with you, and for the record, I'm going to mark this as Exhibit No. 1.  It's a document that's Bates stamped beginning LF 0483.

Do you recognize this document at all?

A.    No, I don't -- it doesn't -- I know it's probably part of a brochure that I saw at one point, but no, it doesn't stick out as anything extraordinary.

Q.    I just stopped sharing it.  I meant to hit a different button.

A.    It doesn't stick out as anything that's --

Q.    I'm going to give you control over the screen so that you can actually scroll through it because there's 14 pages here.  If you take your mouse or touch pad, are you able to scroll through that document?



Exhibit F, Plaintiff

Page 31

A.    It is not -- oh, there we go.  Now, I can.  I need to make it bigger.

Q.    Okay.

A.    I don't know how to make this full page, though.

Q.    I think I can zoom it like this, but I don't know if that helps.

A.    Oh yeah, because I definitely cannot read this.

If I'm going to read this whole thing I need to go get my glasses or resize this computer because --

Q.    I mean, I am not going to ask you to read the whole thing.  I just wanted to give you the opportunity to look through it since I asked you if it looked familiar.

A.    Yeah, it looks like the brochures we had at the time.  That was so long ago.  I don't remember exactly which ones, what I looked at then.  I could say it looks familiar, yeah, absolutely.

Q.    So I can represent to you that this document, because it has the stamp LF and then a number on it, this was provided by your attorneys in discovery.  So that's the source of it.

A.    Okay.

Q.    Now you're just looking at my folders.



A.    Oh, sorry.  I don't know what I'm doing.  I work hands-on in the medical field.  I'm not great with Zoom meetings.

Q.    Not a problem.  I am going to bring you to a couple of places here.  So to your memory, do you recall that L██████'s group from California was combined with another group on the tour?

A.    Yes.

Q.    And did you have an understanding that that was a possibility given the different sizes of the groups that were involved?

A.    Yes.

Q.    Okay.  So you knew that, like, the group from California might be combined with another group of students?

A.    Yes.

Q.    Okay.  When you were signing L██████ up for the tour, did Mr. Arriaga go over any rules for behavior or conduct for the students?

A.    Yes.

Q.    Do you remember what some of those were?

A.    Not off the top of my head, no.

Q.    Do you recall seeing in this brochure that I'm sharing with you, Exhibit No. 1, the EF Rules of the Road that are shown here?



Exhibit F, Plaintiff

Page 33

MS. AYRES:  Morgan, if you want to go get your glasses, we can take a quick break.

THE WITNESS:  Yeah, because I don't know how this -- having a hard time.  Give me one moment.

MS. AYRES:  Just turn your camera and sound off.  Then click them back on when you come back so we know you're back.

THE WITNESS:  Okay.

MS. THORVALDSEN:  Can we go off the record for a minute.

(Pause in proceedings.)

BY MS. THORVALDSEN:

Q.  I wanted to direct your attention to Exhibit No. 1 and the section that says, EF's Rules of the Road. Are you able to read that on your screen or do I need to enlarge it more?

A.  I can now.

Q.  Okay.  So this says, under EF's Rules of the Road, when you enroll in a tour, you agree to EF's Rules of the Road, which can also be found on your personalized website.  Do you see where it says that?

A.  Uh-huh.

Q.  Was that a yes?

A.  Yes, yes.  Sorry, yes.

Q.  That's okay.  Do you recall having a



Exhibit F, Plaintiff

Page 34

personalized website with information about the tour?

A.    Yes, I had an app.

Q.    Okay.  Do you still have access to that?

A.    No, I do not.  I could figure it out, maybe, if I had time, but I do not.

Q.    What was on that app?

A.    I believe just the itinerary.

Q.    Did L███████ also have that on her phone?

A.    I believe so.  I can't say yes or no.  I want to say yes, but I'm unsure now that I think about it.  I can't remember.

Q.    Did you personally go through the rules of the road for the tour with L██████?

A.    We did in one of the meetings, yes with Mr. Arriaga.  Sorry, I was just scrolling down a little bit and messed that up.

Q.    That's okay.  Do you need to, like, zoom out so you see more?

A.    I was just scrolling more down on four.  I'm going to stop touching it because I'm messing it up.  I apologize again.

Q.    You don't need to apologize.  If you want to see a different part of it, I highlighted a couple portions, or just points in this just to direct attention to it.  So, No. 3 it says, "You are expected



to respect the nightly curfew that your group leader may set for your own safety and security.  Room checks will be conducted at the group leader's discretion.  Visitors or group members of the opposite sex are not permitted in your room."  Do you see where I read that?

A.    Uh-huh.  Yes, yes.

Q.    Was that something you discussed with L█████ before the tour?

A.    Yes.

Q.    And what did you talk with her about that?

A.    We talked about that, that exact thing.  That that's not to happen and I told her because my -- I've heard of some children that do drink and get drugs, you know, party because they can when they're younger.  I said, please for the love of God stay away from that stuff.  You'll get kicked off, arrested in a foreign country.  I made it very dramatic to L█████ about everything.

Q.    So L█████ was aware there was going to be a curfew and that she was expected to abide by the curfew while she was on the tour?

A.    Yes.

MS. AYRES:  Objection to form.

BY MS. THORVALDSEN:

Q.    And L█████ was aware that that rule about the


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff
Page 36

curfew was for her safety, right?

A.    Yes.

MS. AYRES:  Object to form.  You can answer.

THE WITNESS:  Yes.

BY MS. THORVALDSEN:

Q.    Did you discuss with L█████ the -- like, the gender separation policy as in, you know, girls were not supposed to go into boys' rooms and vice versa?

A.    Under my understanding, there would not be any boys or girls in the same level.  It would be separated by gender on floors.  I never was under the understanding that L█████ would be in the same floor as other genders.

Q.    So my question was more did you discuss that policy with her, that boys and girls were not supposed to be entering each other's rooms on the tour?

A.    Yeah.  She went through it with -- yeah, yes.

Q.    She understood that that was a rule and breaking the rule could result in her getting dismissed from the tour?

MS. AYRES:  Objection to form, but you can answer.

THE WITNESS:  Yes.

BY MS. THORVALDSEN:

Q.    And now you said that you had an understanding



Exhibit F, Plaintiff

Page 37

that girls and boys would be separated on different levels; is that right?

A.    Yes.

Q.    Where did you gain that understanding?

A.    We were told from Mr. Arriaga and there was another person on one -- it was an EF tour -- it was on a question, Zoom call.  I can bring up emails -- if I can find them, I don't know if I can, but it was just told that that was how it was.  That's what my manager had told me with her daughters, that they both had different -- boys and girls were not allowed on the same floor.  That was one of my hugest concerns actually going into this.  And that -- I had two other parents tell me they had tours where they were separated.

Q.    You just said that was one of your hugest concerns.  Why was that?

A.    Because I don't think boys and girls should be on the same floor unless there's an armed security guard by each room because of the way teenagers act.

Q.    Are you being hyperbolic when you say armed security?

A.    I'm sorry, that -- I believe that there should be -- yeah, boys and girls should be separated.  If not, there should be a security guard on each floor making sure there's order because children do test limits, no


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 38

matter what you tell them.  No matter how good they are, you always have bad ones, you have good ones, you have experimental ones.  I thought it would be a lot more security than there was, absolutely 100 percent.  I was led to believe something different on the security part. I would never let her go, knowing her next door neighbor was 16, 17-year-old boy, unless I was in the room with her.  One hundred percent not.

Q.   Lost my train of thought, I'm sorry.  Oh, you had mentioned when you were speaking a moment ago, some emails that you said you might be able to find.  What emails were you referring to?

A.   I just -- Zoom links which I probably don't have because I know I've -- well, it was still this computer.  For the EF tour meetings prior to, you know, question and answers, going over the brochures.  I know one of them there was a representative from EF tours answering questions.  One of the questions was -- and it was by myself and a couple other parents -- the separation of boys and girls.  And so our understanding -- because there was another mother and I that really wanted to go, but couldn't get time off work.  And we were really concerned about that and so that was a huge, huge issue with me that I tried to -- I got as much information that I could on -- and I was



Exhibit F, Plaintiff
Page 39

comfortable with what I was given.

Q.   Can you point to anything in writing that said that girls and boys would be separated on floors?

A.   I was just assured that's what it was.  And it kind of seems like common practice.  I couldn't think of a scenario where they would be mixed gender under the ruling of their high school chaperone.  That seems like a lot to put on a high school chaperone.  I just listened to what previous people had done and trusted that the EF tour and everybody else's experiences were honest and true and I went with that.

Q.   Did you discuss, before L‌ went on the tour, your concerns about boys and girls being together and, you know, the potential for some kind of sexual activity between them?

A.   Absolutely.  We discussed it in one of our meetings.  That was that.  We discussed it, it would be put to rest, it would be okay.  I discussed it with L‌.   I didn't need to keep harping on it.  It was very well understood.  All of our concerns were put to rest, so we thought.

Q.   I'm specifically asking about your conversation with L‌.

A.   Yes.

Q.   What did you tell L‌ about this policy?



Exhibit F, Plaintiff
Page 40

A.   I don't -- I can't speak what I said exactly, but she was there during all conversations.  She knows my rules as a parent.  I know how her respect levels work.  It's just a common understanding we have.

Q.   So when you say your rules as a parent, what rule did she understand when she was going on this tour?

A.   As in:  Don't do drugs, don't drink, don't do anything with boys, don't go alone with boys, because bad things can happen, don't leave the group.

Q.   Okay.  So those are the rules you discussed with her and told her you expected her to follow?

A.   Yes.

Q.   When you said her level of respect, what do you mean by that?  What was your anticipated level of respect from L██████  in terms of following the rules that you set?

A.   To follow them.

Q.   And did you let her know of potential consequences if she didn't?

A.   I didn't, no.

Q.   Did you discuss the EF policy, that if the student participants broke some of these rules of the road, they could be sent home and they wouldn't get a refund?

A.   L██████  doesn't -- she's -- I can't stress this



Exhibit F, Plaintiff
Page 41

enough, my daughter is scared to death of failure, rejection.  She doesn't want people to look at her in a wrong way.  She does not want to break the rules.  She's never wanted negative attention.  She wants to be the apple of everybody's eye.  She's not a child I've ever had to drill anything into really because she is a people pleaser.  She will go out of her way to make sure -- she doesn't want to cause any problems anywhere.

She would rather suffer alone in silence than create issues for anybody.  So, no I didn't have to keep hammering this into her head.  She knew what was expected of her and she, 99 percent of the time, upholds what she has to do because she is way much an overachiever.

Q.   Going back to Exhibit 1 in a different section from the Rules of the Road, that follows it there's a section called, Release and Agreement.  Do you see that?

A.   Yes.

Q.   And do you recall reading that at the time that you enrolled L█████ in the tour?

A.   I can't say yes or no.  I'm sure I did if it was in that meeting.  I'm sure at one point, I -- I don't know.  I can't answer that.

Q.   Uh-huh.  And did you understand that by, you know, signing up for the tour you were agreeing to


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 42

release EF entities from any kind of liability for injury that L████ might suffer while on the tour?

MS. AYRES:  Objection to form, but you can answer.

BY MS. THORVALDSEN:

Q.    Was it you personally or L████'s father who signed the paperwork to enroll L████ in the tour?

A.    It was both of us doing both, but I can't remember who signed what.

Q.    And did you sign paper copies of documents or something online or something else?

A.    I can't remember, either or.  My memory is very blurry on a lot of this too.  I know I had to block some out.  I know it sounds crazy to some people.  It messed with my mental health as a mother.  I had to get into intensive therapy for this as -- a lot of this stuff is hard for me to give proper answers on because it is very, very blurry.

Q.    In terms of enrolling L████ for the tour, did you have to provide any information to EF about any kind of medical issues or medications, mental health issues, things of that nature?

A.    I want to say, yes, but I can't say for sure. I feel like that's something that, absolutely because she's going overseas, yeah.  I'm 99 percent sure, but I



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 43

can't -- I'm sure we did.  I'm sure we had to have.  I think we had to go a doctor or something.  I'm pretty sure we did.

Q.    Do you recall if L█████ was on any medications at the time of the tour?

A.    No, I cannot recall.

Q.    You don't remember, okay.

Now, when L█████ was going on the tour to Spain in June of 2022, did she bring her cell phone with her?

A.    Yes.

Q.    And was she going to be able to use that in Spain?

A.    Yes.

Q.    And did you keep in touch with her via her cell phone when she traveled to Spain?

A.    Yes.

Q.    And what did you use to communicate with L█████ when she was in Spain.  Like what specific platform?

A.    I just iMessaged through Apple.

Q.    iMessage?

A.    Yes.

Q.    Did you use any other kind of messaging like WhatsApp or Snapchat or any of the social media



Exhibit F, Plaintiff
Page 44

messaging apps?

A.    I might have used Instagram highly doubt it. Sometimes I send her picture on there.  Usually I just use email or message when she was in Spain.

Q.    Did you email L▮▮▮ when she was in Spain?

A.    I don't believe so.  I don't believe so at all.  If I would have tried to reach out it would have been message or email, not social media.  I know she doesn't check that all the time for an urgent message from me.  It's not where she would look if I tried to get hold of her.

Q.    At this time when L▮▮▮ was a junior in high school, how often did you text message and communicate with her, like, if she was just at home in California?

A.    I don't know.

Q.    You primarily -- sorry, thinking back to that time frame, did you primarily communicate with her via text or a phone call or FaceTime or something else?

A.    We were mostly in person.  If she was at her dad's we'd text once or twice, phone call, FaceTime.

Q.    Were you in communication every day?

MS. AYRES:  When are we talking about?

MS. THORVALDSEN:  When L▮▮▮ was a junior in high school.

MS. AYRES:  While she was at home in



Exhibit F, Plaintiff
Page 45

California?

BY MS. THORVALDSEN:

        Q.    Correct.

        A.    Yeah, yeah.

        Q.    Was that the case when she was away in Spain?
Were you communicating with her every day?

        A.    No, because of the time difference.
Everything was wonky.  She was only there for two days,
three days.  I talked to her when she landed.  And then
I worked days.  She was sleeping while I worked and
awake while I was sleeping.  It was only two days.  I
think -- yeah, I talked to her the first day or two.

        Q.    When you say -- I'm sorry.  I didn't mean --

        A.    She wasn't there long enough to have a
consistent record with that.

        Q.    So when you say you were speaking with L████
while she was in Spain, did you literally mean speaking
to her on a telephone or were you using that
colloquially to mean just messaging her?

        A.    We did a phone call.  I can't remember.  I
talked to her.  I don't know if it was a text message or
a phone call.

        Q.    What did she say?

        A.    That she was having a good time.

        Q.    Was she sending you photos or individual



quotes or anything like that?

A.    I don't remember.  Like I told you, she wasn't there that long to have had much interaction with anything or time to do anything before this happened.

Q.    So I'm going to get to the incident, but I'm just trying to get a sense of what your understanding of what she was doing before that happened while she was on the tour.  So what did she tell you about the first day or two of her trip to Spain?

A.    That she landed, she met a couple people.  They met up -- everybody met up together, they met their groups -- I wouldn't say couple people, they all met.  She mentioned that she saw Diego and they were going to -- see, I don't remember everything.  I remember bits and bits and pieces.  She mentioned that she had saw Diego because she -- I don't know -- see, I don't know if -- do I just kind of ramble everything out there, I don't know.  Because we don't have text messages.  So I don't know what's relevant, what's not.  And that they went to -- they landed, they all met at the airport, they all went and they did a tour, then they went to eat and then went back to the hotel room.  I remember that's about how her first day went.

She told me that.  And I don't believe she sent me pictures at that point.  I know she sent



Exhibit F, Plaintiff

Page 47

pictures -- I can't remember if the pictures were sent or she showed me when she got here.  Everything kind of blurs together at that point.  I know at one point, though, she did tell me she met Diego.  She thought he was like really cute or (audio cutting out) and then they went on a tour, and he was really pushy with her, trying to grab her hand.

She explained that to me.  You know, just mom, daughter talking.  I'm like, okay.  Well, you know, just watch yourself.  Watch how you conduct yourself.  My thing is always how you conduct yourself and how you look.  That was our thing.  She's like, I know.  I'm having so much fun, blah.  They were having so much fun. I'm like, all right, Sis, just go have fun.  She did mention she felt very uncomfortable at one point in the museum.  He kept trying to hold her hand.  She didn't like that.  So I said, stay away from him.  Stay away from him or tell someone.  Hey, excuse me -- tell him, hey dude stay away from me, you know.  I remember I said stand up for yourself.  She doesn't want to cause any issues.  I said you have to say something.  She's like okay.  If it gets bad, I'll tell my friends, whatever. After that she's like, we're having the best time of our life.  We're scootering and that was the last I heard from her.  I was going to go to work and she was going



Exhibit F, Plaintiff
Page 48

to do something, and that was the last I had heard from her until the EF tour liaison contacted me.

Q.    So you did cut out a little bit.  Right at the beginning of when you started talking about Diego.  So I missed part of what you said.  You said that she thought Diego was cute and then you said something else that -- you cut out and we weren't able to hear that part.

A.    When she -- they all met up and he was going to go on a tour of a building, a museum with them.  He wasn't going to be in their group.  Oh, my God.  He's cute, he's so nice.  Blah, blah, blah.  I'm like, okay, cool, great.  Like the whole group, she's like mom they're so group, our group they're great.  That's when they had went to the tour.

He was in their group and she had mentioned he made her feel uncomfortable because he kept trying to hold her hand.  And that's when I said, L████, then tell someone.  You have to tell someone.  Tell him to back off you.  Tell your leader, tell your friend.  She's like, well, maybe I'm just -- I don't know.  I'm having so much fun, could be really nervous and blah, blah, blah.  I'll let you know.  I'll figure it out.  That's just how we talk.  She's like, I have to assess the situation.  She gets overwhelmed in certain areas and yeah, we talked about that.


MAGNA
LEGAL SERVICES

Then we touched base.  They were going to dinner.  She was having a good time.  They were riding scooters.  I don't think Diego at that point.  That was the last I had heard from her.

MS. AYRES:  Can we take a break at some point.  Before you get too far into -- just because I don't want to interrupt --

MS. THORVALDSEN:  Yep.

MS. AYRES:  Segments.  We've been going for about an hour.

MS. THORVALDSEN:  Yeah.

MS. AYRES:  Not now.

MS. THORVALDSEN:  Now is fine.  You want to take ten minutes or.

MS. AYRES:  I think that's a good idea.

MS. THORVALDSEN:  Okay.

MS. AYRES:  All right.  Thank you.

MS. THORVALDSEN:  Okay.

BY MS. THORVALDSEN:

Q.   Okay.  That was actually a good natural breaking point.  I would like to talk about the incident.  So just to, again, like frame what we're talking about.  Morgan, when you were home in California and L▬▬ was in Spain, were you notified by someone that some incident had happened involving L▬▬?


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff
Page 50

A.    Yes.

Q.    And how were you contacted?

A.    Phone call.

Q.    Who called you?

A.    I can't remember her name.  She was the liaison.  She was in a lot of our emails in the beginning.  I can't remember her name.

Q.    If I said Meg Allen, does that ring a bell?

A.    That sounds very, very familiar, yes.

Q.    Do you remember what she told you in that initial phone call?

A.    That L███ was in an incident, she was at the hospital.  She wanted to let me know she was okay and Mr. Arriaga was with her.  And she was contacting me to make arrangements to get myself or her father to Spain and she gave me very little detail.  She said that she was sexually assaulted and she was in the hospital.  But that was it.  She just, like, I want you to know she's safe, walking, talking, but this is what's going on and we need to get one of you guys here now.

Q.    What did you do with that information?

A.    I called her dad immediately and he came over and then we got in touch with Mr. Arriaga.  And then we got in touch with Meg again.  She was very awesome and helped us plan the rest of getting L███ home.



Exhibit F, Plaintiff

Page 51

Q.    Did you speak with Mr. Arriaga?

A.    Yes, I did over the phone.  I called him when Trenton was there and he just let us know L▬▬▬ was okay, he was staying with her.  He has a daughter too, so he said I'm staying here.  I am taking care of her. He spoke very, obviously, you know, very bilingual.  So it was nice in the hospital setting and L▬▬▬'s friend stayed with her.  So that's who we spoke with at that time.

Q.    Did Mr. Arriaga give you anymore detail about the incident or what L▬▬▬ had told him about it?

A.    No.

Q.    Did you speak with L▬▬▬ or her friends at that time frame?

A.    Not at that time.  I just wanted to make sure she was okay.

Q.    Okay.  What happened next?

A.    I don't remember.  I know there was phone calls, emails in between.  I don't remember what they were, that's all a blur.  I remember trying to get myself an emergency passport, which I couldn't.  Trenton had one, so we got him to Spain and I took a couple days off of work so I could talk to people.  I remember just talking to hospitals, trying to get the hospitals, what was going on.  I needed translators for it.  I had to



Exhibit F, Plaintiff
Page 52

call them during the night.  So I had to be awake all night and the -- trying to contact the police officers because they wanted to know about pressing charges. There was a lot of, I don't remember exactly what days what happened.

Q.    When was the first time that you spoke with L███████ about the incident?

A.    That night, the night I found out, later that night.  She finally -- she had fallen asleep for a little bit.  I spoke with her friend, Julia, and then L██████ had fallen asleep for a little bit and then L██████ and I spoke.

Q.    What did the friend Julia tell you?

A.    Just that she was really scared, but she was safe and she was staying with L█████.  She chose to stay back from the tour for a night.  She was staying with her because Julia was -- she's bilingual way better than L███████.  So she stayed with L█████ to help.  None of the people at the hospital could speak English.  She chose to stay.  She was going to stay with L██████ until Trenton got there.

Q.    When you spoke with L██████ at that time, what did L███████ tell you?

A.    L██████ just told me that she was really scared.  She could hardly talk because she was crying so


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 53

hard.  She doesn't want to talk about anything, she's safe.  She's really embarrassed and she's like mortified and she's like, mom, I can't talk right now.  Please, please, I can't talk right now.  And that conversation was just -- I just didn't force her to speak about anything.  She was mentally not my daughter.

Q.  When was the next time that you spoke to L████?

A.  I want to say we spoke on and off that night. I remember I called a couple times just to make sure -- just to, like, let her know like I'm here.  She was disassociated with life.  I know I called her a couple times, hey, I'm here.  Like, are you okay?  Do you need anything?  Julia checked in with me and then her dad flew out that next day and was there within 12 hours. So there wasn't much time she was alone.  And then after that I spoke to her full on when her dad was there, but it was just to see how she was doing.  We didn't talk much about what had happened, a little bit, but not much while she was over there.

Q.  Did she tell you that it was Diego who was involved in the incident?

A.  Yes.

Q.  What did she say about Diego?

A.  That he had made her do things she didn't want



Exhibit F, Plaintiff
Page 54

to do.  She was sick about it.

Q.   Did you speak with Trenton while he was there with L█████ ?

A.   Yes.

Q.   And did he provide any additional information?

A.   He provided the information that boys and girls were on the same floor.  He found that Diego's room was right next to L█████'s and he lost his mind and he -- his exact words were, I'm really glad you're not here because you would go psycho with what is going on here.  That Diego's mother was on this tour, which is -- and that just, yeah, the overall nonchalantness of it.

He didn't speak much to me because he knows that I get very much more excitable than him.  So he just told me, he's like, this is ridiculous, Morgan.  L█████ told me what happened, I'm just trying to keep it together for our daughter right now.  I have to go to police stations.  I need this information.  He told me very little about it, you know, just enough to keep my questions at bay, but not enough to make things more difficult while he was over there trying to deal with things.  And I'm in America losing my mind.  Yeah.

Q.   Did you ever speak with Mrs. Taylor, Jennifer Taylor?

A.   No.  I was told immediately to not speak with



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 55

anybody about anything by Trenton, his family. Everybody in his family is in law. They said, we're getting lawyers. Whatever we're doing, don't speak to anybody about anything.

Q. Did you have an understanding of who had made the decision that girls and boys would be on the same floor at the hotel?

A. No.

Q. So you don't know if it was Mr. Arriaga?

A. No.

Q. And you don't know if it was Mrs. Taylor?

A. No.

Q. You don't know if it was anybody affiliated with EF tours?

A. I don't know, no.

Q. Did L█████ want to press criminal charges when she was in Spain?

A. No. She was scared to death that no one would believe her.

Q. But did she change her mind?

A. I talked to her. I said L█████ if -- you know, if this is -- what are you scared of? She's like I just -- what if -- what if, you know, I'm not -- no, I don't -- at first she was scared of what would happen. She had no idea what was going on. She was in shock.



Exhibit F, Plaintiff

Page 56

She didn't know what pressing charges meant, what not pressing charges meant. I let her lead. I let her think about it, completely, overnight. The next day she called me and said mom I want to press charges.

Q. Did she ever express to you that she didn't want Diego to get in trouble?

A. No. She was embarrassed to have the whole world look at her as a, quote/unquote, I'm sure you can fill in the word, promiscuous woman, a liar, everything that almost every woman gets called that stands up for sexual assault.

Q. Did L▇▇▇ want to stay on the tour after the incident?

A. No.

Q. She didn't?

A. No.

Q. She wanted to come home?

A. She was scared to death.

Q. Of being on tour?

A. Yes. She wanted to come home. She's like, I just want to be home. I would have never allowed her to stay on that tour. Her dad at one point just said, I'll stay on the tour with her. I said absolutely not, no. While Diego was on the tour no, 100 percent not. That makes everything okay. No. I don't trust what



Exhibit F, Plaintiff

Page 57

happened.  No.  She did not want to be there.  She was completely traumatized.  She's like, how am I going to go -- this was a chance of a lifetime for me to experience something and I just got raped in a hotel room.  I can't go have fun.  I want to go home.  She was completely traumatized.

Q.    Did you understand that Diego was being sent home?

A.    I had no understanding of anything at that time.

Q.    Did L███████ tell you that she went to Diego's room on the night of the incident?

A.    No.

Q.    Did you learn that at some point?

A.    Yes.

Q.    How did you learn that?

A.    Through all the conversations that have been had.

Q.    So do you understand that L██████ was breaking the rules by going out of her room after curfew and going into a boy's room?

A.    Yes.  L██████ was breaking the rules.  I don't believe L█████ had 100 percent say in breaking said rules.

Q.    Did you have any involvement in the police or



Exhibit F, Plaintiff
Page 58

judicial proceedings in Spain?

A.    I did communicate in the beginning, just to get everything going.  And then her dad took everything over with lawyers and such.  His family, they handled it from there.

Q.    Did you hire a lawyer in Spain?

A.    I don't know if they did or not.  You'd have to speak to Trenton on that.

Q.    Did anything else of any significance with L████ happen in Spain before she returned to California?

MS. AYRES:  Objection to form, but you can answer.

THE WITNESS:  Yeah, not to my knowledge.

BY MS. THORVALDSEN:

Q.    So L████ and her father flew back from Spain to California; is that right?

A.    Yeah.  They spent one night in Paris, I believe, and flew back to California.

Q.    Were you in communication with L████ during her return travel?

A.    Yes.

Q.    Were you texting or calling or communicating in some other way?

A.    Text and call.



Exhibit F, Plaintiff

Page 59

Q.    In connection with the current lawsuit, were you asked to provide your cell phone or your cell phone records to anyone for the purposes of discovery?

A.    Yes, I believe I provided all of my text logs with somebody.  I'm not sure who.  In the very beginning Trent and I did.

Q.    Did you look for text messages between yourself and L_____ from the time period where she was going to Spain and coming back from Spain?

A.    Yes.

Q.    And did you provide those to your attorneys?

A.    Yes.

Q.    Do you still have them?

A.    No.

Q.    Do you have an iPhone?

A.    Yes.

Q.    Is that what you had in 2022, an iPhone?

A.    Yes.

Q.    And do you back up your data to the iCloud?

A.    Yes.

Q.    Do you have any automatic delete on your text messages?

A.    (Nodding.)

Q.    Is that a yes?

A.    Yes.  I don't have any of the old -- I had a



Exhibit F, Plaintiff

Page 60

massive reset on my computer.  I have nothing, no childhood pictures, nothing.  It was a horrible mistake.

Q.   But before that happened, you had given your text messages to counsel?

A.   Yes.

Q.   Is that your current counsel or the predecessor counsel?

A.   Trent was handling it all.

Q.   Did you give him your text messages?

A.   Yes, and it was in an email and I cannot remember who it was with us.

Q.   So Trent was the point of contact for gathering information for discovery; is that correct?

A.   Yes.

Q.   Is that true as to emails and any other records?

A.   Yes.

Q.   You said earlier that at one point when L█████ was in counseling she was doing some journaling; is that right?

A.   Yes.

Q.   When did L██████ start journaling?

A.   I have no idea.  I don't know if she was actually even doing it.  She said she was.  Was she writing in her notes in her phone, in her book or was



Exhibit F, Plaintiff

Page 61

she saying that to appease me, I cannot be sure.

Q.   Do you --

A.   She said off and on through therapy.

Q.   So when you say you're not sure if she was journaling, do you mean you don't know if at any time she was journaling or at that particular time?

A.   At that particular time.  I know she has off and on in the past, I don't know to what extent.

Q.   Were you asked to look for her journals in connection with this lawsuit?

A.   No.

Q.   Did you assist L█████ in looking for her journals in connection with this lawsuit?

A.   Yes, she collected all her journals.  She said she had some stuff she was collecting, to my knowledge, and she handled that.  I don't know exactly what it was. I've never had issues with her not doing what was told, so I don't dig too deep when she says she's handled something.  And her dad didn't ask me to do anything.  I assumed everything was taken care of to my knowledge.

Q.   To your knowledge, L█████ did perform a search for paper journals as she was asked to?

A.   Yes.

Q.   Do you know if any of them were kept at your home?



Exhibit F, Plaintiff
Page 62

A.    At one point she was here and she said she was getting stuff together for this so, yes.

MR. SCHWARTZ:  Sorry, Kara, just clarification.  Ms. Ash, you just said she was collecting it for this, what did you mean by this?

THE WITNESS:  The Court case.

MR. SCHWARTZ:  The lawsuit.  Okay.  Thank you.

BY MS. THORVALDSEN:

Q.    When L[____] got back to California, did she provide you with anymore detail about what she said happened between her and Diego?

A.    Yes, she did, yes.

Q.    And what did she tell you occurred?

A.    I don't want to speak and say because I can't remember at this point.  It's been so long ago, her exact words, that if -- I can't say off the top of my head right now, exactly what she told me that many years ago.  It would be incorrect.

Q.    Did you take any notes or anything like that at the time you were having these conversations?

A.    No, not at the time.  I didn't even think to do that at the time.

Q.    At some point did you try to press charges against Diego in Pennsylvania?

A.    Trenton was handling all of this.  There was a



Exhibit F, Plaintiff
Page 63

whirlwind of so many things happening, I can't speak on a lot. I don't remember for certain.

Q. Were you involved in the decision to file a lawsuit against EF and Diego and his mother?

A. If Trenton did it, I would have been on board with it, if it did happen, yes.

MS. AYRES: Well, just for clarification, counsel's question was about a civil lawsuit, the prior question was about the criminal charges. So could you just reask your question, Kara.

BY MS. THORVALDSEN:

Q. Yep. I think I had asked if you were involved in the decision to start this lawsuit, the one we're here about today, against EF and Diego and his mother?

