**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| L.F., | CIVIL ACTION NO. 4:23-CV-1038 |
| Plaintiff | |
| v. | (MEHALCHICK, J.) |
| EF EDUCATIONAL TOURS, et al., | |
| Defendant | |

**MEMORANDUM**

Presently before the Court are two motions for summary judgment filed by Defendants EF Educational Tours, EF Education First International, Ltd. (Swiss), EF Education First International, Ltd. (US), EF Institute for Cultural Exchange, Inc. (collectively, "EF"), Jennifer Taylor ("Mrs. Taylor" together with EF, "EF Defendants") (Doc. 98), and Diego Taylor ("Taylor") (Doc. 102). Plaintiffs Morgan Ash ("Ash") and Trenton Fallgatter ("Fallgatter") initiated this action by filing a complaint on behalf of their minor daughter, L.F. ("L.F.") (Doc. 1). For the following reasons, each motion is granted in part and denied in part.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

The following factual background comes from EF Defendants and Taylor's statement of material facts, responses thereto, and exhibits.[1] EF Defendants provides an educational

---

[1] Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. The facts have been taken in the light most favorable to the non-moving party with respect to each motion.

opportunity to enroll in experiential learning programs focused on language, travel, cultural exchange, and academics. (Doc. 99, ¶ 6; Doc. 111, ¶ 6). EF Defendants markets its programs to students and teachers at middle schools and high schools. (Doc. 99, ¶ 7; Doc. 111, ¶ 7). As operators of the educational tour, EF Defendants do not own or operate any of the travel related services that make up the tours, including the hotels and excursions. (Doc. 99, ¶ 10; Doc. 111, ¶ 10). One way in which EF Defendants maintain its affordable cost for all students is to utilize group leaders, usually teachers, to assist and plan the tours for groups of their own students.[2] (Doc. 99, ¶ 13; Doc. 111, ¶ 13). Upon finalizing itineraries, the group leaders host information sessions before parents can enroll their children through an enrollment portal. (Doc. 99, ¶ 15; Doc. 111, ¶ 15). As another way to keep tours affordable and service costs low, EF Defendants consolidated different groups with the same itineraries. (Doc. 99, ¶ 18; Doc. 111, ¶ 18).

On June 19, 2021, Ash enrolled L.F., who was sixteen at the time, to participate in a tour to Spain and the Basque Region (the "Tour"). (Doc. 99, ¶¶ 24, 27; Doc. 111, ¶¶ 24, 27). Evelio Arriaga ("Arriaga") served as the group leader for the California students, and L.F. was a part of the California group. (Doc. 99, ¶¶ 28-29; Doc. 111, ¶¶ 28-29). According to EF, L.F. would have had no permission to enroll and participate on the Tour without agreeing to the Booking Conditions (the "Conditions"). (Doc. 99, ¶ 33). However, L.F. avers that "no such signed document exists, has been provided by the Defendants, or is in the possession of Plaintiff or her parents." (Doc. 111, ¶ 33). The Booking Conditions contain EF's Rules of the

---

[2] L.F. denies that group leaders help "run" the tours (Doc. 111, ¶13) but do not work as employees for EF Defendants. (Doc. 113-4, at 33:2-5).

Road, which Arriaga reviewed with Ash and L.F. (Doc. 99, ¶¶ 35-36; Doc. 111, ¶¶ 35-36). The Rules provide in part:

> When you enroll on tour, you agree to EF's Rules of the Road, which can also be found on your personalized website. If you do not conform to these regulations or any specific rules set by your Group Leader, you risk dismissal from the tour, returning home at your expense with no refund for the missed tour portion. Decisions regarding tour dismissal are up to EF and/or your Group Leader.

(Doc. 99, ¶ 37; Doc. 111, ¶ 37).

> You are expected to respect the nightly curfew that your Group Leader may set for your own safety and security. Room checks will be conducted at the Group Leader's discretion. Visitors or group members of the opposite sex are not permitted in your room.

(Doc. 104, ¶ 16).

Ash discussed the rules with L.F. regarding curfews, room checks, and entering the room of male travelers. (Doc. 99, ¶ 39; Doc. 111, ¶ 39). EF states that L.F. knew about the Tour's curfew rules and the expectation to follow them for her safety. (Doc. 99, ¶ 40). In response, L.F. asserts that "the rules on the tour were unclear and repeatedly broken by participants." (Doc. 99, ¶ 40). L.F. knew that breaking the rules could result in dismissal from the Tour. (Doc. 99, ¶ 42; Doc. 104, ¶ 18; Doc. 111, ¶ 42; Doc. 114, ¶ 18).

L.F. and Ash received more information about the tour from Arriaga by email and Zoom meetings.[3] (Doc. 99, ¶ 44; Doc. 111, ¶ 44). Prior to the tour, Ash believed that boys and girls would be assigned to rooms on different floors of the hotel and testified that she did not learn this idea from an EF representative. (Doc. 99, ¶ 45). Ash testified that an EF representative participated in the Zoom meeting where she learned of this room arrangement.

---

[3] L.F. provides that EF representatives also participated in the Zoom meetings. It is not clear to the Court about when exactly these meetings occurred.

3

(Doc. 111, ¶ 45). EF made no written representations that it would assign students of different genders to different floors of a hotel. (Doc. 99, ¶ 46). In response, L.F. contends that EF had clearly stated that it would handle all room assignments and explained the assigning process on a Zoom meeting by assuring the gender separation. (Doc. 111, ¶ 45).

The Conditions also contain a Release and Agreement (the "Release"). (Doc. 99, ¶ 48; Doc. 111, ¶ 48). The Release provides in part:

> I agree to release EF and my school, my school district, my school board, my Group Leader, and Tour Director (collectively, the "Released Parties") from, and agree not to sue the Released Parties for, any and all claims of any nature related in any manner to my participation in an EF-sponsored tour or a Service Learning Tour, including, but not limited to, claims for negligence, breach of contract, breach of express or implied warranties, negligence or wrongful death, or any statutorily based claim. I hereby unconditionally and unequivocally waive any and all claims and demands for all damages, losses, costs and expenses of any nature whatsoever (including attorneys' fees) on account of or arising out of any and all personal injury, death, bodily injury, mental anguish, emotional distress, or property or other damage that I may suffer from any cause whatsoever related in any way to my participation in any EF-sponsored tour or a Service Learning Tour.