A. Yes, yes, yes.

Q. Okay. And was L▬▬ in favor of bringing this lawsuit?

A. Yes.

Q. What do you all hope to achieve by this?

A. That this never happen again to anybody. I've heard horror stories now involving EF tours, like talking to people, reading things, reaching out, things that happened and it's absolutely disgusting. And I just want someone to speak up to girls, boys, don't ever get hurt on what could be one of the best times of their



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 64

life.

Q.   Who have you spoken to that had these stories?

A.   Lots of people actually.  And I think this is -- I don't want to get into this right now.  This is a side topic that I don't think is important right now.  I don't have all that information with me, but I can pull it up at a later date.

Q.   Well, you had some specific recollections of talking to your former mother-in-law or your manager of various people about EF tours before enrolling L███.  This is more recent.  Just trying to get a sense of who you've been talking about?

A.   Yes.  She had two children that went.  Great experience.  My mother-in-law had heard of you and you were a big reputable company in her eyes.  That's all we knew.

Q.   Since the tour, you've talked to other people.  Can you tell me who they are?

A.   No.  I did deep research on the Internet and got reviews from people's stories, active lawsuits, things that have happened in other countries just like L███'s.  They are actual people and actually happened.  I wasn't searching that in the beginning.

Q.   Have you kept your research that you did?

A.   I could find it if I needed it, yes.



Exhibit F, Plaintiff
Page 65

Q.    When L██████ returned to California, what was the first time that she sought medical or psychological treatment back home following the incident?

A.    Within the first week.

Q.    Who was the provider?

A.    I don't remember off the top of my head right now.

Q.    Was it her pediatrician for example?

A.    She was a part of it.  I don't remember the exact date her pediatrician saw her, if it was the first week or the first month.  She saw two doctors that month.  I don't remember which one first.

Q.    The pediatrician and then who was the other doctor?

A.    I don't remember that right now off the top of my head.

Q.    Was it a medical doctor or like a psychiatrist?

A.    Medical doctor.

Q.    Do you know what kind of specialty?

A.    Gynecology.

Q.    And were there any findings that you were concerned about or that L██████ was concerned about?

A.    No.

Q.    Did L██████ show you any injuries or bruises


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff
Page 66

following the incident in Spain?

A.   I don't remember.

Q.   Are you aware of -- sorry, lost my train of thought again there.

Can you point to statements that you feel were made by EF or its representatives in advance of signing L█████ up for the tour that were not true?

A.   Not off the top of my head.

Q.   In this civil lawsuit that we're here about today, one of the defendants that you've named was Mrs. Taylor, who's a group leader, correct?

A.   What do you mean?

Q.   So in this lawsuit you filed, you filed it against EF Educational Tours, EF Education First International, Limited, Diego Taylor and Jennifer Taylor.  Do you understand that those are the defendants?

A.   Yes.

Q.   And Jennifer Taylor was a group leader, correct?

A.   Yes.

Q.   What do you think that Jennifer Taylor did wrong in this lawsuit?

A.   I just can't imagine any mother of any teenager completely being okay with boys and girls



Exhibit F, Plaintiff

Page 67

having hotel rooms right next to each other with no supervision.

Q.   And what about Mr. Arriaga, was he in charge of L██████'s group?

A.   He was downstairs.  He said he stayed downstairs in the lobby later in the evening because kids would sneak out, and he liked to make sure they weren't.

Q.   So you're saying that Mr. Arriaga was in the lobby of the hotel where the two groups were staying on the night of the incident?

A.   I don't know if it was on the night of the incident.  He had told me later on in talking, he would stay down in the lobby because kids would sneak out. And he had told his students, I stay in the lobby, so if you guys plan on sneaking out, I will find you.  But he stays down there because there's never enough security. He said this time there was not enough security.

Q.   So L██████'s group leader was in the lobby to prevent L██████ from sneaking out of her room.  Is that what you're saying?

A.   No, that is not what I'm saying.  I said he said -- he told his group of students there's not enough security on this tour.  If you guys plan on sneaking out, I will be in the lobby.  You will not sneak out.



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 68

He's putting this to the whole tour as children, they're children. He's saying, I am here as your supervisor. If you feel like doing any funny business, I will be in the lobby. He did not say that directly to my daughter. He was stating that and he told me there was not enough security.

I don't know if it was the night this happened, but he had said that multiple times to myself and Trenton. And I think Ms. Taylor, as a chaperone, whatever she is, should have very much -- I would have seen that. There's no way. I would have made a huge deal about that on this tour, if I would have been there.

Q.  About what?

A.  Not having a security guard on every single floor so the children could not sneak around, let alone having boys and girls next to each other. That is absolutely, ridiculously uncalled for.

Q.  You're blaming Mrs. Taylor but not Mr. Arriaga?

A.  Everybody. At least Mr. Arriaga was down in the lobby trying to prevent something from happening, because he knows what high school teenagers do.

Q.  L█████ was in his group, right?

A.  Yes, she was.



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 69

Q.   What's your current relationship with L████ like?  Are you on speaking terms?  Are you on good terms?

A.   Yes, we are on very good terms.

Q.   Were you involved in assisting L█████ with collecting discovery materials for this case?

A.   Yes.

Q.   And what did you do to assist her?

A.   I would help her navigate through her phone, just make sure she had -- she just had questions.  I can't off the top of my head say what.

Q.   Did you help her pull text messages from her phone?

A.   No.  I sat with her while she did a lot, but I didn't personally go through everything.

Q.   Did you work with her or sit with her while she pulled information from her social media accounts?

A.   Yes.

Q.   And who did you provide that to?

A.   We provided it to some counsel in the beginning.  I think it's been shared that way since.  I can't 100 percent say.

Q.   With respect to EF Tours, what do you think that EF Tours did that makes them responsible for the alleged incident?



Exhibit F, Plaintiff

Page 70

A.    There's not enough security.  I don't know on what planet co-ed is okay in any world.  I think it was just very poor planning.  And especially to hear that two tours my boss's children went on were that way, and that's the way we were told.  Now, looking back, should I have picked everything with a fine-tooth comb, absolutely.  But I went on what I thought was good judgment and expected things to be that way.  Especially with the way the world is, just kind of common sense.  And I truly believe it was very lack -- very lack of staffing, poor judgment.  I don't know.  I believe taking a group of teenagers into a situation, there should be 100 percent, no rock unturned for safety.  And having a co-ed floor with no supervision in the hallways is 100 percent uncalled for.  I would've never let her go had I known that, 100 percent no.

Q.    If L███ had been on another floor from the boys, do you think she couldn't have gone to a boy's room?

A.    Not if there was a security guard watching the elevator.

Q.    And do you have some understanding that having a security guard in the hallway of a hotel is a common practice?

A.    If there's children that need to be watched



Exhibit F, Plaintiff

Page 71

overnight, 100 percent.  It's my child's life and safety.  They do it for celebrities.  They do it for my hospital.  You can get security guards in any instance. I don't think it's overdramatic to have a security guard on every floor to watch people's children, at all.  They have them on every floor on my hospital.  I don't see why there can't be one on every floor of a hotel to watch people's children in a foreign country without their parents.

Q.   Have you ever stayed at a hotel that had security guards on every floor?

A.   No, but I've never had unsupervised children on every floor.

Q.   Never.  You've never stayed a hotel with a sports team or something like that?

A.   Not to my knowledge, no.

Q.   I suspect that Attorney Schwartz is going to have some questions for you.  I'm going to end my turn here.  I may have some additional follow-up questions, but for now, I want to thank you for your time and cooperation.

          ///

                    EXAMINATION



BY MR. SCHWARTZ:

Q.   Ms. Ash, my name's Ed Schwartz.  I represent Diego Taylor.  Just have a few questions for you, not a whole lot.

Just to start with, you were asked some questions about L█████'s current sexual activity with her boyfriend, and you adamantly said there is none because of some issues.  And that she's treating with physicians.  Are those medical physicians or mental health providers?

A.   Medical physicians.  She has two appointments for next week, one for gynecology and one for just family doctor.

Q.   What are the names of those practice groups?

A.   I don't have those right off the top of my head.  I could get the information, if needed.  I don't have it with me currently.

Q.   Okay.  How long has she been treating with those two providers?

A.   These are both new appointments.  This is an ongoing issue.  It's been going on, off and on, for a good six months.  It's time -- it's getting worse -- to go see a provider.

Q.   Has she treated with any other provider in the six-month period leading up to these new providers?



A.   Yes.

Q.   Who are those providers?

A.   I don't have the names.

Q.   How many total providers has she treated with over the last, did you say six months, that this has been occurring?

A.   One.

Q.   Okay.  Did that provider give any type of --

A.   No.

Q.   -- diagnosis or treatment plan?

A.   No.

Q.   Was she referred to any specialists?

A.   Yes.

Q.   Okay.  What type of specialist?

A.   These are off subject from anything.  It's for her GI system.  She has to go see a -- I can't even tell you off the top of my head.  Some gastrointestinal specialist that has to do with GI issues she's having. And then she's been referred out to see gynecology.

Q.   Okay.  Has she been placed on any medication in the last six months?

A.   She was put on Omeprazole, I believe.

Q.   That's an antacid?

A.   Yeah.  Nothing prescription -- that's prescription, but otherwise nothing else, no.


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff
Page 74

Q.   Okay.  And then you had said when you were talking about the layout of the hotel in Spain, your belief that there should have been guards on the floors because it was a co-ed floor.  Then you said something, because the way boys and girls act.  Do you recall saying that?

A.   Yes.

Q.   What did you mean by that?

A.   I guess I should -- teenagers.  I shouldn't say boys and girls.  Teenagers in general, they want to be rebellious.  They're in a hotel without their parents in another country, of course sometimes teenagers want to push boundaries.  They do it at home.  That's why we watch our teenagers very close.

Q.   Do you watch L█████ very close?

A.   Yes.

Q.   Do you monitor her Snapchat account?

A.   No, I did not for a little bit.

Q.   Do you monitor her Instagram account?

A.   There are some things I do monitor, yes.

Q.   Do you monitor her TikTok account?

A.   Yes.

Q.   Do you monitor her text messages?

A.   Not always.

Q.   For at least three of those four I just


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff
Page 75

mentioned, you limited your review or your scope of your review, why is that?

A.    Because there's some things that not all parents know about.  Had I known about it, I would have monitored a little bit better.

Q.    Do you have any idea as to the sexual activity or proclivities of L███ from seventh grade through sophomore year of high school?

A.    Yes, I do.

Q.    Okay.  What's your belief?

A.    My belief is I have a great relationship with my daughter now and I was able to talk through everything with her.  And I understand and I have a grasp on her life, and I'm okay with it to this point.

Q.    And I want to clarify that answer.  You said you have a great relationship with her now.  Is that what you said?

A.    Yes.

Q.    Okay.  Does that mean that she has told you everything she's done since seventh grade or?

A.    Yes.

Q.    From this point going forward?

A.    Yes.  We've had very many open discussions moving forward.

Q.    Did she tell you about any of her past



Exhibit F, Plaintiff
Page 76

activities?

A.    Yes.

Q.    Okay.  What did she describe to you?

A.    I don't -- I don't know off the top of my head.

Q.    You don't have any recollection of any activities your daughter told you with respect to her activities, proclivities from seventh grade to the time she went to Spain?

A.    We've had lots of conversations.  I don't have the details off the top of my head, no.

Q.    Nothing?

A.    No.

Q.    Not even vague recollections of what the topic may have been?

A.    No.  We both cried, we hugged, we bonded.  I walked her through life.  It was monumental and I don't have the details off the top of my head.

Q.    So despite the fact that you've self described it as monumental, you can't even give me a general -- general idea of what the subject was?

A.    No.

Q.    Okay.  Have you read her transcript from her deposition testimony in this matter?

A.    I -- yes, read over it.



Exhibit F, Plaintiff
Page 77

Q.    What is read over it mean?

A.    I have read over it.  I don't remember it in great detail.

Q.    And I apologize if that was a poorly worded question.  When you said read over it did you read page for page?

A.    No.

Q.    Or did you skip through it?

A.    I skipped through it.

Q.    What was the --

A.    Very hard for me to deal with and I try to -- it's -- what she's had to go through, we've talked so much about it in detail, I don't -- I have to disassociate a little bit from this.

Q.    Okay.  What are the nature of these conversations you've had with her in detail?

A.    Nothing specific.

Q.    Well, you just said that you've had multiple conversations --

A.    Throughout her life, throughout the period of her going to Spain and back, conversations in detail about things I know what is going on.  I try to disassociate with it a little bit because it's very upsetting, and I don't like this thing.  I don't like it at all.  So, no, I did not completely read through her



Exhibit F, Plaintiff
Page 78

transcripts word for word.

Q.    You believe you have an open honest relationship with L████?

A.    I know I do.

Q.    Do you believe she's been open and transparent with you as to all the details?

A.    Yes.

Q.    Okay.  Would you be upset if it came to light that you have not been -- or that L████ has not been open and honest with you?  Would that impair your relationship with your daughter?

A.    Absolutely not.  We'd work through it and figure out why she wasn't able to come to me because she should never feel that she can't.  I am her safety.  If I can't be here for her, then what's the point.

Q.    I'm sorry.  I didn't mean to interrupt.  Did you finish your answer?

A.    Yes.

Q.    Do you know, did she have these similar open and transparent discussions with her father, Trenton?

A.    I can't speak on their relationship.

Q.    Did you ever ask if she's spoken to her dad about any of these things?

A.    I know they spoke because they did a lot of this together.  Yes, I know they spoke.  To the depth of



it, I cannot speak on.

Q.    You didn't ask L█████ about what she communicated to her father?

A.    Not exactly, no.

Q.    What does exactly --

A.    Their relationship is their relationship.  My relationship with her is mine.  I have maintained a great relationship with Trent by not getting into his parenting.  He doesn't get into mine.  L█████ is very open with us equally.  When we have to come together we come together.  I do not dig into their relationship.

Q.    When you say you come together when you have to come together, is this one of the events in life you felt it was necessary for you and Trenton to, quote, "come together?"

A.    We always do when there's an incident.  We co-parent very well.

Q.    So in that co-parenting role, tell me about what discussions L█████ had with Trenton and what discussions --

A.    I can't say.

Q.    You had with Trenton?

A.    I was not there when L█████ had discussions with Trenton.  I don't ask her what discussions she has with him.  I believe if he wasn't satisfied with the



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 80

discussion, he would come and ask me. He never has. So I can't speak on that. The discussions I've had with Trenton are about meeting with attorneys, getting things together, basic conversations.

Q. Okay. In any of the conversations you've had with L█████ about the events in Spain, did you feel it necessary to go to Trenton to seek either confirmation of the story or get his input as to what you just learned from your daughter?

A. No, because when him and I spoke, it was the same story she gave me. And when him, her and I spoke, they collaborated the same. We all felt we communicated greatly. We've never had issues.

MS. AYRES: I'm sorry. Could we take a quick break, like, just two minutes. I have somebody screaming in another office. I cannot hear.

MR. SCHWARTZ: Yeah, that's fine.

MS. AYRES: All right. Thank you.

BY MR. SCHWARTZ:

Q. Going back to some testimony you gave about -- I'm going to kind of go off my notes. If it's not accurate in any way, please correct me. You were asked a question as to why you chose to bring a lawsuit against Ms. Taylor and not Mr. Arriaga, and your response, I believe, was because at least he made the



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

disclosure that he would be downstairs in the lobby. Does that comport with what you testified to?

A. I wouldn't say that was the reason we did not choose -- that's not the sole reason. I don't believe Arriaga had anything to do with it. He did his job to the fullest and went above and beyond helping throughout this situation with my daughter. I believe she's involved as his mother, and a part of it as a mother. And that's what makes her involvement so, I mean, in it.

Q. Could Mr. Arriaga have posted chaperones or anything on the floors?

A. I believe he did what he could with what he was provided from the school.

Q. What does that mean? What was he provided by the school?

A. If parent chaperones went, then they could go. But he was under the same understanding we were, that there would be some sort of support from EF Tours.

Q. Do you know if Mr. Arriaga was actually physically in the lobby at any point during the night?

A. I don't know about that night. I know other nights the students said he was and he said he was. Other than that, I don't know any more.

Q. Okay. You don't know when he would have been in the lobby?



A.    I don't know any more, no.

Q.    And with respect to the hotel where the alleged incident took place, do you know the layout?  Is the lobby downstairs from the hallway of rooms that --

A.    I don't know.

Q.    L█████ stayed in?  Is it on the same floor?

A.    I don't know.

Q.    You have no way of knowing whether or not anyone standing in the lobby could see up the hallway or --

A.    I don't think his intentions were to watch the hallways.  I think his intentions were just to kind of hang out a little bit later just in case anybody tried to sneak out.  Because the drinking age there was some of the ages of the some of the children.  He was just trying to just go above and beyond as a person.  I don't think it was in his job description or anything.  I think he was keeping an extra eye out on the children.

Q.    So going above and beyond, do you know, did Mr. Arriaga prepare a written code of conduct contract that he presented to the kids in the California group?

A.    No.

Q.    Do you know if Mr. Arriaga had any --

A.    I don't know.

Q.    One on meetings -- one-on-one meetings with



Exhibit F, Plaintiff
Page 83

any of the students --

A.    No, I don't.

Q.    About code of conduct?  I'm sorry?

A.    I don't know.

MS. AYRES:  Morgan, just make sure that Mr. Schwartz has totally done his question before you answer because the court reporter can only type one person talking at a time.

THE WITNESS:  Okay.

MS. AYRES:  Just slow down for a moment, let him finish before you answer, just to make it clear. Okay?

THE WITNESS:  Okay.

BY MR. SCHWARTZ:

Q.    Do you know if Jennifer Taylor had a written code of conduct contract with the Pennsylvania students?

A.    No, but she should have one with her soul protecting children.

Q.    With her what, I'm sorry?

A.    With her soul protecting children.

Q.    Her soul?

A.    She should have a code of conduct with her soul protecting children.  No, I don't know about any code of conduct with anybody outside of the EF tours.

Q.    Who was principally responsible for the safety



Exhibit F, Plaintiff

Page 84

of L█████, Mr. Arriaga or Jennifer Taylor?

A.    I don't know that answer.

Q.    With respect to the journals that you said you saw L█████ came over to your house, and was trying to get those all together and you saw one of them, do you have any recollection as to where those journals were?

MS. AYRES:  Objection to form but you can answer.

BY MR. SCHWARTZ:

Q.    Were they in her room?  Were they in the basement?  Were they in a closet?

A.    I don't know, I don't remember.

Q.    Do you recall where she was searching?

A.    Her room.

Q.    Okay.  Did she search anywhere else in the house?

A.    No.

Q.    Did you see any journals that she came out of her room with?

A.    No.

Q.    Did she ask for your help in finding the journals?

A.    No.

MR. SCHWARTZ:  Those are the questions I have right now.  Kara, do you have anything else?



Exhibit F, Plaintiff

Page 85

MS. THORVALDSEN:  If I may, I would like to just go over the Answers to Interrogatories briefly.

(Whereupon Exhibit No. 2 was marked for identification.)

FURTHER EXAMINATION

BY MS. THORVALDSEN:

Q.   Going to share my screen again here.

So we can mark the Plaintiffs' Responses to Interrogatories Propounded by Defendants, EF Institute for Cultural Exchange and EF Education First International, Limited as Exhibit No. 2.  Once again, I will give remote control to you, Morgan, just in case you would like to scroll through this document.  My first question to you is, is this something that you've seen before?

A.   Yes.

Q.   And did you provide information to answer these?

A.   Yes.  If I answered anything, I provided it.

MS. THORVALDSEN:  Apologize.  I have somebody trying to call me.

MS. AYRES:  At least they're not screaming and cursing through your wall.

MS. THORVALDSEN:  No.  Off the record.

(Discussion off the record.)



Exhibit F, Plaintiff

Page 86

MS. AYRES:  Are we looking at a particular one, or are you scrolling?

MS. THORVALDSEN:  I am navigating to Interrogatory No. 6 and the response.  I was trying to get both pages on one screen.  I'm not sure.  Is that large enough to be legible?

MS. AYRES:  Yeah.

BY MS. THORVALDSEN:

Q.   I'm going to highlight this.  Says, "Her first interaction with defendant, Diego Taylor, when he began acting strangely toward her, which conduct is detailed in the complaint, which is incorporated herein by reference."

Who provided that information that Diego was acting strange?

A.   I'm sure that would have been her.  She told me about it and Trent about it, so I'm sure that's her.

Q.   Do you have an understanding of what acting strange meant, other than what you said already about him wanting to hold her hand?

A.   I don't want to make -- no, I don't.  No.  I can't elaborate on that without her.

Q.   It also says in the same answer a little bit further down, "In the time that L███████ was on the trip, there were threats of discipline made by the EF staff to



the group about not drinking or doing drugs, but those rules were not enforced and people were drinking and smoking on the trip."

Q.   Do you know who that information came from?

A.   L██████.

Q.   And do you know who the EF staff was that was threatening discipline if there was rules being broken?

A.   Not -- no, I don't know.  That was again, L██████.

Q.   Was it L█████ who reported to you that there were people drinking and smoking on the trip?

A.   She confirmed when she came home that there were people drinking and smoking.

Q.   And did L██████ participate in any of that?

A.   No.

Q.   When you said a little while earlier Mr. Arriaga was staining in the lobby to make sure that people didn't sneak out, did you mean that people didn't sneak out of the hotel or rooms or both?

A.   I have no idea.  He just told me that he did that.  He goes, I do that sometimes on the tours if I feel like there's not enough, you know, whatever.  I just like to hang out, read my books, make sure that there's no after-hour activity.  I don't know for sure. That was the only time he spoke about it.  He didn't



Exhibit F, Plaintiff

Page 88

elaborate.

Q.    This last line of the answer to Interrogatory No. 6 that says, "Nothing was discussed by the EF staff about the boys and girls in the groups dating or having sexual contact with one another."

Do you know who that information came from?

A.    That sounds like probably Trent.

Q.    Did Trent attend all of the meetings before the trip with Mr. Arriaga?

A.    Yes, I believe we both did together.  Sorry.  One moment.  I'm going to turn the video off.  I have to plug my computer in.

MS. THORVALDSEN:  No problem.  Go ahead.

(Pause in proceedings.)

BY MS. THORVALDSEN:

Q.    I'm scrolling down to Interrogatory No. 20 which asks for an -- excuse me -- an itemized calculation of damages that the plaintiffs are claiming in this lawsuit.  And the answer says, "Economic damages include the cost of traveling involved in the retrieval of L█████, and the loss of money for L█████ having to leave the trip early, as well as medical copays for treatment related to the incident."

Do you see that?

A.    No.



MS. AYRES:  Under 20.

THE WITNESS:  Yes, sorry.  I apologize.

MS. THORVALDSEN:  Right here.

THE WITNESS:  Yes.

BY MS. THORVALDSEN:

Q.   So the cost of travel to retrieve L███████, did you or Trenton have to pay for that out of pocket?

A.   I did.

Q.   You paid for Trenton's plane ticket to Spain?

A.   Oh, no, no.  I don't know how Trent handled that.  I thought you were talking about EF Tours.  Trent handled that.  I don't know how he handled that.  Honestly, I don't remember.

Q.   So you don't know who paid for him to travel to Spain to retrieve L███████?

A.   Honest to God, I cannot remember off the top of my head right now.

Q.   Do you remember requesting first class tickets for them to return to California?

A.   No.

Q.   Did you understand that if a student was found to be in violation of EF's Rules of the Road, they could be dismissed from the tour without a refund?

A.   Yes.

Q.   Do you understand that L███████ did break the



Exhibit F, Plaintiff

Page 90

rules of the tour by leaving the room after curfew and entering a room of the opposite gender?

A.   I believe there was a lot going on at the time.  I'm not sure anything completely that happened. I mean, I wasn't there.  I haven't seen any video footage of it.  I don't exactly everything that's happened.  I do, all the details.  I'm in this lawsuit, but I -- there was a lot that went on at that time.

Q.   With respect to the medical copays for treatment, do you know what those amount to?

A.   Not off the top of my head.

Q.   At some point, L▒▒▒▒ stopped treating with one or more of her counselors because of nonpayment.  Do you remember that?

A.   Yes.

Q.   And do you know why there was an issue with respect to paying the providers?

A.   Yes, because I had to go back to days at work and I lost about $2,000 a month doing that.  So we had to stop seeing her therapist at that time for a few months until I caught back up with everything.

Q.   Are there other out-of-pocket expenses that you're claiming or that L▒▒▒▒ is claiming as damages in this case?

A.   I'm not sure off the top of my head.  I'd have



Exhibit F, Plaintiff
Page 91

to go back and talk to Trent.

Q.    Have you spoken with any of the individuals listed under the answer to Interrogatory No. 22, on this right side of the screen here, about the incident?

A.    Julia.  I spoke with her the day it happened, while they were in the hospital.  When we spoke earlier, that's all I've spoken to on there.

Q.    You haven't spoken with Johnny Marones?

A.    No.

Q.    You haven't spoken with Aiden Compton?

A.    No.  These are all people L█████ told me about.  I've never met them or spoke with them.  Just Julia.  I've never met Julia, just spoke with her.  I heard about her off and on through L█████'s high school but we've never met.

Q.    Lawrence Mancini, it says he's L█████'s former boyfriend.  Do you know him?

A.    That was the one I told you she met through friends and they had spoken online and phone, but they had never met.  That was quote, unquote if you'd call dating, which I did not believe.  Yes, I met him through phone conversation, text.  We'd FaceTime with his parents before.

Q.    You've never spoken with him about this incident?



Exhibit F, Plaintiff
Page 92

A.    No.

Q.    Okay.

MS. THORVALDSEN:  Those are all the questions I have then.

MS. AYRES:  I don't have any questions.  Thank you.

MR. SCHWARTZ:  Hold on.  I may have one question.  I'm sorry.

MS. AYRES:  I'm sorry.

FURTHER EXAMINATION

BY MR. SCHWARTZ:

Q.    Just following up on that last question about Lawrence Mancini.  Did you -- and I apologize, I couldn't hear -- did you say that L████'s never met Lawrence Mancini?

A.    No.

Q.    That's not what you said?

A.    No, that they've never met.  They had a phone, text relationship.

MR. SCHWARTZ:  Okay.  That's the only question I have.  Thank you.

THE WITNESS:  Thank you.

MS. AYRES:  Morgan, you can log off.  Thanks for your time.  Get some rest.



Exhibit F, Plaintiff
Page 93

Ms. Jackson, could I have a copy of the transcript, e-tran, full size, please. And I don't know -- I don't think there is any need to attach the exhibits. Do you think, Kara?

MS. THORVALDSEN: I can send them. What's the email address to send them to Magna? I will email them to the Magna so they can be included with the transcript. It just makes it more convenient, I think.

THE WITNESS: It's just the two.

THE COURT REPORTER: Copies, Counsel?

MS. THORVALDSEN: Yes, please.

MR. SCHWARTZ: I don't need a transcript right now. Thank you.

(Whereupon proceedings concluded at 12:15 p.m.)



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 94

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____, 2025, at _____, _____.

_____

MORGAN ASH



Exhibit F, Plaintiff

Page 95

STATE OF CALIFORNIA          )

COUNTY OF SAN JOAQUIN        )

I, MARY JACKSON, hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that to the best of my ability, the foregoing transcript constitutes a full, true, and correct report of the proceedings heard via Zoom by me, a Certified Shorthand Reporter and disinterested person, and was thereafter transcribed into typewriting, and that the pertinent provisions of the applicable code or rules of civil procedure relating to the notification of the witness and counsel for the parties hereto of the availability of the original transcript of the deposition for reading, correcting and signing have been met.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said action.