(Doc. 99, ¶ 50; Doc. 111, ¶ 50).

Ash denies that "the Release relied upon by Moving Defendants was provided to the Plaintiff or her parents, that it was reviewed with Plaintiff or her parents, or that it was signed by Plaintiff or her parents." (Doc. 111, ¶ 50).

Taylor, a seventeen-year-old, participated on the Tour as a member of the Pennsylvania group, which Mrs. Taylor, his mother, led. (Doc. 104, ¶¶ 2, 9; Doc. 114, ¶¶ 2, 9). Mrs. Taylor has served as a group leader for approximately six other EF tours prior to the Tour. (Doc. 99, ¶ 58; Doc. 111, ¶ 58). EF combined the two groups, which entailed traveling on one tour bus, staying at the same hotel, and visiting the same museums. (Doc. 104, ¶ 12; Doc. 114, ¶ 12). Mrs. Taylor required that each Pennsylvania traveler read and signed a

Student Behavior Contract, which included expectations of students refraining from sexual conduct, honoring Mrs. Taylor's curfew, not entering the hotel room of the opposite sex, and not leaving hotel rooms after bed checks. (Doc. 104, ¶¶ 20-21). L.F. denied that this occurred or such rules were enforced. (Doc. 114, ¶ 21).

After arriving in Madrid, Spain on June 24, 2022, the two groups visited a museum where L.F. and Taylor began a flirtatious relationship. (Doc. 104, ¶¶ 24-25; Doc. 114, ¶¶ 24-25). At the hotel, L.F. stayed in a room with female members of the California group while Taylor stayed in the directly adjacent room with a male Pennsylvania group member. (Doc. 104, ¶¶ 28-30; Doc. 114, ¶¶ 28-30). On each night of the tour, Mrs. Taylor performed room checks for the female Pennsylvania travelers while her husband, also serving as a chaperone, checked on the male Pennsylvania travelers. (Doc. 104, ¶ 33). L.F. denies that these room checks ever occurred, including on the night of the alleged assault. (Doc. 114, ¶ 33). Over the next two days of the tour, L.F. and Taylor continued to flirt with each other. (Doc. 104, ¶ 37; Doc. 114, ¶ 37). During an afternoon, L.F. informed Ash about Taylor and how she began to feel uncomfortable around him. (Doc. 104, ¶ 38; Doc. 114, ¶ 38). According to EF and Taylor, L.F. did not notify any group leader about her feelings of discomfort. (Doc. 99, ¶ 99; Doc. 104, ¶ 40). L.F. does not admit nor deny this fact. (Doc. 111, ¶ 99; Doc. 114, ¶ 14).

After the curfew on June 26, 2022, the night of the alleged assault, L.F. told her roommates that she was meeting Taylor in the hallway. (Doc. 104, ¶ 43). L.F. admits that she informed her roommates but also submit that she met Taylor after the curfew, given it was inconsistent and not enforced. (Doc. 104, ¶ 43). Taylor states that L.F. voluntarily entered his room, but L.F. denies this fact and asserts that he pulled her in. (Doc. 104, ¶ 46; Doc. 114, ¶ 46). According to Taylor, L.F. did not feel scared or alarmed, had the ability to leave if she

wanted to, and knew that she defied the rules by entering a boy's room after curfew. (Doc. 104, ¶¶ 47-49). L.F. denies these facts and submits that she did voice her concerns, Taylor held her against the wall, and she did not meet Taylor after the curfew. (Doc 114, ¶¶ 47-49). Taylor states that the kissing upon entering the room was consensual. (Doc. 104, ¶ 51). L.F. counters that because Taylor held her against the wall, she engaged in the hopes that he would stop momentarily. (Doc. 114, ¶ 51).

Over the course of approximately three to four hours, L.F. and Taylor engaged in sexual intercourse three to four times. (Doc. 104, ¶ 52). L.F. denies that she stayed in Taylor's room voluntarily because "she was held down on the bed and pulled back into the bed when she tried to get up." (Doc. 114, ¶ 52). L.F. made no attempt to attract notice of anyone outside the room for assistance. (Doc. 104, ¶ 54; Doc. 114, ¶ 54). L.F. further explains that, according to an expert, her behavior aligns with that of sexual assault victims and denies that her lack of attempt to attract notice implies consent. (Doc. 114, ¶ 54). On three separate occasions, Taylor retrieved a towel from the bathroom, but L.F. never attempted to leave his room. (Doc. 104, ¶ 55). Without explicitly denying this specific fact, L.F. reiterates that she did not voluntarily stay in Taylor's room. (Doc. 114, ¶ 55). According to Taylor, L.F. did not need medical attention when she left the room. (Doc. 104, ¶ 57). L.F. denies this fact and further responds that she went to a hospital to receive medical treatment and a police station for an interview. (Doc. 114, ¶ 57). The following night, L.F. notified Arriaga that she had sex with Taylor against her will. (Doc. 104, ¶ 61; Doc. 114, ¶ 61).

On June 28, 2022, L.F. went to the hospital for an evaluation. (Doc. 104, ¶ 62; Doc. 114, ¶ 62). Between the alleged assault and the hospital admission, L.F. changed her clothes but did not shower. (Doc. 104, ¶ 63; Doc. 114, ¶ 63). L.F. underwent a medical examination.

Taylor submits that the hospital records do not refer to any physical injury she suffered resulting from the night of June 26. (Doc. 104, ¶ 64). L.F. denies this and states, "[T]he certified translation of the medical record reflecting 'injury on the inner side of left thigh.'" (Doc. 114, ¶ 64). Arriaga brought L.F. to the police station in Burgos, Spain to file a report. (Doc. 104, ¶ 65; Doc. 114, ¶ 65). On the morning of June 29th, the police arrested Taylor and took him into custody. (Doc. 104, ¶ 68; Doc. 114, ¶ 68). L.F. further explains that she received psychological treatment due to her distress from the incident and experienced discomfort with people touching her for approximately two years. (Doc. 114, ¶ 68). After the Spanish tribunal dismissed the charges against him, Taylor returned to Pennsylvania. (Doc. 104, ¶¶ 69-70; Doc. 114, ¶¶ 69-70). After learning of the incident, Fallgatter traveled to Spain and accompanied L.F. home back to California. (Doc. 104, ¶ 71; Doc. 114, ¶ 71).