DATED:  _____

_____

MARY JACKSON, CSR NO. 8688





Exhibit F, Plaintiff

# Magna
## Key Contacts

Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 1

| A | | | |
|---|---|---|---|
| **abide** | **access** | **affiliated** | 46:12,20,21 47:14 |
| 35:20 | 34:3 | 55:13 | 48:8 49:17 51:20 |
| **ability** | **account** | **after** | 52:1 57:17 59:4 |
| 95:8 | 74:17,19,21 | 8:14 21:8 22:7,20 | 60:8 61:14 62:25 |
| **able** | **accounts** | 23:3,5 47:23 53:16 | 63:19 64:6,15 71:5 |
| 16:8 19:9,9,10 30:7 | 69:17 | 56:12 57:20 90:1 | 75:3 77:25 78:6 |
| 30:25 33:15 38:11 | **accurate** | **afterwards** | 80:12,18 84:5 88:8 |
| 43:12 48:7 75:12 | 80:22 | 22:21 | 90:7 91:7,11 92:3 |
| 78:13 | **achieve** | **after-hour** | **allegations** |
| **about** | 63:19 | 87:24 | 21:15 |
| 10:9 11:22 15:25 | **acrimonious** | **again** | **alleged** |
| 17:10,17 18:8 19:12 | 10:13 | 19:21 27:19 28:8 | 21:21 69:25 82:3 |
| 20:9 21:18 22:23 | **across** | 34:21 49:22 50:24 | **Allen** |
| 24:16,24 25:2 26:25 | 6:23 | 63:20 66:4 85:7,11 | 50:8 |
| 27:1,4,6,7 28:9 29:4 | **act** | 87:8 | **allowed** |
| 29:13 34:1,10 35:10 | 37:19 74:5 | **against** | 11:12 25:9,11 37:11 |
| 35:11,17,25 38:23 | **acting** | 62:24 63:4,14 66:14 | 56:21 |
| 39:13,22,25 42:20 | 86:11,15,18 | 80:24 | **almost** |
| 44:22 46:8,23 48:4 | **action** | **age** | 23:11 56:10 |
| 48:25 49:10,21,23 | 95:22 | 13:13 25:3 82:14 | **alone** |
| 51:10,11 52:3,7 | **active** | **ages** | 22:4 40:8 41:9 53:16 |
| 53:1,5,19,24 54:1 | 15:15 17:8 26:21,22 | 82:15 | 68:16 |
| 54:19 55:1,4 56:3 | 27:9 64:20 | **ago** | **already** |
| 62:10 63:8,9,14 | **activities** | 9:3 11:22 17:18 | 86:19 |
| 64:10,12 65:23,23 | 13:14 76:1,7,8 | 31:17 38:10 62:15 | **also** |
| 66:9 67:3 68:12,14 | **activity** | 62:18 | 16:18,18 18:25 24:21 |
| 72:6 74:2 75:4,4,25 | 39:15 72:6 75:6 | **agree** | 30:3 33:20 34:8 |
| 77:13,22 78:23 79:2 | 87:24 | 33:19 | 86:23 |
| 79:18 80:3,6,20 | **actual** | **agreeing** | **always** |
| 81:21 83:3,23 86:17 | 28:10 64:22 | 41:25 | 8:1 11:12 13:1,3,6 |
| 86:17,19 87:1,25 | **actually** | **Agreement** | 38:2 47:11 74:24 |
| 88:4 89:11 90:19 | 26:2,14,17 29:8,18 | 41:17 | 79:16 |
| 91:4,12,14,24 92:13 | 30:23 37:12 49:20 | **ahead** | **am** |
| **above** | 60:24 64:3,22 81:19 | 12:9 23:20 88:13 | 5:19 8:22,23 31:12 |
| 81:6 82:16,19 | **adamantly** | **Aiden** | 32:4 51:5 57:2 68:2 |
| **abrupt** | 72:7 | 91:10 | 78:14 86:3 95:19 |
| 24:24 28:9 | **additional** | **airport** | **America** |
| **absences** | 54:5 71:19 | 46:20 | 54:22 |
| 14:14,16 | **address** | **al** | **amicable** |
| **absolutely** | 7:13,14 93:6 | 1:10 2:10 | 10:12,14 |
| 22:3 31:19 38:4 | **ADHD** | **all** | **amount** |
| 39:16 42:24 56:23 | 15:4 24:15 | 2:16 6:8 11:15 12:13 | 90:10 |
| 63:23 68:18 70:7 | **adopted** | 14:24 16:8 18:1 | **an** |
| 78:12 | 24:21 | 19:13 25:19 26:25 | 6:5 8:12,16 12:8 13:7 |
| | **advance** | 27:4 28:8 30:15 | 13:20 15:7 18:14 |
| | 66:6 | 39:20 40:2 44:7,9 | 27:2 30:5 32:9 34:2 |


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff    Page  2

36:25 37:6,18 41:13
44:9 49:10 50:12
51:21 55:5 59:15,17
60:10 72:20 73:23
78:2 79:16 82:18
86:18 88:17,17
90:16

**animals**
12:22

**annoying**
23:8

**another**
32:7,14 37:6 38:21
70:17 74:12 80:16
88:5

**answer**
6:14,16 7:3,9 12:6,10
17:19 36:3,22 41:23
42:4 58:13 75:15
78:17 83:7,11 84:2
84:8 85:17 86:23
88:2,19 91:3

**answered**
29:17 85:19

**answering**
6:13 38:18

**answers**
6:21 28:7 38:16
42:17 85:2

**antacid**
73:23

**anticipated**
40:14

**anxiety**
13:1 17:2

**any**
6:25 10:20 11:14,17
14:3 15:4,5 17:2,12
17:15,16 18:6 20:4
24:12,17 28:7 32:18
36:9 41:8 42:1,20
42:20 43:4,24,25
47:20 54:5 57:25
58:9 59:21,25 60:15
61:5,24 62:19 65:22
65:25 66:24,24 68:3

70:2 71:3 72:24
73:8,12,20 75:6,25
76:6,6 78:23 80:5
80:22 81:20,23 82:1
82:23 83:1,23 84:6
84:18 87:14 90:5
91:2 92:5 93:3
95:20,21

**anybody**
6:11 14:5 16:7,16
19:16 41:10 55:1,4
55:13 63:20 82:13
83:24

**anymore**
51:10 62:10

**anyone**
59:3 82:9

**anything**
7:6 13:21 14:9 19:11
20:13 25:11 27:6,22
28:1,2 30:18,21
39:2 40:8 41:6 46:1
46:4,4 53:1,6,14
55:1,4 57:9 58:9
61:19 62:19 73:15
81:5,11 82:17 84:25
85:19 90:4

**anytime**
20:13

**anywhere**
20:15 41:8 84:15

**apologize**
10:2 11:5 19:22
34:21,22 77:4 85:20
89:2 92:14

**app**
34:2,6

**appearing**
2:17

**appease**
61:1

**apple**
41:5 43:21

**applicable**
95:13

**appointments**

28:3 72:11,20

**approximately**
9:3 25:3

**apps**
25:19,19 44:1

**April**
1:16 2:18 5:1

**are**
5:14 8:21,23 12:2
14:18 17:12 18:19
19:19 21:12 22:9,10
22:25 24:16 28:14
28:15 30:25 32:25
33:15 34:25 35:4
37:20 38:1 40:10
44:22 53:13 55:22
64:18,22 66:3,16
69:2,2,4 72:9,14,20
73:2,15 74:20 77:15
80:3 84:24 86:1,2
88:18 90:22 91:11
92:3

**area**
16:10 23:18

**areas**
48:24

**Arizona**
8:7,10 11:15

**armed**
37:18,20

**around**
13:1 15:15,17 18:15
19:22,24 23:8 68:16

**arrangement**
11:7

**arrangements**
50:15

**arrested**
35:16

**Arriaga**
28:22,23,24 29:14
30:1 32:18 34:15
37:5 50:14,23 51:1
51:10 55:9 67:3,9
68:20,21 80:24 81:5
81:10,19 82:20,23

84:1 87:17 88:9

**art**
13:20,24,24

**as**
5:8,18 6:9 12:17
13:12,24 15:22 17:9
20:12,23 21:21
22:15 23:5 24:10
28:9,11 30:12,18,21
36:7,12 38:25 40:3
40:5,7 42:15,16
56:8 60:15 61:22
68:1,2,9 75:6 76:20
78:6 80:8,23 81:8,8
82:16 84:6 85:11
88:22,22 90:23

**Ash**
1:5,14 2:5,16 5:6
7:14 8:25 10:21,22
62:4 72:2 94:8

**ask**
6:11,14 7:2,6,8 23:25
27:22 31:12 61:19
78:22 79:2,24 80:1
84:21

**asked**
31:14 59:2 61:9,22
63:12 72:5 80:22

**asking**
7:10 21:6 23:25
39:22

**asks**
88:17

**asleep**
52:9,11

**Aspire**
18:18

**assault**
56:11

**assaulted**
50:17

**assess**
48:23

**assist**
61:12 69:8

**assisting**



Exhibit F, Plaintiff Page 3

69:5
**associate**
8:20 16:4
**associates**
3:3 8:12
**associate's**
8:16
**assume**
7:9
**assumed**
61:20
**assured**
39:4
**at**
2:18 6:25 7:8 9:15,16
10:3 11:16 14:6,9
14:21,24 15:1,10,21
16:17,20 17:3,25
18:25 20:1 21:7,10
22:8 24:5 25:5 26:1
26:2,25 27:21 28:6
29:7 30:7,15,17
31:16,18,25 35:3
41:2,19,22 43:5
44:6,12,14,19,25
46:20,25 47:3,3,15
48:3 49:3,5 50:12
51:8,13,15 52:19,22
54:20 55:7,24 56:8
56:22 57:9,14 60:18
61:5,6,7,24 62:1,15
62:20,21,22,23 64:7
68:21 71:5,10 74:13
74:25 77:25 80:25
81:20 83:8 85:22
86:1 90:3,8,12,18
90:20 93:14 94:4
95:7
**attach**
93:3
**attempts**
20:18
**attend**
88:8
**attending**
14:20

**attention**
14:6 33:13 34:25
41:4
**attorney**
5:19,19 6:6 71:17
95:20
**attorneys**
31:22 59:11 80:3
**audio**
47:5
**autism**
23:7
**automatic**
59:21
**availability**
95:16
**Avenue**
3:9 7:15
**awake**
45:11 52:1
**aware**
22:6 24:16 25:21
26:11 28:18 35:19
35:25 66:3
**away**
25:10 35:15 45:5
47:17,17,19
**awesome**
50:24
**awful**
22:14
**AYRES**
3:3 5:12 12:5,8 23:24
24:4 33:1,5 35:23
36:3,21 42:3 44:22
44:25 49:5,9,12,15
49:17 58:12 63:7
80:14,18 83:5,10
84:7 85:22 86:1,7
89:1 92:5,9,24
**A-R-R-I-A-G-A**
28:23
**a.m**
2:18 5:2

_____
**B**
_____

**back**
9:13,14 11:19 17:10
19:20 23:10 25:18
33:6,6,7 41:15
44:16 46:22 48:19
52:16 58:16,19 59:9
59:19 62:9 65:3
70:5 77:21 80:20
90:18,21 91:1
**background**
10:6
**bad**
38:2 40:9 47:22
**Bakersfield**
11:16
**bartending**
8:4
**base**
17:13 26:12 49:1
**basement**
84:11
**basic**
8:13 13:25 16:6 29:6
80:4
**basketball**
13:15
**Bates**
30:13
**bay**
54:20
**be**
8:13 10:2 19:9,23
20:10,18,21,22 23:8
24:8 28:4 30:7
32:14 33:20 35:3,19
36:9,10,12,16 37:1
37:17,23,23,24 38:3
38:11 39:3,6,17,18
40:23 41:4 43:12
48:10,21 52:1 55:6
56:21 57:1 61:1
62:18 63:25 67:25
68:3 70:8,13,25
71:7 74:11 78:8,15
81:1,18 86:6 89:22
89:23 93:7

**bear**
30:4
**became**
22:12 26:20
**because**
13:7 14:16 15:16,23
16:8,19 19:1,11
20:10,16 22:23 23:5
30:23 31:8,11,21
33:3 34:20 35:12,14
37:17,19,25 38:14
38:21 40:8 41:6,13
42:17,24 45:7 46:16
46:18 48:16 49:6
52:3,17,25 54:10,13
62:14 67:6,14,17
68:23 72:8 74:4,5
75:3 77:23 78:13,24
80:10,25 82:14 83:7
90:13,18
**become**
22:6 25:18 28:18
**bed**
22:13
**been**
5:7,22 8:1 9:13 10:9
20:20,25 27:3 28:3
29:20 44:8 49:9
57:17 62:15 63:5
64:12 68:12 69:21
70:17 72:18,21 73:6
73:19,20 74:3 76:15
78:5,9,9 81:24
86:16 95:17
**before**
2:18 5:10,22 6:12,14
7:4 8:3 9:24 29:14
29:18,21,24 35:8
39:12 46:4,7 49:6
58:10 60:3 64:10
83:6,11 85:15 88:8
91:23
**began**
86:10
**beginning**
10:4 30:13 48:4 50:7



Exhibit F, Plaintiff Page 4

58:2 59:5 64:23
69:21
**behalf**
1:4,5 2:4,5
**behavior**
32:18
**being**
11:17 15:20 16:7,8
19:10 22:4 37:20
39:13 56:19 57:7
66:25 87:7
**belief**
74:3 75:10,11
**believe**
5:25 10:1 18:3 25:8
28:23 29:22 34:7,9
37:22 38:5 44:6,6
46:24 55:19 57:23
58:19 59:4 70:10,11
73:22 78:2,5 79:25
80:25 81:4,7,12
88:10 90:3 91:21
**bell**
50:8
**best**
47:23 63:25 95:8
**better**
52:17 75:5
**between**
9:12 16:21 39:15
51:19 59:7 62:11
**beyond**
81:6 82:16,19
**big**
13:1 64:15
**bigger**
31:2
**bilingual**
51:6 52:17
**biological**
1:4,6 2:4,6
**bit**
34:16 48:3 52:10,11
53:19 74:18 75:5
77:14,23 82:13
86:23

**bits**
46:14,15
**Black**
3:9
**blah**
47:13 48:11,11,11,21
48:22,22
**blaming**
68:19
**blessed**
13:9
**block**
42:13
**blue**
22:10
**blur**
51:20
**blurry**
42:13,18
**blurs**
47:3
**board**
63:5
**bonded**
76:16
**book**
60:25
**books**
87:23
**born**
9:24,25,25
**boss's**
70:4
**Boston**
3:10
**both**
16:21 19:8 29:8
37:10 42:8,8 72:20
76:16 86:5 87:19
88:10
**boundaries**
74:13
**boutique**
15:1
**boy**
26:8,15 38:7

**boyfriend**
26:17 27:10 72:7
91:17
**boys**
25:22,24 36:8,10,15
37:1,11,17,23 38:20
39:3,13 40:8,8 54:6
55:6 63:24 66:25
68:17 70:18 74:5,10
88:4
**boy's**
57:21 70:18
**break**
6:25 19:24 33:2 41:3
49:5 80:15 89:25
**breaking**
36:19 49:21 57:19,22
57:23
**briefly**
85:2
**bring**
32:4 37:7 43:9 80:23
**bringing**
63:16
**brochure**
4:9 30:17 32:23
**brochures**
31:16 38:16
**broke**
40:22
**broken**
87:7
**brother**
23:6
**brought**
26:16
**bruises**
65:25
**building**
48:9
**bulging**
19:20
**bummed**
15:25
**bunch**
12:21 23:6 29:17

**bus**
25:5
**business**
68:3
**but**
5:13 6:7 12:5,9,15
13:19 14:1 16:3,14
16:21 17:12,23
20:22 21:3,11 22:1
22:4,20 25:12 26:12
26:17 27:4,5,19
28:2 30:17 31:6
34:5,10 36:21 37:8
38:22 40:2 42:3,8
42:23,25 46:5 50:17
50:19 52:14 53:17
53:19 54:20 55:20
58:12 60:3 64:6
67:16 68:8,19 69:14
70:7 71:12,20 73:25
81:17 83:17 84:7
87:1 90:8 91:15,19
95:6
**button**
30:20
**by**
1:19 4:3,10 5:17 6:13
8:23 12:16 20:18
24:7 30:10 31:22
33:12 35:20,24 36:5
36:11,24 37:19
38:19 40:14 41:24
42:5 45:2 49:19,24
55:1 57:20 58:15
62:5,8 63:11,19
66:6 72:1 74:8 79:8
80:19 81:14 83:14
84:9 85:6,9 86:8,12
86:25 88:3,15 89:5
90:1 92:12 95:4,10

---
**C**
---

**C**
3:1 5:3
**calculation**
88:18



Exhibit F, Plaintiff

Page 5

**California**
2:20 7:15 11:20,24
 32:6,14 44:14 45:1
 49:23 58:11,17,19
 62:9 65:1 82:21
 89:19 94:2 95:1
**call**
 6:11 37:7 44:18,20
 45:20,22 50:3,11
 52:1 58:25 85:21
 91:20
**called**
 18:17 41:17 50:4,22
 51:2 53:10,12 56:4
 56:10
**calling**
 58:23
**calls**
 25:12 51:19
**Camarillo**
 7:15 14:11 15:2
 16:20
**came**
 23:4 50:22 78:8 84:4
 84:18 87:4,12 88:6
**camera**
 33:5
**can**
 10:5 12:5,9 17:13,25
 18:7 19:21 21:20
 23:24 27:5,7,22
 30:23 31:1,6,20
 33:2,9,17,20 35:14
 36:3,21 37:7,8,8
 39:2 40:9 42:3 49:5
 56:8 58:12 64:6,18
 66:5 71:3 83:7 84:7
 85:8 92:24 93:5,7
**cannot**
 31:8 43:6 60:10 61:1
 79:1 80:16 89:16
**can't**
 9:23 10:1 17:18 18:4
 21:14 23:16 26:18
 34:9,11 40:1,25
 41:21,23 42:8,12,23

43:1 45:20 47:1
 50:5,7 53:3,4 57:5
 62:14,16 63:1 66:24
 69:11,22 71:7 73:16
 76:20 78:14,15,21
 79:21 80:2 86:22
**care**
 20:12 24:19 28:7
 51:5 61:20
**case**
 6:4 24:3 45:5 62:6
 69:6 82:13 85:12
 90:24
**caught**
 90:21
**cause**
 41:8 47:20 95:6,22
**celebrities**
 71:2
**cell**
 25:15 43:9,16 59:2,2
**center**
 7:23 15:1
**certain**
 21:25 22:1 27:12
 48:24 63:2
**Certified**
 2:19 95:10
**certify**
 95:3,19
**chair**
 19:21
**chance**
 57:3
**change**
 55:20
**changed**
 11:10,11
**chaperone**
 39:7,8 68:9
**chaperones**
 81:10,16
**character**
 19:12
**charge**
 67:3

**charges**
 52:3 55:16 56:1,2,4
 62:23 63:9
**check**
 17:11 44:9
**checked**
 53:14
**checks**
 35:2
**child**
 1:5,6 2:5,6 10:17
 12:17 13:7 41:5
**childhood**
 60:2
**children**
 10:20 35:13 37:25
 64:13 68:1,2,16
 70:4,25 71:5,8,12
 82:15,18 83:18,20
 83:23
**child's**
 71:1
**choose**
 81:4
**chose**
 52:15,19 80:23
**civil**
 63:8 66:9 95:14
**claiming**
 88:18 90:23,23
**clarification**
 62:4 63:7
**clarify**
 7:9 14:15 75:15
**class**
 89:18
**classes**
 13:25 16:8
**clear**
 83:11
**clearing**
 14:13,14
**click**
 33:6
**close**
 12:12,13 74:14,15

**closet**
 84:11
**code**
 82:20 83:3,16,22,24
 95:13
**collaborated**
 80:12
**collected**
 61:14
**collecting**
 61:15 62:5 69:6
**College**
 14:21
**colloquially**
 45:19
**color**
 22:11
**comb**
 70:6
**combined**
 32:6,14
**come**
 6:23 13:3 33:6 56:17
 56:20 78:13 79:10
 79:11,12,13,15 80:1
**comfortable**
 27:1 39:1
**coming**
 22:16 59:9
**comment**
 13:6
**common**
 27:5 28:10 39:5 40:4
 70:9,23
**communicate**
 19:18 43:18 44:13,17
 58:2
**communicated**
 79:3 80:12
**communicating**
 45:6 58:23
**communication**
 44:21 58:20
**company**
 64:15
**complaint**



Exhibit F, Plaintiff Page 6

86:12
**completely**
26:11 56:3 57:2,6
66:25 77:25 90:4
**comport**
81:2
**Compton**
91:10
**computer**
31:11 38:15 60:1
88:12
**concerned**
38:23 65:23,23
**concerns**
37:12,16 39:13,20
**concluded**
28:1 93:14
**conduct**
32:19 47:10,11 82:20
83:3,16,22,24 86:11
**conducted**
35:3
**confirmation**
80:7
**confirmed**
87:12
**connect**
19:8
**connection**
6:2 59:1 61:10,13
**consequences**
40:19
**consistent**
45:15
**constitutes**
95:9
**contact**
52:2 60:12 88:5
**contacted**
48:2 50:2
**contacting**
50:14
**contract**
82:20 83:16
**control**
30:22 85:12

**convenient**
93:8
**conversation**
39:23 53:4 91:22
**conversations**
40:2 57:17 62:20
76:10 77:16,19,21
80:4,5
**cool**
48:12
**cooperation**
71:21
**copays**
88:22 90:9
**copies**
42:10 93:10
**copy**
93:1
**Coronado**
18:1
**correct**
18:19 21:16 45:3
60:13 66:11,20
80:22 94:3 95:9
**correcting**
95:17
**correctly**
28:22
**cost**
88:20 89:6
**could**
6:20 7:12 11:14
17:23 22:8 27:20
28:4 31:18 34:4
36:19 38:25 40:23
48:21 51:23 52:19
52:25 63:9,25 64:25
68:16 72:16 80:14
81:10,12,16 82:9
89:22 93:1
**couldn't**
19:2 38:22 39:5
51:21 70:18 92:15
**counsel**
60:4,6,7 69:20 93:10
95:15,19

**counseling**
18:1,18 60:19
**counselor**
15:11 18:10,13
**counselors**
90:13
**counsel's**
63:8
**countries**
64:21
**country**
35:17 71:8 74:12
**County**
7:23 95:2
**couple**
13:17,18 14:12 20:20
27:24,25 29:15 32:5
34:23 38:19 46:10
46:12 51:22 53:10
53:12
**course**
23:20 74:12
**court**
1:1 2:1 5:4 6:9 62:6
83:7 93:10
**COVID**
15:15,17,24 16:5
**co-ed**
70:2,14 74:4
**co-parent**
79:17
**co-parenting**
79:18
**crazy**
18:13 19:13,15 42:14
**create**
41:10
**cried**
76:16
**criminal**
55:16 63:9
**crowds**
13:1
**crying**
52:25
**crystal**

22:10
**CSR**
1:21 5:5 95:25
**Cultural**
4:11 85:10
**curfew**
35:1,20,20 36:1
57:20 90:1
**current**
27:9 59:1 60:6 69:1
72:6
**currently**
8:21,22,23 9:4,8
14:20 17:15,23
72:17
**cursing**
85:23
**custody**
11:7,8,9
**cut**
48:3,7
**cute**
47:5 48:6,11
**cutting**
47:5

---

**D**

**D**
5:3
**dad**
9:12 12:12 13:6,23
14:12 16:19 19:7
23:5 24:15 26:11
50:22 53:14,17
56:22 58:3 61:19
78:22
**dad's**
9:13 23:9 24:18
44:20
**damages**
88:18,19 90:23
**data**
59:19
**date**
10:2 25:1 64:7 65:10
**DATED**



Exhibit F, Plaintiff

Page 7

95:23
**dating**
26:6,11,13,14,15,17
88:4 91:21
**daughter**
7:17 16:3 41:1 47:9
51:4 53:6 54:17
68:4 75:12 76:7
78:11 80:9 81:7
**daughters**
29:8 37:10
**day**
12:20 44:21 45:6,12
46:8,23 53:15 56:3
91:5
**days**
15:20 45:8,9,10,11
51:22 52:4 90:18
**deal**
11:16 13:8 54:21
68:12 77:11
**death**
41:1 55:18 56:18
**debate**
13:18
**decided**
8:5 25:7
**decision**
55:6 63:3,13
**declare**
94:1
**deep**
61:18 64:19
**defendant**
3:13 86:10
**defendants**
1:11 2:11 3:7 4:11
66:10,17 85:9
**define**
23:16
**definitely**
24:10 31:8
**degree**
8:9,11,16 11:23
**delete**
59:21

**demand**
15:23
**deposed**
5:22
**deposition**
1:14 2:16 6:9 18:7
76:24 95:4,7,17,21
**depressed**
15:19 21:10 23:10
**depression**
16:5,25 18:11 19:14
**depth**
78:25
**describe**
76:3
**described**
23:2 76:19
**description**
82:17
**desires**
9:12
**despite**
76:19
**detail**
50:16 51:10 62:10
77:3,13,16,21
**detailed**
86:11
**details**
76:11,18 78:6 90:7
**detention**
14:10
**detentions**
14:8,16,19
**diagnosed**
24:15
**diagnosis**
73:10
**didn't**
8:15 11:16 13:16
14:1 16:12,13 18:12
18:22 19:1,16 39:19
40:19,20 41:10
45:13 47:16 53:5,18
53:25 54:13 56:1,5
56:15 61:19 62:21

69:15 78:16 79:2
87:18,18,25
**die**
20:7,22
**Diego**
3:13 21:19 46:13,16
47:4 48:4,6 49:3
53:21,24 56:6,24
57:7 62:11,24 63:4
63:14 66:15 72:3
86:10,14
**Diego's**
54:7,11 57:11
**diet**
17:6
**difference**
45:7
**different**
18:23 28:14 30:20
32:10 34:23 37:1,11
38:5 41:15
**difficult**
54:21
**dig**
61:18 79:11
**dinner**
49:2
**direct**
33:13 34:24
**directly**
68:4
**disabilities**
15:4
**disassociate**
77:14,23
**disassociated**
53:12
**discipline**
14:4 86:25 87:7
**disclosure**
81:1
**discovery**
31:22 59:3 60:13
69:6
**discretion**
35:3

**discuss**
36:6,14 39:12 40:21
**discussed**
35:7 39:16,17,18
40:10 88:3
**discussion**
80:1 85:25
**discussions**
75:23 78:20 79:19,20
79:23,24 80:2
**disgusting**
63:23
**disinterested**
95:11
**disks**
19:19
**dismissed**
36:19 89:23
**DISTRICT**
1:1,2 2:1,2
**divorce**
10:8,12
**divorced**
9:23 10:10 11:6
**doctor**
20:14 43:2 65:14,17
65:19 72:13
**doctors**
27:25 65:11
**doctor's**
28:3
**document**
30:13,15,25 31:20
85:13
**documents**
42:10
**does**
9:10 10:24 17:2,5
21:4 27:22 41:3
50:8 75:19 79:5
81:2,14
**doesn't**
19:13 30:16,18,21
40:25 41:2,8 44:9
47:20 53:1 79:9
**doing**



Exhibit F, Plaintiff   Page 8

8:3,8 10:15 13:17
17:9 24:9 32:1 42:8
46:7 53:18 55:3
60:19,24 61:17 68:3
87:1 90:19
**done**
23:13,16 39:9 75:20
83:6
**door**
38:6
**doubt**
44:2
**down**
16:20 21:3 34:15,19
67:14,17 68:21
83:10 86:24 88:16
**downstairs**
67:5,6 81:1 82:4
**dramatic**
35:17
**draw**
14:6
**dress**
12:20,21
**drill**
41:6
**drink**
7:1 23:19,24 24:10
35:13 40:7
**drinking**
82:14 87:1,2,11,13
**drugs**
35:13 40:7 87:1
**dude**
47:19
**due**
14:11
**duly**
5:7 95:4
**during**
15:17,23 16:15 40:2
52:1 58:20 81:20

---

**E**

**E**
3:1,1 5:3,3

**each**
6:18 21:1 36:16
37:19,24 67:1 68:17
**earlier**
17:1 24:16 60:18
87:16 91:6
**early**
88:22
**easy**
10:16 11:13 27:2
**eat**
22:11 46:21
**Economic**
88:19
**Ed**
72:2
**education**
1:10 2:10 3:7 4:11
5:20 15:7 66:14
85:10
**educational**
1:9 2:9 3:7 4:9 5:20
15:5 28:10 66:14
**EDWIN**
3:14
**EF**
1:9,9 2:9,9 3:7,7 4:9
4:11,11 5:19,20
28:10,14 29:9,11,12
29:21 32:24 37:6
38:15,17 39:10
40:21 42:1,20 48:2
55:14 63:4,14,21
64:10 66:6,14,14
69:23,24 81:18
83:24 85:9,10 86:25
87:6 88:3 89:11
**EF's**
33:14,18,19 89:22
**eighth**
25:16,17
**either**
24:12,13 42:12 80:7
95:20
**elaborate**
27:20 86:22 88:1

**elevator**
70:21
**else**
16:16 18:24 30:2
42:11 44:18 48:6
58:9 73:25 84:15,25
**else's**
39:10
**email**
44:4,5,8 60:10 93:6,6
**emails**
37:7 38:11,12 50:6
51:19 60:15
**embarrassed**
14:5 53:2 56:7
**emergency**
51:21
**emotional**
22:24
**end**
26:15 71:18
**enforced**
87:2
**English**
52:19
**enlarge**
33:16
**enough**
41:1 45:14 54:19,20
67:17,18,23 68:5
70:1 86:6 87:22
**enroll**
33:19 42:7
**enrolled**
19:3 41:20
**enrolling**
42:19 64:10
**entering**
36:16 90:2
**entities**
28:15 42:1
**equally**
79:10
**eschwartz@mcnee...**
3:16
**especially**

6:18 70:3,8
**ESQUIRE**
3:3,8,14
**et**
1:10 2:10
**even**
60:24 62:21 73:16
76:14,20
**evening**
67:6
**events**
21:9,12 79:13 80:6
**ever**
5:22 11:13 15:3,7
41:5 54:23 56:5
63:24 71:10 78:22
**every**
12:20 22:8 44:21
45:6 56:10 68:15
71:5,6,7,11,13
**everybody**
15:18 39:10 46:11
55:2 68:21
**everybody's**
41:5
**everything**
6:10 17:5 21:15
35:18 45:8 46:14,17
47:2 56:9,25 58:3,3
61:20 69:15 70:6
75:13,20 90:6,21
**exact**
10:2 17:19 20:8 25:1
28:7 35:11 54:9
62:16 65:10
**exactly**
31:18 40:1 52:4
61:16 62:17 79:4,5
90:6
**Examination**
4:3 5:16 71:24 85:5
92:10
**examined**
5:8
**example**
7:7 65:8



MAGNA
LEGAL SERVICES

Page 9

**Exchange**
4:11 85:10
**excitable**
54:14
**excuse**
8:22 9:25 11:3 16:23
22:9 47:18 88:17
**Executed**
94:4
**exhibit**
4:9,10 30:5,8,12
32:24 33:13 41:15
85:3,11
**exhibits**
4:7 93:4
**expected**
34:25 35:20 40:11
41:12 70:8
**expenses**
90:22
**experience**
57:4 64:14
**experiences**
39:10
**experiencing**
18:11
**experimental**
38:3
**explained**
47:8
**express**
56:5
**extent**
61:8
**extra**
82:18
**extracurricular**
13:14 14:1
**extraordinary**
30:18
**extreme**
20:11
**eye**
41:5 82:18
**eyes**
22:9,10 64:15

**e-tran**
93:2

———————————
F
———————————
**FaceTime**
44:18,20 91:22
**fact**
76:19
**failure**
41:1
**Falcon**
3:9
**fallen**
52:9,11
**Fallgatter**
1:4 2:4 9:20 10:18
**familiar**
28:14 29:11 31:15,19
50:9
**family**
12:3,13 16:10 24:12
24:17,18,20 55:1,2
58:4 72:13
**family's**
12:13
**far**
49:6
**father**
9:16 11:6 12:2 42:6
50:15 58:16 78:20
79:3
**favor**
63:16
**feel**
7:8 42:24 48:16 66:5
68:3 78:14 80:6
87:22
**feeling**
23:13
**feelings**
20:16 22:6
**felt**
22:3 47:15 79:14
80:12
**few**
14:10 19:7 28:2 72:3

90:20
**field**
25:6 32:2
**figure**
19:17 34:4 48:22
78:13
**file**
63:3
**filed**
66:13,13
**fill**
56:9
**filled**
6:6
**finalize**
10:8
**finally**
22:14,19 23:13,17
52:9
**find**
37:8 38:11 64:25
67:16
**finding**
84:21
**findings**
65:22
**fine**
5:13,14 10:5 24:4
49:13 80:17
**fine-tooth**
70:6
**finish**
6:12,14,17 78:17
83:11
**finished**
6:16 11:22
**first**
1:10 2:10 3:7 4:12
5:7,20 11:6 15:19
16:1 22:8 24:25
26:6,20 28:18 29:3
45:12 46:8,23 52:6
55:24 65:2,4,10,11
65:12 66:14 85:10
85:14 86:9 89:18
**five**

29:8
**flew**
53:15 58:16,19
**floor**
36:12 37:12,18,24
54:7 55:7 68:16
70:14,17 71:5,6,7
71:11,13 74:4 82:6
**floors**
36:11 39:3 74:3
81:11
**focusing**
12:1
**folders**
31:25
**follow**
18:7 40:11,17
**following**
40:15 65:3 66:1
92:13
**follows**
5:8 41:16
**follow-up**
71:19
**food**
15:1,1
**footage**
90:6
**force**
53:5
**foregoing**
94:2 95:4,8
**foreign**
35:16 71:8
**form**
12:5,9 35:23 36:3,21
42:3 58:12 84:7
**former**
64:9 91:16
**forth**
9:14 25:18
**forward**
75:22,24
**foster**
24:19
**found**



33:20 52:8 54:7
89:21
**four**
10:9 34:19 74:25
**frame**
18:15 21:18 23:1
44:17 49:22 51:14
**free**
7:8
**friend**
48:19 51:7 52:10,13
**friends**
17:8 25:23,24 26:9
47:22 51:13 91:19
**from**
11:6 14:16 18:1
25:25 28:20 29:7,13
32:6,13 35:15 36:20
37:5 38:17 40:15
41:16 42:1 44:10
47:17,18,19,25 48:1
49:4 52:16 58:5,16
59:8,9 64:20 67:20
68:22 69:12,17
70:17 73:15 75:7,22
76:8,23 77:14 80:9
81:13,18 82:4 87:4
88:6 89:23
**full**
7:12 9:10 11:8,9,10
11:14 31:4 53:17
93:2 95:9
**fullest**
81:6
**full-time**
14:22 23:11
**fun**
47:13,13,14 48:21
57:5
**funny**
68:3
**further**
21:8 85:5 86:24
92:10 95:19