Ash and Fallgatter initiated this lawsuit, on behalf of L.F., by the filing of a complaint on June 22, 2023. (Doc. 1). The complaint alleges the following counts: Count I—Negligence against EF Defendants; Count II—Negligent Infliction of Emotional Distress against EF Defendants; Count III—Negligent Misrepresentation against EF Defendants; Count IV—Fraudulent Misrepresentation against EF Defendants; Count V—Breach of Contract; Count VI—Assault against Diego Manuel Taylor; Count VII—Intentional Infliction of Emotional Distress against Diego Manuel Taylor; and Count VIII—Negligence against Jennifer Taylor and John Doe Defendants I-V. (Doc. 1). On July 14, 2025, EF Defendants and Taylor each filed a motion for summary judgment, statement of facts, and brief in support. (Doc. 98; Doc. 99; Doc. 100; Doc. 102; Doc. 103; Doc. 104). On September 17, 2025, L.F. filed her brief in opposition and answer to statement of facts in response to both motions for summary

judgement. (Doc. 111; Doc. 113; Doc. 114; Doc. 116). On September 29, 2025, EF Defendants and Taylor filed their respective reply briefs. (Doc. 119; Doc. 120).

## II.    MOTION FOR SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." M.D. Pa. L.R. 56.1.

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility

determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories, or the like to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony . . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment.").

III.    DISCUSSION

A. EF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

9

### 1. Massachusetts law will apply to claims against EF.

The Court has jurisdiction under 28 U.S.C. § 1332. (Doc. 1, ¶ 2). "A federal court exercising diversity jurisdiction generally applies the choice-of-law rules of the forum state," which in this case is Pennsylvania. *Fin Assocs. LP v. Hudson Specialty Ins. Co.*, 741 F. App'x 85, 87 (3d Cir. 2018) (citations omitted). The Release and Agreement included in the Booking Conditions contains a Massachusetts choice of law provision. (Doc. 99-1, at 27). Pursuant to Pennsylvania law, "Pennsylvania courts generally honor the intent of the contracting parties" unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular use[,]

> *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (citations omitted).

EF Defendants and L.F. agree that, under Pennsylvania law, the Court should apply Massachusetts substantive law to Count I, Count II, Count III, Count V, and Count VIII. (Doc. 100, at 16-23; Doc. 113, at 21). Accordingly, the Court will address the counts against EF Defendants under Massachusetts law. *See Catlin Specialty Insurance Co. v. J.J. White, Inc.*, 309 F. Supp. 3d 345, 353 (E.D. Pa. 2018), *opinion clarified*, 387 F. Supp. 3d 583 (E.D. Pa. 2019) (noting that a federal court applying Pennsylvania's choice of law rules must first determine whether the parties agree on governing law); *see also Atlantic Pier Assocs., LLC v. Boardakan Rest. Partners*, 647 F. Supp. 2d 474, 486-87 (E.D. Pa. 2009) (acknowledging that, under Pennsylvania choice of law rules, a court must determine whether the laws of the different states conflict only "[i]f the parties have not agreed upon a choice of law").

### 2. Summary Judgment will be entered on Count I, Count II, and Count VIII.

Count I and Count II allege negligence and negligent infliction of emotional distress, respectively, against EF. (Doc. 1, ¶¶ 52-56, ¶¶ 57-59). Count VIII alleges negligence against Mrs. Taylor. (Doc. 1, ¶¶ 92-95). EF Defendants argue that it did not owe L.F. a duty to protect her from the alleged sexual assault. (Doc. 100, at 31). L.F. counters that EF Defendants owed a duty to "comply with industry safety standards" given "the known problem of youth-on-youth sexual violence."[4] (Doc. 113, at 32). The Court will determine whether EF Defendants owed a duty of care to L.F. *See Pratt v. Martineau*, 69 Mass. App. Ct. 670, 674 (2007) (noting that the court had to determine whether defendant owed a reasonable care to plaintiff before considering motion for summary judgment).

To succeed on a negligence claim under Massachusetts law, "a plaintiff must show by a preponderance of the evidence '(1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage of injury.'" *Plourde v. Sorin Group USA, Inc.*, 517 F. Supp. 3d 76, 88 (D. Mass. 2021) (quoting *Primus v. Galgano*, 329 F.3d 236, 241 (1st Cir. 2003)). Courts ordinarily do not resolve a negligence claim on summary judgment because the cause of action often entails a question of fact for the jury. *See Arruda v. Newport Constr. Corp.*, 103 Mass. App. Ct. 31, 32 (2023); *see also Nutt v. Florio*, 75 Mass. App. Ct. 482, 485 (2009) (citing *Solimene v. B. Grauel & Co., KG*, 399 Mass. 790, 794 (1987)). Nevertheless, a court may grant summary judgment if the moving party establishes that the nonmoving party cannot prove an essential element of a negligence claim. *See Nutt*, 75 Mass. at 485 (citing *Manning v. Noble*, 411 Mass. 382, 388 (1991)). The first element of a negligence

---

[4] In her brief, L.F. grouped together her arguments for Count I, Count II, and Count VIII, all of which require negligence. (Doc. 113, at 31-34).

claim is a question of law, rendering it an appropriate subject of summary judgment. *See Jupin v. Kask*, 447 Mass. 141, 146 (2006).

To prevail on a negligent infliction of emotional distress claim, "a plaintiff must establish (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology, i.e., objective corroboration of the emotional distress alleged; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *ABC Soils, Inc. v. DRS Power Tech., Inc.*, 386 F. Supp. 3d 107, 112 (D. Mass. 2019) (citing *Rodriguez v. Cambridge Hous. Auth.*, 443 Mass. 697, 701 (2005)). As such, one must establish negligence to succeed on a claim for negligent infliction of emotional distress. *See Lanier v. President & Fellows of Harvard Coll.*, 490 Mass. 37, 44 (2022); *see also Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 338 (1st Cir. 2022).