——————————
**G**
——————————

**G**
5:3
**gain**
37:4
**gastrointestinal**
73:17
**gathering**
60:13
**gave**
50:16 80:11,20
**gears**
24:23 28:8
**gender**
36:7,11 39:6 90:2
**genders**
36:13
**general**
74:10 76:20,21
**generations**
24:16
**germaphobe**
16:12
**get**
5:10 7:1 10:6 12:25
13:8,13,16 14:10
19:2 22:13,24 24:25
28:6 29:13 31:11
33:1 35:13,16 38:22
40:23 42:15 44:11
46:5,6 49:6 50:15
50:20 51:20,24
54:14 56:6 58:3
63:25 64:4,11 71:3
72:16 79:9 80:8
84:5 86:5 92:25
**gets**
47:22 48:24 56:10
**getting**
7:8 17:10 36:19
50:25 55:3 62:2
72:22 79:8 80:3
**GI**
73:16,18
**girlfriend**
26:18
**girls**

25:24 36:7,10,15
37:1,11,17,23 38:20
39:3,13 54:7 55:6
63:24 66:25 68:17
74:5,10 88:4
**give**
30:22 31:13 33:4
42:17 51:10 60:9
73:8 76:20 85:12
**given**
32:10 39:1 60:3
**glad**
54:9
**glasses**
31:11 33:2
**go**
6:7 7:3,4 8:9 11:7
12:9 18:10 19:1
23:20 25:18 31:1,11
32:18 33:1,9 34:12
36:8 38:6,22 40:8
41:7 43:2 47:14,25
48:9 54:10,17 57:3
57:5,5 69:15 70:16
72:23 73:16 77:12
80:7,21 81:16 82:16
85:2 88:13 90:18
91:1
**God**
35:15 48:10 89:16
**goes**
8:13 87:21
**going**
6:10,11 7:10 17:25
18:17 20:14 23:2,21
24:23 27:25 28:8
29:12 30:4,6,12,22
31:10,12 32:4 34:20
35:19 37:13 38:16
40:6 41:15 42:25
43:8,12 46:5,13
47:25,25 48:8,10
49:1,9 50:19 51:25
52:20 54:10 55:25
57:2,20,21 58:3
59:9 71:17,18 72:21

75:22 77:21,22
80:20,21 82:19 85:7
86:9 88:11 90:3
**gone**
29:9 70:18
**good**
5:4 12:23 17:6 38:1,2
45:24 49:2,15,20
69:2,4 70:7 72:22
**goodness**
9:22 17:21
**gosh**
15:14
**got**
8:21 9:2,23,23 10:1
11:23 12:25 14:25
17:7 21:3,9 22:18
38:25 47:2 50:23,24
51:22 52:21 57:4
62:9 64:20
**gotten**
17:6
**grab**
47:7
**grade**
25:2,4,6,16 75:7,20
76:8
**graduated**
23:17
**grandmother**
29:10
**grasp**
75:14
**gravitated**
23:8
**great**
32:2 48:12,13 64:13
75:11,16 77:3 79:8
**greatly**
80:13
**ground**
6:8
**group**
19:6 26:9 28:25
29:20 32:6,7,13,14
35:1,3,4 40:9 48:10



MAGNA
LEGAL SERVICES

48:12,13,13,15
66:11,19 67:4,19,23
68:24 70:12 82:21
87:1
**groups**
32:11 46:12 67:10
72:14 88:4
**grow**
23:13
**growing**
15:3
**guard**
37:18,24 68:15 70:20
70:23 71:4
**guards**
71:3,11 74:3
**guess**
21:4 26:7 27:6 74:9
**guys**
29:5 50:20 67:16,24
**gynecology**
65:21 72:12 73:19

---

**H**

**had**
8:5 10:14,17 11:8,9
11:12 14:15,16
15:16 17:1 18:24
21:1 22:4,11 25:23
26:8,10,12 29:9,15
29:15,16,20 31:16
34:2,5 36:25 37:10
37:10,13,14 38:10
39:9 41:6 42:13,15
43:1,2 46:3,15 48:1
48:14,15 49:4,25
51:11,22,25 52:1,9
52:11 53:19,25 55:5
55:25 57:9,18,23
59:17,25 60:3 61:15
61:17 63:12 64:2,8
64:13,14 67:13,15
68:8 69:10,10 70:16
70:17 71:10,12 74:1
75:4,23 76:10 77:12
77:16,18 79:19,22

79:23 80:2,5,13
81:5 82:23 83:15
90:18,19 91:19,20
92:19
**hadn't**
9:13
**hallway**
70:23 82:4,9
**hallways**
70:14 82:12
**hammering**
41:11
**hand**
47:7,16 48:17 86:20
**handled**
10:15 58:4 61:16,18
89:10,12,12
**handling**
60:8 62:25
**hands-on**
32:2
**hang**
82:13 87:23
**happen**
20:17 35:12 40:9
55:24 58:10 63:6,20
**happened**
18:24 21:9,19 23:3
46:4,7 49:25 51:17
52:5 53:19 54:16
57:1 60:3 62:11
63:23 64:21,22 68:8
90:4,7 91:5
**happening**
63:1 68:22
**happiest**
9:15
**happy**
6:17,17
**hard**
21:25 22:25 33:4
42:17 53:1 77:11
**harder**
13:8
**hardly**
22:23 52:25

**harping**
39:19
**Harrisburg**
3:15
**has**
6:6 12:3,12 20:24
27:24 31:21 41:13
51:4 61:7 72:11,18
72:24 73:4,5,16,18
73:20 75:19 78:9
79:24 80:1 83:6
**hasn't**
17:16
**haven't**
6:16 28:1 90:5 91:8
91:10
**having**
5:7 17:12 22:7 25:21
27:25 28:3,5 33:4
33:25 45:24 47:13
47:13,23 48:21 49:2
62:20 67:1 68:15,17
70:14,22 73:18 88:4
88:21
**he**
10:24 11:11,15 16:19
23:5 24:18 29:15,16
29:20,22 47:4,6,16
48:8,9,15,15,16
50:22 51:3,4,4,5,6
53:25 54:2,5,6,7,8,9
54:13,13,14,18,21
67:3,5,5,5,7,13,13
67:15,16,18,22,23
68:4,5,5,8,23 79:9
79:25 80:1,1,25
81:1,5,12,12,12,14
81:17,22,22,22,24
82:15,18,21 86:10
87:20,20,21,25,25
89:12
**head**
6:22 11:2 17:21,23
18:5 32:22 41:11
62:17 65:6,16 66:8
69:11 72:16 73:17

76:5,11,18 89:17
90:11,25
**health**
15:11 16:3 24:22
42:15,21 72:10
**healthy**
17:7
**hear**
20:13 48:7 70:3
80:16 92:15
**heard**
20:24 35:13 47:24
48:1 49:4 63:21
64:14 91:14 95:10
**heart**
9:11
**help**
15:19 21:14 52:18
69:9,12 84:21
**helped**
19:8 50:25
**helping**
81:6
**helps**
31:7
**here**
14:11 15:2 20:21,22
21:17 23:10 24:2,5
30:24 32:5,25 47:2
50:20 51:5 53:11,13
54:10,11 62:1 63:14
66:9 68:2 71:19
78:15 85:7 89:3
91:4
**hereby**
95:3
**herein**
86:12
**hereto**
95:15
**herniation**
19:20
**Hers**
20:9
**herself**
14:7 23:15



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 12

**hey**
47:18,19 53:13
**he's**
10:23 23:7 48:10,11
54:15 68:1,2 91:16
**hi**
5:18
**high**
13:13,24 14:3 25:14
25:22,25 26:3 39:7
39:8 44:12,24 68:23
75:8 91:14
**highlight**
86:9
**highlighted**
34:23
**highly**
15:18 44:2
**HILL**
3:3
**him**
9:1,21 10:1 11:17
26:10 47:17,18,18
48:18 51:2,11,22
54:14 60:9 79:25
80:10,11 83:11
86:20 89:14 91:17
91:21,24
**hire**
58:6
**hired**
14:25
**his**
1:4 2:4 9:19 18:5
24:19,19,21 26:12
26:16 54:8,9 55:1,2
58:4 63:4,14 67:15
67:23 68:24 79:8
80:8 81:5,8 82:11
82:12,17 83:6 91:22
**history**
14:8 20:4 24:13 26:3
**hit**
30:19
**hold**
25:10 44:11 47:16

48:17 86:20 92:7
**home**
16:9 40:23 44:14,25
49:23 50:25 56:17
56:20,21 57:5,8
61:25 65:3 74:13
87:12
**honest**
10:2 39:11 78:2,10
89:16
**honestly**
19:16 89:13
**hope**
63:19
**Hopefully**
30:6
**horrible**
20:17 60:2
**horror**
63:21
**hospital**
5:25 50:13,17 51:7
52:19 71:3,6 91:6
**hospitals**
51:24,24
**hotel**
46:22 55:7 57:4 67:1
67:10 70:23 71:7,10
71:14 74:2,11 82:2
87:19
**hour**
19:4 49:10
**hours**
12:20 53:15
**house**
16:12 26:16 84:4,16
**how**
5:24 6:7 7:24 10:12
10:22 11:6,9 19:12
19:18 21:13,16 22:6
25:13 28:18 29:23
31:4 33:3 37:9 38:1
40:3 44:13 46:23
47:10,11,11 48:23
50:2 53:18 57:2,16
72:18 73:4 89:10,12

**huge**
12:12 13:2 38:24,24
68:11
**hugest**
37:12,15
**hugged**
76:16
**hundred**
38:8
**hurt**
63:25
**husband**
16:22
**husband's**
8:24
**hyperbolic**
37:20

---

**I**

**iCloud**
59:19
**idea**
10:15 49:15 55:25
60:23 75:6 76:21
87:20
**ideation**
20:5,9,23
**identification**
30:9 85:4
**if**
6:16,20,25 7:2,6,9
10:4 17:25 18:13
19:19,23 20:6,22
21:18,20,21 23:12
23:19 25:19 27:9
28:11,22 30:24 31:7
31:10,14 33:1 34:5
34:22 37:7,8,23
40:19,21 41:21 43:4
44:7,10,14,19 45:21
46:17 47:1,22 50:8
55:9,11,13,21,22,23
55:23 58:7 60:23
61:4,5,24 62:16
63:5,6,12 64:25
65:10 67:12,15,24

68:3,7,12 70:17,20
70:25 72:16 77:4
78:8,14,22 79:25
80:21 81:16,19
82:23 83:15 85:1,19
87:7,21 89:21 91:20
**illness**
24:13,17
**imagine**
66:24
**iMessage**
43:22
**iMessaged**
43:21
**immediately**
50:22 54:25
**impair**
78:10
**important**
64:5
**incident**
6:5 21:19,21,21 22:2
22:2,7 26:23 27:23
46:5 49:22,25 50:12
51:11 52:7 53:22
56:13 57:12 65:3
66:1 67:11,13 69:25
79:16 82:3 88:23
91:4,25
**include**
88:20
**included**
93:7
**incorporated**
86:12
**incorrect**
62:18
**incorrectly**
22:1
**INDEX**
4:1
**individual**
15:7 45:25
**individuals**
91:2
**information**



Exhibit F, Plaintiff 13

10:6 29:4,13 34:1 38:25 42:20 50:21 54:5,6,18 60:13 64:6 69:17 72:16 85:17 86:14 87:4 88:6

**initial**
22:24 50:11

**injuries**
65:25

**injury**
42:2

**input**
80:8

**insight**
16:4

**Instagram**
44:2 74:19

**instance**
71:3

**Institute**
4:11 85:9

**instrument**
13:20

**intend**
6:19

**intense**
21:2

**intensive**
18:14 20:12 42:16

**intentions**
82:11,12

**interaction**
46:3 86:10

**interested**
95:21

**International**
1:10 2:10 3:7 4:12 5:20 66:15 85:11

**Internet**
64:19

**Interrogatories**
4:10 85:2,9

**Interrogatory**
86:4 88:2,16 91:3

**interrupt**

18:22 49:7 78:16

**into**
36:8 37:13 41:6,11 42:16 49:6 57:21 64:4 70:12 79:8,9 79:11 95:12

**involved**
13:14,16 25:18 28:15 32:11 53:22 63:3,12 69:5 81:8 88:20

**involvement**
57:25 81:9

**involving**
49:25 63:21

**in-home**
13:24

**iPhone**
59:15,17

**is**
5:4,5,18 6:20 7:2,14 7:22 8:12,16 9:6 10:17,22 11:1 12:21 14:20,22,24,25 15:24 17:15 18:1 19:12 20:14 23:7 25:7,17 26:8,24 27:2,8,11,11,12,19 28:11 31:1 37:2 41:1,6,13 42:12,17 42:18 47:11 49:13 50:19 54:10,11,15 55:2,22 58:17 59:17 59:24 60:6,13,15,19 64:4,4,5,11 67:20 67:22 68:10,17 70:2 70:9,15,23 71:17 72:7,20 75:2,11,16 77:1,22 79:6,7,9,13 82:3,6 85:14,14 86:5,11,12 90:23 93:3 94:2

**issue**
38:24 72:21 90:16

**issues**
11:13,17 13:4 14:3 15:4,5 16:5,6 17:1

17:12 22:5 28:1,4,6 41:10 42:21,21 47:21 61:17 72:8 73:18 80:13

**itemized**
88:17

**itinerary**
34:7

**its**
66:6

**it's**
7:1,18 16:6,8 18:23 21:25 22:24 23:12 27:3,4,17 28:5,5 30:13,16 40:4 44:10 62:15 63:23 69:21 71:1,4 72:21,22,22 73:15 77:12,23 80:21 93:9

**I'd**
17:4 23:3 90:25

**I'll**
6:13 7:9 47:22 48:22 48:22 56:22

**I'm**
6:6,11,17 7:8,21 10:5 10:6 11:5 12:1 13:12 15:22 17:25 19:15 20:13,21 22:16,23 23:13 24:5 24:6,23 27:19 28:8 28:9,22 30:4,6,7,12 30:22 31:10 32:1,2 32:23 34:10,19,20 37:22 38:9 39:22 41:21,22 42:25 43:1 43:1,2 45:13 46:5,5 47:9,12,14 48:11,20 48:20 51:5 53:11,13 54:9,16,22 55:23 56:8 59:5 67:22 71:18 75:14 78:16 80:14,21 83:3,19 86:5,9,16,17 88:11 88:16 90:4,7,25 92:8,9

**I've**
16:22 18:6 20:16,23 20:25 35:12 38:14 41:5 61:17 63:20 71:12 80:2 91:7,12 91:13

---

**J**

**Jackson**
1:20 2:19 5:5 93:1 95:3,25

**Jennifer**
54:23 66:15,19,22 83:15 84:1

**jewelry**
12:21

**JOAQUIN**
95:2

**job**
1:22 11:21,23 81:5 82:17

**jog**
17:25

**Johnny**
91:8

**journaling**
17:10 60:19,22 61:5 61:6

**journals**
61:9,13,14,22 84:3,6 84:18,22

**judged**
19:12

**judgment**
70:8,11

**judicial**
58:1

**Julia**
18:3 52:10,13,17 53:14 91:5,13,13

**June**
21:20 43:9

**junior**
14:18,21 44:12,23

---

**K**



**Kara**
3:8 5:18 62:3 63:10
84:25 93:4
**Kayden**
26:15
**keep**
6:20 7:10 16:8 23:20
39:19 41:10 43:15
54:16,19
**keeping**
82:18
**kept**
47:16 48:16 61:24
64:24
**kicked**
35:16
**kids**
67:7,14 82:21
**kill**
20:8
**kind**
6:4 9:11 23:8 24:17
39:5,14 42:1,20
43:24 46:17 47:2
65:20 70:9 80:21
82:12
**KM-DFB**
1:7 2:7
**knew**
22:11 32:13 41:11
64:16
**knowing**
38:6 82:8
**knowledge**
26:22 58:14 61:15,20
61:21 71:16
**known**
70:16 75:4
**knows**
40:2 54:13 68:23
**kthoravldsen@law...**
3:11

————— **L** —————
**lack**
14:13 70:10,10

**lady**
22:18
**landed**
45:9 46:10,20
**large**
86:6
**last**
11:9 14:10,25 23:17
25:13 26:14,15
47:24 48:1 49:4
73:5,21 88:2 92:13
**later**
21:7 52:8 64:7 67:6
67:13 82:13
**law**
8:23 13:17 55:2
**Lawrence**
91:16 92:14,16
**laws**
94:1
**LAWSON**
3:9
**lawsuit**
28:15 59:1 61:10,13
62:7 63:4,8,13,17
66:9,13,23 80:23
88:19 90:7
**lawsuits**
64:20
**lawyer**
58:6
**lawyers**
55:3 58:4
**layout**
74:2 82:3
**lead**
56:2
**leader**
29:1,20 35:1 48:19
66:11,19 67:19
**leader's**
35:3
**leading**
21:11 72:25
**learn**
23:12 57:14,16

**learned**
80:9
**learning**
15:4,4
**least**
68:21 74:25 80:25
85:22
**leave**
16:12 19:9 40:9
88:22
**leaving**
90:1
**led**
38:5
**left**
16:22
**legal**
11:10,14
**legible**
86:6
**Lenzi**
7:14,16
**lessons**
13:23
**let**
6:12,13,17,17,25
10:5 16:23 19:16,25
20:2 23:16 38:6
40:18 48:22 50:13
51:3 53:11 56:2,2
68:16 70:15 83:10
**level**
36:10 40:13,14
**levels**
37:2 40:3
**LF**
30:14 31:21
**liability**
42:1
**liaison**
48:2 50:6
**liar**
56:9
**license**
5:5
**life**

17:8 19:18 24:19
26:25 47:24 53:12
64:1 71:1 75:14
76:17 77:20 79:13
**lifetime**
57:3
**light**
78:8
**like**
6:21 8:13 12:11,17
12:23 13:13,21 15:4
15:5 17:3 19:2,5,6
20:13,20 22:9 23:13
23:16 24:6,8,14
25:2,4,22 26:1,25
27:21 31:6,16 32:13
34:17 36:6 39:5,7
42:24 43:19,24
44:14 46:1,2 47:5,9
47:12,14,17,21,23
48:11,12,12,20,23
49:21,22 50:18 53:2
53:3,11,11,13 54:15
55:22 56:20 57:2
62:19 63:21 64:21
65:17 68:3 69:2
71:15 77:24,24
80:15 85:1,13 87:22
87:23 88:7
**liked**
67:7
**limited**
3:7 4:12 5:21 66:15
75:1 85:11
**limits**
37:25
**Lincoln**
10:21,22 23:7
**line**
88:2
**lined**
28:3
**links**
38:13
**list**
17:22 20:23



MAGNA
LEGAL SERVICES

| | | | |
|---|---|---|---|
| **listed** 91:3 | **looking** 24:5 30:7 31:25 61:12 70:5 86:1 | **Magna** 93:6,7 | **Massachusetts** 3:10 |
| **listened** 39:9 | **looks** 31:16,19 | **maintained** 79:7 | **massive** 60:1 |
| **literally** 45:17 | **loosely** 26:8 | **make** 21:5 25:12 31:2,4 41:7 50:15 51:15 53:10 54:20 67:7 69:10 83:5,11 86:21 87:17,23 | **materials** 69:6 |
| **little** 12:14 13:18 15:1 23:6 34:15 48:3 50:16 52:10,11 53:19 54:19 74:18 75:5 77:14,23 82:13 86:23 87:16 | **losing** 54:22 | | **maternal** 24:14 |
| | **loss** 88:21 | | **matter** 38:1,1 76:24 |
| **live** 9:8,10 10:24 | **lost** 22:8 38:9 54:8 66:3 90:19 | **makes** 19:13 56:25 69:24 81:9 93:8 | **matured** 23:12 |
| **lived** 16:20,21 | **lot** 12:25 13:8 16:9,19 19:19 20:11 25:23 27:3 28:1,5 29:18 38:3 39:8 42:13,16 50:6 52:4 63:2 69:14 72:4 78:24 90:3,8 | **making** 37:24 | **may** 35:1 71:19 76:15 85:1 92:7 |
| **living** 7:20 9:4 16:16,16 23:15 | | **male** 18:4,6 | **maybe** 20:16 34:4 48:20 |
| **LLC** 3:14 | | **malnourished** 22:13 | **MCNEES** 3:14 |
| **lobby** 67:6,10,14,15,19,25 68:4,22 81:1,20,25 82:4,9 87:17 | **lots** 20:17 64:3 76:10 | **man** 23:4 | **me** 6:12,17 7:9 8:22 9:12 9:25 10:5 11:3 13:6 16:13,13,21,23,24 17:22 20:12 21:25 22:10,15,20 23:16 26:13 27:6 30:5 33:4 37:10,14 38:24 42:17 44:10 46:24 46:25 47:2,4,8,18 47:19 48:2 50:13,14 50:16 52:24 53:14 54:13,15,16,18 56:4 57:3 61:1,19 62:17 64:6,18 67:13 68:5 72:17 76:20 77:11 78:13 79:18 80:1,11 80:22 85:21 86:17 87:20 88:17 91:11 95:4,10 |
| | **love** 35:15 | **manager** 29:7 37:9 64:9 | |
| **log** 26:2 92:24 | **loved** 8:7 12:22 13:25 | **Mancini** 91:16 92:14,16 | |
| **Logan** 8:25 | **lower** 19:20 | **mandated** 22:15,16 | |
| **Logan's** 11:3,4 | **L████'s** 9:16 11:6 12:12 16:5 24:14,24 26:25 29:9 32:6 42:6 51:7 54:8 64:22 67:4,19 72:6 91:14,16 92:15 | **many** 5:24 20:17 29:23 62:17 63:1 73:4 75:23 | |
| **logs** 59:4 | | **mark** 30:12 85:8 | |
| **long** 7:24 11:9 25:13 31:17 45:14 46:3 62:15 72:18 | **L-E-N-Z-I** 7:18 | **marked** 30:8 85:3 | |
| | **L.F** 1:5,6 2:5,6 | **Market** 3:4 | |
| **long-term** 13:19 | | **Marones** 91:8 | **mean** 16:2 18:22 31:12 40:14 45:13,17,19 61:5 62:5 66:12 74:8 75:19 77:1 78:16 81:9,14 87:18 90:5 |
| **look** 14:5 26:1,2 31:14 41:2 44:10 47:12 56:8 59:7 61:9 | **——— M ———** | **married** 8:21,22,23 9:1,2,16 9:21,24 10:1 | |
| | **made** 16:14 35:17 48:16 53:25 55:5 66:6 68:11 80:25 86:25 | **Martha** 29:10 | |
| **looked** 31:14,18 | | **Mary** 1:20 2:18 5:5 95:3,25 | |



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff 16

**meant**
24:14 30:19 56:1,2
86:19
**media**
25:9,25 26:3 43:25
44:8 69:17
**medical**
7:23 11:15 27:6,16
27:17 32:2 42:21
65:2,17,19 72:9,11
88:22 90:9
**medication**
17:15,16 73:20
**medications**
42:21 43:4
**meet**
29:15
**meeting**
41:22 80:3
**meetings**
29:16,23,25 32:3
34:14 38:15 39:17
82:25,25 88:8
**Meg**
50:8,24
**members**
35:4
**memory**
10:7 17:25 32:5
42:12
**mental**
15:11 16:3 24:13,17
24:22 42:15,21 72:9
**mentally**
53:6
**mention**
47:15
**mentioned**
7:19 16:25 17:1
38:10 46:13,15
48:15 75:1
**message**
25:12 44:4,8,9,13
45:21
**messages**
46:18 59:7,22 60:4,9

69:12 74:23
**messaging**
26:1,3 43:24 44:1
45:19
**messed**
34:16 42:15
**messing**
34:20
**met**
23:14 24:19 26:9,10
26:13,16 46:10,11
46:11,11,12,20 47:4
48:8 91:12,13,15,18
91:20,21 92:15,19
95:18
**mid**
25:4
**middle**
1:2 2:2 13:13
**might**
20:1 32:14 38:11
42:2 44:2
**mind**
23:19 54:8,22 55:20
**mine**
79:7,9
**minor**
1:5,6 2:5,6
**minute**
22:22 33:10
**minutes**
49:14 80:15
**missed**
14:12 48:5
**missing**
14:11
**mistake**
60:2
**mixed**
39:6
**mom**
47:8 48:12 53:3 56:4
**moment**
9:15 28:6 33:4 38:10
83:10 88:11
**money**

88:21
**monitor**
74:17,19,20,21,23
**monitored**
75:5
**monitoring**
25:15
**month**
17:11 65:11,12 90:19
**months**
17:18 19:7 72:22
73:5,21 90:21
**monumental**
76:17,20
**Moorpark**
14:21
**more**
9:12 23:9 27:3 33:16
34:18,19 36:14 38:3
54:14,20 64:11
81:23 82:1 90:13
93:8
**Morgan**
1:5,14 2:5,16 5:6
7:14,20 23:24 30:11
33:1 49:23 54:15
83:5 85:12 92:24
94:8
**morning**
5:4
**mortified**
53:2
**most**
18:4 24:9
**mostly**
44:19
**mother**
12:4,7,15 29:10
38:21 42:15 54:11
63:4,14 66:24 81:8
81:8
**mother's**
24:20
**mother-in-law**
64:9,14
**mouse**

30:24
**move**
11:19 19:19,21 23:14
**moved**
11:21,23 23:4,10
**moving**
75:24
**Mr**
4:5 28:24 29:14 30:1
32:18 34:15 37:5
50:14,23 51:1,10
55:9 62:3,7 67:3,9
68:20,21 72:1 80:17
80:19,24 81:10,19
82:20,23 83:6,14
84:1,9,24 87:17
88:9 92:7,12,21
93:12
**Mrs**
54:23 55:11 66:11
68:19
**Ms**
4:4 5:10,12,15,17
12:5,8,16 23:24
24:4,7 30:4,10 33:1
33:5,9,12 35:23,24
36:3,5,21,24 42:3,5
44:22,23,25 45:2
49:5,8,9,11,12,13
49:15,16,17,18,19
58:12,15 62:4,8
63:7,11 68:9 72:2
80:14,18,24 83:5,10
84:7 85:1,6,20,22
85:24 86:1,3,7,8
88:13,15 89:1,3,5
92:3,5,9,24 93:1,5
93:11
**much**
13:15 19:8 23:6
25:20 38:25 41:13
46:3 47:13,13 48:21
53:16,19,19 54:13
54:14 68:10 77:13
**multiple**
68:8 77:18



Exhibit F, Plaintiff Page 17

**museum**
47:16 48:9
**my**
5:4,5,18 6:12,14 7:7
7:9,14 9:22 12:4,7
12:13,14,15 13:6
15:14 16:18,22
17:21,21,23 18:5
19:20 20:10 23:7
24:2,18,20 26:22
29:7,7 30:6,11
31:11,25 32:22
35:12 36:9,14 37:9
37:12 38:9 40:3
41:1 42:12,15 47:10
47:22 48:10 53:6
54:19,22 58:14 59:4
60:1 61:15,20 62:16
64:14 65:6,16 66:3
66:8 68:4 69:11
70:4 71:1,2,6,16,18
72:2,15 73:17 75:11
75:12 76:4,11,18
79:6 80:21 81:7
85:7,13 87:23 88:12
89:17 90:11,25 95:8
**myself**
8:6 9:9,12 20:8 38:19
50:15 51:21 68:8

---

**N**

**N**
3:1 5:3
**name**
5:4,18 7:12 8:24 9:19
17:24 18:5,7 50:5,7
**named**
66:10 95:22
**names**
72:14 73:3
**name's**
72:2
**natural**
1:4,5 2:4,5 49:20
**naturally**
17:6

**nature**
15:23 42:22 77:15
**navigate**
69:9
**navigating**
86:3
**necessary**
79:14 80:7
**need**
6:25 19:14,24 22:22
24:10 31:2,10 33:15
34:17,22 39:19
50:20 53:13 54:18
70:25 93:3,12
**needed**
51:25 64:25 72:16
**negative**
41:4
**neighbor**
38:6
**nervous**
12:25 48:21
**never**
11:10,11,12 14:6
16:9 20:7,24,25
21:11 24:19 26:10
26:13 27:3 36:11
38:6 41:4 56:21
61:17 63:20 67:17
70:15 71:12,14,14
78:14 80:1,13 91:12
91:13,15,20,24
92:15,19
**new**
23:14 72:20,25
**next**
6:14 38:6 51:17 53:7
53:15 54:8 56:3
67:1 68:17 72:12
**nice**
48:11 51:7
**night**
52:1,2,8,8,9,16 53:9
57:12 58:18 67:11
67:12 68:7 81:20,21
**nightly**

35:1
**nights**
81:22
**nine**
10:23
**ninth**
25:16,17
**nobody's**
16:21
**Nodding**
59:23
**noises**
6:21
**nonchalantness**
54:12
**none**
52:18 72:7
**nonpayment**
90:13
**nor**
95:21
**noted**
5:19
**notes**
60:25 62:19 80:21
**nothing**
60:1,2 73:24,25
76:12 77:17 88:3
95:5
**notification**
95:14
**notified**
49:24
**now**
9:13 12:2 17:5,8,9,13
25:20 26:15 27:4
31:1,25 33:17 34:10
36:25 43:8 49:12,13
50:20 53:3,4 54:17
62:17 63:21 64:4,5
65:7,15 70:5 71:20
75:12,16 84:25
89:17 93:13
**number**
4:8 5:5 31:21
**NURICK**

3:14
**nursing**
8:13

---

**O**

**O**
5:3
**Object**
36:3
**objection**
12:5,8 35:23 36:21
42:3 58:12 84:7
**observed**
23:1
**obviously**
51:6
**OB/GYNs**
27:25
**occurred**
62:13
**occurring**
73:6
**October**
7:25
**off**
7:3,4 13:6 16:18 17:4
17:21,23 18:5 22:19
23:5 25:10 32:22
33:6,9 35:16 38:22
48:19 51:23 53:9
61:3,7 62:16 65:6
65:15 66:8 69:11
72:15,21 73:15,17
76:4,11,18 80:21
85:24,25 88:11
89:16 90:11,25
91:14 92:24
**office**
80:16
**officers**
52:2
**often**
44:13
**oh**
6:2 9:22 11:22 12:11
15:14 17:21 23:3



Exhibit F, Plaintiff

Page 18

29:15 31:1,8 32:1
38:9 48:10 89:10
**okay**
 5:15 6:14,23,24 7:4,5
 7:10,11,12,19 8:11
 8:19,24 10:12 12:1
 12:11 14:8 15:3
 16:23 17:14 18:9,20
 18:23 20:3 21:24
 22:23 23:20,23 25:7
 28:11 29:11 31:3,24
 32:13,17 33:8,18,25
 34:3,17 39:18 40:10
 43:7 47:9,22 48:11
 49:16,18,20 50:13
 51:4,16,17 53:13
 56:25 62:7 63:16
 66:25 70:2 72:18
 73:8,14,20 74:1
 75:10,14,19 76:3,23
 77:15 78:8 80:5
 81:24 83:9,12,13
 84:15 92:2,21
**old**
 10:9,22 59:25
**Omeprazole**
 73:22
**once**
 5:25 17:11 20:7
 44:20 85:11
**one**
 9:17 13:25 15:21
 17:3 18:2 19:1 20:1
 20:19 25:5,8 30:17
 33:4 34:14 37:6,12
 37:15 38:8,17,18
 39:16 41:22 47:3,15
 50:20 51:22 55:18
 56:22 58:18 60:18
 62:1 63:13,25 65:12
 66:10 71:7 72:12,12
 73:7 79:13 82:25
 83:7,17 84:5 86:2,5
 88:5,11 90:13 91:18
 92:7
**ones**