According to Massachusetts law, tour operators owe no "'heightened duty of care'" than an innkeeper would owe to a guest. *Weinberg v. Grand Circle Travel, LLC*, 891 F. Supp. 2d 228, 248 (D. Mass. 2012) (quoting *Deacy v. Studentcity.com, LLC*, 75 Mass. App. Ct. 1110, 2009 WL 3517972, at *2 (2009)). Generally, "travel agents are not 'liable for the negligence or dangerous conditions of third-party hotel or travel operators.'" *Weinberg*, 891 F. Supp. 2d at 248 (quoting *Hofer v. Gap, Inc.*, 516 F. Supp. 2d 161, 176 (D. Mass. 2007)). The intervening wrongful act of a third party is a superseding cause that breaks the chain of proximate causation only if the wrongful act is not reasonably foreseeable. *See, e.g., Copithorne v. Framingham Union Hosp.*, 401 Mass. 860, 862 (1988) (citing *Mullins v. Pine Manor College*, 389 Mass. 47, 62-63 (1983)). "Although proximate causation is generally a question of fact for the jury, it may be decided as a matter of law." *Ledet v. Mills Van Lines, Inc.*, 97 Mass. App. Ct. 667, 672 (2020) (citing *Leavitt v. Brockton Hosp., Inc.*, 454 Mass. 37, 44-45 (2009)).

12

Foreseeability defines both the limits of a duty of care and proximate causation. *Ledet*, 97 Mass. Appl. Ct. at 672 (citations omitted). As a general rule, a duty to exercise reasonable care does not ordinarily extend to controlling the conduct of a third party unless a "special relationship" exists between the party who may endure a risk of foreseeable harm and the party who can prevent that harm from occurring. *See Roe No. 1 v. Children's Hosp. Med. Ctr.*, 469 Mass. 710, 714 (2014) (citation omitted); *see also* Restatement (Third) of Torts: Liability for Phys. & Emot. Harm § 41 (2012).[5] A duty of care stems from a special relationship when a "'defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so.'" Lev v. Beverly Enters.-Mass., Inc. 457 Mass. 234, 243 (2010) (quoting Irwin v. Ware, 392 Mass. 745, 756 (1984)).

Throughout an educational tour, EF holds the group leaders responsible for supervising student travelers. (Doc. 99-1, at 172, 175; Doc. 113-4, at 37:16-22). EF recommends that group leaders enforce a curfew rule to "set clear expectations for travelers' behavior[.]" (Doc. 99-1, at 175; Doc. 113-4, at 37:11-13). Travelers must respect the curfew set by a group leader, who would also conduct room checks. (Doc. 99-1, at 26). As group leader for the Pennsylvania students, Mrs. Taylor enforced a nightly curfew and performed

---

[5] The Restatement outlines four types of special relationships that give rise to a duty of reasonable care with regard to risks posed by a third party arising within the scope of the relationship: "(1) a parent with dependent children; (2) a custodian with those in its custody; (3) an employer with employees when the employment facilitates the employee's causing harm to third parties; and (4) a mental-health professional with patients." Restatement (Third) of Torts: Liability for Phys. & Emot. Harm § 41 (2012).

room checks with the help of her husband.[6] (Doc. 99, ¶ 88; Doc. 113-11, at 42:10-13, 46:5-7). According to her testimony, L.F. knew that EF had a curfew rule and that she was under the supervision of Arriaga. (Doc. 110-1, at 15:11-12; Doc. 110-2, at 26:18-20, 58:2-4). Although she has no recollection of what the curfew was, L.F. testifies that it was not set after midnight.[7] (Doc. 110-2, at 60:4-8).

There is no dispute of fact that L.F. did not inform anyone, including Arriaga, Mrs. Taylor, or Allen, that she was leaving her room to meet Taylor. (Doc. 110-1, at 21:22-24, 25:2-5; Doc. 113-11, at 62:15-22; Doc. 113-4, at 13:3-6). L.F. testifies that she made her own decision to meet Taylor alone at approximately midnight despite thinking he acted strange hours earlier. (Doc. 110-2, at 16:3-6). L.F. points out EF Defendants' inaccurate depiction of Ash's testimony that L.F. did not tell a group leader about her uncomfortable interactions with Taylor before the alleged assault (Doc. 111, ¶ 99), but the record does not contain evidence that she in fact did.[8] The record does not indicate that EF Defendants knew or should have known about L.F.'s discomfort due to Taylor's conduct.

According to L.F., a special relationship exists here because EF Defendants could foresee student travelers "may experiment" and "push boundaries[.]" (Doc. 113, at 35). The

---

[6] L.F. admits that Mrs. Taylor had set a curfew routinely for the Pennsylvania students. (Doc. 111, ¶ 68). However, L.F. denies Mrs. Taylor and her husband conducted room checks around the time of curfew. (Doc. 111, ¶ 69).

[7] L.F. also testifies that she does not remember if she left before or after the curfew set by Arriaga. (Doc. 110-1, at 16:23-25).

[8] EF Defendants cite to Ash's deposition, stating that L.F. did not notify any group leader that Taylor made her feel uncomfortable. (Doc. 99, ¶ 99). L.F. denies this statement and clarifies Ash's actual testimony. (Doc. 111, ¶ 99). The Court notes that Ash advised L.F., "You have to tell someone. Tell him to back off you. Tell your leader, tell your friend." (Doc. 113-8, at 48:18-19).