31:18 38:2,2,3
**one-on-one**
 30:2 82:25
**ongoing**
 72:21
**online**
 16:9 24:24 25:22
 26:10,17 42:11
 91:19
**only**
 7:2 10:17 14:19 45:8
 45:11 83:7 87:25
 92:21
**oOo**
 4:6
**open**
 21:1 75:23 78:2,5,10
 78:19 79:10
**opened**
 22:20
**openly**
 27:4
**opportunity**
 31:13
**opposite**
 35:4 90:2
**order**
 37:25
**original**
 95:16
**ornery**
 13:7
**other**
 5:13 6:18,20 10:20
 12:1,2,3,15 21:1
 30:1,3 36:13 37:13
 38:19 43:24 58:24
 60:15 64:17,21
 65:13 67:1 68:17
 72:24 81:21,23
 86:19 90:22
**otherwise**
 5:13 73:25
**other's**
 36:16
**ounce**

22:9
**our**
 10:15 38:20 39:16,20
 47:12,23 48:13 50:6
 54:17 74:14
**out**
 11:17 19:17 22:13
 27:4 29:9 30:18,21
 34:4,17 41:7 42:14
 44:7 46:17 47:5
 48:3,7,22 52:8
 53:15 57:20 63:22
 67:7,14,16,20,25,25
 73:19 78:13 82:13
 82:14,18 84:18
 87:18,19,23 89:7
**outcome**
 95:21
**outpatient**
 18:15
**outside**
 17:8 18:7 83:24
**outstanding**
 17:13
**out-of-pocket**
 90:22
**over**
 6:8,18 16:24 30:22
 32:18 38:16 50:22
 51:2 53:20 54:21
 58:4 73:5 76:25
 77:1,2,5 84:4 85:2
**overachiever**
 41:14
**overall**
 54:12
**overcome**
 13:3
**overdramatic**
 71:4
**overnight**
 56:3 71:1
**overreact**
 20:16
**overseas**
 42:25

**overwhelmed**
 48:24
**own**
 29:7 35:2
**o0o**
 1:3 2:3

---

**P**

---

**P**
 3:1,1 5:3
**Pacific**
 2:18
**pad**
 30:25
**page**
 4:3,8 6:8 31:4 77:5,6
**pages**
 30:24 86:5
**paid**
 89:9,14
**Palmer**
 7:14
**pamphlets**
 29:5
**paper**
 42:10 61:22
**paperwork**
 42:7
**parent**
 20:12 40:3,5 81:16
**parenting**
 79:9
**parents**
 10:15 19:5,6,18
 24:21 26:12,16 30:2
 30:3 37:13 38:19
 71:9 74:11 75:4
 91:23
**Paris**
 58:18
**part**
 30:17 34:23 38:5
 48:5,7 65:9 81:8
**participants**
 40:22
**participate**



MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff   Page 19

18:14 87:14
**particular**
61:6,7 86:1
**parties**
2:16 95:15,20
**party**
35:14
**part-time**
9:10
**passport**
51:21
**Passwords**
25:18
**past**
8:2 21:8 23:15 29:8
61:8 75:25
**paternal**
24:14
**Pause**
33:11 88:14
**pay**
89:7
**paying**
90:17
**pediatric**
20:12
**pediatrician**
65:8,10,13
**penalty**
94:1
**pending**
7:4
**Pennsylvania**
1:2 2:2 3:4,15 62:24
83:16
**people**
12:11 23:14 39:9
41:2,7 42:14 46:10
46:12 51:23 52:19
63:22 64:3,10,17,22
87:2,11,13,18,18
91:11
**people's**
64:20 71:5,8
**percent**
27:11 38:4,8 41:12

42:25 56:24 57:23
69:22 70:13,15,16
71:1
**perception**
21:6
**perform**
61:21
**period**
14:7 15:23 16:15
59:8 72:25 77:20
**perjury**
94:1
**permission**
24:1
**permitted**
35:4
**person**
26:10 28:25 37:6
44:19 82:16 83:8
95:11
**personal**
27:8,19
**personality**
12:17 22:9
**personalized**
33:21 34:1
**personally**
34:12 42:6 69:15
**pertinent**
95:13
**pet**
15:1,1
**Philadelphia**
3:4
**phone**
25:10,12,12,15 26:2
34:8 43:9,16 44:18
44:20 45:20,22 50:3
50:11 51:2,18 59:2
59:2 60:25 69:9,13
91:19,22 92:19
**phonetic**
29:10
**photos**
45:25
**physically**

81:20
**physicians**
72:9,9,11
**piano**
13:22
**picked**
70:6
**picture**
12:20 44:3
**pictures**
46:25 47:1,1 60:2
**pieces**
46:15
**pigtails**
12:22
**Pine**
3:15
**place**
18:17 82:3 95:7
**placed**
73:20
**places**
32:5
**plaintiffs**
1:7 2:7 3:2 4:10 85:8
88:18
**plan**
15:8 17:6 50:25
67:16,24 73:10
**plane**
89:9
**planet**
70:2
**planning**
70:3
**plans**
20:24
**platform**
43:20
**play**
13:20
**please**
6:16 7:8,12 19:25
21:23 35:15 53:3,4
80:22 93:2,11
**pleaser**

41:7
**plethora**
28:4
**plug**
88:12
**pocket**
89:7
**point**
9:17 15:10,21 16:17
17:3 20:1 21:10
25:5 30:17 39:2
41:22 46:25 47:3,3
47:15 49:3,5,21
56:22 57:14 60:12
60:18 62:1,15,23
66:5 75:14,22 78:15
81:20 90:12
**points**
21:7 34:24
**police**
52:2 54:18 57:25
**policy**
36:7,15 39:25 40:21
**poor**
70:3,11
**poorly**
77:4
**portions**
34:24
**possibility**
32:10
**posted**
81:10
**potential**
39:14 40:18
**PowerPoint**
29:17
**practice**
13:22 39:5 70:24
72:14
**predecessor**
60:7
**prepare**
82:20
**prescription**
73:24,25



MAGNA
LEGAL SERVICES

**presence**
24:25
**presentation**
29:17
**presented**
82:21
**press**
55:16 56:4 62:23
**pressing**
52:3 56:1,2
**pretty**
11:13 21:1,1,2,3,7
22:20 23:10 43:2
**prevent**
67:20 68:22
**previous**
39:9
**primarily**
44:16,17
**princes**
12:21
**princess**
12:19
**principally**
83:25
**prior**
22:4 38:15 63:8
**probably**
16:4 23:4 25:14
30:17 38:13 88:7
**problem**
10:3 32:4 88:13
**problems**
41:8
**procedure**
95:14
**proceedings**
33:11 58:1 88:14
93:14 95:10
**proclivities**
75:7 76:8
**professional**
16:3
**program**
18:15 19:10
**progressing**

21:8
**promiscuous**
56:9
**pronouncing**
28:22
**proper**
42:17
**Propounded**
4:10 85:9
**protecting**
83:18,20,23
**provide**
7:12 8:6 42:20 54:5
59:2,11 62:10 69:19
85:17
**provided**
31:22 54:6 59:4
69:20 81:13,14
85:19 86:14
**provider**
65:5 72:23,24 73:8
**providers**
72:10,19,25 73:2,4
90:17
**provisions**
95:13
**psychiatrist**
65:18
**psycho**
54:10
**psychological**
65:2
**pull**
30:5 64:7 69:12
**pulled**
69:17
**purposes**
59:3
**push**
74:13
**pushes**
23:15
**pushy**
47:6
**put**
5:11 12:8 39:8,18,20

73:22
**putting**
68:1
**P.C**
3:3
**p.m**
93:14

_____
### Q
**quarantined**
15:18 16:7
**question**
6:12,14 7:4,7,9 10:4
12:9 23:25 36:14
37:7 38:16 63:8,9
63:10 77:5 80:23
83:6 85:14 92:8,13
92:21
**questions**
29:17 38:18,18 54:20
69:10 71:18,19 72:3
72:6 84:24 92:3,5
**quick**
8:6 23:19 33:2 80:14
**quickly**
22:21
**quote**
79:14 91:20
**quotes**
46:1
**quote/unquote**
56:8

_____
### R
**R**
3:1 5:3
**ramble**
46:17
**raped**
57:4
**rather**
41:9
**reach**
44:7
**reached**
29:9

**reaching**
63:22
**read**
5:12 31:8,10,12
33:15 35:5 76:23,25
77:1,2,5,5,25 87:23
**reading**
41:19 63:22 95:17
**really**
8:6 17:8 19:1 21:14
21:25 22:17,25 23:8
23:19 27:2,8 38:22
38:23 41:6 47:5,6
48:21 52:14,24 53:2
54:9
**reask**
63:10
**reason**
7:2 27:12 81:3,4
**rebellious**
74:11
**recall**
18:17 32:5,23 33:25
41:19 43:4,6 74:5
84:13
**recent**
17:19 18:4 64:11
**recently**
14:25 18:2
**recognize**
30:15
**recollection**
76:6 84:6
**recollections**
64:8 76:14
**record**
5:11 6:7 7:3,13,16
12:9 30:12 33:9
45:15 85:24,25
**records**
18:1 59:3 60:16
**refer**
21:20 28:11
**reference**
28:11 86:13
**referred**



Exhibit F, Plaintiff

Page 21

73:12,19
**referring**
21:12 38:12
**reflect**
24:22
**refund**
40:24 89:23
**rejection**
41:2
**related**
88:23
**relating**
95:14
**relationship**
69:1 75:11,16 78:3
78:11,21 79:6,6,7,8
79:11 92:20
**relationships**
12:3 25:22
**release**
41:17 42:1
**relevant**
46:19
**remember**
6:4 9:23 10:2 15:14
15:15 17:18,20 25:1
25:2,5 29:23 31:17
32:21 34:11 42:9,12
43:7 45:20 46:2,14
46:14,22 47:1,19
50:5,7,10 51:18,19
51:20,23 52:4 53:10
60:11 62:15 63:2
65:6,9,12,15 66:2
77:2 84:12 89:13,16
89:18 90:14
**remote**
1:14 2:16 5:1 85:12
**remotely**
2:17
**report**
95:9
**reported**
1:19 87:10
**reporter**
2:19 5:4 6:10 22:15

22:16 83:7 93:10
95:11
**represent**
31:20 72:2
**representative**
38:17
**representatives**
66:6
**reputable**
64:15
**requesting**
89:18
**research**
29:7,12,18 64:19,24
**reserve**
5:12
**reset**
60:1
**resize**
31:11
**respect**
14:4 35:1 40:3,13,15
69:23 76:7 82:2
84:3 90:9,17
**respiratory**
7:21 8:1,13 15:22
**response**
80:25 86:4
**Responses**
4:10 85:8
**responsible**
69:24 83:25
**rest**
39:18,21 50:25 92:25
**result**
36:19
**retrieval**
88:20
**retrieve**
89:6,15
**return**
58:21 89:19
**returned**
58:10 65:1
**review**
75:1,2

**reviews**
64:20
**ridiculous**
54:15
**ridiculously**
68:18
**riding**
49:2
**right**
8:17,18 9:6 11:1
15:14,17,24 17:13
23:3,18 25:10 28:8
36:1 37:2 47:14
48:3 49:17 53:3,4
54:8,17 58:17 60:20
62:17 64:4,5 65:6
65:15 67:1 68:24
72:15 80:18 84:25
89:3,17 91:4 93:12
**ring**
50:8
**road**
32:25 33:14,19,20
34:13 40:23 41:16
89:22
**rock**
70:13
**role**
79:18
**romantic**
26:25
**room**
35:2,5 37:19 38:7
46:22 54:8 57:5,12
57:20,21 67:20
70:19 84:10,14,19
90:1,2
**rooms**
36:8,16 67:1 82:4
87:19
**rule**
35:25 36:18,19 40:6
**rules**
6:9 32:18,24 33:14
33:18,19 34:12 40:3
40:5,10,15,22 41:3

41:16 57:20,22,24
87:2,7 89:22 90:1
95:13
**ruling**
39:7
**run**
6:8

---

**S**

**S**
3:1 5:3
**sad**
16:10 19:3
**safe**
50:19 52:15 53:2
**safety**
22:4 35:2 36:1 70:13
71:2 78:14 83:25
**said**
10:3 17:3 20:7 23:13
24:8 29:11 35:15
36:25 37:15 38:11
39:2 40:1,13 47:17
47:19,21 48:5,5,6
48:17 50:8,16 51:5
55:2,21 56:4,22,23
57:23 60:18,24 61:3
61:14 62:1,4,10
67:5,18,22,23 68:8
72:7 74:1,4 75:15
75:17 77:5,18 81:22
81:22 84:3 86:19
87:16 92:18 95:6,20
95:22
**same**
6:8,13 7:16 28:25
36:10,12 37:11,18
54:7 55:6 80:11,12
81:17 82:6 86:23
**SAN**
95:2
**sat**
19:21 69:14
**satisfied**
79:25
**saw**



MAGNA
LEGAL SERVICES

16:1 17:3 18:13 30:17 46:13,15 65:10,11 84:4,5

**say** 11:21 15:16,17 17:5 17:17 20:24 21:4,25 22:1 23:3,9 24:13 25:4 27:7 28:2,5 31:18 34:9,10 37:20 40:5 41:21 42:23,23 45:13,16,23 46:12 47:21 53:9,24 57:23 61:4 62:14,16 68:4 69:11,22 73:5 74:10 79:12,21 81:3 92:15

**saying** 13:10 22:25 61:1 67:9,21,22 68:2 74:6

**says** 6:11 33:14,18,21 34:25 61:18 86:9,23 88:3,19 91:16

**scared** 16:11 18:12 19:11 20:25 22:3 41:1 52:14,25 55:18,22 55:24 56:18

**scenario** 39:6

**school** 8:9 12:24 13:13,13 13:24 14:3,9,12,17 14:20 15:8,20 17:7 25:14,22,25 26:4 39:7,8 44:13,24 68:23 75:8 81:13,15 91:14

**Schwartz** 3:14 4:5 62:3,7 71:17 72:1,2 80:17,19 83:6,14 84:9,24 92:7,12,21 93:12

**science** 8:12,20

**scootering**

47:24

**scooters** 49:3

**scope** 75:1

**screaming** 80:16 85:22

**screen** 30:6,11,22 33:15 85:7 86:5 91:4

**scroll** 30:23,25 85:13

**scrolling** 34:15,19 86:2 88:16

**search** 61:21 84:15

**searching** 64:23 84:13

**second** 30:5,7

**section** 33:14 41:15,17

**security** 35:2 37:18,21,24 38:4,5 67:17,18,24 68:6,15 70:1,20,23 71:3,4,11

**see** 11:12,22 13:10 16:13 17:11,25 18:10 19:15 27:24 30:7 33:21 34:18,23 35:5 41:17 46:14,16 53:18 71:6 72:23 73:16,19 82:9 84:18 88:24

**seeing** 15:10 16:7 17:14 20:13,14 22:18 32:23 90:20

**seek** 80:7

**seeking** 15:19

**seem** 24:24

**seemed** 19:3

**seems** 39:5,7

**seen** 17:17 18:2,6 20:17 68:11 85:15 90:5

**Segments** 49:9

**self** 76:19

**self-image** 19:17

**send** 44:3 93:5,6

**sending** 45:25

**senior** 14:17 23:11

**sense** 21:5 46:6 64:11 70:9

**sent** 40:23 46:25,25 47:1 57:7

**separated** 8:23 9:2 36:10 37:1 37:14,23 39:3

**separation** 36:7 38:20

**seriously** 20:19

**services** 15:8

**sessions** 19:4,5

**set** 35:2 40:16

**setting** 51:7

**seventh** 25:4,5,16,17 75:7,20 76:8

**sex** 26:25 27:2 35:4

**sexual** 39:14 56:11 72:6

75:6 88:5

**sexually** 26:20,22 27:9 50:17

**shaking** 6:22 11:2

**share** 30:6 85:7

**shared** 30:11 69:21

**sharing** 30:19 32:24

**she'd** 20:20

**she's** 9:11,12,14,14,15 12:13 14:21 16:3,11 17:7,8,9,9,14,16 18:2 19:11 22:12,16 23:15,16,17,25 26:15,16 27:9,25 28:3,5 40:25 41:3,5 42:25 47:12,21,23 48:12,20,23 50:18 52:17 53:1,2,2,3 55:22 56:20 57:2 61:18 72:8 73:18,19 75:20 77:12 78:5,22 81:7

**shift** 24:23 28:8

**shock** 55:25

**shorthand** 2:19 21:20 95:11

**should** 6:7 10:3 37:17,22,23 37:24 68:10 70:5,13 74:3,9 78:14 83:17 83:22

**shouldn't** 74:9

**show** 30:6 65:25

**showed** 47:2

**shown**



MAGNA
LEGAL SERVICES

32:25
**shrugs**
6:22
**shy**
12:19
**sick**
54:1
**side**
13:22,23 24:12,13,14
24:18,20,22 64:5
91:4
**sign**
5:13 42:10
**signed**
29:14,18,24 42:7,9
**significance**
58:9
**significant**
12:3,14
**signing**
32:17 41:25 66:6
95:17
**silence**
41:9
**similar**
78:19
**since**
16:22 17:4,5 22:2
31:14 64:17 69:21
75:20
**single**
12:20 68:15
**Sis**
47:14
**sit**
19:5 69:16
**sitting**
24:5
**situation**
20:10,20 48:24 70:12
81:7
**six**
9:3 72:22 73:5,21
**six-month**
72:25
**size**

93:2
**sizes**
32:10
**skip**
77:8
**skipped**
77:9
**sleeping**
45:10,11
**slow**
83:10
**smaller**
12:14
**smartphone**
24:25
**smoking**
87:3,11,13
**Snapchat**
26:3 43:25 74:17
**sneak**
67:7,14,25 68:16
82:14 87:18,19
**sneaking**
67:16,20,24
**social**
25:9,24 26:2 43:25
44:8 69:17
**sole**
11:10,14 81:4
**some**
10:6 14:16 15:10
16:4,25 17:1 18:1
21:7,9 22:18,25
23:16 28:3 32:21
35:13 38:10 39:14
40:22 42:14,14 49:5
49:25 57:14 58:24
60:19 61:15 62:23
64:8 69:20 70:22
71:18,19 72:5,8
73:17 74:20 75:3
80:20 81:18 82:14
82:15 90:12 92:25
**somebody**
59:5 80:15 85:20
**someone**

47:18 48:18,18 49:24
63:24
**something**
8:5 18:24,24 20:19
25:6,7 26:24 30:2
35:7 38:5 42:11,11
42:24 43:2 44:18
47:21 48:1,6 57:4
61:19 68:22 71:15
74:4 85:14
**sometimes**
6:18 10:24 20:16
22:24 44:3 74:12
87:21
**son**
10:21 11:4 16:18
23:7
**sophomore**
75:8
**sorry**
11:5 13:6 18:22
27:19 32:1 33:24
34:15 37:22 38:9
44:16 45:13 62:3
66:3 78:16 80:14
83:3,19 88:10 89:2
92:8,9
**sort**
6:8 13:12 81:18
**sought**
65:2
**soul**
83:17,20,21,23
**sound**
33:5
**sounds**
42:14 50:9 88:7
**source**
31:23
**Spain**
21:19 28:13,19 43:9
43:13,16,19 44:4,5
45:5,17 46:9 49:24
50:15 51:22 55:17
58:1,6,10,16 59:9,9
66:1 74:2 76:9

77:21 80:6 89:9,15
**Spanish**
28:20
**speak**
21:4 26:25 27:3 40:1
51:1,13 52:19 53:5
54:2,13,23,25 55:3
58:8 62:14 63:1,24
78:21 79:1 80:2
**speaking**
27:1 38:10 45:16,17
69:2
**special**
15:8
**specialist**
73:14,18
**specialists**
73:12
**specialty**
65:20
**specific**
43:19 64:8 77:17
**specifically**
16:5 39:22
**spectrum**
23:7
**spell**
7:16
**spells**
7:17
**spent**
58:18
**spiraled**
22:20
**spoke**
17:4 51:6,8 52:6,10
52:12,22 53:7,9,17
78:24,25 80:10,11
87:25 91:5,6,12,13
**spoken**
64:2 78:22 91:2,7,8
91:10,19,24
**sports**
13:14 14:1 71:15
**staff**
86:25 87:6 88:3



Exhibit F, Plaintiff    Page 24

**staffing**
70:11
**staining**
87:17
**stamp**
31:21
**stamped**
30:13
**stand**
19:24 47:20
**standing**
82:9
**stands**
56:10
**start**
6:12 15:10,13 16:24
26:6,14 60:22 63:13
72:5
**started**
5:10 15:19 22:14
48:4
**state**
2:20 11:17 94:2 95:1
**stated**
95:8
**statements**
66:5
**STATES**
1:1 2:1
**stating**
68:5
**stations**
54:18
**stay**
16:19 22:19 35:15
47:17,17,19 52:15
52:20,20 56:12,22
56:23 67:14,15
**stayed**
51:8 52:18 67:5
71:10,14 82:6
**staying**
51:4,5 52:15,16
67:10
**stays**
67:17

**stepsister**
18:25
**stick**
14:1 30:18,21
**still**
8:7 11:15 23:10
25:19 27:2 34:3
38:14 59:13
**stipulations**
5:11,14
**stop**
34:20 90:20
**stopped**
30:19 90:12
**stories**
63:21 64:2,20
**story**
80:8,11
**straight**
15:21
**strange**
86:15,19
**strangely**
86:11
**street**
3:4,15 16:20
**stress**
40:25
**stuck**
11:14
**student**
12:23 40:22 89:21
**students**
32:15,19 67:15,23
81:22 83:1,16
**stuff**
35:16 42:17 61:15
62:2
**subject**
27:2 73:15 76:21
**such**
11:17 58:4
**Sue**
21:13,14
**sue@hilljustice.com**
3:5

**suffer**
41:9 42:2
**suicidal**
20:4,23 21:10 22:3
**suicide**
20:18
**Suite**
3:4,9
**super**
16:11 19:3
**supervision**
20:15 67:2 70:14
**supervisor**
68:2
**support**
81:18
**supposed**
36:8,15
**sure**
6:6 15:22 27:11,24
37:25 41:8,21,22
42:23,25 43:1,1,3
51:15 53:10 56:8
59:5 61:1,4 67:7
69:10 83:5 86:5,16
86:17 87:17,23,24
90:4,25
**surprising**
13:4,5
**SUSAN**
3:3
**suspect**
71:17
**suspicions**
14:9
**sweet**
12:19
**sworn**
5:7 95:4
**system**
73:16

_____
**T**
_____

**tables**
8:4
**take**

17:2 19:24 20:19
22:22 23:19,24
30:24 33:2 49:5,14
62:19 80:14
**taken**
2:16 28:7 61:20 95:7
**taking**
51:5 70:12
**talk**
6:18 19:9,10 21:18
22:12,23 24:24 27:5
27:7 28:9 35:10
48:23 49:21 51:23
52:25 53:1,3,4,18
75:12 91:1
**talked**
22:15 25:23 26:8,9
35:11 45:9,12,21
48:25 55:21 64:17
77:12
**talking**
22:14 24:9 44:22
47:9 48:4 49:23
50:19 51:24 63:22
64:9,12 67:13 74:2
83:8 89:11
**tardies**
14:14
**Taylor**
3:13 54:23,24 55:11
66:11,15,16,19,22
68:9,19 72:3 80:24
83:15 84:1 86:10
**teacher**
28:20 29:6
**team**
13:18 71:15
**teenage**
16:6 19:17
**teenager**
66:25
**teenagers**
20:18 37:19 68:23
70:12 74:9,10,12,14
**teens**
19:6



Exhibit F, Plaintiff

Page 25

**telephone**
45:18
**tell**
17:24 19:11 22:8
26:18 37:14 38:1
39:25 46:8 47:4,18
47:18,22 48:18,18
48:18,19,19 52:13
52:23 53:21 57:11
62:13 64:18 73:16
75:25 79:18
**telling**
22:17
**tells**
29:6
**ten**
25:4 49:14
**term**
18:23 26:7
**terms**
20:8 40:15 42:19
69:2,3,4
**test**
10:7 37:25
**testified**
5:8 81:2
**testify**
95:5
**testimony**
76:24 80:20
**text**
25:12 44:13,18,20
45:21 46:18 58:25
59:4,7,21 60:4,9
69:12 74:23 91:22
92:20
**texting**
58:23
**than**
12:1,2,15 38:4 41:9
52:17 54:14 81:23
86:19
**thank**
24:11 49:17 62:7
71:20 80:18 92:5,22
92:23 93:13

**Thanks**
7:19 92:24
**that's**
5:13 7:4 8:18 10:5
11:1,18 13:2 14:13
15:19 19:21 20:6,8
24:4 28:23 29:12
30:13,21 31:23
33:25 34:17 35:12
37:9 39:4 42:24
46:22 48:13,17,23
49:15 51:8,20 64:15
70:5 73:23,24 74:13
80:17 81:4,9 86:17
90:6 91:7 92:18,21
**theater**
13:25
**their**
39:7 46:11 48:10,15
63:25 71:9 74:11
78:21 79:6,6,11
**them**
12:13 22:11 33:6
37:8 38:1,17 39:15
40:17 48:9 52:1
59:13 61:24 69:24
71:6 84:5 89:19
91:12,12 93:5,6,6
**then**
8:5,13 13:18 16:7,13
17:5 19:4 24:20,20
29:6 31:18,21 33:6
45:9 46:21,22 47:5
48:6,17 49:1 50:23
50:23 52:10,11
53:14,16 58:3 65:13
73:19 74:1,4 78:15
81:16 92:4
**therapist**
7:21 8:1 15:22 16:1
17:11,14,17 18:6
19:15 20:14,23
22:14 90:20
**therapists**
17:4
**therapy**

19:6 21:2 42:16 61:3
**there**
7:24 12:2 13:18
16:16 18:4 20:1
21:8 22:2 25:6 27:4
27:12 31:1 35:19
36:9 37:5,22,24
38:4,17,21 40:2
44:3 45:8,14 46:3
46:17 51:3,18 52:4
52:21 53:15,16,17
53:20 54:2,21 57:1
58:5 62:25 65:22
66:4 67:17,18 68:5
68:13 70:12,20 71:7
72:7 74:3,20 79:23
81:18 82:14 86:25
87:7,10,12 90:3,5,8
90:16,22 91:7 93:3
**thereafter**
95:12
**therein**
95:7
**there's**
6:9 10:4 20:19 25:20
27:6 30:24 37:18,25
41:16 67:17,23
68:11 70:1,25 75:3
79:16 87:22,24
**these**
20:15,15 22:17 40:22
62:20 64:2 72:20,25
73:15 77:15 78:19
78:23 85:18 91:11
**they**
22:10,10,15 26:10,12
35:14 37:10,14,14
38:1 39:6 40:23,23
46:11,11,12,13,19
46:20,20,21,21,21
47:6,13 48:8,14
49:1,2 51:19 52:3
55:2 58:4,7,18
64:18,22 67:7 71:2
71:2,5 74:10,13
78:24,24,25 80:12

81:16 84:10,10,11
89:22 91:6,19,19
92:19 93:7
**they're**
26:17 35:14 48:13,13
68:1 74:11 85:22
**they've**
92:19
**thing**
6:20 7:2 13:1,2 31:10
31:13 35:11 47:11
47:12 77:24
**things**
13:17,18 19:17 20:17
21:6,25 22:1,18
28:4 40:9 42:22
53:25 54:20,22 63:1
63:22,22 64:21 70:8
74:20 75:3 77:22
78:23 80:3
**think**
11:13 16:6,25 18:4,6
19:4 20:25 21:10
31:6 34:10 37:17
39:5 43:2 45:12
49:3,15 56:3 62:21
63:12 64:3,5 66:22
68:9 69:21,23 70:2
70:18 71:4 82:11,12
82:17,18 93:3,4,8
**thinking**
13:12 17:10 18:24
20:9 44:16
**thirsty**
24:6
**Thirteen**
7:25
**this**
6:7,11 8:12 10:3
11:21,23 13:2 19:3
19:21 20:14 21:13
22:18 23:13,16 25:7
26:8,14 27:8,19
28:5,15 30:12,15
31:4,6,9,10,11,20
31:22 32:23 33:4,18



Exhibit F, Plaintiff Page 26

34:24 37:13 38:14
39:25 40:6,25 41:11
42:13,16,16 44:12
46:4 50:19 54:11,15
54:18 55:22 57:3
61:10,13 62:2,5,5
62:15,25 63:13,17
63:19,20 64:3,4,4
64:11 66:9,13,23
67:18,24 68:1,7,12
69:6 72:20 73:5
75:14,22 76:24
77:14,24 78:25
79:13 81:7 85:13,14
86:9 88:2,19 90:7
90:24 91:3,24
**THORAVLDSEN**
3:8
**Thorvaldsen**
4:4 5:10,15,17,18
12:16 24:7 30:4,10
33:9,12 35:24 36:5
36:24 42:5 44:23
45:2 49:8,11,13,16
49:18,19 58:15 62:8
63:11 85:1,6,20,24
86:3,8 88:13,15
89:3,5 92:3 93:5,11
**those**
6:22 14:2,18 22:6
32:21 40:10 59:11
66:16 72:9,14,15,19
73:2 74:25 84:5,6
84:24 87:1 90:10
92:3
**though**
27:22 31:5 47:4
**thought**
13:8 18:12,13 19:15
38:3,9 39:21 47:4
48:5 66:4 70:7
89:11
**thoughts**
20:15
**threatening**
87:7

**threats**
86:25
**three**
17:18 19:4 45:9
74:25
**through**
16:14 19:2,5 20:10
23:2 25:24 26:9
30:23,25 31:14
34:12 36:17 43:21
57:17 61:3 69:9,15
75:7,12 76:17 77:8
77:9,12,25 78:12
85:13,23 91:14,18
91:21
**throughout**
17:4 77:20,20 81:6
**ticket**
89:9
**tickets**
89:18
**TikTok**
74:21
**time**
2:18 6:25 11:16
15:23 16:11,14,15
16:20 18:15,25
19:13 22:19 23:1
25:7 27:21 31:17
33:4 34:5 38:22
41:12,19 43:5 44:9
44:12,17 45:7,24
46:4 47:23 49:2
51:9,14,15 52:6,22
53:7,16 57:10 59:8
61:5,6,7 62:20,21
62:22 65:2 67:18
71:20 72:22 76:8
83:8 86:24 87:25
90:4,8,20 92:25
95:7
**times**
5:24 14:10,12 19:4
20:20 22:3 53:10,13
63:25 68:8
**tiny**