Court recognizes that it is foreseeable that the student travelers would reasonably rely on the group leaders for assistance in the event of an emergency during EF's educational tour. *See Helfman v. Northeastern Univ.,* 485 Mass. 308, 321 (2020) (concluding that "a university has a special relationship with its students, and a corresponding duty to take reasonable measures to protect students from harms associated with alcohol-related emergencies"); *see also Dzung Duy Nguyen v. Massachusetts Inst. of Tech.,* 479 Mass. 436, 455 (2018) (acknowledging that it is foreseeable for students living in dormitories or away from their parents to rely on the university for assistance). The duty of care rooted in a special relationship applies only if a university already knows that a student is faced with an imminent risk of harm. *Helfman,* 485 Mass. at 321. The Court finds that L.F. had a special relationship with EF Defendants but rejects her argument regarding typical adolescent behavior and that placing opposite genders together renders sexual assault a foreseeable event. See *Helfman,* 485 Mass. at 324 (noting that the generally prevalent connection between alcohol and sexual assault on college campuses does not sufficiently, on its own, impose a duty on an academic institution). At the time of the alleged assault, EF Defendants had no reason to believe that Taylor posed a risk to L.F. Nothing in the record indicates that L.F. made EF Defendants aware of her conversations with Taylor or that she voluntarily left her hotel room to meet him in the hallway at approximately midnight. Accordingly, reasonable minds could not disagree that EF Defendants did not owe L.F. a duty of care due to a special relationship. *See Helfman,* 485 Mass. at 322 (finding a special relationship but affirming summary judgment in favor of university defendant because plaintiff, who was voluntarily intoxicated during alleged sexual assault, did not raise any concerns regarding assailant nor provide evidence suggesting that she had informed dorm staff members); *see also Dzung Duy Nguyen,* 479 Mass. at 458

15

(concluding that there was no duty of care because student never conveyed to any university employee that he had intended to commit suicide). As there is no dispute that L.F. did not inform EF Defendants about her interactions with Taylor leading up to the alleged assault, EF Defendants' motion for summary judgment on Count I , Count II, and Count VIII is **GRANTED**. (Doc. 98). *See Plourde*, 517 F. Supp. 3d at 92 (ruling summary judgment for defendant because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

### 3. Summary Judgment will be entered on Count III and Count IV.

Count III alleges negligent misrepresentation and Count IV alleges fraudulent misrepresentation. (Doc. 1, ¶¶ 60-73). EF Defendants argue that there is simply no evidence in the record to support these allegations, and that L.F. cannot identify a specific misrepresentation that EF Defendants made before the tour. (Doc. 100, at 28-29). L.F. avers that EF Defendants made "unfulfilled" promises and representations to "lure families into sending their minor children abroad with them[.]" (Doc. 113, at 31).

On a negligent misrepresentation claim in Massachusetts, "'a plaintiff must prove that the defendant (1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information.'" *Conley v. Roseland Residential Tr.*, 442 F. Supp. 3d 443, 459 (D. Mass. 2020) (citing *Gossels v. Fleet Nat'l Bank*, 453 Mass. 366, 371-72 (2009)). Under Massachusetts law, claims of negligent misrepresentation are approached as negligence actions, focusing on the degree of care exercised in making the statements. *See Optim LLC v. Freeman Manufacturing LLC*, 774 F. Supp.

16

3d 274, 288 (D. Mass. 2025) (citing *Cummings v. HPG Int'l, Inc.* 244 F.3d 16, 24 (1st Cir. 2001)). Courts assess if "the speaker was negligent in failing to discover the falsity of his or her statements." *Robert E. Ricciardelli Carpet Serv., Inc. v. Home Depot U.S.A., Inc.*, 679 F. Supp. 2d 192, 210 (D. Mass. 2010) (citing *Cummings*, 244 F.3d at 24). "'[F]alse statements of opinion, of conditions to exist in the future,' and promises to perform an act cannot sustain a claim for negligent misrepresentation unless the promisor had no intention to perform the promise at the time it was made." *Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 474 (2009) (citations omitted). In order for a negligent misrepresentation claim to survive summary judgment, "'plaintiffs must "produce specific facts, in suitable evidentiary form," supporting each of the six elements of negligent misrepresentation.'" *Robert E. Ricciardelli Carpet Serv., Inc.*, 679 F. Supp. 2d at 210 (quoting *20 Atl. Ave. Corp. v. Allied Waste Indus., Inc.*, 482 F. Supp. 2d 60, 63-64 (D. Mass. 2007)).

To recover for fraudulent misrepresentation under Massachusetts law, a plaintiff "must allege and prove that: (i) the defendants made a false representation of a material fact with knowledge of its falsity for the purpose of inducing him to act thereon, (ii) he relied upon the representation as true and acted upon it to his detriment, and (iii) that his reliance was reasonable under the circumstances. *Integrated Commc'ns & Techs., Inc. v. Hewlett-Packard Fin. Servs. Co.*, 573 F. Supp. 3d 513, 528 (D. Mass. 2021) (quoting *Rodi v. S. New England Sch. of L.*, 532 F.3d 11, 15 (1st Cir. 2008)). Despite that the third element is usually a question of fact for the jury, a court may grant summary judgment if no reasonable jury could find the party's reasonable reliance. *Rodi*, 532 F.3d at 15 (citing *Cataldo Ambul. Serv., Inc. v. City of Chelsea*, 426 Mass. 383, 688 N.E.2d 959, 962 (1998); *Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 242 (D. Mass. 1999)). Pursuant to the heightened pleading standard

17

of Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff must specify the "'who, what, where, and when of the allegedly false or fraudulent representation." *Robert E. Ricciardelli Carpet Serv., Inc.*, 679 F. Supp. 2d at 207 (quoting *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004)). Fraudulent misrepresentation and negligent misrepresentation share common elements, but the two differ in that negligent misrepresentation "'does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff.'" *Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co.*, 53 F. Supp. 3d 279, 300 (D. Mass. 2014) (citations omitted).

L.F. raised the allegations in her complaint, but she did not address explicitly any element of either claim. (Doc. 113). Instead, L.F. focuses on the fact that, prior to the tour, EF explained to students and parents that students of opposite genders would be placed in rooms on different floors of the hotel. (Doc. 113, at 31). Ash testified that she received this information from Arriaga on a Zoom call. (Doc. 113-8, at 37:5-7). Allen and Mrs. Taylor testify that group leaders, not EF, handle room assignments. (Doc. 113-4, at 71:6-8; Doc. 113-11, at 33:17-24). Mrs. Taylor further testifies that the process of assigning travelers to rooms varied by each hotel, which she explained "thoroughly with all of [her] parents and students to let them know that [she] [had] no control over this, but [she] will make the best of that situation." (Doc. 113-11, at 33:6-16). The record supports this as the safety guidelines state that "traveler rooming configurations may change from one hotel to the next." (Doc. 99-1, at 175). Although Mrs. Taylor did not serve as L.F.'s group leader, L.F. has not presented testimony of Arriaga regarding room assignments for the California group. L.F. did not even include Arriaga as a defendant in this action. Without evidence that Arriaga's representations

about room assignments were false and that he knew such communications were false, Count III and Count IV fail. *See Weber v. Sanborn*, 526 F. Supp. 2d 135, 148-49 (D. Mass. 2007) (granting partial summary judgment for defendant because plaintiff failed to provide evidence of a false statement for purposes of a negligent misrepresentation claim); *see also Integrated Commc'ns & Techs., Inc.*, 573 F. Supp. 3d at 528 (finding summary judgment for defendant because plaintiff "failed to submit evidence sufficient to conclude that [defendant] knew that the equipment was not genuine" at the time of the sale). Accordingly, EF Defendants' motion for summary judgment on Count III and Count IV is **GRANTED**. (Doc. 98).