22:12
**today**
63:14 66:10
**together**
9:4 16:16 21:19
23:17 39:13 46:11
47:3 54:17 62:2
78:25 79:10,11,12
79:13,15 80:4 84:5
88:10
**token**
6:13
**told**
13:6 35:12 37:5,9,10
40:11 46:2,24 50:10
51:11 52:24 54:15
54:16,18,25 61:17
62:17 67:13,15,23
68:5 70:5 75:19
76:7 86:16 87:20
91:11,18
**too**
16:11 42:13 49:6
51:4 61:18
**took**
19:8 22:18 25:5
28:13 51:22 58:3
82:3
**top**
17:21,23 18:5 32:22
62:16 65:6,15 66:8
69:11 72:15 73:17
76:4,11,18 89:16
90:11,25
**topic**
64:5 76:14
**total**
73:4
**totally**
8:15 24:4 83:6
**touch**
17:13 30:24 43:15
50:23,24
**touched**
26:12 49:1
**touching**

34:20
**tour**
13:2 28:10,11,16,18
29:1,4,13 32:7,18
33:19 34:1,13 35:8
35:21 36:16,20 37:6
38:15 39:10,13 40:6
41:20,25 42:2,7,19
43:5,8 46:8,21 47:6
48:2,9,14 52:16
54:11 56:12,19,22
56:23,24 64:17 66:7
67:24 68:1,12 89:23
90:1
**tours**
1:9 2:9 3:7 4:9 5:20
29:9,11,12,21 37:14
38:17 55:14 63:21
64:10 66:14 69:23
69:24 70:4 81:18
83:24 87:21 89:11
**toward**
86:11
**towards**
23:9
**train**
38:9 66:3
**transcribe**
6:10
**transcribed**
95:12
**transcript**
6:23 76:23 93:2,8,12
95:9,16
**transcripts**
78:1
**translators**
51:25
**transparent**
78:5,20
**traumatized**
57:2,6
**travel**
58:21 89:6,14
**traveled**
43:16



**traveling**
88:20
**treated**
72:24 73:4
**treating**
72:8,18 90:12
**treatment**
17:2 65:3 73:10
88:23 90:10
**Trent**
59:6 60:8,12 79:8
86:17 88:7,8 89:10
89:11 91:1
**Trenton**
1:4 2:4 9:20 10:18
24:21 51:3,21 52:21
54:2 55:1 58:8
62:25 63:5 68:9
78:20 79:14,19,22
79:24 80:3,7 89:7
**Trenton's**
11:1 29:10 89:9
**tried**
38:24 44:7,10 82:13
**trip**
25:6 28:13 46:9
86:24 87:3,11 88:9
88:22
**trouble**
56:6
**true**
39:11 60:15 66:7
94:2 95:9
**truly**
70:10
**trust**
56:25
**trusted**
39:9
**truth**
95:5,5,6
**try**
6:12,13,20 62:23
77:11,22
**trying**
10:6,6 19:17 28:6

46:6 47:7,16 48:16
51:20,24 52:2 54:16
54:21 64:11 68:22
82:16 84:4 85:21
86:4
**Tuesday**
1:16 2:17 5:1
**turn**
33:5 71:18 88:11
**turns**
19:8
**twice**
17:11 44:20
**two**
17:17 19:19 26:24
29:25,25 37:13 45:8
45:11,12 46:9 64:13
65:11 67:10 70:4
72:11,19 80:15 93:9
**type**
73:8,14 83:7
**typewriting**
95:12
**typical**
19:17

———————
**U**
**uh-huh**
6:21 8:18 33:22 35:6
41:24
**uncalled**
68:18 70:15
**uncle**
12:15
**uncomfortable**
19:23 24:9 47:15
48:16
**under**
33:18 36:9,11 39:6
81:17 89:1 91:3
94:1,1
**understand**
7:7 8:16 11:19 14:15
16:2 40:6 41:24
57:7,19 66:16 75:13
89:21,25

**understanding**
27:5 32:9 36:9,12,25
37:4 38:21 40:4
46:6 55:5 57:9
70:22 81:17 86:18
**understood**
7:10 36:18 39:20
**unexcused**
14:16
**unit**
20:12
**UNITED**
1:1 2:1
**unless**
37:18 38:7
**unquote**
91:20
**unsupervised**
71:12
**unsure**
34:10
**until**
23:3,4,9,10,18 25:14
26:23 48:2 52:20
90:21
**unturned**
70:13
**up**
15:3 16:8 18:7 19:24
21:11 22:20 23:3,4
23:9,18 28:3 29:14
29:19,24 30:5 32:17
34:16,20 37:7 41:25
46:11,11 47:20 48:8
56:10 59:19 63:24
64:7 66:7 72:25
82:9 90:21 92:13
**upholds**
41:12
**upset**
78:8
**upsetting**
77:24
**urgent**
44:9
**us**

6:25 13:2 14:13
16:21 19:9,11,11,25
20:2 42:8 50:25
51:3 60:11 79:10
**usage**
25:15
**use**
21:16 25:9 43:12,18
43:24 44:4
**used**
26:8 44:2
**using**
45:18
**usual**
5:11,13
**Usually**
44:3

———————
**V**
**vague**
76:14
**various**
64:10
**Ventura**
7:23
**verbal**
6:21
**verge**
19:20
**versa**
36:8
**very**
10:16 12:12,19,19
13:3 15:15,25 16:10
17:7 19:12 21:9,9
21:10 22:3 24:22
26:8,15 27:19 35:17
39:20 42:13,18,18
47:15 50:9,9,16,24
51:6,6 54:14,19
59:5 68:10 69:4
70:3,10,10 74:14,15
75:23 77:11,23 79:9
79:17
**via**
2:17 43:15 44:17


MAGNA
LEGAL SERVICES

Exhibit F, Plaintiff

Page 28

95:10
**vice**
36:8
**video**
88:11 90:5
**videoconference**
2:17
**violation**
89:22
**visitation**
11:11
**Visitors**
35:3
**vs**
1:8 2:8

**W**

**waiting**
8:4
**Walda**
29:10
**walk**
19:24
**walked**
76:17
**walking**
50:19
**wall**
85:23
**WALLACE**
3:14
**want**
5:11 7:3 11:16,21
15:16,16 16:12,13
17:17 18:10 19:1,13
19:16,23 20:7,7,10
20:18,21,21,22 21:3
21:18,20 22:1 24:8
24:23,24 25:4 28:2
28:4 33:1 34:9,22
41:2,3,8 42:23
47:20 49:6,13 50:18
53:1,9,25 55:16
56:4,6,12,21 57:1,5
62:14 63:24 64:4
71:20 74:10,12

75:15 86:21
**wanted**
11:14 14:6 30:5
31:13 33:13 38:22
41:4 50:13 51:15
52:3 56:17,20
**wanting**
86:20
**wants**
20:24 22:17 41:4
**warning**
28:9
**wash**
15:1
**wasn't**
13:16 23:5 25:11
45:14 46:2 48:10
53:16 64:23 78:13
79:25 90:5
**watch**
47:10,10 71:5,8
74:14,15 82:11
**watched**
70:25
**watching**
21:2 70:20
**water**
7:1 24:2
**way**
7:17 23:14 37:19
41:3,7,13 52:17
58:24 68:11 69:21
70:4,5,8,9 74:5
80:22 82:8 95:21
**website**
29:7 33:21 34:1
**week**
14:25 19:4 65:4,11
72:12
**weird**
16:14
**WEITZEN**
3:9
**well**
6:23 13:3 19:15 20:6
21:2 24:22 26:7

38:14 39:20 47:9
48:20 63:7 64:8
77:18 79:17 88:22
**went**
20:10 25:6 28:19
29:16,23 36:17
39:11,12 46:20,21
46:21,22,23 47:6
48:14 57:11 64:13
70:4,7 76:9 81:6,16
90:8
**were**
8:3 9:1,16,18,21
10:14,15 11:5 13:18
15:22 19:9 21:1,2,9
25:15,21 26:11,11
29:3 32:11,17,21
36:7,15 37:5,11,14
38:10,12,23 39:10
39:20 41:25 44:19
44:21 45:6,16,18
46:13 47:1,13 49:1
49:2,23,24 50:2
51:20 54:7,9 58:20
58:23 59:1 61:9,24
62:20 63:3,12 64:15
65:22,22 66:5,7
67:10 69:5 70:4,5
72:5 74:1 80:22
81:17 82:11,12 84:6
84:10,10,11 86:25
87:2,2,11,13 89:11
91:6
**weren't**
48:7 67:8
**we'd**
44:20 78:12 91:22
**We'll**
5:12
**we're**
6:7 17:10,12 20:13
20:14 21:16 27:24
27:25 28:6 29:12
47:23,24 49:22 55:2
55:3 63:13 66:9
**we've**

17:6 23:16 49:9
75:23 76:10 77:12
80:13 91:15
**whatever**
7:2 47:22 55:3 68:10
87:22
**whatnot**
19:18
**WhatsApp**
43:25
**WhatsApps**
26:3
**what's**
8:11,24 9:19 27:15
46:19,19 50:19 69:1
75:10 78:15 93:5
**when**
9:1,21,23 10:10 11:5
11:19 15:13,15,18
15:19 16:1,19 18:11
24:13,25 25:16,17
26:6,13,20 32:17
33:6,19 35:14 37:20
38:10 40:5,6,13
43:8,16,19 44:4,5
44:12,22,23 45:5,9
45:13,16 47:2 48:4
48:8,13,17 49:23
51:2 52:6,22 53:7
53:17 55:16 60:18
60:22 61:4,18 62:9
65:1 74:1 77:5
79:10,12,12,16,23
80:10,11 81:24
86:10 87:12,16 91:6
**whenever**
11:12
**where**
7:6,22 33:21 35:5
37:4,14 39:6 44:10
59:8 67:10 82:2
84:6,13
**Whereupon**
30:8 85:3 93:14
**wherever**
9:11,15



**whether**
7:1 16:23 29:20 82:8
**which**
31:18 33:20 38:13
51:21 54:11 65:12
86:11,12 88:17
91:21
**while**
9:13 13:16,23 23:24
27:2 35:21 42:2
44:25 45:10,11,17
46:7 53:20 54:2,21
56:24 69:14,16
87:16 91:6
**whirlwind**
63:1
**who**
9:8 17:20 28:21 42:6
42:9 50:4 51:8
53:21 55:5 59:5
60:11 64:2,11,18
65:5,13 69:19 73:2
83:25 86:14 87:4,6
87:10 88:6 89:14
**whole**
17:22 24:19 29:16
31:10,13 48:12 56:7
68:1 72:4 95:5
**whom**
26:16
**who's**
6:10 66:11
**why**
11:18 13:2 19:21
37:16 71:7 74:13
75:2 78:13 80:23
90:16
**wild**
15:21
**will**
35:2 41:7 67:16,25
67:25 68:3 85:12
93:6
**wise**
12:18 17:7,7 27:6
**within**

29:8 53:15 65:4
**within-entitled**
95:6
**without**
20:15 71:8 74:11
86:22 89:23
**witness**
12:7,11 24:2,5 33:3,8
36:4,23 58:14 62:6
83:9,13 89:2,4
92:23 93:9 95:4,15
**witnessed**
6:5
**woman**
28:6 56:9,10
**wonky**
45:8
**word**
21:13 56:9 78:1,1
**worded**
77:4
**words**
21:16 22:25 54:9
62:16
**work**
6:1,2 7:19 20:11,11
22:19 23:17 29:7
32:2 38:23 40:4
47:25 51:23 69:16
78:12 90:18
**worked**
7:24 15:20 45:10,10
**working**
14:24 16:13,19 17:7
23:5,6
**works**
21:22
**world**
56:8 70:2,9
**worried**
19:12
**worse**
72:22
**would**
7:2 8:6,12 10:9 12:14
12:25 13:8,22 16:18

19:5 20:23,25 22:10
23:9 24:22 25:18
26:1 27:21 36:9,10
36:12 37:1 38:3,6
39:3,6,17,18 41:9
44:7,7,10 49:21
54:10 55:6,18,24
56:21 62:18 63:5
67:7,13,14 68:10,11
68:12 69:9 75:4
78:8,10 80:1 81:1
81:18,24 85:1,13
86:16
**wouldn't**
22:11,12,13 40:23
46:12 81:3
**would've**
70:15
**writing**
39:2 60:25
**written**
82:20 83:15
**wrong**
19:14 41:3 66:23

—————————
**Y**
—————————
**yeah**
8:2,18 10:25 13:11
15:16,25 16:6 18:9
21:3 22:19 23:22
28:23 29:18,22,22
31:8,16,19 33:3
36:17,17 37:23
42:25 45:4,4,12
48:25 49:11 54:12
54:22 58:14,18
73:24 80:17 86:7
**year**
14:1,11,17,18 23:11
23:17 25:1 26:14,15
75:8
**years**
7:25 8:2 9:3 10:9
11:22 29:8 62:17
**Yep**
49:8 63:12

**yet**
20:1 27:24 28:1,2,7
**young**
8:5 10:14
**younger**
35:14
**your**
5:18 6:2,6,14,16,21
7:12,17 8:13,24
10:7 11:6,23 16:3
17:25 21:6 29:3,7
30:24 31:22 32:5
33:1,5,13,15,20
35:1,2,5 37:15
39:13,22 40:5,14
46:6 48:19,19 59:2
59:2,11,19,21 60:3
60:6,9 61:21,24
63:10 64:9,9,24
68:2 69:1 71:20
74:2 75:1,1,1,10
76:7 78:10,11,17
80:9,24 84:4,21
85:23 92:25
**yourself**
47:10,10,11,20 59:8
**you'd**
58:7 91:20
**you'll**
30:7 35:16
**you're**
9:4 13:10 16:2 24:9
27:12 31:25 33:7
54:9 61:4 67:9,21
68:19 90:23
**you've**
64:12,17 66:10 71:14
76:19 77:16,18 80:5
85:14 91:24

—————————
**Z**
—————————
**zoom**
2:17 6:18 29:25 31:6
32:3 34:17 37:7
38:13 95:10



Exhibit F, Plaintiff

Page 30

**$**

**$2,000**
90:19

**0**

**02210**
3:10
**0483**
30:14

**1**

**1**
4:9 30:8,13 32:24
33:14 41:15
**100**
3:15 27:11 38:4
56:24 57:23 69:22
70:13,15,16 71:1
**12**
53:15
**12:15**
93:14
**13**
8:2 11:22
**1323945**
1:22
**1350**
3:4
**14**
30:24
**16**
38:7
**17-year-old**
38:7
**1700**
3:4
**17108**
3:15
**19-year-old**
9:14
**19103**
3:4

**2**

**2**
4:10 85:3,11

**20**
88:16 89:1
**2003**
9:22
**2004**
9:22
**2005**
9:25 10:1
**2006**
9:25
**2010**
9:22,23 10:8
**2012**
11:21
**2014**
9:2
**2020**
15:16,17 17:5 18:11
**2021**
15:17 16:1 21:8
**2022**
21:20 43:9 59:17
**2023**
23:18
**2025**
1:16 2:18 5:1 94:4
**215.567.7600**
3:5
**22**
91:3
**24**
12:20 23:18
**29**
1:16 2:18 5:1

**3**

**3**
34:25
**30**
4:9
**345**
3:9
**39**
15:20

**4**

**4:23-CV-01038**
1:7 2:7

**5**

**5**
4:4
**50/50**
10:25 11:11

**6**

**6**
86:4 88:3
**617.439.4990**
3:10

**7**

**717.232.8000**
3:16
**72**
4:4

**8**

**85**
4:5,10
**8688**
1:21 5:5 95:25
**88**
3:9

**9**

**9:57**
2:18 5:2
**93010**
7:15
**963**
7:14
**99**
41:12 42:25



Case 4:23-cv-01038-KM    Document 113-8    Filed 09/17/25    Page 127 of 151    Exhibit F, Plaintiff

L.F. 0483

"I believe travel will help me appreciate the world more than ever—not just its beauty, but all the history and culture the world has to offer."

Monica F., DE (Student)
2020 Global Citizen Scholarship Winner



# A scholarship that helps students see the world

Travel has the ability to bring classroom lessons to life, unlock new potential, and open a world of possibilities. That's why we believe everyone should have the opportunity to go on tour. Through our annual **Global Citizen Scholarship**, we give up to 100 students from across the country $1,000 off their EF tours.

**It's easy to apply:**

- Fill out a quick online application
- Have your child create a short video explaining how traveling will change the way they think or feel about the world

For more information visit **eftours.com/global-citizen**

800-665-5364    15

Case 4:23-cv-01038-KM   Document 113-8   Filed 09/17/25   Page 128 of 151   Exhibit plantiff

L.F. 0484

# General Terms and Conditions

These Booking Conditions are valid for all EF tours departing after October 1, 2020, and are subject to change with or without notice. The most current Booking Conditions at the time of your departure will apply, which are available at eftours.com/bc. All tours are operated outside of the U.S. by EF Education First International, Ltd., Switzerland. EF Institute for Cultural Exchange, Inc. is a marketing service provider for that company and is referred herein together with EF Education First International, Ltd. as "EF."

## WHAT'S INCLUDED IN THE PROGRAM PRICE?
– $95 non-refundable deposit
– Round-trip airfare
– Accommodations in hotels with private bathrooms
– A Tour Director available 24 hours a day from when you arrive until you depart
– Breakfast and dinner daily in Europe. (For non-European destinations different meal plans may apply.)
– Sightseeing tours and excursions led by licensed local guides as specified
– Airport transfers and transportation between destination cities
– Transportation to all included activities
– Entrance fees and theater tickets as specified
– EF walking tours and Tour Director-led sightseeing as specified
– Cruises, trains, or ferries as specified
– Adult supplement (if applicable)
– 24-hour worldwide emergency service
– Support from EF representatives abroad
– EF backpack and luggage tag for each tour

The above apply to all tours unless otherwise noted on the tour itinerary. If we ever fail to provide you with any of the above, we will refund you its value upon your return from the tour.

## What does the non-refundable deposit include?
All travelers must pay the non-refundable, non-transferable $95 deposit upon enrollment in order for the enrollment to be complete. After travel is completed on the first tour, repeat travelers will receive a $100 repeat traveler discount off of future tours.* (EF Explore America repeat travelers will receive a $50 repeat traveler discount off of future EF tours.) The $95 non-refundable deposit includes:
– EF's Standard Cancellation Policy and Peace of Mind program as described on p. 20
– Processing services by EF staff
– Eligibility for discounts on other EF programs

*Repeat travelers are paying travelers who traveled beginning in 2003. Travelers who cancel their tour prior to traveling are not eligible for a repeat traveler discount. The repeat traveler discount is non-refundable and non-transferable.

## WHAT'S NOT INCLUDED IN THE PRICE?
– Rooming supplement (if applicable)
– Optional excursions (except where indicated)
– Global Travel Protection plan or Global Travel Protection Plus plan (except where indicated)
– Beverages and lunches (except where indicated)
– Transportation to free-time activities
– Customary gratuities (for your Tour Director, bus drivers, and local guides)
– Porterage

– Any applicable baggage-handling fees imposed by the airlines (see eftours.com/baggage for complete details)
– Expenses caused by airline rescheduling, cancellations, or delays caused by the airlines, bad weather, or events beyond EF's control (see next page for details)
– Passport, visa, and reciprocity fees or any other fees associated with entry to a specific destination

## GROUP TRAVEL
### How does group travel work?
We believe that all students should have the opportunity to travel, which means we do everything we can to keep our program prices the lowest in the industry without sacrificing quality. One of the ways we do that is by combining groups to fill a tour bus so that all travelers help cover the costs of the bus, the Tour Director, local guides, etc. Consolidating groups also allows travelers to meet students from other schools, although groups may not be of the same age level.

Therefore, in order for everyone to travel for the lowest price possible, group travel requires some flexibility. Each group submits its preferred tour choices and travel dates, and then we book all of the groups with the same requested tours on one specific departure date. Because EF is the largest student travel provider, it's rare that groups do not travel on their first-choice tour. However, on occasion, we may need to book your group on a second-choice tour. In the event we cannot offer for booking a tour comparable to your first-choice tour, travelers can opt to receive a full refund. Once a program is booked, EF's Standard Cancellation Policy applies. EF strives to keep departure dates within two days of the requested date for tours departing October through April and within four days of the requested date for tours departing May through September. Your final tour itinerary and travel dates will be confirmed approximately two months prior to departure.

### Anything else I need to know about my itinerary?
Based on your travel dates, there may be times when it becomes necessary to modify your itinerary. Sometimes this involves changing the order in which cities are visited, altering your length of stay in a city or country, or using an alternate airport. On certain days, especially holidays, some tour inclusions may be unavailable. In such cases, we will substitute different inclusions or provide a refund after the tour. Tours are designed for students, as reflected in the pacing, accommodations, and other aspects of the tour.

## PRIVATE GROUPS
### What if my group wants to travel on our own without being consolidated?
If you want the privacy of your own tour bus and Tour Director, you can choose to travel as a private group. This option is available for an additional fee, which varies based on the final number of paying travelers. If your group fills a standard-size tour bus, the private group option is free. The itinerary may not be modified while on tour (i.e. you do not have the tour bus at your disposal); however you are able to make certain tour modifications prior to the tour departure. Although your base itinerary will include only your group, you may be consolidated with others during optional excursions. Also, due to flight and hotel availability, we require the same departure date flexibility as described above. Please let EF know prior to your first enrollment if you would like to be a private group.

### What if my group is traveling on a customized tour?
If your group is traveling on a customized tour, you will automatically be traveling as a private group. The tour price for your customized tour can fluctuate based on the group size and will be finalized based on the number of paying travelers at the time of departure.

## ENROLLMENT
All Enrollment Forms must be received at EF by at least 110 days prior to departure. Travelers should provide complete first, middle, and last names, and dates of birth as they appear (or will appear) on their passports.

### What is the cost of a name correction?
Any corrections to match passport names made after 110 days prior to departure require that we change the flight reservation, resulting in a minimum fee of $200

per airline up to the cost of a new published fare ticket. This may also result in a different flight itinerary from the rest of the group. Travelers who have not yet applied for a passport should provide their full name and date of birth as they appear on their birth certificate.

### How do travelers enroll?
Enrollment Forms and payment can be submitted to EF in any of the following ways:
– Online: eftours.com/enroll
– Phone: 800-665-5364
– Mail:
  EF Educational Tours
  EF Center Boston
  Two Education Circle
  Cambridge, MA 02141

For your convenience, travelers are automatically enrolled in paperless billing. Travelers who prefer to receive invoices by mail may request this by logging into their account at eftours.com or by calling 800-665-5364.

### Can a traveler enroll on a waitlist if the tour is full?
Upon the discretion of the Group Leader, a waitlist may be offered for full tours. The $95 non-refundable deposit is required for waitlist enrollments. If space becomes available on the tour and the applicant chooses to enroll, EF's payment plan and cancellation policies apply immediately. If space is not available by 14 days prior to departure or if the applicant cancels from the waitlist, the $95 deposit will be refunded.

### Can children under 11 go on tour?
We do not allow children under the age of 6 to travel with us. Travelers ages 6-10 must have an adult chaperone other than the Group Leader and will have to room with that chaperone. Travelers may choose to stay in a family room (a room with two twin beds and a cot) or in a twin (a room with two beds). Applicable fees will apply.

### Can adults go on tour?
EF's published program prices are based on student rates for transportation, admissions, accommodations, etc. We welcome adults (those age 20 and older, including those who will turn 20 while on tour) but have to charge a per-person flat fee supplement of $100 plus $50 per night of the tour to cover the difference between student and adult rates. Adults will pay an additional $40 per night for the sea portion of their tour on overnight ferries and cruises, where applicable. Please see next page for information on adult rooming. Groups comprised of a majority of adults must select the private group option. All adult travelers will be required to complete a background check through a third party company prior to traveling. EF reserves the right to cancel any traveler if, in EF's sole discretion, it determines the results pose a risk to the group's safety or wellbeing.

## LATE ENROLLMENTS
### Can a traveler enroll on tour after 110 days prior to departure?
Yes. A traveler may submit a late enrollment request 109 days or fewer prior to departure. The traveler must enroll on the tour, pay a non-refundable $145 late enrollment fee, and make full payment of the current program fee. The traveler will be placed on a waiting list while we check bus, flight, and hotel availability. The traveler is responsible for any additional charges that may apply. We may also offer an alternate flight to meet up with the tour or the option of arranging your own flight and buying the land-only portion of the tour.

If we are unable to place the traveler on a tour or the traveler does not wish to pay the additional charges, the traveler may cancel their enrollment request and receive a full refund.

## PASSPORTS AND VISAS
### Who is responsible for getting travelers' passports, visas, and other travel documents?
Each traveler must obtain a passport and any applicable visas or other travel

documents prior to departure. For all tours, we will need passport information by 110 days prior to departure. If a traveler is unable to obtain these travel documents, EF's Standard Cancellation Policy will apply (see first column on p. 18). Please be sure that passports are valid for at least six months after the tour ends. Visit the U.S. Department of State at www.travel.state.gov for further information. Non-U.S. citizens will need to contact the embassy or consulate of their destination countries to ensure they meet specific entry requirements. Remember to check the itinerary carefully for all countries that will be visited (including countries visited in transit).

## CAN I HELP PROTECT MY INVESTMENT?
### Global Travel Protection plan
Travelers can help protect their investment from the unexpected with the offered Global Travel Protection plan. Designed specifically with EF travelers in mind, this plan includes both pre and post departure benefits, which includes medical expense coverage that may apply on tour and tour cancellation for stated reasons such as serious injury or illness or financial hardship due to job loss. All benefits are subject to the limits, terms, and exclusions of the policy available at https://www.sis-inc.biz/tours/efeducationaltours/. Learn more at eftours.com/protection. The Global Travel Protection plan becomes non-refundable after any of the following occur: when you depart on your tour, when you file a claim, or 10 days after receipt.

### Global Travel Protection Plus plan
In addition to the benefits provided in our Global Travel Protection plan, travelers who purchase the Global Travel Protection Plus plan are provided with additional coverage for tour cancellation. Travelers are able to cancel their tour up to 24 hours prior to departure for any reason. Learn more at eftours.com/protection. The Global Travel Protection Plus plan must be purchased at the time of enrollment and is non-refundable after any of the following occur: when you depart on your tour, when you file a claim, or 10 days after receipt.

## FLIGHT INFORMATION
### Which airlines are used by EF?
EF reserves seats with major airlines, including Aer Lingus, Air Canada, Air France, Air New Zealand, Alitalia, American, British Airways, Copa Airlines, Delta, Iberia, Icelandair, KLM, LATAM Airlines, Lufthansa, Qantas, Swiss, United, Virgin Atlantic Airways, and other U.S. and international carriers. Our contracts do not allow upgrades, stopovers, or the accrual of frequent flier miles.

### What will my flights be like?
We always do our best to provide the most direct route to your destination city. However, due to available flight routings, we cannot guarantee non-stop or direct flights. Sometimes, groups may travel on an overnight red-eye flight, departing the evening before the tour is scheduled to begin. In rare cases, groups may have a domestic and/or international overnight, layover, and/or bus transfer. Based on seat availability and the size of the plane, we may not be able to accommodate all members of a group on the same flight, in which case the Group Leader will determine on which flight itinerary each traveler will travel. In such instances that a traveler is not satisfied with their flight assignment, standard cancellation fees apply. We are not able to pre-assign seating. Seat assignments will be provided upon check-in. Depending on your group's size, travelers may or may not sit together. Some countries may require aircraft insecticide treatment for inbound foreign flights. A list of such countries is available at eftours.com/insecticide.

### Do I have to travel on all legs of my flight itinerary?
You must travel on all legs of your itinerary. If you do not travel on a portion of your flights, the remaining portions will be cancelled. You will be responsible for purchasing a new ticket as well as for any service fees charged by the airlines.

### What happens if my flight is delayed?
EF is not responsible for airline schedule changes or mechanical, weather, or capacity-related flight delays; however, visit eftours.com/protection for benefits offered in the Global Travel Protection plan and Global Travel Protection Plus plan.

Case 4:23-cv-01038-KM   Document 113-8   Filed 09/17/25   Page 129 of 151   Exhibit, Plaintiff   L.F. 0485

### Are any airports interchangeable?

Flights to and from the following destinations may originate/end at any of the airports in that vicinity. On occasion, the tour may return to a different airport than the one you departed from.

– Chicago: O'Hare or Midway
– Dallas: Dallas/Fort Worth or Dallas Love Field
– Houston: George Bush Intercontinental or Hobby
– Miami: Fort Lauderdale or Miami
– New York: LaGuardia, JFK, or Newark
– San Francisco: Oakland, San Jose, or San Francisco
– Washington, D.C./Baltimore: BWI, Dulles, or Ronald Reagan National
– Ireland: Cork or Shannon
– Italy: Milan or Venice
– Scotland: Edinburgh or Glasgow

### Are there flight restrictions for travelers under 18?

Anyone younger than 18 years old traveling apart from the group without an adult companion must contact each airline on the minor's itinerary and may need to register as an unaccompanied minor per the airlines' policies. Some airlines will not allow minors under 16 years of age to travel without an adult companion. Any resulting fees will be assessed by the airlines and are the responsibility of the traveler. Additionally, travelers younger than 18 years old are not permitted to travel land-only unless accompanied by an adult traveling on the tour.

### SPECIAL TRAVEL REQUESTS

EF is happy to provide stay-ahead/stay-behind options, alternate departure airports, and land-only tours for individual travelers or the whole group. If you have requested special travel arrangements, EF cannot guarantee that you will fly with your group in either direction.

### What if the whole group wants to do a stay-ahead or stay-behind?

Where possible, EF will provide altered flight and/or land arrangements for a group of at least six paying travelers plus the Group Leader. Each traveler will have to pay any additional air and/or land costs. The Group Leader should submit one request for the whole group, which needs to be received prior to the first enrollment.

### What if only one traveler has a special travel request?

Individual special travel requests should be submitted online at eftours.com by 110 days prior to departure. Please keep in mind that you should not make any actual arrangements—such as booking a flight or hotel—until final tour itinerary and departure date have been finalized (around 60 days prior to departure). A $150 service fee plus any additional air and/or land costs will be charged.

### What are the types of individual special travel requests?

– Individual stay-ahead/stay-behind option: Where possible, EF will provide altered flight arrangements, according to a traveler's request. Travelers are responsible for making their own arrangements to and from the hotel or airport as well as all land costs.

– Alternate departure airports: Program prices are based on group departures. If an individual chooses to fly out of a different airport than the group, the program price of the alternate airport will apply. Travelers must depart from and return to the same domestic airport.

– Land-only tours: On certain tours, travelers have the option to make their own flight arrangements and join the tour at the first hotel on the itinerary. Travelers are responsible for making their own arrangements to and from the hotel or airport. In this case, the program price will be reduced depending on the length and destination of the tour. EF is not responsible for any travel-related delays or inconveniences for land-only travelers. Additionally, travelers younger than 18 years old are not permitted to travel land-only unless accompanied by an adult traveling on the tour.

### EXCURSIONS

### What are excursions?

EF offers these activities in addition to what is already included on the itinerary. Most Group Leaders choose to add excursions to all traveler accounts.

### When should I purchase excursions?

To secure a discounted price, most excursions need to be purchased by 50 days prior to departure (70 days for Versailles). Some excursions may be purchased on tour, though at an increased price.