### 4. Summary Judgment will not be granted on Count V.

Count V alleges a breach of contract against EF. (Doc. 1, ¶¶ 74-80). EF states that it never promised L.F. that she would not suffer an injury during the tour. (Doc. 100, at 23). In response, L.F. argues that EF breached an agreement with her by failing to provide a safe, secure, and supervised international experience. (Doc. 113, at 30).

A breach of contract claim under Massachusetts law "requires a plaintiff to demonstrate that: (1) there was an agreement between the parties, (2) the agreement was supported by consideration, (3) the plaintiff was ready, willing, and able to perform his or her part of the contract, (4) the defendant committed a breach of the contract and (5) the plaintiff suffered harm as a result." *Thermal Eng'g Int'l (USA) Inc. v. Lanaville*, 646 F. Supp. 3d 202, 205 (D. Mass. 2022) (citing *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690, 46 N.E.3d 24, 39 (2016)). Summary judgment is appropriate on a breach of contract claim when the plain terms of contract "unambiguously favor either side." *Clinical Tech., Inc. v. Covidien Sales, LLC*, 192 F. Supp. 3d 223, 232 (D. Mass. 2016) (citing *Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777, 784 (1st Cir. 2011)). "The terms of a contract are unambiguous 'where the contract language

19

has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Alantra LLC v. Apex Indus. Techs. LLC*, 636 F. Supp. 3d 223, 232 (D. Mass. 2022) (citation omitted).

Massachusetts law favors the enforceability of releases. *Sharon v. City of Newton*, 437 Mass. 99, 105 (2002) (citing *Lee v. Allied Sports Assocs., Inc.*, 349 Mass. 544, 550 (1965)). "It is 'well-established that a party may relinquish its right to sue by agreeing to release another party from liability.'" *Armstrong v. White Winston Select Asset Funds, LLC*, 648 F. Supp. 3d 230, 246 (D. Mass. 2022) (quoting *Craft v. Regions Mortg., Inc.*, 769 F. Supp. 2d 7, 10 (D. Mass. 2011)). "The parties to a release need not have imagined the specific wrongs released." *A.J. Props., LLC v. Stanley Black & Decker, Inc.*, 989 F. Supp. 2d 156, 163 (D. Mass. 2013) (citing *Naukeag Inn, Inc. v. Rideout*, 351 Mass. 353, 356 (1966)). In Massachusetts, principles of contract law govern the interpretation of releases. *See Kimmel & Silverman, P.C. v. Porro*, 53 F. Supp. 3d 325, 336 (D. Mass. 2014) (citation omitted). The court must determine if the contract provisions concerning the releases are ambiguous. *Armstrong*, 648 F. Supp. 3d at 246. If so, the factfinder will have to interpret the releases, "in which 'summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary.'" *Armstrong*, 648 F. Supp. 3d at 246 (quoting *Farmers Ins. Exchange*, 632 F.3d at 784)). If not, "'[t]he guiding principle is that the plain meaning of the unambiguous terms of the release control.'" *Armstrong*, 648 F. Supp. 3d at 246 (quoting *Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC*, 16 F.4th 304, 310 (1st Cir. 2021)). Without fraud or duress, the failure to read or understand the contents of a release does not nullify its effects. *Sharon*, 437 Mass. at 103 (citing *Lee*, 349 Mass. at 550-51)).

20

In order to form a contract online under Massachusetts law, "the user of the online interface [1] must have been given reasonable notice of the terms of the agreement and [2] must have made a reasonable manifestation of assent to those terms." *Emmanuel v. Handy Technologies*, 992 F.3d 1, 7 (1st Cir. 2021) (internal quotations omitted). The party seeking to enforce the online contract carries the burden of establishing that both requirements are met. *Emmanuel*, 992 F.3d at 7 (quoting *Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 572 (2021)). The first requirement is satisfied when a "party to the online contract has 'actual notice' of its terms, such as would be the case if that party had 'reviewed' those terms or 'must somehow interact with the terms before agreeing to them.'" *Emmanuel*, 992 F.3d at 7 (quoting *Kauders*, 486 Mass. at 572). Without actual notice, the party seeking to enforce the online contract could still satisfy the reasonable notice requirement if "'the totality of the circumstances' indicates that the user of the online interface was provided with such notice of the terms." *Emmanuel*, 992 F.3d at 7-8 (quoting *Kauders*, 486 Mass. at 573). The court considers, "inter alia, 'the nature, including the size, of the transaction,' 'the interface by which the terms are being communicated,' 'the form of the contract,' and 'whether the notice conveys the full scope of the terms and conditions.'" *Good v. Uber Techs., Inc.*, 494 Mass. 116, 128 (2024) (quoting *Kauders*, 486 Mass. at 573). For internet transactions, the particularities of the "'design and content of the relevant interface'" are considerably relevant in assessing whether offeror provided reasonable notice. *Kauders*, 486 Mass. at 573. "Ultimately, the offeror must reasonably notify the user that there are terms to which the user will be bound and give the user the opportunity to review those terms." *Kauders*, 486 Mass. at 573.

In determining whether the user reasonably assented to the terms of an online agreement, Massachusetts law considers the specific actions required to manifest assent.