### Are excursions refundable?

If EF cancels an excursion (due to low enrollment, for example), travelers will receive a full refund for the excursion after returning home from tour. To receive a refund for an excursion that you simply no longer wish to be enrolled in, you must let us know by 50 days prior to departure or no refund will be given.

### ROOMING

EF handles final rooming assignments for all travelers. We make rooming assignments based on the sex identified on your passport. If you tell us you identify as a different sex, we will work to accommodate you. Please ensure that all rooming requests are submitted by 110 days prior to departure.

### How are students roomed?

Students will room in triples or quads with others of the same sex from the entire tour group. This means that students from different schools may room together. EF uses hotels with rooms that contain two double beds (beds for two people). Two students are expected to share each bed.

### Can students request a twin room?

Students may request twin accommodations (a hotel room with two single beds) by submitting the name of their roommate. The following additional fees will apply:

– $50 per hotel night per student

– $90 per ferry or cruise night per student
  (Please note: Twin accommodations are not available on overnight trains.)

### How are adults roomed?

Adults are placed in twin accommodations (a hotel room with two single beds) with another adult of the same sex from the entire tour group, unless the name of a roommate has been provided. This will mean that adults from different schools/ organizations may room together.

### Can adults request a room with a double bed?

Adults can request double-bed accommodations (a room with one bed for two people) by providing EF with the name of their roommate by 110 days prior to departure.

### Can adults request a single room?

Adults can request a single room for an additional $40 per hotel, cruise, or ferry night. This fee is in addition to the standard adult supplement fees covered on the previous page. Single rooms are not available on overnight trains.

### What are the sleeping arrangements on trains?

Overnight trains provide couchette sleeping berths or sessels (recliners). The couchettes contain up to six fold-out beds that come down from the wall; on rare occasions, these compartments may not be exclusive to EF travelers and may be mixed gender. Single rooms and private bathrooms are not available on overnight trains.

### MISCELLANEOUS

### When does the tour officially start and end?

Each tour begins with the take-off from the departure airport and ends when the flight lands at the return airport. For those making their own flight arrangements, the tour begins upon arrival at the first EF hotel and ends upon departure from the last EF hotel, according to the itinerary. The official length of an EF tour does not include stay-ahead, stay-behind, or any optional periods or activities when travelers are not escorted by a Tour Director.

### What if a refund is due?

Where applicable, refunds for overpayment will be issued upon request and after the most recent payment has been in the traveler's account for 21 days. Refunds will be issued back to the original form of payment unless that is no longer valid, in which case a refund check will be issued in the name that appears on the traveler's account. All refund checks are mailed 4-6 weeks after the request has been processed. There will be a non-refundable $35 stop-payment fee for lost refund checks.

### Non-Refundable Fees

Non-Refundable Fees are defined as the Enrollment Deposit ($95), Global Travel Protection plan cost ($165), Global Travel Protection Plus plan cost ($460) and Manual Payment Plan Fee ($50) as well as any late fees, late enrollment fees, Automatic Payment Plan decline charges, return check/ direct debit fees, late special travel request fees and canceled check fees which have been applied to the account at the time of cancellation.

### What about lost belongings?

EF is not responsible for loss of passports, airline tickets, or other documents, or for loss of or damage to luggage or any other passenger belongings. In the case of lost travel documents, the traveler is solely responsible for meeting the airline's requirements (both logistical and financial) for ticket replacement.

### What about travelers with food allergies?

EF recognizes that some travelers may have severe food allergies. We will do our best to ensure that our suppliers are informed of the situation, but we cannot guarantee that all requests will be accommodated. Travelers are responsible for making their own arrangements for all in-flight meals.

### How can I protect myself from the risk of COVID-19 while on tour?

Taking personal responsibility for your wellbeing begins with packing any personal protective equipment and sanitizers you require. Adopt physical distancing and hygiene practices throughout your pre-trip travel arrangements and follow all health instruction whether physical signage, or requests from the Tour Director or our staff once on tour.

### What items are prohibited from tour?

For the safety and well-being of all travelers, no firearms or any other weapons are permitted on tour except as required by law.

### What if my tour dates do not fall in the range covered by these Booking Conditions?

Visit eftours.com/bc for the most recent version of the latest travel year's Booking Conditions. The most current Booking Conditions will apply.

### PERSONAL DATA

EF will process your personal data in compliance with applicable data protection legislation for the purposes of completing your enrollment, customer service, the purchase of an offered travel protection plan, and providing you with the products and services related to your tour. This may entail sharing your personal data with corporate affiliates, claims handlers, insurance providers, and other business partners both within and outside the U.S., including to and within the EEA/Switzerland. We have put appropriate safeguards in place for such transfers of your personal data, including the standard data protection clauses adopted by the European Commission. EF may also use your personal data, combined with data from third parties, to market products and services based on your interests, including by email and SMS/text. You may contact EF at any time to unsubscribe from any direct marketing purposes.

We will only keep your personal data for as long as it is necessary for the purposes for which it has been collected or in accordance with time limits stipulated by law and good market practice, unless further retention is necessary for compliance with a legal obligation or for the establishment, exercise or defense of legal claims. We will keep your personal data for marketing purposes until you withdraw your consent. If you have questions about the processing or use of your personal data, would like to have a copy of the information EF holds about you, or have inaccurate personal data corrected or erased, please contact Traveler Support at 800-665-5364.

### PROTECTION FOR TRAVELERS' PAYMENTS

Traveler's tour money has protection in the unlikely event of EF bankruptcy, insolvency, or cessation of business under our participation in the United States Tour Operators Association (USTOA) $1 Million Travelers Assistance Program. For program details and a list of its affiliates, contact USTOA by mail at 275 Madison Avenue, Suite 2014, NY, NY 10016, by email at information@ustoa.com, or online at USTOA.com.

### TERMS AND PROVISIONS

The terms and provisions of these Booking Conditions supersede any other warranties, representations, terms, or conditions, unless they are expressly stated within a Booking Conditions Addendum or in a letter signed by an EF officer. While EF makes every effort to ensure the accuracy of its publications, it cannot be held responsible for typographical or printing errors (including prices).

The tour operator for your trip is EF Education First International, Ltd., Selnaustrasse 30, 8001 Zurich, Switzerland, organization number CHE-109.874.655, VAT number CHE-116.325.678 MWST. EF Institute for Cultural Exchange, Inc. is an affiliate of EF Education First International, Ltd. and acts only as a marketing services provider for that company. EF Institute for Cultural Exchange Inc. is not an agent of EF Education First International, Ltd., does not provide any goods or services for your trip, and is located at Two Education Circle, Cambridge, MA 02141 (t: 800-665-5364). The services provided are tax-exempt with credit in accordance with Swiss Federal Law with regard to VAT Article #23.

EF is a registered as a Seller of Travel with the following states: Florida (Reg. No. ST36778); California (Reg. No. 2015641-20); Washington (Reg. No. 603084928); Iowa (Reg. No. TA1300).

## Cancellations and Modifications

### STANDARD CANCELLATION POLICY

The cancellation policies outlined below take into consideration the costs EF incurs long before groups ever depart. Notice of cancellation from an EF tour will only be accepted from the traveler, his or her legal guardian, or the Group Leader. The date of cancellation will be determined by the date on which EF receives notice. In order to qualify for refunds in accordance with EF's Standard Cancellation Policy, all payments must be received on time.

### EF's Standard Cancellation Policy*

– 150 days or more prior to departure: Full refund less the $95 non-refundable deposit, all Non-Refundable Fees, and a $300 cancellation fee.

– 149 to 110 days prior to departure: Full refund less the $95 non-refundable deposit, all Non-Refundable Fees, and a $500 cancellation fee.

– 109 to 45 days prior to departure: Full refund less the $95 non-refundable deposit, all Non-Refundable Fees, and 50% of the program price.

– 44 days or less prior to departure: No refund will be issued.

*Travelers who purchase a Global Travel Protection plan have the opportunity to cancel the trip until 60 days prior to departure due to reasons not covered by the insurance underwritten by United States Fire Insurance Company and have the option to rebook to another EF Educational Tour within 30 days of such cancellation. Traveler is responsible for finding a new tour, and final placement is based on availability. Such tour needs to take place within 180 days from cancellation, and any difference in price will be covered by the traveler (non-refundable fees from the original tour will not be put toward the rebooked tour). This benefit is not an insurance provided by United States Fire Insurance Company.

*Travelers who purchase the Global Travel Protection Plus plan have the option to cancel with a non-insurance Cancel for Any Reason waiver provided by EF Educational Tours. The non-insurance Cancel for Any Reason waiver provided by EF Educational Tours provides a cash refund for trip costs paid to EF Educational Tours for cancellation prior to departure. For plans issued in New York, customers

L.F. 0486

Exhibit Plaintiff
Case 4:23-cv-01038-KM   Document 113-8   Filed 09/17/25   Page 130 of 151

can purchase the non-insurance Cancel for Any Reason waiver separately from the rest of the travel protection plan – for further details, please contact Specialty Insurance Solutions at 877-974-7462 ext. 321.

**Cancellation with replacement\*\***

– *150 days or more prior to departure:* Full refund less the $95 non-refundable deposit and all Non-Refundable Fees.

– *149 to 110 days prior to departure:* Full refund less the $95 non-refundable deposit, all Non-Refundable Fees, and a $100 substitution fee.

– *109 days or less prior to departure:* Replacements can no longer be accepted and EF's Standard Cancellation Policy will apply.

\*\* Cancellation with replacement refers to a traveler who cancels but finds a person to replace him or her for the same program. The replacement's Enrollment Form must be submitted at the same time as the notification of cancellation.

**GROUP LEADER CANCELLATIONS**

A Group Leader must accompany travelers on every tour. If a Group Leader cancels for any reason, he or she will be asked to assign a new Group Leader. Any travelers who cancel at this point and choose not to travel with their replacement Group Leader will be treated as standard cancellations. If no replacement Group Leader is found, the affected travelers will need to cancel to be eligible for EF's Standard Cancellation Policy. Those travelers interested in being placed with a new tour group should contact EF at 800-665-5364. If we cannot find a new tour for these travelers, EF's Standard Cancellation Policy will apply.

**CANCELLATIONS OR MODIFICATIONS REQUIRED BY EXTERNAL EVENTS BEYOND EF'S REASONABLE CONTROL**

EF shall not be liable to any traveler for the need to cancel, modify, or postpone the tour as a result of events that are beyond EF's reasonable control. These matters include such "acts of God" or force majeure events as actual or threats of: epidemics or pandemics, or other public health issues or emergencies (such as but not limited to the current COVID-19 pandemic); severe weather events or natural disasters such as but not limited to hurricanes, earthquakes, tsunamis, tornadoes, fires, floods, volcanic activity, or landslides; war (whether declared or undeclared); terrorist activities; instability in a destination location; incidents of violence, riot, sabotage, civil commotion, or nationalization; strikes or labor disputes or lockouts; government orders, sanctions, actual or potential quarantines, or other restrictions affecting travel in, to, or around a location; disruption to transportation; chemical or radioactive contamination; or any other reason that makes it actually or potentially impossible or illegal for EF to conduct the tour as originally contracted. EF incurs substantial non-recoverable costs and expenses of its own in planning, preparing, and pre-paying amounts for such tours. Accordingly, if EF cancels a tour for any such reason, travelers will receive an EF future travel voucher for all monies paid, less the cost of any purchased travel protection plan. Cancellation, modification, or postponement by EF for causes described in this section shall not be a violation of its obligations to any traveler.

**COVID-19 CANCELLATIONS OR MODIFICATIONS BY EF**

In the event external events beyond EF's reasonable control have not rendered a tour program impossible or illegal to depart as scheduled yet EF decides in its sole discretion that the program must nevertheless be cancelled, modified, or postponed due to health or safety concerns related to the COVID-19 pandemic or because issues related to the COVID-19 pandemic would affect the quality of the program, travelers acknowledge that EF's sole obligation to them will be to issue a COVID-19 Future Travel Voucher that may be used for future travel or exchanged for the cash refund option consistent with all terms and conditions set forth in the COVID-19 Peace of Mind section of these Booking Conditions. EF and the enrolled traveler agree that, in the event of a cancellation, modification, or postponement of a tour program by EF consistent with this provision, the cash refund option made available through the exchange of the COVID-19 Future Travel Voucher shall constitute fair consideration under the circumstances.

## Peace of Mind Program

We understand that plans can change due to unforeseen circumstances. EF provides an exclusive Peace of Mind program to account for such situations. This program is automatically included for all travelers and can be enacted at the group level for any reason, including terrorism or other world events. Your Group Leader may choose from the following options:

**45 days or more prior to departure**

– Change the travel dates of your group's current tour

– Work with EF to modify your group's current tour or find a new tour

– Cancel your tour and all travelers will receive a transferrable travel voucher

**44 days or less prior to departure**

If any location(s) included in the group's tour itinerary is designated as a Travel Advisory Level 3 or 4 by the U.S. Department of State, your Group Leader may still choose any option from the section above.

**Peace of Mind Program Terms & Conditions**

Benefits of the Peace of Mind program are only available to the entire group and not to individual travelers. Travelers missing any payment deadlines must pay any incurred late fees to qualify for this program. Revised tours must fall within the date range that these Booking Conditions are valid. If the revised tour has a higher price than the original tour, travelers will be required to pay the difference as a condition of traveling on the revised tour. If EF cannot accommodate a revised tour request and/or the group decides not to travel on the original tour, then the group may opt for travel vouchers. If the group does not travel on the original tour, travel on a revised tour, or receive a future travel voucher, standard cancellation fees will apply. Travelers cancelling from a revised tour will be charged a cancellation fee based on the date that the original tour was revised or the date of cancellation from the revised tour, whichever is higher. EF will make every effort to accommodate revised tour requests. Travel vouchers will be issued in the amount of all monies paid by a traveler for the original tour less the $95 non-refundable deposit and any other non-refundable fees. Travel vouchers are valid for the current and following travel year. Travel vouchers are transferable at the face value of the voucher to members of the traveler's immediate family or to students and faculty of the traveler's school. The future travel voucher is not a merchandise credit or a gift certificate and may not be redeemed for cash.

**COVID-19 Peace of Mind Program**

In addition to our standard Peace of Mind program, EF provides an exclusive COVID-19 Peace of Mind program to account for situations related to the COVID-19 pandemic. This program is automatically included for all travelers and can be enacted at the group level and specific options can be implemented at the individual level.

For programs scheduled to depart between October 1, 2020 and September 30, 2021, your Group Leader can enact the COVID-19 Peace of Mind program in the event that any of the following conditions occur as a result of the COVID-19 pandemic between 109 to 45 days prior to your tour program's original departure date:

– a U.S. federal governmental authority has issued a travel ban or an order restricting travel to a location on your group's itinerary

– a U.S. federal or state governmental authority has issued an order that would require a self-quarantine for travelers in your group upon return home from a location on your group's itinerary

– a governmental order applicable to a location on your group's itinerary would ban or restrict travel or require visitors to self-quarantine upon arrival

If COVID-19 Peace of Mind is enacted, your Group Leader may choose one of the following COVID-19 Options:

– Change the travel dates or tour itinerary of your group's current tour; or

– Cancel your tour with each traveler receiving a transferable COVID-19 Future Travel Voucher for 100% of all money paid to EF; or

– Cancel your tour with each traveler receiving a cash refund for all of the money paid to EF less $500

**COVID-19 Peace of Mind Program Terms & Conditions**

The benefits of the COVID-19 Peace of Mind program are available at the group level and for individual travelers. So long as the COVID-19 Peace of Mind program would apply, individual travelers can choose to cancel from their original tour or revised tour and receive a COVID-19 Future Travel Voucher to be used for future travel or exchanged for the cash refund option detailed above. Travelers missing any payment deadlines must pay any incurred late fees to qualify for this program. EF will make every effort to accommodate revised tour requests. Revised tours must fall within the date range that these Booking Conditions are valid. If the revised tour has a higher price than the original tour, travelers will be required to pay the difference as a condition of traveling on the revised tour. If the group does not travel on the original tour, travel on a revised tour, or if EF cannot accommodate a revised tour request, the travelers will receive COVID-19 Future Travel Vouchers. Travelers cancelling from a revised tour will be charged a cancellation fee based on the date that the original tour was revised or the date of cancellation from the revised tour, whichever is higher. COVID-19 Future Travel Vouchers will be issued in the amount of all monies paid by a traveler for the original tour. COVID-19 Future Travel Vouchers are valid for the current and following two travel years expiring on September 30, 2023 and may be exchanged during that time period for the cash refund option set forth in this COVID-19 Peace of Mind program provision COVID-19 Future Travel Vouchers are transferable at the face value of the voucher to members of the traveler's immediate family or to students and faculty of the traveler's school. The COVID-19 Future Travel Voucher is not a merchandise credit or a gift certificate.

## Payment Plan Terms and Conditions

Should you choose the Automatic Payment Plan or Manual Payment Plan, the following Terms and Conditions apply.

**AUTOMATIC PAYMENT PLAN**

– Travelers must select a payment method of either direct debit from a checking account or an ATM/debit card (card must display the Visa or MasterCard logo).

– EF must have the checking account or card holder signature on the Enrollment Form, electronic signature, or verbal authorization indicating agreement to EF's Automatic Payment Plan Terms and Conditions before the plan is activated.

– A minimum of three months of automated payments are required. Travelers who are not eligible for the Automatic Payment Plan must pay in full upon enrollment or enroll in the Manual Payment Plan.

– Travelers must provide a valid email address and pay the tour's $95 non-refundable deposit before the plan is activated.

– Travelers who choose monthly payments must choose a date between the 1st and 26th of the month on which their account will be automatically debited.

– Travelers who choose bi-weekly payments must choose a weekday on which their account will be automatically debited.

– Due to weekends and holidays, EF reserves the right to debit the travelers' account up to three days after the scheduled date.

– The Automatic Payment Plan amounts are subject to change if tour items or payments (other than the Automatic Payment Plan) are added or removed in excess of $20. All other items or payments totaling $20 or less that are added or removed will only be reflected in the final payment.

– After the Automatic Payment Plan's final scheduled payment, any additional items are due at time of purchase. Payments will no longer be automatically deducted.

– A non-refundable $35 fee will be assessed each time a payment is returned or declined. In these cases, the plan will be recalculated to have the missed payment redistributed across the remaining schedule. EF reserves the right to withdraw travelers from the plan for returns or declines in two consecutive payments. Should the final payment be returned or declined, travelers will automatically be withdrawn from the plan.

– Travelers are not charged late fees while enrolled in the Automatic Payment Plan. If the traveler opts to withdraw from the plan or is withdrawn by EF, the traveler will be enrolled in the Manual Payment Plan, and the $50 plan fee will be assessed.

– All of the above terms and conditions of the Automatic Payment Plan also apply to travelers on EF Tours for Girls programs.

**MANUAL PAYMENT PLAN**

– If travelers do not pay in full upon enrollment or choose the Automatic Payment Plan, they will be enrolled in the Manual Payment Plan and a non-refundable $50 plan fee will be applied.

– Based on date of enrollment, travelers will be invoiced up to three payments. The first payment of $500 is due 30 days after enrollment. The second payment of $500 is due 90 days after enrollment. The remaining balance is due 110 days prior to departure.

– Based on date of enrollment, travelers on an EF Tours for Girls program will be invoiced up to four payments. The deposit of $95 is due at the time of enrollment. The first payment of $300 is due 60 days after enrollment. The second payment of $500 is due 14 months prior to departure. The third payment of $500 is due 9 months prior to departure. The remaining balance is due 110 days prior to departure.

– A late fee of $95 will be assessed for any missed payment. All late fees are non-refundable.

– Travelers can pay with ATM/debit card, credit card (card must display the Visa or MasterCard logo), or personal checks.

– Payments made by personal check must be submitted with the traveler's name and account number.

– A non-refundable $35 fee will be assessed each time a payment is returned or declined.

– Travelers are responsible for making on-time payments even if an invoice is not received.

– All payment due dates refer to the dates by which each payment must be received by EF.

– EF reserves the right to cancel the traveler's reservation if any payment is past due by 30 days (or 15 days after final payment).

– Payment for the Global Travel Protection plan or Global Travel Protection Plus plan is due at time of purchase, and the plan will not be purchased until payment is received.

## Paperless Billing Terms and Conditions

For travelers enrolled in Paperless Billing, the following Terms and Conditions apply:

– Travelers will receive electronic invoices in connection with all information related to their EF account, including tour invoices, and other notices that are available in electronic format. Travelers understand this means that, once enrolled, they will not receive paper copies. Invoice reminders will be sent to the primary contact e-mail address that travelers provide on their enrollment form. Travelers may view and print invoices by logging into their account at eftours.com.

– EF is not responsible for any delay or failure to deliver any invoice, and travelers understand that nothing in these Terms and Conditions relieves obligation to pay any invoice.

– Travelers may elect not to receive electronic invoices and change to billing by US mail at any time by logging into account at eftours.com or by calling 800-665-5364.

– To the extent permitted by law, paperless billing is provided "as is" with faults and without warranties of any kind, either expressed or implied. Travelers assume all responsibility and risk for use of paperless billing. EF does not warrant that the information, processes, or services will be uninterrupted, or bug or error free.

## DIVERSITY, EQUITY, INCLUSION AND BELONGING

EF is committed to providing an inclusive tour experience, and all of our travelers play a role in this. On tour, you will meet people who represent a variety of backgrounds and beliefs and explore diverse cultures and histories. Our goal is to create an environment that celebrates these differences and fosters learning more about the world, yourself, and yourself in the world.

## EF's Rules of the Road

When you enroll on tour, you agree to EF's Rules of the Road, which can also be found on your personalized website. If you do not conform to these regulations or any specific rules set by your Group Leader, you risk dismissal from the tour, returning home at your expense with no refund for the missed tour portion. Decisions regarding tour dismissal are up to EF and/or your Group Leader.

**All travelers must adhere to the following regulations while on tour:**

1. All scheduled activities are obligatory. If you are sick, have signs of becoming sick, or have a physical ailment that might prevent you from participating in an activity, you must tell the Group Leader, who should notify the Tour Director.

2. If you want to visit friends or relatives in a destination country, your Group Leader must be told before the tour begins. Please complete the Tour Leave Form, found under Forms and Resources on the Help Center (eftours.com/help-center), to receive permission for the visits. You must then give the form to your Tour Director upon arrival.

3. You are expected to respect the nightly curfew that your Group Leader may set for your own safety and security. Room checks will be conducted at the Group Leader's discretion. Visitors or group members of the opposite sex are not permitted in your room.

4. Smoking is not allowed on buses, during meals, in hotel rooms, or in any other shared, enclosed space.

5. Hitchhiking and the driving or renting of any motor vehicle is strictly forbidden for all travelers.

6. You are required to pay for any phone calls or incidental personal expenses incurred at hotels. These will be payable the evening before departure at each hotel.

7. Travelers under the age of 18 may not consume alcohol on tour. Travelers over the age of 18 (or older, if local laws require) may consume beer or wine in moderation. The consumption of hard liquor is strictly forbidden. Group Leaders and/or parents may prohibit all alcohol consumption at their discretion. Excessive drinking by any traveler will not be tolerated and will result in dismissal from tour at the traveler's own expense.

8. Illegal activities will not be tolerated and are punishable by immediate dismissal from the tour. If you are involved in any illegal activities, all costs to return home are at your own expense. If the local authorities are involved, you will be subject to the laws of the country you are visiting.

9. Payment for damage done to hotel rooms or to buses is your responsibility. If you notice any damage upon arrival at a hotel, you should notify the Tour Director immediately.

## Release and Agreement

I (or parent or legal guardian if enrollee is under 18 or a minor under any other applicable law) have read, understand and agree to the following in exchange for enrollment on an EF Educational Tour:

1. I acknowledge and understand that my tour is operated outside of the U.S. by EF Education First International, Ltd., Switzerland, and that EF Institute for Cultural Exchange, Inc. acts only as a marketing service provider for that company.

2. EF Institute for Cultural Exchange, Inc., EF Education First International, Ltd., and their affiliated companies, partners, and any companies acting on their behalf, along with their officers, directors, employees, agents, and authorized representatives (collectively referred to herein as "EF") do not own or operate any entity which is to or does provide goods or services for my program, including, for example, hotels; arrangements for, ownership of, or control over houses, apartments, or other lodging facilities; tour directors; airline, vessel, bus, or other transportation companies; local ground operators; visa processing services; providers or organizers of optional excursions; or food service or entertainment providers; etc. I acknowledge that all such persons and entities, specifically the Tour Director assigned to my tour, are independent contractors and not employees or agents of EF. As a result, EF is not liable for any negligent or willful act or failure to act of any such person or entity or of any third party.

3. Without limitation, EF is not responsible for any injury, loss or damage to person or property, death, delay, or inconvenience in connection with the provision of any goods or services occasioned by or resulting from, but not limited to, acts of God; force majeure; acts of government; acts of war or civil unrest; insurrection or revolt; strikes or other labor activities; public health issues or emergencies, epidemics, pandemics, plagues, outbreaks of infectious disease, mass-illness; criminal, terrorist, or threatened terrorist activities of any kind; overbooking or downgrading of accommodations; structural or other defective conditions in houses, apartments, or other lodging facilities (or in any heating, plumbing, electrical, or structural problem therein); mechanical or other failure of airplanes or other means of transportation or for any failure of any transportation mechanism to arrive or depart timely or safely; financial failure or other defaults by suppliers; dangers associated with water-based activities; dangers associated with or bites from animals, insects, or pests; sanitation problems; food poisoning; lack of access to or quality of medical care; difficulty in evacuation in case of a medical or other emergency; or any negligent or willful act or failure to act of any third party or for any other cause beyond the direct control of EF.

4. I agree to release EF and my school, my school district, my school board, my Group Leader, and Tour Director (collectively, the "Released Parties") from, and agree not to sue the Released Parties for, any and all claims of any nature related in any manner to my participation in an EF-sponsored tour or a Service Learning Tour, including, but not limited to, claims for negligence, breach of contract, breach of express or implied warranties, negligence or wrongful death, or any statutorily based claim. I hereby unconditionally and unequivocally waive any and all claims and demands for all damages, losses, costs and expenses of any nature whatsoever (including attorneys' fees) on account of or arising out of any and all personal injury, death, bodily injury, mental anguish, emotional distress, or property or other damage that I may suffer from any cause whatsoever related in any way to my participation in any EF-sponsored tour or a Service Learning Tour.

5. I understand that travel in other nations is not similar to travel within the United States. Travel outside of the United States can involve inconvenience and risk, including, but not limited to, forces of nature, geographic and climatic conditions, different hygienic standards, infrastructure problems (including road maintenance, transportation delays and accommodation conditions), civil unrest, vandalism, crime, political instability, and terrorism. Medical services or facilities may not be readily available or available at all during all or part of a program and, if available, may not be equal to standards in the participant's home country. I understand that a Service Learning Tour is a physically demanding excursion in a developing country, and I knowingly assume the risks of such an excursion. I further understand that different parts of the world present unique health, disease, and safety concerns, and I agree to review any specific risks related to my destination by visiting the Centers for Disease Control and Prevention's Traveler's Health website at www.cdc.gov/travel and the State Department's International Travel website at travel.state.gov/content/travel/en/international-travel.html. I assume all risk of bodily injury, death, emotional trauma, property damage, inconvenience, and/or loss resulting from negligence or any other acts of any and all persons or entities, however caused, including, but not limited to, those risks mentioned above. It is my intention fully to assume all of the risks of travel and participation in the program and to release the Released Parties from any and all liabilities to the maximum extent permitted by law.

6. I further agree to release the Released Parties from any and all decisions to cancel, modify, or delay the tour as a result of unforeseeable events that are beyond the reasonable control of EF or which become necessary or advisable for my safety or for the quality of the tour experience.

7. I agree that this Release applies to and binds myself and my minor child enrolling on tour (if applicable) along with my personal representatives, executors, heirs, and family.

8. In addition, EF shall have no responsibility for me whatsoever when I am absent from an EF-supervised activity or for non-supervised activities, such as visits to friends or relatives or during stay-ahead/stay-behind option periods or any other optional period or activity when not escorted by a Tour Director.

9. My tour begins with the takeoff from the EF departure airport and ends upon completion of the flight back to the origination (or other arrival) airport.

10. The air carrier's liability for loss of or damage to baggage or property, or for death or injury to person, is subject to and limited by the airlines' contract of carriage, its tariff, the Montreal Convention or Warsaw Convention and their amendments or both.

11. EF or my Group Leader reserves the right to refuse or cancel my registration at its sole discretion. In such event, standard cancellation policies as outlined in the Booking Conditions apply.

12. I agree to abide by EF's regulations and the directions of my Group Leader, my Tour Director, and EF's personnel during my tour. Failure to do so may result in my Group Leader or EF terminating me from the tour immediately. I understand that to disobey such rules or directions is to waive the right to a refund of any part of my program price, and that my Group Leader or EF may then send me home at my own expense.

13. I agree to abide by all local laws, regulations, and governmental advisories for all locations of my tour while abroad. I understand that if I refuse to follow, abuse, or disobey those laws, even unintentionally, I waive my right to a refund of any part of the program price, and my Group Leader or EF may send me home at my own expense. I also understand that, should local authorities be involved, I will be subject to the laws of the country I am visiting.

14. If I become ill or incapacitated, EF and their employees, my Tour Director, or my Group Leader, may take any action they deem necessary for my safety and wellbeing, including notifying parents/guardians and/or securing medical treatment (at my own expense) and transporting me home. EF retains the right, in its sole discretion, to contact the traveler's parents/guardians with regard to health issues or any matter whatsoever that relates to the traveler's tour. These rights transcend any and all privacy regulations that may apply. In the event of a medical emergency, EF will attempt to cause appropriate treatment to be administered, and the traveler authorizes EF to do so. EF, however, makes no warranty that it will be able to cause effective (or any) emergency treatment to be administered or to be timely administered.

15. I have made the choice to travel with the teacher/Group Leader organizing my group. I understand that this choice is not the responsibility of EF. I understand that my Group Leader is able to make decisions on my behalf, including but not limited to changing the group's requested tour or travel date and requiring that I purchase items such as the Global Travel Protection plan and optional excursions. I understand that a Group Leader must accompany me on tour. If my Group Leader cancels for any reason, EF will ask him or her to assign a new Group Leader. If I cancel at this point and choose not to travel with the replacement Group Leader, I will be treated as a standard cancellation. If no replacement Group Leader can be found, I will need to cancel and EF's Standard Cancellation Policy will apply. I may also request that EF place me with a new tour group. If EF cannot find a new tour group for me, EF's Standard Cancellation Policy will apply.

16. If I will be age 20 or older at any time during my tour, I acknowledge that EF will conduct a criminal background check ("CBC") as a pre-condition to travel. If such a traveler refuses to consent to the CBC, it will be deemed a cancellation and EF's Standard Cancellation Policy will apply.

17. This Release and Agreement and EF's Booking Conditions constitute the entire agreement between EF and me with reference to the subject matter herein, and I do not rely upon any promises, inducements, marketing materials, or agreements not herein, including, but not limited to, any oral statements made to me by any agents or employees of EF or by my school or Group Leader. This agreement may be amended or modified only in a writing, signed by EF. The waiver by EF of any provision of this agreement shall in no way affect the remaining provisions of this agreement, and this agreement shall be interpreted as if such clause or provision were not contained herein.