*Kauders*, 486 Mass. at 573-74. An online contract may require the user to expressly and affirmatively manifest assent by clicking or checking a box that states that the user agrees to the terms and conditions. *Kauders*, 486 Mass. at 574. Courts regularly enforce these "clickwrap" agreements because they are the clearest manifestations of assent. See *Kauders*, 486 Mass. at 574. Whereas "browsewrap" agreements do not require a user to check a box indicating assent but simply post terms and conditions of use on a website often as a hyperlink to the bottom of the screen. *Kauders*, 486 Mass. at 579 n.26. Under Massachusetts law, these agreements are typically unenforceable because "there is no assurance that the user was ever put on notice of the existence of the terms or the link to those terms." *Kauders*, 486 Mass. at 579 n.26.

There is a genuine dispute of material fact as to whether Ash, on behalf of L.F., had reasonable notice of the conditions. (Doc. 113, at 22-24; Doc. 119, at 2-7). The conditions contain the release (Doc. 99-1, at 26-27), which provides, in pertinent sections:

> 8. In addition, EF shall have no responsibility for me whatsoever when I am absent from an EF-supervised activity or for non-supervised activities, such as visits to friends or relatives or during stay-ahead/stay-behind option periods or any other optional period or activity when not escorted by a Tour Director.
> …
>
> 12. I agree to abide by EF's regulations and the directions of my Group Leader, my Tour Director, and EF's personnel during my tour. Failure to do so may result in my Group Leader or EF terminating me from the tour immediately. I understand that to disobey such rules or directions is to waive the right to a refund of any part of my program price, and that my Group Leader or EF may then send me home at my own expense.
> …
>
> 17. This Release and Agreement EF's Booking Conditions constitute the entire agreement between EF and me with reference to the subject matter herein, and I do not rely upon any promises, inducements, marketing materials, or agreements not herein, including, but not limited to, any oral statements made to me by any agents or employees of EF or by my school or Group Leader. This agreement may be amended or modified only in a writing, signed by EF.

> The waiver by EF of any provision of this agreement shall in no way affect the remaining provisions of this agreement, and this agreement shall be interpreted as if such clause or provision were not contained herein.

(Doc. 99-1, at 27).

The record indicates that EF's system registered that Ash, on behalf of L.F., signed the Conditions on June 19, 2021. (Doc. 99-1, at 146). The record also indicates that no traveler could enroll and participate in a tour without agreeing to the Booking Conditions. (Doc. 99-1, at 61). This does not establish actual notice. *Good*, 494 Mass. at 127 (finding that checking a box next to the statement that he reviewed the terms does not suffice as admission by plaintiff that he, in fact, reviewed the terms of use, or even scrolled through them). Although Arriaga reviewed the rules with Ash when she registered L.F. (Doc. 113-8, at 32:17-20), this fails to establish that Ash had reasonable notice of the conditions at the exact moment when she registered L.F. (Doc. Doc. 99-1, at 146). Ash testifies that she does not recall reading the Release at the time of registration. (Doc. 113-8, at 41:15-18). While EF has provided that its system logged that Ash checked the box, it does not provide similar logs to suggest she accessed the conditions while completing the application on behalf of L.F. *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018) (noting that the court must examine "the language that was used to notify users that the terms of their arrangement … could be found by following the link, how prominently displayed the link was, and any other information that would bear on the reasonableness of communicating [the terms]."); *see also Gaker v. Citizens Disability, LLC*, 654 F. Supp. 3d 66, 76 (D. Mass. 2023) (examining the totality of the page, including language of disclosure, font size, and placement on webpage, to determine whether defendant gave reasonable notice of terms). The record contains no evidence of how the interface displayed the conditions while a user completed registration for the tour. As

23

such, there is a genuine dispute of material fact as to whether Ash was given reasonable notice of the conditions when registering for the tour on behalf of L.F. Accordingly, the issue of the release's enforceability must go to the fact-finder, and EF Defendants' motion for summary judgment on Count V is **DENIED**. (Doc. 98).

    B.   TAYLOR'S MOTION FOR SUMMARY JUDGMENT[9]

        **1.**   **Summary Judgment will not be granted on Count VI.**

Count VI alleges assault against Taylor. (Doc. 1, ¶¶ 81-84). According to Taylor, the evidence shows that L.F.'s actions constitute consent. (Doc. 103, at 7). L.F. responds that a jury could find L.F. credible and that Taylor forced sexual intercourse against her will. (Doc. 116, at 7).

"In Pennsylvania, 'an assault may be described as an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery.'" *Regan v. Upper Darby Twp.*, 363 F. App'x 917, 921 (3d Cir. 2010) (italics omitted) (quoting *Cucinotti v. Ortmann*, 399 Pa. 26, 159 A.2d 216, 217 (1960)). In other words, assault is an action that leads one to believe that he or she is about to suffer a battery. *See Nace v. Pennridge Sch. Dist.*, 185 F. Supp. 3d 564, 584 (E.D. Pa. 2016), *aff'd in part, vacated in part*, 744 F. App'x 58 (3d Cir. 2018). Consent provides a defense to the intentional tort of assault and "may be manifested by an individual's words and/or affirmative actions which indicate a willingness for another's conduct to occur." *Quinn v. Ltd. Exp., Inc.*, 715 F. Supp. 127, 130 (W.D. Pa. 1989). "Express consent may be given by words or affirmative conduct and implied consent may be manifested when a person takes no action, indicating an

---

[9] Both parties agree that Pennsylvania law should apply to the claims against Taylor.

apparent willingness for the conduct to occur." *Barnes v. American Tobacco Co.*, 161 F.3d 127, 148 (3d Cir. 1998) (citing Restatement (Second) of Torts § 892)).

Despite that both parties provide very little caselaw in support of their arguments, the record shows a genuine dispute of material facts relating to the interaction between L.F. and Taylor during the alleged assault. The parties dispute whether Taylor had L.F.'s consent, or willingness, to engage in sexual intercourse. Taylor testified that he did not push L.F. against the wall and that he stood against the wall. (Doc. 102-4, at 409:12-18). L.F. testified that once she entered Taylor's room, he pushed her against the wall and physically held her against her will. (Doc. 110-1, at 31:23-32:1-2). According to her, L.F. initially told Taylor that she wanted to return to her room and not engage further (Doc. 110-2, at 36:21-23), but Taylor denies this fact in his testimony. (Doc. 102-4, at 411:1-5). Their testimonies conflict about whether Taylor forced L.F. onto the bed. (Doc. 102-4, at 411:6-11; Doc. 110-2, at 36:15-19). In between sexual penetrations, L.F. testified that she made numerous attempts to leave and Taylor would pull her back down to the bed (Doc. 110-2, at 40:19-25), but he denies this. (Doc. 102-4, at 403:12-17). L.F. described an instance when Taylor forcefully opened her mouth open for him to receive oral pleasure. (Doc. 110-2, at 44:1-7). This conflicts with his testimony because, according to Taylor, L.F. never performed oral sex on him. (Doc. 110-2, at 394:16-24-394:1-18).