18. This agreement and performance hereunder shall be governed in all respects by the substantive laws of the Commonwealth of Massachusetts. In the event of any claim, dispute, or proceeding arising out of my relationship with EF, or any claim which arises between the Parties, whether or not related to this agreement, the literature for the trip or the trip itself, it shall be resolved solely in courts of the Commonwealth of Massachusetts and/or the United States District Court for the District of Massachusetts.

19. For travelers in Utah only: This tour is not sponsored by any public school, public school district, or other public entity and is operated and organized by a privately owned company.

20. EF may use any film or digital likeness taken of me and any of my comments while on an EF tour as well as any project work (including, but not limited to, online learning programs offered by EF) for future publicity without compensation to me and also use my contact information for future EF promotions. I have read and agreed to the Terms of Use and Privacy Policy outlined at eftours.com/legal-notices and I consent to EF's processing of my personal data.

21. I have read and agreed to the Terms of Use and Privacy Policy outlined at eftours.com/legal-notices, and I consent to EF's processing of my personal data as set forth on page 17.

## LIMITED POWER OF ATTORNEY

**For parents/guardians of travelers under the age of 18 or a minor under any applicable law**

The tour itinerary may include certain activities (such as whitewater rafting in Costa Rica) that may require the Group Leader to sign a release on behalf of the travelers (who are minors and cannot sign for themselves) in order to allow participation. This Limited Power of Attorney allows the Group Leader to execute these documents on your behalf should the need arise. Your execution of this Limited Power of Attorney is voluntary, and if you choose not to grant this Limited Power of Attorney, your child may still participate in the tour but may not be able to participate in some tour activities. With regard to said activities:

1. I understand and agree that my child, with my permission, has voluntarily chosen to participate in the activities, and we assume all dangers and risks associated with the activities.

2. I do hereby delegate to the Group Leader a "Limited Power of Attorney" and full authority to sign any documents, including, but not limited to, liability releases, permission slips, waivers, and/or any other type of participation agreement required by the operators of any activity for participation. By signing the EF Educational Tours Enrollment Form, I understand and agree to the above.

L.F. 0487

Case 4:23-cv-01038-KM    Document 113-8    Filed 09/17/25    Page 132 of 151

Exhibit F, Plaintiff

L.F. 0488

**BRISCILLA**



**SHANII**

# One trip.
# Two changed lives.

Traveling to the other side of the world is no small feat—something that 16-year-old Shanii and her mother Briscilla were well aware of. After overcoming a bit of initial nervousness, both mother and daughter experienced some big changes. Here's their story.

### On letting go

"The tour was like a test. Like, if she can make it in China then she can go anywhere. As a parent, you want to prepare your child to fly, and her going to China was exactly that. Yes, you're freaking out, but you can do this." –Briscilla

### On making it happen

"When I saw the tour to China, I was like, 'Mom, listen. I have to go to China.'" –Shanii

"I don't think for parents there's such a thing as a dumb question, especially when your kid is going away. Sometimes you just get nervous and when you read something, it doesn't stick. But when EF tells you, it makes sense." –Briscilla

### On cultural differences

"It's surprising how much you learn by going to another country without realizing it, and how different people can be while still being people. And it helps you realize how similar people can be but still be different." –Shanii

### On moving away for college

"I was like, 'Well, I went to China. How hard can Boston be?' It's not that far. It's still the U.S., so I thought, 'Yeah, I got this.'" –Shanii

### On showing them the world

"It was just a few days, but it's totally changed her perspective on how the world works. When you go out into the world and you're able to talk to new people, change is inevitable. You evolve and grow. And I saw that change in her." –Briscilla

**Hear the full story:**
Scan the code with your phone's camera or visit **eftours.com/gettingthere**

24    eftours.com/enroll

"I saw joy on my students' faces. Being immersed in the local culture gave everyone a confidence they will always carry with them."

Katie N., WI (Teacher)

Exhibit F, Plaintiff



"This experience took our daughter out of her comfort zone in so many ways. She came home changed."

Teresa R., NC (Parent)

Ready to give your child a global perspective? Enroll them on tour today.



Visit
eftours.com/enroll

OR

Contact our Traveler Support Team at 800-665-5364

EF / EDUCATIONAL TOURS





# Get there

A parent's guide to making student travel happen

L.F. 0489

Case 4:23-cv-01038-KM    Document 113-8    Filed 09/17/25    Page 134 of 151    Exhibit F, Plaintiff    L.F. 0490



"I stepped outside my comfort zone. I tried unfamiliar foods, spoke Spanish, and danced with locals. It was so worth it."

Grace C., MI (Student)

# They've got this (and you do, too)

Growth happens when new experiences meet open minds. Like when your child encounters a painting that stops them in their tracks—even if they can't explain why yet. Or when they want ketchup and, for the first time, it's up to them to place the order. Growth can show up in big, life-changing realizations or within the littlest of victories.

At EF Educational Tours, we know those new experiences can be nerve-racking—for your child and for you, too. But it's these kinds of experiences that give kids the confidence and cultural awareness they'll carry throughout their lives. And when you have a support system by your side every step of the way, you start to see those experiences for what they really are: catalysts for growth. That's why we're both here, so let's get started.

**02**   Welcome to the EF family

**04**   Impact of educational travel

**06**   Everything you get

**08**   Safety is a non-negotiable

**10**   Planning for the future

**12**   Paying for your tour

**14**   Helping students travel

**16**   Booking Conditions

**24**   Hear from a fellow parent

Case 4:23-cv-01038-KM    Document 113-8    Filed 09/17/25    Page 135 of 151

Exhibit F, Plaintiff

L.F. 0491

# Your partner in travel-y goodness

Here at EF, our goal has always been *Opening the World Through Education*, and we've delivered on that promise for over 55 years. We believe travel is teeming with transformative moments just waiting to be experienced.

## Say hello to your Tour Director

Along with your local teacher (a.k.a. Group Leader), your child's tour will be led by a Tour Director who'll be with them from day one until they head home. They offer around-the-clock support and the training, experience, and local knowledge to keep groups safe. Plus, their personality and logistical wizardry make our tours shine.

**Your child's Tour Director will be:**



**Savvy**

Tour Directors are full of cultural and historical knowledge only a local would have and are comfortable communicating in foreign languages.



**Professional**

Tour Directors undergo a background check, are skilled at handling student groups, and travel with groups for the duration of their tour, ensuring safety for each traveler.



**A teacher at heart**

Tour Directors make tours educational—from delivering illuminating commentary to enabling hands-on learning, they do it all.



**ARTIN**
Actually Greek
Baklava connoisseur
Strong commentary game

Meet Artin, a Tour Director in Greece. When he's not sidestepping ancient ruins, he's designing his own T-shirts and hunting down the best gyro in town. (Yup, he'll share.)



His passions—food, travel, and all things Greek—put a personal spin on his tours.



Travelers describe him as "nurturing," "engaging," and (this one's ours) "warm as the Athenian sun."



Every seaside learning moment or bus-ride lesson is infused with his lifelong love of Greece.

## Questions? Your Traveler Support Specialist has *all* the answers.

They're basically a human search engine for all things EF, so consider them your go-to for any what-ifs or other questions. Don't understand travel coverage options? Want to switch to bi-weekly payments? Got food allergy questions? Your Traveler Support Specialist has your back.

Just give them a call at 800-665-5364 and they'll help you out.

Case 4:23-cv-01038-KM    Document 113-8    Filed 09/17/25    Page 136 of 151

Exhibit F, Plaintiff

L.F. 0492

# The real-life benefits of real-world travel

Just like you, we're thinking about the future. More specifically, how to help your child succeed in their future. That's why when students travel with us they return home with more than a suitcase full of souvenirs—they also gain understanding of cultural differences, global issues, and, most importantly, themselves. Insights that lead the way for small and big transformations. But don't just take it from us.

## 93%

of travelers say their tour expanded their knowledge of the world

## 89%

say they understand more about new people, places, and cultures

## 92%

say they discovered more about themselves

## 88%

of travelers say they grew more confident and independent

Source: EF Educational Tours 2019 Post-Tour Student Survey

"From the moment you get off the plane until you leave, you are learning. EF makes sure you get a real feeling of the culture and all the country has to offer."

Beth H., NC (Teacher)

### Give their tour extra mileage

Our educational tools are designed to give our travelers even more opportunities to grow from their experiences, this time in tangible ways. With EF, students can:

- Earn college credit with a course specially designed for EF tours and offered by Southern New Hampshire University

- Turn their tour into inspiration for a college essay that will stand out to any admissions officer

Case 4:23-cv-01038-KM    Document 113-8    Filed 09/17/25    Page 137 of 151

Exhibit F, Plaintiff

L.F. 0493

# From Airlines to Ziplines

When your child travels with us, you're giving them more than just a seat on a plane—you're giving them all the benefits of partnering with the leader in educational travel.

We're talking about an extensive global presence, culturally rich activities, integrated learning opportunities, and yes, you guessed it: a free backpack.

## Everything that's included

**Airfare and on-tour transportation**
Round-trip flights on major carriers and all on-tour transportation

**Hotel accommodations**
All hotels must meet our high standards for quality, safety, and cleanliness to become a home away from home

**Regional-style meals**
Local cuisine at breakfast and dinner for a more immersive cultural experience

**Guided tours, activities, and entries**
Students experience everything the destination has to offer with educational, insightful, and hands-on learning experiences that enhance their curriculum

**Full-time professional Tour Director**
The Tour Director is full of cultural insights only a local could know and is a constant companion for every traveler's group

**Expert local guides**
Topic-and location-specific guides share their deep knowledge on cultural and historical touchstones with students

**24-hour emergency assistance**
Our Emergency Service & Support Team is available around the clock to help groups from our European and North American offices

**Peace of Mind program**
Automatic coverage that provides flexibility to change travel dates, destination, or itinerary up to 45 days before departure

**Safety precautions and procedures**
We've taken steps including 24/7 response teams in our European and North American offices, background checks, on-site quality control, and more

**Traveler Support resources**
This team will walk you through the what-ifs and how-tos of any topic, including things like payment plans and insurance inquiries

**$50 million general liability policy**
All Group Leaders and their schools are automatically added as additional insureds under our General Liability Policy, which helps safeguard against claims related to covered on-tour incidents like personal injury

**Tour donation page**
Available to every traveler, this easy-to-share page makes it simple for friends and family to contribute a little something that's automatically applied to the balance of their tour

**High school and college credit opportunities**
In addition to the intangible benefits of travel that last forever, students can earn actual credits for transcripts and gain the confidence that comes along with them

**Travel gear**
For style and safety, every traveler gets a complimentary EF backpack and emergency wristband to wear on tour

**College essay help**
Students can receive guidance on turning a life-changing trip into inspiration for essays and college applications

Actually, that's not everything. But it couldn't all fit here.
See the whole list at eftours.com/whats-included

Case 4:23-cv-01038-KM    Document 113-8    Filed 09/17/25    Page 138 of 151

Exhibit F, Plaintiff

L.F. 0494



# Our commitment to safety

Your child's safety is a non-negotiable. We would never send a traveler to a location we believe to be unsafe—and with our extensive global presence, our best-in-the-industry experience, and our close working relationships with U.S. and international authorities, that's a statement we can back up with real insight.

## We're leading the charge on student safety

In addition to following guidance from the U.S. Centers for Disease Control and local and federal authorities around the world, we're developing our own protocols to help keep your child healthy and safe. Our teams are actively innovating on and shaping the new worldwide standards for cleanliness and safety.

## When you need us most, we're always close

We have staff on the ground 365 days a year in over 50 countries. And we call these countries home. EF team members live in nearly every one of our tour destinations. That means we have the local knowledge to help keep our groups safe, and there's always a friendly face nearby to offer a helping hand (or a high five).

### Safety & Incident Response Team

EF's Safety & Incident Response Team is strategically based in our Boston, Panama, Tokyo, and Zurich offices to accommodate for all time zones. Available 24 hours a day, every day of the year, they are trained to react quickly if our travelers need help.

Case 4:23-cv-01038-KM   Document 113-8   Filed 09/17/25   Page 139 of 151   Exhibit F, Plaintiff

L.F. 0495

# Feel confident planning for the future

When you decide to have your child travel with EF, we want you to feel secure in the decision. That's why as the world changes, so do we. By constantly adapting, enhancing, and expanding our policies, we're doing everything we can to make planning for the future as flexible as possible.

For full details on all EF policies, visit **eftours.com/flexibility**



# Flexible and secure traveling

These exclusive benefits are built into every EF program. They provide families and travelers with added security when planning future travel.

### Peace of Mind

We understand plans can change due to unforeseen circumstances. This program accounts for such circumstances and can be enacted anytime up to 45 days prior to departure at the group level for any reason, including terrorism or other world events.

### COVID Care Promise

If any EF customer is diagnosed with—or requires quarantine on account of—COVID-19 while on tour, we'll help facilitate the care and support they need.

### COVID Peace of Mind

In addition to our standard Peace of Mind program, this accounts for situations related to the COVID-19 pandemic. It can be enacted from 109 to 45 days prior to departure at the group level, while specific options can be implemented at the individual level.



# Individual protection

Travelers can help protect their investment and themselves from certain unexpected events and expenses while on tour.

### Global Travel Protection

Provides both pre-departure and post-departure benefits, including medical expense coverage that may apply on tour and tour cancellation for specified reasons.

### Global Travel Protection Plus

To further protect your investment, this plan provides all of the coverage included in the Global Travel Protection plan as well as expanded cancellation protection.

Case 4:23-cv-01038-KM   Document 113-8   Filed 09/17/25   Page 140 of 151   Exhibit F, Plaintiff

L.F. 0496

# Let's do this
## (Payments made easy)

Travel is for everyone and, by breaking the cost of your trip into manageable payments, our recommended **Automatic Payment Plan** makes it possible for everyone, too. With tours planned well ahead of departure, you can make small payments over a long period of time—often up to two years in advance.

✓ Enroll with just $95

✓ Pay with your checking account or debit card*

✓ Choose monthly or bi-weekly payments, down to the very day of the week

✓ Make your final payment about a month before you leave

*Card must display the Visa or Mastercard logo

**Want more options?**
We have other payment plans. Just give us a call at **800-665-5364** and we'll find the right one for you.

## Get a helping hand

Sometimes it takes a village—and a donation page. That's why each of our travelers gets their very own. It's an easy-to-share page where friends and family can contribute to their tour in exchange for, say, mowing the lawn or babysitting, maybe cooking dinner, or just because.



**Build your page**
We give you the platform. You fill in the details.



**Share your page**
Got friends? Share your child's tour donation page through email or social media.



**Get donations**
All contributions are automatically applied to your child's balance. Easy-peasy.



800-665-5364   13

Exhibit F, Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Trenton Fallgatter, on behalf of his natural and biological minor child, L.F., & Morgan Ash, on behalf of her natural and biological minor child, L.F.**<br>**Plaintiffs** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **CIVIL ACTION LAW**<br><br>**NO. 4:23-cv-01038-MWB**<br><br>**JURY TRIAL**<br>**DEMANDED** |
| **vs.** | :<br>:<br>: | |
| **EF Educational Tours,**<br>**EF Education First International, Ltd.,**<br>**EF Institute for Cultural Exchange, Inc.,**<br>**EF Education First International, Ltd.,**<br>**Switzerland,**<br>**Diego Manuel Taylor,**<br>**Jennifer Taylor, &**<br>**John Does I-V**<br>**Defendants** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |

**PLAINTIFFS' RESPONSES TO INTERROGATORIES PROPOUNDED BY
DEFENDANTS EF INSTITUTE FOR CULTURAL EXCHANGE AND EF EDUCATION
FIRST INTERNATIONAL , LTD.**

Plaintiffs Trenton Fallgatter, on behalf of his natural and biological minor child, L.F., &

Morgan Ash, on behalf of her natural and biological minor child, L.F., by and through their

counsel, Hill & Associates, P.C., hereby respond to the Interrogatories Propounded by

Defendants EF Institute for Cultural Exchange and EF Education First International , Ltd. as

follows:

**INTERROGATORIES**

1.    Please state your full name, date of birth, and address.



Exhibit F, Plaintiff

**Trenton Fallgatter**
**7/29/84**
**5243 Corte Estima, Apt. 71**
**Camarillo, CA 93012**

**Morgan Ash**
**8/29/85**
**963 Palmer Ave**
**Camarillo, CA 93010**

2.      Please state how you first learned of the EF Defendants' educational tours, specifically including the June 2022 educational tour of Spain and the Basque Country (the "EF Spain Tour") and describe in detail the steps you took thereafter for L.F. to participate in the EF Spain Tour.

**L▮▮▮▮ was first given information about the trip at school, Rancho Campana High School, through an email to the best of her recollection. L▮▮▮▮ showed the information to her mom, Morgan Ash, and they were interested.  Morgan then reached out to L▮▮▮'s paternal grandmother, Martha Ward, who is knowledgeable about travel and education. Ms. Ward said she knew people who had gone on similar types of trips and agreed it would be a good experience for L▮▮▮.  Morgan also spoke to her boss at Ventura County Medical Center who had a daughter that went on a trip with Education First a year oir two before and had a positive experience, very secure, housing very safe, security on each floor, and girls and boys on different floors.  L▮▮▮ also had a cousin who had gone on a similar trip prior and had a good experience.  L▮▮▮, her mom, and L▮▮▮'s dad, Trent, were all in agreement for L▮▮▮ to go.**

3.      Please identify and describe in detail any written representations, promises, reassurances, or other written information which you relied upon in making the decision to send your minor daughter, L.F., on the EF Spain Tour.

**Morgan, Trent and L▮▮▮ participated in zoom calls at various times with the "leader" from their school group Mr. Arriaga, and had several conversations with him as well.  He gave information about what was going to be happening, and answered the Plaintiffs'**

questions, including confirming that the trip was secure, that the housing was monitored with a chaperone on each floor and that girls and boys were separated by floor.  Since Mr. Arriaga had gone on the trip previously, he had a great deal of information and gave the Plaintiffs much reassurance.  Mr. Arriaga also sent group emails to those going on the trip about deadlines and getting paperwork in, but most of the specific discussions about the trip details were verbal/zoom.  Plaintiffs watched You Tube  on places the trip would visit, Morgan and L███ were on the EF website reading about the trip often, reading reviews, and other families' experiences.  Morgan also went on Reddit to look at reviews.  Plaintiffs thought it was a reputable company, knew it had been around for years, knew of others through Trent's side of the family that had been on an EF trip, and also of her boss's daughter having gone on such a trip before.

4.      Please identify and describe in detail the sign-up and enrollment process for L.F.'s participation on the EF Spain Tour.

**Morgan completed online documents through the EF website to do the enrollment.  Trent, Morgan, and L███  helped L███e get her passport.**

5.      Please identify and describe in detail every communication you, or L.F., had with the EF Defendants, or any Group Leader, relating to L.F.'s participation on the EF Spain Tour.

**Objection to the form of the question as it is vague as to the timeframe being inquired about.  Further, we object to that extent that Defendants consider the group leader not part of the EF Defendants, Plaintiffs object.  Subject to and without waiver of said objection, prior to L███ leaving on the trip, the only verbal communication Plaintiffs had with EF was with their agent, employee, servant, and/or representative, Mr. Arriaga as described in response to Interrogatory No. 3 above.**

6.      Please describe in detail L.F.'s experience on the EF Spain Tour prior to June 27, 2022.

**Objection. This interrogatory is vague, overly broad, and ambiguous with regard to**

**specifically what is being asked via the use of the word "experience" and also the timeframe being covered.  Subject to and without waiver of said objection, when L███ left for the EF Spain Trip she was excited.  Initially she was making friends, specifically with three of the boys and two of the girls from her school, who she knew beforehand but was not "friends" with beforehand more like acquaintances.  Some of these "new friends" were in different grades than L███.  L███ sat with some of these other students on the flight to Spain.  Once they arrived, the newly formed friend group was having fun hanging out, and getting to know each other better.  L███ was feeling excited and having fun right from the start.  The first place the trip went, straight from the airport, was the museum.  The airport transitions were smooth.  The California group had met the Pennsylvania group in the Madrid airport and they had combined to travel in the same buses to the museum.  L███ though the museum was interesting and fun.  Her first interaction with Defendant Diego Taylor was at the museum when he began acting strangely toward her, which conduct is detailed in the Complaint, which is incorporated herein by reference.  In the time that L███ was on the trip, there were threats of discipline made by the EF staff to the group about not drinking or doing drugs, but those rules were not enforced and people were drinking and smoking on the trip.  Nothing was discussed by the EF staff about the boys and girls in the groups dating or having sexual contact with one another.**

7.      Please describe in detail L.F.'s memory of June 26, 2022 and June 27, 2022, and state in chronological order, every action L.F. took during those days.

**Objection. This interrogatory is vague, overly broad, and ambiguous.  L███'s first interaction with Defendant Diego Taylor was at the museum when he began acting strangely toward her, which conduct is detailed in the Complaint, which is incorporated herein by reference.**

8.      Please describe in detail every action L.F. took from the time she left Diego Taylor's hotel room on June 27, 2022, until she left the police station in Burgos, Spain on June 28, 2022.

When L[REDACTED] left Defendant Deigo Taylor's room, she went back to her room and tried to go to sleep. She slept about an hour, as best as she can estimate. L[REDACTED] got up, packed and went to breakfast with her friends. She saw Defendant Deigo who approached her and said "good morning". The group of students got on the bus and headed to Burgos. While in Burgos at a shopping center/plaza with her friends, L[REDACTED] finally told them what happened. Specifically, she told Johnny, Tanner, Aidan, and Annabelle. Her friends encouraged her to report the incident, but L[REDACTED] did not want to and did not know what to do. She was upset and scared. L[REDACTED] was crying and Aidan gave her his sunglasses so people would not know she was crying. She could not eat or even sit at the dinner so she returned to her room and Julia came to check on her. L[REDACTED] then told Julia what had happened and Julia went and got Mr. Arriaga. Mr. Arriaga came to L[REDACTED]'s room and she told him what happened and he went and got the EF Tour Guide, Eduardo, who also came to the room. L[REDACTED] was then taken to the hospital. Mr. Arriaga, Julia, and Eduardo accompanied her to the hospital, which was traumatic for L[REDACTED]. She was interviewed about the incident which she described to hotel staff as set forth in the Complaint, which is incorporated herein by reference, examined, given many medications that she did not understand, that made her feel sick for days, and tasted horribly, she felt violated and not in control all over again. Immediately from the hospital, a police car took L[REDACTED] to the police station. Mr. Arriaga and Julia went with L[REDACTED] to the police station. At the police station, she was exhausted and heavily medicated. L[REDACTED] kept falling asleep from exhaustion and medication. She had difficulty even keeping her head up, they kept giving her Dr. Pepper but it did not help and she was not even able to hold it, dropping it on the floor. Mr. Arriaga was translating for her.

9.      Please identify and describe in detail every communication L.F. had from the time she left Diego Taylor's hotel room on June 27, 2022, until she left the police station in Burgos, Spain on June 28, 2022.

Objection. This interrogatory is vague, overly broad and ambiguous, with regard to the subject matter of the communication being sought, and the participants of the communications being sought.   Subject to and without waiver of said objections, see

Exhibit F, Plaintiff

**preceding response.**

10.    Please describe in detail what occurred at the University Hospital of Burgos (Hospital Universitario de Burgos) in Burgos, Spain once L.F. arrived there on June 27, 2022.

**See response to no. 8 above, as well as the hospital records produced.**

11.    Please identify and describe in detail every communication L.F. had at the University Hospital of Burgos (Hospital Universitario de Burgos) in Burgos Spain, from her arrival until her departure, on June 27, 2022.

**Objection. This interrogatory is vague, overly broad and ambiguous, with regard to the subject matter of the communication being sought, and the participants of the communications being sought.   Subject to and without waiver of said objections, see response to no. 8 above.**

12.    Please describe in detail what occurred at the police station in Burgos, Spain once L.F. arrived there on June 28, 2022.

**See response to No. 8 above.  L⬛⬛⬛ initially was in a waiting room for awhile, and then went into the office.  Mr. Arriaga went in there and translated.  She was exhausted and her head kept falling.  They gave her Dr. Pepper to keep awake, but she dropped it.  The kept repeating questions about what happened and she repeated to them what she had said at the hospital and what is contained in the Complaint.  Mr. Arriaga kept translating.  They knew she was under the influence of medications and had just come from the hospital.**

13.    Please identify and describe in detail every communication L.F. had at the police station in Burgos Spain, from her arrival until her departure, on June 28, 2022.

**See responses to Nos. 8 and 12 above.**

14.    Please describe in detail every action you took from the time you were made aware of L.F.'s allegations against Diego Taylor, until you arrived in Spain.

**While L████ was hospital, Morgan was called by someone named Tara from EF and told to pull over as she knew Morgan was driving. Tara then gave Morgan the details of the event. Morgan called Trent who came to Morgan's home. Morgan and Trent then spoke with Mr. Arriaga about the incident. Megan from EF was then in touch to set up Trent's itinerary for the flight to go get L████. L████ was permitted to stay on the tour if she wanted to but she just wanted to come home. Trent was also communicating with Tori from EF who was the European contact for EF, to the best of his recollection, whereas Megan was here in the U.S. Itinerary information about the travel has been produced.**

15.    Please identify and describe in detail if you, or L.F., spoke with, or cooperated with, any member of the Juvenile Division of the Provincial Prosecution Office for Burgos or any member of the Spain Justice Department. Paper attached had that name on it, but they did not speak with anyone from that office.

**It is unclear who was with what office while Trent and L████ were in Spain; however, Trent was told at some point that he had to file another police report because L████ was a minor and to press charges he needed to file another report. There was also some communication about whether the police report had to be filed in Madrid instead of in Burgos because the incident happened in Madrid. There seemed to be some confusion among the officials about where the report had to be filed, and Plaintiffs were adamant about making certain the charges were pressed. The day after the hospital, L████ had gone to the courthouse with Mr. Arriaga and Julia and had to talk to someone who wanted clarification about some of the details of the incident, revisions were made to the report to the best of L████'s understanding. L████ was told that Defendant Diego Taylor was saying that the sexual intercourse was consensual. Went to another police station a couple days later in Madrid, and Trent was there to press charges. EF tours had a female translator meet Trent there, (Pillar). The officials there said the charges had already been filed and nothing more was needed. It was explained that Defendant Diego Taylor would**

**be held for 24 hours and then released because he was a minor.  They said a court date would be set but that they did not expect him to return for it and he would just likely be detained if he ever tried to enter Spain again.**

16.      Please identify and describe in detail every communication you, or L.F., had with any member of the Juvenile Division of the Provincial Prosecution Office for Burgos or any member of the Spain Justice Department.

**See preceding response.**

17.      Please identify and describe in detail every judicial event or court proceeding that you, or L.F., attended in any capacity relating to L.F.'s allegations against Diego Taylor and describe in detail the outcome of that judicial event or court proceeding.

**See preceding response.**

18.      Please identify every communication, excluding attorney-client communications, that you, or L.F., had after June 27, 2022, until present, relating to L.F.'s allegations against Diego Taylor.  For each communication, please describe: (a) the date and time of the communication; and (b) the mode of the communication.

**Objection. This interrogatory is vague, overly broad and ambiguous, with regard to the subject matter of the communication being sought, and the participants of the communications being sought.   Subject to and without waiver of said objections, upon return to the U.S., L█████ spoke with her former boyfriend Lawrence about the incident, as well as a friend Ava.  However, to Ava, L█████ merely said that something bad happened and that she had to leave the trip early.  L█████ has also spoke to her medical providers about the incident.  Those records have been and are being produced as more become available.**

19.    Please identify and describe in detail every communication you had with the EF Defendants, from the time you learned of L.F.'s allegations against Diego Taylor, until present. For each communication, please describe: (a) the date and time of the communication; (b) the mode of the communication; and (c) the subject of the communication.

**EF did not continue to communicate with Plaintiffs once they returned to the U.S. other than to check that they returned safely, to the best of Plaintiffs' recollection.  In addition, Plaintiffs sought legal representation and so conversations directly with EF ceased for that reason as well.**

20.    Please provide an itemized calculation of damages you and L.F. suffered as a result of the L.F.'s allegations against Diego Taylor which are referenced and alleged in the Complaint.

**Economic damages include the cost of the travel involved in the retrieval of L⬛⬛⬛, and the loss of the money for L⬛⬛⬛ having to leave the trip early, as well as medical copays for treatment related to the incident. The costs of these items, to the extent that they are currently available, are identified on the attached documents.  Plaintiffs reserve the right to supplement this response as additional evidence of the costs incurred are being located.**

21.    Please identify all person(s) that you have retained as an expert witness who you may use at trial.  For each expert, identify: (a) the expert witness's written report; (b) a complete statement of all opinions the expert witness will express and the basis and reasons for them; (c) the facts or data considered by the expert witness in forming their expert opinions; (d) any exhibit that the expert witness will use to summarize or support their expert opinions; (e) the expert witness's qualifications, including a list of all publications authored by the expert witness in the previous ten (10) years; (f) a list of all other cases in which, during the previous four (4) years, the expert witness testified as an expert at trial or by deposition; and (g)  a statement of the compensation to be paid for the expert witness's study and testimony in the case.

Exhibit F, Plaintiff

**Objection. This interrogatory calls for expert information prematurely. The same will be provided in accordance with the Court's scheduling Order.**

22.    Please identify all person(s) who were witnesses to any occurrence, events, facts or circumstances concerning any of the allegations in the Complaint, specifically including the identities and addresses of L.F.'s five friends who L.F. informed of her allegations against Diego Taylor the day after the alleged incident occurred.  For each person, describe in detail the information that person is known or is believed to possess and the person's home address.

**Johnny Mirones- address unknown. L▮▮▮▮ told this individual what transpired the day following.  He witnessed some of Defendant Diego's behavior leading up to the incident.**

**Aiden Compton: address unknown. L▮▮▮▮ told this individual what transpired the day following. He witnessed some of Defendant Diego's behavior leading up to the incident.**

**Annabelle Atkins: address unknown. Roommate who was aware Minor L.F. was stepping out of the room. L▮▮▮▮ told this individual what transpired the day following. She witnessed some of Defendant Diego's behavior leading up to the incident.**

**Tanner Kinsley: address unknown. L▮▮▮▮ told this individual what transpired the day following. He witnessed some of Defendant Diego's behavior leading up to the incident.**

**Julia Rodriguez (presumed minor): address unknown. L▮▮▮▮ told this individual what transpired the day following, and Julia was with L▮▮▮▮ throughout some of the events following the reporting of the incident as set forth in the preceding interrogatory responses. She witnessed some of Defendant Diego's behavior leading up to the incident.**

**Anjelina Salas: other roommate of L▮▮▮▮ She was not aware of the incident until about 2 months later. She witnessed Defendant Diego's behavior leading up to the incident.**

Exhibit F, Plaintiff

**Lawrence Mancini: L████'s former boyfriend. He was not on the trip. L████ informed him of the incident about 2 days after.**

                         **HILL & ASSOCIATES, P.C.**
                         /s/*Susan B. Ayres*

                         **SUSAN B. AYRES, ESQUIRE**
                         **1700 MARKET STREET, SUITE 3150**
                         **PHILADELPHIA, PA 19103**
                         **PHONE: 215-567-7600**
                         **FACSIMILE: 215-525-4311**
                         **SUE@HILLJUSTICE.COM**

Date: 12/13/23