The discrepancies between the testimonies are not proper considerations for the Court to resolve on summary judgment. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (noting that a district court "may not make credibility determinations or engage in any weighing of the evidence" on a motion for summary judgment). Based on the conflicting accounts of the events that occurred on June 26, 2022 and the evidence presented by both

parties, the Court finds there is a genuine dispute of material fact because a reasonable jury could find for L.F. *See Doe v. Moravian Coll.*, No. 5:20-CV-00377-JMG, 2022 WL 17812816, at \*5 (E.D. Pa. Dec. 16, 2022) (finding a genuine dispute of material fact in a sexual encounter where plaintiff and defendants bring conflicting evidence regarding consent). Accordingly, the issue of the L.F.'s consent must go to the fact-finder, and Taylor's motion for summary judgment on Count VI is **DENIED**. (Doc. 102).

### 2.  Summary Judgment will be entered on Count VII.

Count VII alleges intentional infliction of emotional distress against Taylor. (Doc. 1, ¶¶ 85-91). Arguing that this allegation fails, Taylor avers that the evidence lacks both medical records that cite physical harm and facts that support his behavior arose to "extreme conduct." (Doc. 103, at 11-13). In response, L.F. argues that a jury could find Taylor's behavior "outrageous and well beyond the bounds of decency." (Doc. 116, at 9).

"For a plaintiff to succeed on a claim of intentional infliction of emotional distress under Pennsylvania state law, '(1) the conduct [of the defendant] must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; [and] (4) the distress must be severe.'" *Zucal v.Cnty. of Lehigh*, 760 F. Supp. 3d 290, 305 (E.D. Pa. 2024) (citations omitted). "In Pennsylvania, '[l]iability on an intentional infliction of emotional distress claim has been found only when the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Kasper v. Cnty. of Bucks*, 514 F. App'x 210, 217 (3d Cir. 2013) (citations and internal quotations omitted). It is not adequate to show "'that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has

been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.'" *Hoy v. Angelone*, 554 Pa. 134, 151 (1998) (citations omitted). Determining outrageous conduct falls within the "'sound discretion of the fact-finder.'" *Arnold v. City of Philadelphia*, 151 F. Supp. 3d 568, 579 (E.D. Pa. 2015) (quoting *SHV Coal, Inc. v. Continental Grain Co.*, 526 Pa. 489, 495-96 (1991)).

A plaintiff must also demonstrate physical injury or harm for a viable cause of action for intentional infliction of emotional distress. *See Betz v. Satteson*, 259 F. Supp. 3d 132, 196 (M.D. Pa. 2017); *see also Dempsey v. Bucknell Univ.*, 76 F. Supp. 3d 589 (M.D. Pa. 2015), *amended in part*, No. 4:11-CV-1679, 2015 WL 999101 (M.D. Pa. Mar. 6, 2015) (noting that defendant is entitled to judgment as a matter of law if plaintiff fails to provide competent medical evidence of physical injury) (citation omitted). Physical harm may include depression, nightmares, stress, and anxiety, all of which are ongoing and require psychological treatment. *See Brown v. Am. Airlines, Inc.*, 723 F. Supp. 3d 411, 423 (E.D. Pa. 2024) (citation omitted). Therefore, "'[a] plaintiff seeking to establish intentional infliction of emotional distress must also support his claim with competent medical evidence, because it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's outrageousness without expert medical confirmation that the plaintiff actually suffered the claimed distress.'" *Betz*, 259 F. Supp. 3d at 196 (quoting *Lawson v. Penn. SPCA*, 124 F. Supp. 3d 394, 409 (E.D. Pa. 2015)); *see Wilson v. Dewees*, 977 F. Supp. 2d 449, 460 (E.D. Pa. 2013) (acknowledging that Pennsylvania courts require "competent medical evidence" to show emotional distress); *see also Kazatsky v. King David Mem'l Park, Inc.*, 515 Pa. 183, 197 (1987) ("[T]he requirement of some objective proof of severe emotional distress will not present an unsurmountable obstacle to recovery. Those truly damaged should have little

difficulty in procuring reliable testimony as to the nature and extent of their injuries."); *see also Fewell v. Besner*, 444 Pa. Super. 559, 569 (1995) ("A plaintiff must also show physical injury or harm in order to sustain a cause of action for intentional infliction of emotional distress.").

Although L.F. testified that she suffered physical and emotional harm, the record does not contain any competent medical evidence or expert medical confirmation supporting a claim of intentional infliction of emotional distress. Despite this testimony, and the testimony of Ash and L.F. that she received mental health treatment, the record does not contain the requisite competent medical evidence necessary to establish the claim of intentional infliction of emotional distress. The only evidence in the record of any medical treatment is an observation of an injury on the inner side of the left thigh. (Doc. 116-13, at 7). This alone is not adequate evidence upon which a reasonable jury could find for L.F. on the claim of intentional infliction of emotional distress. *See Betz*, 259 F. Supp. 3d at 196.[10]

## IV.    CONCLUSION

Based on the foregoing, EF Defendants' motion for summary judgment (Doc. 98) is **GRANTED in part** and **DENIED in part**. EF Defendants' motion is **GRANTED** as to Counts I, II, III, IV and VIII and **DENIED** as to Count V. (Doc. 98). Taylor's motion for summary judgment (Doc. 102) is **GRANTED in part** and **DENIED in part**. Taylor's motion is **GRANTED** as to Count VII and **DENIED** as to Count VI. (Doc. 102).

**Dated: March 31, 2026**

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States District Judge**

---

[10] L.F. concedes that medical records have been exchanged in discovery yet has not produced any in support of its claims in this case.